SEAN C. CUNNINGHAM (Bar No. 174931)
sean.cunningham@dlapiper.com
STANLEY J. PANIKOWSKI (Bar No. 224232)
stanley.panikowski@dlapiper.com
ERIN P. GIBSON (Bar No. 229305)
erin.gibson@dlapiper.com
RYAN W. COBB (Bar No. 277608)
ryan.cobb@dlapiper.com
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA  92101-4297
Telephone:  619.699.2700
Facsimile:  619.699.2701

RAJIV DHARNIDHARKA (Bar No. 234756)
rajiv.dharnidharka@dlapiper.com
DLA PIPER LLP (US)
400 Capitol Mall, #2400
Sacramento, CA  95814
Telephone:  916-930-3200
Facsimile:   916-930-3201

Attorneys for Plaintiff NETLIST, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

SACV13 - 00996 DOC (JPRX)

| | |
|---|---|
| NETLIST, INC.,<br><br>         Plaintiff,<br><br>    v.<br><br>SMART MODULAR<br>TECHNOLOGIES, INC.,<br><br>       Defendant. | Case No. _____<br><br>**COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION AND FRAUD; DEMAND FOR JURY TRIAL** |

WEST\241504765.1

1    Plaintiff Netlist, Inc. ("Netlist") complains against Defendant Smart Modular

2    Technologies, Inc. ("Smart Modular") as follows:

3                            **NATURE OF THE ACTION**

4        1.      This is an action against Defendant Smart Modular seeking, among

5    other things, the following: (a) relief under federal antitrust laws for Smart

6    Modular's violations of Section 2 of the Sherman Act; and (b) damages and other

7    equitable relief under California statutory and common law for Smart Modular's

8    unfair competition, deceptive trade practices, and fraud.

9                                 **THE PARTIES**

10       2.      Plaintiff Netlist is a corporation organized and existing under the laws

11   of the State of Delaware with its principal place of business at 51 Discovery, Suite

12   150, Irvine, California 92618.  Netlist is widely regarded in the computing industry

13   as a pioneer in high-performance server memory, with many of its innovations

14   adopted by the giants of the industry.  The company was founded in 2000 in Irvine,

15   California by Chuck Hong, Christopher Lopes and Jay Bhakta.  The co-founders,

16   who combined have more than 80 years of semiconductor design and marketing

17   experience, recognized that the server industry's need for high performance

18   memory products was not being sufficiently met by existing technologies.  The

19   company's mission was to create breakthrough technologies that filled the

20   performance gap between the server architecture and the capabilities of existing

21   memory technologies.

22       3.      Defendant Smart Modular is a Delaware corporation with its principal

23   place of business at 39870 Eureka Drive, Newark, California 94560.  On

24   information and belief, Smart Modular was founded in 1988 as a contract

25   manufacturer of memory products.  Its business has been largely building products

26   for others, not creating products from its own design and technology.

27   /////

28   /////

COMPLAINT
WEST\241504765.1

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of these claims under 28 U.S.C. §§ 1331, 1367, 2201 and 2202, the United States antitrust laws, and supplemental jurisdiction under 28 U.S.C. § 1367 for Netlist's related claims under California law.

5.     This Court has personal jurisdiction over Smart Modular.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391, as well as 15 U.S.C. §§ 15 and 22.

## GENERAL ALLEGATIONS

**A.     Overview of Smart Modular's Deceptive and Anticompetitive Conduct**

7.     This action arises out of Smart Modular's deceptive, anticompetitive and abusive litigation and related conduct against Netlist, a company that Smart Modular considers to be one of its competitors.  On information and belief, Smart Modular's campaign of deceptive and anticompetitive behavior includes the following:

a.     Smart Modular obtained United States Patent No. 8,250,295 ("the '295 patent") through inequitable conduct at the United States Patent & Trademark Office ("Patent Office") by deliberately withholding known, material prior art from the Patent Examiner;

b.     Smart Modular filed a sham patent infringement lawsuit against Netlist, knowing that the '295 patent was both invalid and unenforceable due to Smart Modular's inequitable conduct at the Patent Office, and without conducting a legally sufficient inquiry into the basis for its infringement claims against Netlist;

c.     Smart Modular claimed in that lawsuit that the '295 patent allegedly covers an essential feature in an industry standard promulgated by the JEDEC standard-setting body, but Smart Modular failed for years to disclose its purportedly relevant '295 patent application, despite a clear duty to disclose that patent application to JEDEC;

d.     In the litigation, Smart Modular sought a preliminary injunction against Netlist's flagship memory product, HyperCloud, forcing Netlist to expend large sums of money to defeat that baseless motion; and

e.     Smart Modular continually publicized its litigation efforts through misleading and deceptive press releases designed to harm Netlist's business.

8.     On information and belief, Smart Modular has colluded with other industry members in some or all of the activities described above, with the goal of furthering Smart Modular's anticompetitive scheme against Netlist.  On more than one occasion, Smart Modular's agents informed Netlist that Smart Modular had deeper pockets than Netlist, and that Smart Modular was using the litigation to put Netlist out of business.

**B.     Smart Modular's Fraud on the Patent Office**

9.     Smart Modular breached its duty of candor and good faith to the United States Patent and Trademark Office ("the Patent Office") by deliberately withholding known, material prior art from the Patent Office when the '295 patent was being examined by the Patent Office.

10.     On January 5, 2004, Smart Modular filed a patent application (Application No. 10/752,151) that issued as the '295 patent on August 21, 2012 ("the '295 patent application").  The '295 patent application named Hossein Amidi, Kelvin A. Marino, and Satyadey Kolli as inventors.

11.     During the prosecution of the '295 patent application, the applicants and/or their counsel became aware of Japanese patent application JP-10-320270-A (the "Takeda reference"), when Netlist provided that prior art reference to Smart Modular.  The Takeda reference is material prior art to the claims of the '295 patent, and the '295 applicants understood the materiality of the Takeda reference. However, to obtain the '295 patent, the applicants and/or their counsel deliberately withheld the Takeda reference from the Patent Examiner.

COMPLAINT
WEST\241504765.1

12.     The Takeda reference is "but-for" material to the patentability of the claims of the '295 patent.  The "but-for" materiality test requires consideration of whether the Patent Office would not have allowed a particular claim if a withheld prior art reference had been provided during examination.  The Takeda reference is highly material to the patentability of the claims of the '295 patent because, on December 7, 2012, the Patent Office ordered reexamination of the '295 patent and simultaneously rejected all asserted claims of the '295 patent as being invalid based on the Takeda reference in view of JEDEC Standard 21-C.  This rejection demonstrates that the asserted claims of the '295 patent would not have been allowed to issue if the Examiner had known about the Takeda reference during the original prosecution.

13.     On information and belief, the applicants and/or their counsel acted with the specific intent to deceive the Patent Office during prosecution of the '295 patent.  On October 11, 2010, after more than six years of failing to get any claims of the '295 patent application allowed, Smart Modular filed a continuation application from the '295 patent application ("the '295 continuation application") to provoke a patent interference with Netlist's United States Patent No. 7,619,912 ("the Netlist '912 patent").  A patent interference is a contest under 35 U.S.C. § 135(a) between an application and either another application or a patent.  An interference is declared to assist the Director of the Patent Office in determining priority; that is, which party first invented the claimed subject matter within the meaning of 35 U.S.C. §102(g).

14.     To attempt to provoke an interference with the Netlist '912 patent, Smart Modular copied the claims of the '912 patent into the '295 continuation application.  Smart Modular's prosecution counsel, Stephen Durant of the law firm Schwegman, Lundberg & Woessner, wrote to the Patent Office that "claims 1-40 of this patent application (the present application) were copied from claims 1-7, 10, 14-26, 28-34, 36-37, 39-44, 46, and 49-51 of U.S. Patent No. 7,619,912 (the '912

1   Patent)….." Therefore, Smart Modular claimed that the '295 patent application

2   disclosed the same subject matter as claimed in the Netlist '912 patent.

3          15.    On October 20, 2010, Smart Modular filed a request for *inter partes*

4   reexamination of the Netlist '912 patent.  Michael Heafey of Orrick, Herrington &

5   Sutcliffe LLP filed that request on behalf of Smart Modular.  Smart Modular's

6   reexamination request was given Control No. 95/000,578 ("the '578

7   reexamination").  The Patent Office later consolidated the '578 reexamination with

8   two other reexaminations of the Netlist '912 patent filed by Google and Inphi

9   Corporation.  The three reexaminations were merged into a single proceeding ("the

10  Netlist '912 reexamination").

11         16.    In the Netlist '912 reexamination, all parties filed Information

12  Disclosure Statements ("IDS") at various times disclosing prior art references the

13  parties believed to be material to the patentability of the Netlist '912 patent.  On

14  June 6, 2011, Smart Modular's counsel, Mr. Durant, filed an IDS ("the First IDS")

15  in the '295 patent application listing prior art references, including a partial

16  prosecution history of the Netlist '912 reexamination and the prior art references

17  that had been disclosed in the Netlist '912 reexamination by Smart Modular,

18  Google, Inphi and Netlist.  Smart Modular therefore regarded the prior art

19  references disclosed in the Netlist '912 reexamination as being material to the

20  patentability of the claims in the '295 patent application.

21         17.    On February 6, 2012, Netlist filed an IDS ("the Netlist IDS") in the

22  Netlist '912 reexamination disclosing the Takeda reference, among other things.

23  Netlist attached a Japanese copy, an English abstract, and an English machine

24  translation of the Takeda reference to the Netlist IDS.  On that same day, Netlist's

25  reexamination counsel mailed a copy of the Netlist IDS, together with the Japanese

26  copy, English abstract, and English translation of the Takeda reference, to Smart

27  Modular's reexamination counsel Mr. Heafey.

28  /////

-6-

18.     On February 7, 2012, Smart Modular filed a Second Supplemental IDS ("the Second IDS") in the '295 patent application, in which Smart Modular disclosed more prior art references submitted by various parties in the Netlist '912 reexamination.  In the Second IDS, Smart Modular noted that *inter partes* reexaminations had been ordered for the Netlist '912 patent, and that Smart Modular was the requestor in one of those reexaminations.  In the Second IDS, Smart Modular disclosed prior art references cited by both Smart Modular and Netlist during the Netlist '912 reexamination.  Thus, Smart Modular regarded the prior art cited in the Netlist '912 reexamination to be relevant to the '295 patent application.

19.     Despite Smart Modular's practice of disclosing in the '295 patent application essentially all prior art references cited in the Netlist '912 reexamination, Smart Modular never disclosed the Takeda reference during the prosecution of the '295 patent application.  Upon receipt of the Takeda reference, Smart Modular and its agents, including its '295 patent prosecution counsel Mr. Durant, had a legal obligation to disclose that reference in the co-pending prosecution of the '295 patent application.

20.     On April 18, 2011, Smart Modular issued a press release providing a summary of the status of the Netlist '912 patent reexamination.  Smart Modular stated in that press release that "Netlist's '912 patent relates to 'rank multiplication' technology associated with high density registered DIMMs that support the high growth server market."  Smart Modular also stated that the '295 patent application "invalidates claims" of the Netlist '912 patent and that "SMART believes that its ['295 patent application] shows that SMART engineers invented 'rank multiplication' technology in 2003.  As SMART's ['295 patent application] was filed before the Netlist '912 Patent, SMART believes that Netlist is not entitled to the '912 patent."  Thus, Smart Modular believed that the '295 patent and the Netlist '912 patent cover the same subject matter.

21.     At all relevant times to the '295 patent application, the following persons had a duty of candor and good faith toward the Patent Office: (i) the named inventors, (ii) every attorney or agent who prepared or prosecuted the '295 patent application, including Mr. Durant and all other attorneys involved in the application, and (iii) every other person who was substantively involved in the preparation or prosecution of the application and who was associated with the inventor, with the assignee, or with anyone to whom there was an obligation to assign the application.  All of these individuals had a duty to disclose to the Patent Office any information that was material to the examination of the '295 patent application.

22.     As attorneys admitted to practice before the Patent Office, Mr. Durant and others at the Schwegman firm were aware of their duty to disclose material information to the Patent Office, including all prior art from co-pending patent prosecution covering the same or similar subject matter.  Smart Modular also was aware of its duty of disclosure to the Patent Office, because it caused the named inventors to execute sworn declarations during the prosecution of the '295 patent application that acknowledged that duty of disclosure.

23.     Despite their actual knowledge of the Takeda reference at least as early as February 6, 2012, and despite many opportunities to disclose the Takeda reference in the '295 patent application, Smart Modular deliberately withheld the Takeda reference from the Patent Office during the pendency of the '295 patent application.  As a result, the Examiner issued Smart Modular's application for the '295 patent approximately six months after the Takeda reference was provided to Smart Modular.

24.     Based on these facts, the single most reasonable inference is that Smart Modular and/or its counsel made a deliberate decision not to disclose the known, material Takeda reference in their possession to wrongfully obtain issuance of the '295 patent claims and file this patent infringement lawsuit against Netlist.

-8-

## C.   Smart Modular's Fraud on JEDEC

25.     Smart Modular also engaged in a pattern of misleading silence and misrepresentations about the purported relevance of the '295 patent application to the development of the JEDEC LRDIMM Standard (LRDIMM is short for Load Reduced Dual In-Line Memory Module), intentionally ignoring a clear duty to disclose its patent interests while voting to approve the LRDIMM Standard and otherwise participating in JEDEC standard-setting activities. The JEDEC Patent Policy requires its members to disclose potentially standard-essential patents and patent applications and to offer licenses to all interested licensees on reasonable and non-discriminatory ("RAND") terms.

26.     During the eight-plus years that the '295 patent application was pending at the Patent Office, Smart Modular participated in the JEDEC standard-setting body and voted multiple times to approve the LRDIMM Standard. The entire time, Smart Modular knew about the purported relevance of the '295 patent to the LRDIMM Standard and secretly amended its '295 claims at the Patent Office without ever disclosing the '295 patent application to JEDEC, in clear violation of the JEDEC Patent Policy.

27.     On August 27, 2012, one week after the '295 patent issued and years after voting for the relevant JEDEC standard, Smart Modular finally submitted a "License Assurance/ Disclosure Form" to JEDEC identifying the '295 patent and promising to license the patent on RAND terms. On that form, Smart Modular identified the "relevant JEDEC Standard" as "JESD82-xx, JC40.4, JC45.4, MB Specification, JESD82-20A," and promised that "a license will be offered to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms that are demonstrably free of any unfair discrimination." Despite its promise, Smart Modular has never offered a RAND license to Netlist, a maker of JEDEC-compliant HyperCloud products.

/////

**D.    Smart Modular's Sham Litigation Against Netlist**

28.    On September 10, 2012, Smart Modular filed suit against Netlist in the United States District Court for the Eastern District of California, alleging infringement of the '295 patent.  On information and belief, Smart Modular failed to perform a proper analysis to confirm that HyperCloud infringes the '295 patent. Weeks later, Smart Modular filed a motion for preliminary injunction against Netlist's flagship products, the HyperCloud products, ignoring its promise to license the '295 patent on RAND terms at the JEDEC standard-setting organization. Smart Modular then made a series of misleading statements to the press to make sure that its assertions of patent infringement and its motion for preliminary injunction would create uncertainty and doubt about the viability of Netlist's HyperCloud products and cause maximum damage to Netlist's business.

29.    On information and belief, Smart Modular has proceeded in bad faith with knowledge that the '295 patent is not infringed and is invalid and unenforceable.  On information and belief, Smart Modular's lawsuit was not intended to enforce valid patent rights.  Instead, it was motivated by the desire to put a competitor out of business.  Smart Modular's litigation is knowingly and objectively baseless because (a) the '295 patent is invalid and unenforceable because of Smart Modular's inequitable conduct at the Patent Office and its misleading silence at JEDEC, (b) Smart Modular failed to perform a legally sufficient investigation into infringement of the '295 patent, and (c) Smart Modular sought a preliminary injunction despite its promise to offer RAND licenses for the '295 patent at the JEDEC standard-setting organization.  On information and belief, Smart Modular has invoked the legal process as an exclusionary, discriminatory, predatory and illegitimate method of harming Netlist's business.  The Eastern District of California court has denied Smart Modular's frivolous motion for preliminary injunction and has stayed Smart Modular's lawsuit pending the completion of the reexamination of the '295 patent.

30.    On information and belief, Smart Modular's motive is to harm competition and to put a competitor out of business.  Its conduct in suing Netlist and seeking a preliminary injunction using the '295 patent, which is tainted with Smart Modular's misconduct at JEDEC and deception at the Patent Office, is fraud on the market and the public.

E.    **Smart Modular's Deceptive Statements to the Public**

31.    Smart Modular further has engaged in anticompetitive behavior by waging a public relations campaign against Netlist since filing its lawsuit against Netlist, using even administrative orders from the Court to issue press releases designed to harm Netlist's business and cause uncertainty in the market about Netlist's products.

32.    For example, on September 13, 2012, Smart Modular issued a press release announcing the commencement of the lawsuit and stating that Smart Modular has "asked the court for permission to file an immediate motion for preliminary injunction to prevent Netlist from selling HyperCloud products in order to stop the alleged continuing infringement by Netlist." On September 25, 2012, when the Court granted Smart Modular's *ex parte* request to file a brief exceeding a page limit by three pages, Smart Modular issued a press release stating that the Court had "Authorized Filing a Motion for Immediate Preliminary Injunction." Not surprisingly, given Smart Modular's deceptive statements to the market, Netlist's stock price and market capitalization dropped by about half in the months after Smart Modular's lawsuit was filed.  Netlist's sales of HyperCloud products also declined dramatically as a result of Smart Modular's sham litigation, it baseless preliminary injunction motion, and its misleading statements to the public.

F.    **Smart Modular's Collusion With Other Industry Members**

33.    Smart Modular also has made statements to Netlist indicating that its anticompetitive and deceptive campaign was perpetrated by Smart Modular with the help of, and possibly at the behest of, other industry members.  Smart Modular

-11-

1    also has made statements to Netlist that Smart Modular's true intent is to put Netlist

2    out of business by outspending Netlist in the litigation.

3                                    **COUNT ONE**

4                   **Attempted Monopolization Under 15 U.S.C. § 2**

5        34.    Netlist incorporates by reference the preceding allegations of its

6    Complaint.

7        35.    By engaging in the conduct alleged above, Smart Modular has

8    willfully pursued a plan to exclude competition and obtain monopoly in a relevant

9    market with power to exercise control over prices.

10       36.    The relevant market is a technology market consisting of rank

11   multiplication (the "Relevant Technology"). Rank multiplication is embodied in

12   the JEDEC LRDIMM Standard and is an essential component of the LRDIMM

13   Standard. Smart Modular alleges that the '295 patent covers the Relevant

14   Technology.

15       37.    The relevant geographic market for the Relevant Technology is

16   worldwide. The United States constitutes a relevant geographic submarket in

17   which it is proper to assess the anticompetitive effects of Smart Modular's improper

18   assertion of the '295 patent.

19       38.    Consumers in the market of the Relevant Technology include

20   manufacturers of products that incorporate the Relevant Technology and end users

21   of those products, who necessarily deploy the Relevant Technology when they

22   operate those products.

23       39.    Because of the growing adoption of the LRDIMM Standard, there are

24   no readily-available or reasonably-interchangeable substitutes for the Relevant

25   Technology. Netlist and other manufacturers have further made substantial

26   investments in products incorporating the Relevant Technology (the "Relevant

27   Products"), and consumers have come to rely on the Relevant Technology.

28   /////

40.     Smart Modular is interpreting the claims of the '295 patent in a manner that would potentially preclude other companies from competing in the production and sale of the Relevant Products.  Smart Modular has sought to give credibility to the '295 patent by touting the '295 patent as essential to compliance with the LRDIMM Standard.

41.     The detrimental impact of Smart Modular's unlawful conduct and the specific injury to Netlist is evident.  As a result of Smart Modular's unlawful conduct, there have been or will be adverse competitive effects in the relevant market.  Smart Modular has sought to capitalize on the disruptive effects of, and resulting uncertainty generated by, its claim of patent infringement against Netlist. The inevitable impact of Smart Modular's inequitable conduct at Patent Office, its misuse of an invalid and unenforceable patent, and its decision to file a motion for preliminary injunction against Netlist's Relevant Products, and its misleading media campaign against Netlist have been to impose on consumers of the Relevant Technology the burden or threat of an elevated price for the Relevant Technology as a direct result of bad-faith patent enforcement.

42.     By engaging in this unlawful conduct, Smart Modular has further threatened to deny consumers the competitive benefits of future standard-setting efforts.  Willingness to participate in future standard-setting activities, including efforts to extend LRDIMM, has been or will be chilled.

43.     Smart Modular has pursued a scheme with specific intent to monopolize the Relevant Technology and has engaged in unreasonable, anticompetitive and exclusionary conduct through activities that have included, as alleged above: (i) securing the '295 patent through inequitable conduct at the Patent Office and seeking to enforce the '295 patent; (ii) seeking to enforce the patent against JEDEC-compliant products knowing that the patent is invalid and unenforceable; (iii) asserting patent claims to give itself control over the Relevant Technology by threatening, instituting and perpetuating objectively baseless

-13-

1    litigation in bad faith; and (iv) filing a motion for preliminary injunction attempting

2    to halt the sale of Netlist's HyperCloud products, which Smart Modular alleges to

3    be the primary competition with Smart Modular's own LRDIMM products.

4        44.    Based on the facts alleged above, there was and is a dangerous

5    probability that Smart Modular will succeed in obtaining monopoly power in the

6    Relevant Technology, if not already achieved, unless restrained from engaging in

7    further unlawful conduct.

8        45.    Smart Modular's unlawful conduct has caused injury to competition

9    and to Netlist as creators and consumers of the Relevant Technology and, unless

10   enjoined and restrained, will cause further injury to competition and to Netlist.

11       46.    Netlist has been injured in its business and has been threatened with

12   further injury, including the payment of attorneys' fees and other defense costs

13   associated with Smart Modular's patent infringement claims, as a direct and

14   proximate result of Smart Modular's conduct.

15

16                           **COUNT TWO**

17               ***Walker Process* Violation Under 15 U.S.C. § 2**

18         **Bad Faith Enforcement of Fraudulently-Obtained Patent**

19       47.    Netlist incorporates by reference the preceding allegations of its

20   Complaint.

21       48.    This claim seeks damages and injunctive relief against Smart Modular

22   for a *Walker Process* violation by reason of Smart Modular's fraud on the Patent

23   Office and its resulting bad faith enforcement of a fraudulently-obtained patent in

24   violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

25       49.    This intentional failure to disclose known and material prior art to the

26   Patent Office constitutes fraud on the Patent Office that is actionable under Section

27   2 of the Sherman Antitrust Act.

28   /////

                                                                    COMPLAINT
                                                                    WEST\241504765.1

50.    By reason of its fraud on the Patent Office, Smart Modular has a dangerous probability of achieving monopoly power in the international and United States markets for rank multiplication technology.

51.    Smart Modular's deceitful conduct has had a substantial effect on interstate (and foreign) commerce and it will continue to have such an effect as long as Smart Modular continues to assert that its '295 patent is valid, enforceable and necessary to practice the LRDIMM Standard.

52.    As a direct and proximate result of Smart Modular's unlawful attempted monopolization, Netlist has been injured in its business and property in an amount that has yet to be determined, but will be established at trial.

53.    Unless Smart Modular is enjoined by this Court, Smart Modular's unlawful conduct will continue and Netlist will continue to sustain injury and damages

## COUNT THREE

## Unfair Competition Under California Business & Professions Code § 17200

54.    Netlist incorporates by reference the preceding allegations of its Complaint.

55.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "'unlawful, unfair or fraudulent business act or practice."

56.    Smart Modular has engaged in unfair competition or unlawful, unfair, or fraudulent business practices in violation of the Unfair Competition law when they engaged in any one or more of the following:

a.    Smart Modular disparaged Netlist's business and products by falsely and misleadingly alleging that Netlist's products infringe the '295 patent and by seeking to enjoin Netlist from making and selling products to consumers using a wrongfully obtained patent;

/////

-15-

b.      Smart Modular falsely asserted, in litigation and in public press releases, that Netlist infringed the '295 patent, which Smart Modular knew was invalid and unenforceable;

c.      Smart Modular engaged in collusion with other industry participants with the specific intent of harming Netlist's business.

57.     Smart Modular's deceptive, fraudulent, negligent, and/or unlawful business practices are ongoing and are specifically designed to injure Netlist.

58.     Smart Modular has acted in bad faith while engaging in these deceptive trade practices.

59.     Netlist has been harmed by Smart Modular's unfair competition and deceptive trade practices.  This harm will continue or can reasonably be expected to continue as long as Smart Modular continues to falsely assert that the '295 patent is infringed by Netlist.

### COUNT FOUR
### Common Law Fraud

60.     Netlist incorporates by reference the preceding allegations of its Complaint.

61.     Netlist has been a member of JEDEC since 2000 and a member of several JEDEC committees, including JC-40 and JC-45.

62.     At all times relevant to these Claims, Smart Modular was a member of JEDEC and a member of several JEDEC committees, including JC-40 and JC-45.

63.     Despite its membership in several JEDEC committees and its active participation in JEDEC voting activities, Smart Modular did not disclose the '295 patent application to the relevant JEDEC committees during the eight-plus years the '295 patent application was pending in the Patent Office.  The '295 patent application was filed in the Patent Office on January 5, 2004.  At no time between January 5, 2004 and August 27, 2012 did Smart Modular disclose the '295 patent application to JEDEC, as it was required to do under the JEDEC Patent Policy.  As

-16-

COMPLAINT
WEST\241504765.1

1  a result, specifications of several relevant JEDEC standards were drafted, finalized

2  and published, and the JEDEC committees had no opportunity to consider

3  reasonable workarounds or technical alternatives to the technology purportedly

4  disclosed in the '295 patent application.

5       64.    Despite Smart Modular's failure to timely disclose the '295 patent

6  application and despite its failure to offer a license to Netlist on reasonable and

7  nondiscriminatory terms, Smart Modular is asserting the '295 patent against Netlist,

8  a JEDEC member and maker of JEDEC-compliant products.

9       65.    Despite its duty to disclose relevant patents and its knowledge of the

10  proposed LRDIMM Standard, Smart Modular intentionally failed to disclose the

11  application for the '295 patent.  Smart Modular failed to disclose the '295 patent

12  application because it intended to induce the adoption of the LRDIMM Standard

13  and its inclusion in various products.

14       66.    As a result of Smart Modular's fraudulent failure to disclose the '295

15  patent application and subsequent attempts to assert the patent, Netlist has incurred

16  damages and will continue to be damaged in the future.

17  **PRAYER FOR RELIEF**

18  WHEREFORE, Netlist prays for the following relief:

19       i)    A permanent injunction prohibiting further or future enforcement of

20  the '295 patent;

21       ii)    An award of damages adequate to compensate Netlist for the harm it

22  has sustained as a result of Smart Modular's unlawful conduct;

23       iii)    An award of treble damages, under Clayton Act § 4, against Smart

24  Modular for its Sherman Act violations;

25       iv)    An award of attorneys' fees under Clayton Act §§ 4 and 16; and

26       v)    Such other and further equitable or legal relief as the Court or a jury

27  deems proper.

28  /////

COMPLAINT
WEST\241504765.1

1

## **DEMAND FOR JURY TRIAL**

2      In accordance with Fed. R. Civ. P. 38(b), Netlist demands a trial by jury on

3  all issues so triable.

4

5  Dated:  July 1, 2013                          DLA PIPER LLP (US)

6

7                                                By: _Stanley J. Panikowski_

8                                                SEAN C. CUNNINGHAM
                                                 STANLEY J. PANIKOWSKI

9                                                ERIN P. GIBSON
                                                 RAJIV DHARNIDHARKA

10                                               RYAN W. COBB

11

12                                               Attorneys for Plaintiff NETLIST, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-18-                                                                    COMPLAINT