1    SEAN C. CUNNINGHAM (Bar No. 174931)
2    sean.cunningham@dlapiper.com
     STANLEY J. PANIKOWSKI (Bar No. 224232)
3    stanley.panikowski@dlapiper.com
     ERIN P. GIBSON (Bar No. 229305)
4    erin.gibson@dlapiper.com
5    RYAN W. COBB (Bar No. 277608)
     ryan.cobb@dlapiper.com
6
     DLA PIPER LLP (US)
7    401 B Street, Suite 1700
8    San Diego, CA 92101-4297
     Telephone:  619-699-2700
9    Facsimile:  619-699-2701
10
11    RAJIV DHARNIDHARKA (Bar No. 234756)
     rajiv.dharnidharka@dlapiper.com
12    DLA PIPER LLP (US)
13    400 Capitol Mall, #2400
     Sacramento, CA 95814
14    Telephone:  916-930-3200
15    Facsimile:  916-930-3201
16    THOMAS J. WIMBISCUS (*Pro Hac Vice* Pending)
17    twimbiscus@mcandrews-ip.com
     GREGORY C. SCHODDE (*Pro Hac Vice* Pending)
18    gschodde@mcandrews-ip.com
19    WAYNE H. BRADLEY (*Pro Hac Vice* Pending)
     wbradley@mcandrews-ip.com
20    McANDREWS, HELD & MALLOY
21    500 West Madison Street, 34th Floor
     Chicago, IL  60661
22    Telephone:  312-775-8000
23    Facsimile:  312-775-8100

24    Attorneys for Plaintiff NETLIST, INC.

25    /////
26    /////
27    /////
28

FILED

2013 AUG 23  AM 10: 45

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

| | |
|---|---|
| NETLIST, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>SMART MODULAR TECHNOLOGIES, INC., SMART STORAGE SYSTEMS, INC., SMART WORLDWIDE HOLDINGS, INC. and DIABLO TECHNOLOGIES, INC.<br><br>        Defendants. | Case No.  8:13-cv-00996-DOC-JPR<br><br>**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT, ANTITRUST VIOLATIONS, TRADEMARK INFRINGEMENT, CORRECTION OF INVENTORSHIP, TRADE SECRET MISAPPROPRIATION, BREACH OF CONTRACT, UNFAIR COMPETITION AND FRAUD; DEMAND FOR JURY TRIAL** |

Plaintiff Netlist, Inc. ("Netlist") complains against Defendants Smart Modular Technologies, Inc. ("Smart Modular"), Smart Storage Systems, Inc. ("Smart Storage"), Smart Worldwide Holdings, Inc. ("Smart Worldwide") and Diablo Technologies, Inc. ("Diablo") (collectively "Defendants") as follows:

## NATURE OF THE ACTION

1.     This is an action against Defendants seeking, among other things, the following: (a) damages and injunctive relief for Defendants' infringement of Netlist's patents; (b) relief under federal antitrust laws for Smart Modular and Smart Worldwide's violations of Section 2 of the Sherman Act; and (c) relief under the Lanham Act for Diablo's trademark infringement; (d) damages and other equitable relief under California statutory and common law for Defendants' misappropriation of Netlist's trade secrets, unfair competition, deceptive trade practices and fraud.

/////

**THE PARTIES**

2.     Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 51 Discovery, Suite 150, Irvine, California 92618.  Netlist is widely regarded in the computing industry as a pioneer in high-performance memory for servers and storage systems, with many of its innovative products being adopted by its primary customers—IBM, HP and Dell.  The company was founded in 2000 in Irvine, California by Chuck Hong, Christopher Lopes and Jay Bhakta.  The co-founders, who combined have more than 80 years of semiconductor design and marketing experience, recognized that the industry's need for high performance memory products was not being sufficiently met by existing technologies.  The company's mission was to create breakthrough technologies that filled the performance gap between the server and storage architectures and the capabilities of existing memory technologies.  As a result of its research and development efforts over the past 13 years, Netlist has delivered numerous breakthrough products to the marketplace and amassed a seminal and valuable patent portfolio in the area of high-performance memory architecture and design.

3.     Defendant Smart Modular is a Delaware corporation with its principal place of business at 39870 Eureka Drive, Newark, California 94560.  On information and belief, Defendant Smart Modular was founded in 1988 as a contract manufacturer of memory products.  Its business has been largely building products for others, not creating products from its own design and technology.

4.     Defendant Smart Storage is an Arizona corporation with its principal place of business at 39870 Eureka Drive, Newark, California 94560.  On information and belief, Defendant Smart Storage designs, develops, manufactures, and deploys enterprise memory modules and solid-state storage products.

5.     On information and belief, Defendant Smart Worldwide Holdings, Inc. purports to be a corporation governed by at least three corporate officers, whose

1   principal place of business is 39870 Eureka Drive, Newark, California 94560.  On

2   information and belief, Defendant Smart Worldwide is the parent company of

3   Defendant Smart Modular and Defendant Smart Storage and, as alleged below,

4   directed and continues to direct the relevant actions of both Smart Modular and

5   Smart Storage.

6       6.   Defendant Diablo is a Canadian corporation with its principal place of

7   business at 80 Aberdeen Street, Suite 401, Ottawa, Ontario, K1S 5R5, Canada.  On

8   information and belief, Diablo was founded in 2003 and holds itself out as

9   delivering product solutions that enhance the performance and capability of

10  memory system designs.  On information and belief, Defendant Diablo has

11  partnered with Defendant Smart Storage to develop the infringing ULLtraDIMM

12  product, as alleged below.

13                  **JURISDICTION AND VENUE**

14      7.   This Court has jurisdiction over the subject matter of these claims

15  under 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202, because this action involves

16  claims arising under the patent laws of the United States, 35 U.S.C. § 1, et seq., the

17  United States antitrust laws and the Lanham Act.  The Court has supplemental

18  jurisdiction under 28 U.S.C. § 1367 for Netlist's related claims under California

19  law.

20      8.   Personal jurisdiction and venue are proper in this Court pursuant to 28

21  U.S.C. §§ 1391, 1391 and/or 1400, as well as 15 U.S.C. §§ 15 and 22, because

22  Smart Modular, Smart Storage and Smart Worldwide reside in this state and

23  because all Defendants do business in this state and district and have committed

24  acts of infringement in this district.

25                  **GENERAL ALLEGATIONS**

26  **A.    Overview of Defendants' Unlawful Conduct.**

27      9.   On information and belief, Defendants have engaged in a pattern of

28  deceptive and unlawful conduct, alone or in concert with one another and other

WEST\241824038.2                    -4-              FIRST AMENDED COMPLAINT
                                                     8:13-CV-00996-DOC-JPR

1    parties, over a period of at least five years, which includes (a) misappropriation of

2    Netlist's trade secrets, (b) incorporation of Netlist's proprietary technology into

3    competing products, (c) infringement of Netlist's HyperCloud® trademark, (d)

4    filing sham litigation based on a fraudulently procured patent, and (e) making

5    misleading statements to the public in an attempt to put Netlist out of business.  On

6    information and belief, Defendants' unlawful scheme was planned and executed in

7    advance of the announcement of an important new product by Defendants,

8    ULLtraDIMM, which infringes multiple Netlist patents and incorporates

9    misappropriated Netlist trade secrets.

10        10.    On information and belief, the chronology of Defendants' misconduct

11   includes the following:

12        a.    In or about early 2008, Diablo approached Netlist seeking to

13   license Netlist's proprietary server memory technology and to design under contract

14   a semiconductor chipset for Netlist's HyperCloud® product.  On information and

15   belief, Diablo has been a contract design house that implements semiconductor chip

16   designs on silicon under "for hire" contracts, using its customers' own designs.  In

17   March 2008, Netlist and Diablo signed a nondisclosure agreement to begin

18   discussing a business arrangement between the two companies.  In April 2008,

19   Netlist provided to Diablo two documents containing specifications of a new

20   product, HyperCloud®, which was to become the heart of Netlist's business.

21   Netlist had been working on HyperCloud® for years, and those years of work were

22   consolidated into the specifications provided to Diablo.  Soon afterwards, the

23   technical teams from Netlist and Diablo began holding meetings, during which

24   Netlist presented many aspects of its proprietary design to Diablo.  In late April

25   2008, Netlist provided Diablo with presentation slides entitled "DxD/LRD

26   Opportunity Review," marked "Netlist Confidential" on each page, which detail the

27   architecture and implementation of HyperCloud®.  Throughout the summer of

28

WEST\241824038.2                              -5-                    FIRST AMENDED COMPLAINT
                                                                     8:13-CV-00996-DOC-JPR

1    2008, Netlist and Diablo continued to hold numerous meetings and telephone

2    conferences to discuss Netlist's proprietary technology.

3              b.     In September 2008, Netlist signed an agreement with Diablo for

4    Diablo to design and supply chipsets for Netlist based on Netlist's specifications

5    and under Netlist's direction.  Netlist continued to disclose to Diablo its most

6    valuable technical trade secrets under strict confidentiality restrictions.  Within one

7    week of signing this agreement with Netlist, however, Diablo filed a provisional

8    patent application with the United States Patent & Trademark Office ("Patent

9    Office") that included significant portions of the confidential information Netlist

10   had provided to Diablo.  That provisional patent application contains many of the

11   technical features disclosed in the presentation slides Netlist had provided to

12   Diablo, including interoperability, transparency to system, plug-and-play/no

13   modification to BIOS, and other features.  Diablo did not name any of the Netlist

14   engineers as inventors on that patent application, nor did Diablo notify Netlist that

15   Diablo was planning to file the patent application.

16             c.     Upon learning of Diablo's provisional patent application, Netlist

17   immediately demanded that the relevant Netlist engineers be named as inventors on

18   the patent application and that it be assigned to Netlist according to the agreement

19   between the companies, which required that all architecture-related intellectual

20   property belong to Netlist.  Rather than meeting Netlist's demands, Diablo

21   attempted to use the patent application as leverage to demand that Diablo be

22   permitted to supply more market share of Netlist's chipsets than was called for

23   under the agreement.

24             d.     In May 2009, Diablo filed a second provisional patent

25   application disclosing more technical information provided by Netlist to Diablo,

26   again without notifying Netlist or including Netlist's engineers as inventors.  In

27   September 2009, Diablo filed a utility patent application claiming priority to the

28   two provisional patent applications, again without notifying Netlist or including

1   Netlist's engineers as inventors.  Diablo chose to allow the patent application to be

2   published, thereby intentionally disclosing Netlist's proprietary and trade secret

3   technology to the world in March 2010.  Netlist was not aware of the pending

4   publication of its technology when it attempted to resolve its disputes with Diablo,

5   resulting in a settlement agreement between Netlist and Diablo in January 2010.

6           e.      In 2012, Diablo began to offer on its website Netlist's

7   proprietary HyperCloud® technology in Diablo's own chipset, VT-Berlinetta.

8   Diablo repeatedly referred to Netlist's HyperCloud® trademark to promote the VT-

9   Berlinetta chipset.  Diablo also invited visitors to its website to contact Diablo for

10  more information about the availability and specifications of the VT-Berlinetta

11  chipset, which contains Netlist's trade secrets.  Diablo's conduct in offering a

12  competing product using Netlist's trade secrets and without Netlist's consent is a

13  clear breach of the agreements between the parties, among other things.  As result

14  of Diablo's repeated unlawful behavior, Netlist sent several demand letters to

15  Diablo before formally terminating the agreement with Diablo in or about July

16  2012.

17          f.      On information and belief, in or about May 2013, Diablo

18  announced that it had entered into an "exclusive relationship" with Defendant

19  Smart Storage to design and manufacture products for Smart Storage.  In or about

20  August 2013, Diablo and Smart Storage announced the introduction of a new

21  product, ULLtraDIMM, that contains Netlist trade secrets misappropriated by

22  Diablo.  Smart Storage claims that the "ULLtraDIMM SSD connects flash directly

23  to the CPU through the memory channel by leveraging Diablo Technologies, Inc.'s

24  Memory Channel Storage (MCS) architecture, which SMART Storage Systems has

25  exclusive access to through the companies' technology partnership."  On

26  information and belief, Smart Storage knows that Diablo worked closely with

27  Netlist on the HyperCloud® product, and that Diablo's so-called "Memory Channel

28  Storage" architecture was derived from Netlist's HyperCloud® architecture.  And

1  as alleged below, ULLtraDIMM infringes multiple Netlist patents and incorporates

2  numerous Netlist trade secrets that Diablo misappropriated.

3         g.    In September 2012, Smart Modular filed a lawsuit against

4  Netlist alleging that HyperCloud® infringes United States Patent No. 8,250,295

5  ("the '295 patent") owned by Smart Modular.  The '295 patent issued on August

6  21, 2012 from application No. 10/752,151 ("the '295 application").  Smart Modular

7  prosecuted the '295 application at the Patent Office for eight years, during which

8  time Smart Modular was participating in the standard-setting organization known as

9  JEDEC.  The bylaws of JEDEC require its members to disclose all patents and

10  patent applications that its members believe are relevant to the work of the

11  committees in which they participate.  Despite now claiming that the '295 patent is

12  relevant to the JEDEC LRDIMM standard, Smart Modular intentionally failed to

13  disclose the '295 application to JEDEC and its members.  On information and

14  belief, at the same time Smart Modular was voting to adopt the future LRDIMM

15  standard, it was secretly amending its patent claims to try to cover that same

16  standard.  Smart Modular did not disclose the '295 patent to JEDEC until after

17  voting had closed on the LRDIMM standard, after the '295 patent issued, and just

18  before Smart Modular sued Netlist.  When Smart Modular disclosed the '295 patent

19  to JEDEC, it promised that licenses would be offered to applicants desiring to

20  utilize the license for the purpose of implementing the relevant JEDEC standards

21  under reasonable terms that are demonstrably free of any unfair discrimination

22  ("RAND" terms).  Despite its promise, Smart Modular never offered a RAND

23  license to Netlist, a maker of JEDEC-compliant HyperCloud® products, before

24  suing Netlist and seeking a preliminary injunction.

25         h.    Smart Modular also procured the '295 patent through

26  inequitable conduct at the Patent Office.  In February 2012, Netlist provided a list

27  of prior art references to Smart Modular's counsel in a reexamination proceeding

28  on one of Netlist's patents, in which Smart Modular was participating.  Netlist had

disclosed prior art references to Smart Modular before, and Smart Modular had disclosed these prior art references to the Patent Office in the prosecution of its '295 application.  The list of references provided by Netlist to Smart Modular in February 2012 contained a Japanese patent application by Takeda ("the Takeda reference"), which is highly material to the patentability of Smart Modular's claims in the '295 patent.  Contrary to its prior conduct, Smart Modular did not disclose these prior art references to the Examiner of the '295 application.  Several months later, the Examiner issued a notice of allowance for the '295 patent, unaware of the material Takeda reference.

i.     On information and belief, Smart Modular's conduct after filing the suit demonstrated that the purpose of the lawsuit was not to enforce a valid patent, but to use a fraudulently obtained patent to harm Netlist's business, drain Netlist's resources and dissuade Netlist's customers from adopting HyperCloud®. Disregarding its obligation to offer a RAND license, Smart Modular moved for a preliminary injunction against HyperCloud®.  Smart Modular's motion alleged irreparable harm, a position that was contradicted by Smart Modular's own witnesses.  Before and during the litigation, Smart Modular also issued a series of deceptive press releases designed to further harm Netlist's business.  On information and belief, Smart Modular's agents have also admitted that its purpose in suing Netlist was for reasons other than the enforcement of a valid patent. During the Smart Modular lawsuit, Smart Worldwide's CEO, Iain MacKenzie told Netlist's CEO, Chuck Hong, that MacKenzie "had no beef" against Netlist and that he had been "railroaded" into filing suit against Netlist by other companies.

11.    Based on the conduct alleged above and more fully below, Netlist seeks damages, injunctive relief and attorneys' fees as relief from Defendants' unlawful conduct.

/////

/////

**B.     The Netlist Patents and Defendants' Infringement**

12.     On August 16, 2011, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 8,001,434 ("the '434 patent"), entitled "Memory board with self-testing capability" to Dr. Hyun Lee, Jayesh R. Bhakta, and Soonju Choi.  A true and correct copy of the '434 patent is attached to this First Amended Complaint as Exhibit A.  Netlist owns the entire right, title and interest in and to the '434 patent.  The application for the '434 patent was filed on April 13, 2009.

13.     On October 30, 2012, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 8,301,833 ("the '833 patent"), entitled "Non-volatile memory module" to Chi-she Chen, Jeffrey C. Solomon, Scott Milton, and Jayesh Bhakta.  A true and correct copy of the '833 patent is attached to this First Amended Complaint as Exhibit B.  Netlist owns the entire right, title and interest in and to the '833 patent.  The application for the '833 patent was filed on September 29, 2008.

14.     On January 22, 2013, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 8,359,501 ("the '501 patent"), entitled "Memory board with self-testing capability" to Dr. Hyun Lee, Jayesh R. Bhakta, and Soonju Choi. A true and correct copy of the '501 patent is attached to this First Amended Complaint as Exhibit C.  Netlist owns the entire right, title and interest in and to the '501 patent.  The application for the '501 patent was filed on July 14, 2011.

15.     On August 20, 2013, the United States Patent and Trademark Office duly and lawfully issued United States Patent No. 8,516,185 ("the '185 patent"), entitled "System and method utilizing distributed byte-wise buffers on a memory module" to Dr. Hyun Lee and Jayesh R. Bhakta.  A true and correct copy of the '185 patent is attached to this First Amended Complaint as Exhibit D.  Netlist owns

1  the entire right, title and interest in and to the '185 patent. The application for the

2  '185 patent was filed on April 15, 2010.

3      16. On August 20, 2013, the United States Patent and Trademark Office

4  duly and lawfully issued United States Patent No. 8,516,187 ("the '187 patent"),

5  entitled "Data transfer scheme for non-volatile memory module" to Chi-she Chen,

6  Jeffrey C. Solomon, Scott Milton, and Jayesh Bhakta. A true and correct copy of

7  the '187 patent is attached to this First Amended Complaint as Exhibit E. Netlist

8  owns the entire right, title and interest in and to the '187 patent. The application for

9  the '187 patent was filed on June 28, 2012.

10      17. Where appropriate, Netlist refers to the '434 patent, the '833 patent,

11  the '501 patent, '185 patent, and the '187 patent collectively as the "Netlist

12  Asserted Patents."

13      18. On or about August 12, 2013, Smart Storage, at the direction of Smart

14  Worldwide, publicly announced that it had begun sampling to select customers its

15  ULLtraDIMM low-latency memory module, which it claims is the result of a close

16  partnership between Smart Storage and Diablo. The ULLtraDIMM memory

17  module employs, among other things, a distributed buffer architecture that infringes

18  the Netlist Asserted Patents, as alleged more fully below.

19      19. On information and belief, each Defendant has been and is involved in

20  the manufacture, testing, distribution, marketing, offer for sale, and/or sale of the

21  infringing ULLtraDIMM product, and therefore each Defendant is jointly and

22  severally liable for infringement of the Netlist Asserted Patents, as alleged more

23  fully below.

24  **C.**   **Smart Modular and Smart Worldwide's Deceptive and Anticompetitive**

25      **Conduct**

26      20. This action arises, in part, out of the deceptive, anticompetitive and

27  abusive litigation and related conduct against Netlist by Smart Modular and Smart

28  Worldwide. On information and belief, Smart Worldwide controls the actions of

1   Smart Modular, its subsidiary, and therefore stands in the shoes of Smart Modular

2   with respect to the conduct alleged herein.  On information and belief, Smart

3   Modular and Smart Worldwide's campaign of deceptive and anticompetitive

4   behavior includes the following:

5           a.      At the direction of Smart Worldwide, Smart Modular obtained

6   the '295 patent through inequitable conduct at the United States Patent &

7   Trademark Office ("Patent Office") by deliberately withholding known, material

8   prior art from the Patent Examiner;

9           b.      At the direction of Smart Worldwide, Smart Modular filed a

10  sham patent infringement lawsuit against Netlist, knowing that the '295 patent was

11  both invalid and unenforceable due to Smart Modular's inequitable conduct at the

12  Patent Office, and without conducting a legally sufficient inquiry into the basis for

13  its infringement claims against Netlist;

14          c.      At the direction of Smart Worldwide, Smart Modular claimed in

15  that lawsuit that the '295 patent allegedly covers an essential feature in an industry

16  standard promulgated by the JEDEC standard-setting body, but Smart Modular

17  failed for years to disclose its purportedly relevant '295 patent application, despite a

18  clear duty to disclose that patent application to JEDEC;

19          d.      At the direction of Smart Worldwide, Smart Modular sought a

20  preliminary injunction in the litigation against Netlist's flagship memory product,

21  HyperCloud®, forcing Netlist to expend large sums of money to defeat that

22  baseless motion;

23          e.      At the direction of Smart Worldwide, Smart Modular

24  continually publicized its litigation efforts through misleading and deceptive press

25  releases designed to harm Netlist's business; and

26          f.      At the direction of Smart Worldwide, Smart Modular took these

27  steps of filing a sham patent infringement lawsuit and issuing misleading and

28

WEST\241824038.2                                    -12-                    FIRST AMENDED COMPLAINT
                                                                            8:13-CV-00996-DOC-JPR

1  deceptive press releases in an effort to drive Netlist out of business, all prior to the

2  announcement of the ULLtraDIMM product.

3         21.    On information and belief, Smart Modular and Smart Worldwide have

4  colluded with other industry members in some or all of the activities described

5  above, with the goal of furthering Smart Modular and Smart Worldwide's

6  anticompetitive scheme against Netlist.  On more than one occasion, agents of

7  Smart Modular and/or Smart Worldwide informed Netlist that Smart Modular had

8  deeper pockets than Netlist, and that Smart Modular was using the litigation to put

9  Netlist out of business.

10         a.    **Smart Modular and Smart Worldwide's Fraud on the Patent**

11               **Office**

12         22.    At the direction of Smart Worldwide, Smart Modular breached its duty

13  of candor and good faith to the Patent Office by deliberately withholding known,

14  material prior art from the Patent Office when the '295 patent was being examined

15  by the Patent Office.

16         23.    Smart Modular filed the '295 application on January 5, 2004.  During

17  the prosecution of the '295 application, the applicants and/or their counsel became

18  aware of the Takeda reference when Netlist provided that prior art reference to

19  Smart Modular.  The Takeda reference is material prior art to the claims of the '295

20  patent, and the '295 applicants understood the materiality of the Takeda reference.

21  However, to obtain the '295 patent, the applicants and/or their counsel deliberately

22  withheld the Takeda reference from the Patent Examiner.

23         24.    The Takeda reference is "but-for" material to the patentability of the

24  claims of the '295 patent.  On December 7, 2012, the Patent Office ordered

25  reexamination of the '295 patent and simultaneously rejected all asserted claims of

26  the '295 patent as being invalid based on the Takeda reference in view of JEDEC

27  Standard 21-C.  This rejection demonstrates that the asserted claims of the '295

28

1   patent would not have been allowed to issue if the Examiner had known about the

2   Takeda reference during the original prosecution.

3         25.   On information and belief, the applicants and/or their counsel acted

4   with the specific intent to deceive the Patent Office during prosecution of the '295

5   patent.  On October 11, 2010, after more than six years of failing to get any claims

6   of the '295 application allowed, Smart Modular filed a continuation application

7   from the '295 patent application ("the '295 continuation") to provoke a patent

8   interference with Netlist's United States Patent No. 7,619,912 ("the Netlist '912

9   patent").  To attempt to provoke an interference with the Netlist '912 patent, Smart

10  Modular copied the claims of the '912 patent into the '295 continuation.  Therefore,

11  Smart Modular claimed that the '295 application disclosed the same subject matter

12  as claimed in the Netlist '912 patent.

13        26.   On October 20, 2010, Smart Modular filed a request for *inter partes*

14  reexamination of the Netlist '912 patent.  Michael Heafey of Orrick, Herrington &

15  Sutcliffe LLP filed that request on behalf of Smart Modular.  The Patent Office

16  later consolidated that reexamination with two other reexaminations of the Netlist

17  '912 patent filed by Google and Inphi.  The three reexaminations were merged into

18  a single proceeding ("the Netlist '912 reexamination").

19        27.   In the Netlist '912 reexamination, all parties filed Information

20  Disclosure Statements ("IDS") at various times disclosing prior art references the

21  parties believed to be material to the patentability of the Netlist '912 patent.  On

22  June 6, 2011, Smart Modular's counsel filed an IDS ("the First IDS") in the '295

23  application listing prior art references, including the prior art references that had

24  been disclosed in the Netlist '912 reexamination.  Smart Modular therefore

25  regarded the prior art references disclosed in the Netlist '912 reexamination as

26  being material to the patentability of the claims in the '295 application.

27        28.   On February 6, 2012, Netlist filed an information disclosure statement

28  ("the Netlist IDS") in the Netlist '912 reexamination disclosing the Takeda

reference, among other things.  Netlist attached a Japanese copy, an English abstract, and an English machine translation of the Takeda reference to the Netlist IDS.  On that same day, Netlist's reexamination counsel mailed a copy of the Netlist IDS, together with the Japanese copy, English abstract, and English translation of the Takeda reference, to Smart Modular's reexamination counsel Mr. Heafey.

29.   On February 7, 2012, Smart Modular filed a Second Supplemental IDS ("the Second IDS") in the '295 application, in which Smart Modular disclosed more prior art references submitted in the Netlist '912 reexamination.  In the Second IDS, Smart Modular disclosed prior art references cited by both Smart Modular and Netlist during the Netlist '912 reexamination.  Thus, Smart Modular regarded the prior art cited in the Netlist '912 reexamination to be relevant to the '295 patent application.

30.   Despite Smart Modular's practice of disclosing in the '295 application essentially all prior art cited in the Netlist '912 reexamination, Smart Modular never disclosed the Takeda reference during the prosecution of the '295 application.  Smart Modular and its agents, including its '295 patent prosecution counsel Mr. Durant, had a legal obligation to disclose that reference in the co-pending prosecution of the '295 application.

31.   At all relevant times to the '295 application, the following persons had a duty of candor and good faith toward the Patent Office: (i) the named inventors, (ii) every attorney or agent who prepared or prosecuted the '295 patent application, and (iii) every other person who was substantively involved in the preparation or prosecution of the application and who was associated with the inventor, with the assignee, or with anyone to whom there was an obligation to assign the application.

32.   Despite their actual knowledge of the Takeda reference at least as early as February 6, 2012, and despite many opportunities to disclose the Takeda reference in the '295 application, Smart Modular deliberately withheld the Takeda

1    reference from the Patent Office.  As a result, the Patent Office issued the '295

2    patent six months after the Takeda reference was provided to Smart Modular.

3        33.     Based on these facts, the single most reasonable inference is that Smart

4    Modular and/or its counsel made a deliberate decision not to disclose the material

5    Takeda reference in their possession to wrongfully obtain issuance of the '295

6    patent claims and file this patent infringement lawsuit against Netlist.

7        **b.**     **Smart Modular and Smart Worldwide's Fraud on JEDEC**

8        34.     At the direction of Smart Worldwide, Smart Modular also engaged in a

9    pattern of misleading silence and misrepresentations about the purported relevance

10    of the '295 patent application to the development of the JEDEC LRDIMM Standard

11    (LRDIMM is short for Load Reduced Dual In-Line Memory Module), intentionally

12    ignoring a clear duty to disclose its patent interests while voting to approve the

13    LRDIMM Standard and otherwise participating in JEDEC standard-setting

14    activities.  The JEDEC Patent Policy requires its members to disclose potentially

15    standard-essential patents and patent applications and to offer licenses to all

16    interested licensees on reasonable and non-discriminatory ("RAND") terms.

17        35.     During the eight-plus years that the '295 application was pending at

18    the Patent Office, Smart Modular participated in the JEDEC standard-setting body

19    and voted multiple times to approve the LRDIMM Standard.  The entire time,

20    Smart Modular knew about the purported relevance of the '295 patent to the

21    LRDIMM Standard and secretly amended its '295 claims at the Patent Office

22    without ever disclosing the '295 application to JEDEC, in clear violation of the

23    JEDEC Patent Policy.

24        36.     On August 27, 2012, one week after the '295 patent issued and years

25    after voting for the relevant JEDEC standard, Smart Modular finally submitted a

26    "License Assurance/ Disclosure Form" to JEDEC identifying the '295 patent and

27    promising to license the patent on RAND terms.  On that form, Smart Modular

28    identified the "relevant JEDEC Standard" as "JESD82-xx, JC40.4, JC45.4, MB

1   Specification, JESD82-20A," and promised that "a license will be offered to
2   applicants desiring to utilize the license for the purpose of implementing the
3   JEDEC Standard under reasonable terms that are demonstrably free of any unfair
4   discrimination." Despite its promise, Smart Modular has never offered a RAND
5   license to Netlist, a maker of JEDEC-compliant HyperCloud® products.

6            c.      **Smart Modular and Smart Worldwide's Sham Litigation Against**
7                    **Netlist**

8            37.     On September 10, 2012, at the direction of Smart Worldwide, Smart
9   Modular filed suit against Netlist in the United States District Court for the Eastern
10  District of California, alleging infringement of the '295 patent. On information and
11  belief, Smart Modular failed to perform a proper investigation to find a reasonable
12  basis to confirm its allegation that HyperCloud® infringes the '295 patent. Weeks
13  later, Smart Modular filed a motion for preliminary injunction against Netlist's
14  flagship products, the HyperCloud® products, ignoring its promise to license the
15  '295 patent on RAND terms. Smart Modular then made a series of misleading
16  statements to the press to make sure that its assertions of patent infringement and its
17  motion for preliminary injunction would create uncertainty and doubt about the
18  viability of Netlist's HyperCloud® products and cause maximum damage to
19  Netlist's business.

20           38.     On information and belief, Smart Modular and Smart Worldwide have
21  proceeded in bad faith with knowledge that the '295 patent is not infringed and is
22  invalid and unenforceable. On information and belief, Smart Modular's lawsuit
23  was not intended to enforce valid patent rights. Instead, it was motivated by the
24  desire to put a competitor out of business. Smart Modular's litigation is knowingly
25  and objectively baseless because (a) the '295 patent is invalid and unenforceable
26  because of Smart Modular's inequitable conduct at the Patent Office and its
27  misleading silence at JEDEC, (b) Smart Modular failed to perform a legally
28  sufficient investigation into infringement of the '295 patent, and (c) Smart Modular

1   sought a preliminary injunction despite its promise to offer RAND licenses for the

2   '295 patent at JEDEC.  On information and belief, Smart Modular and Smart

3   Worldwide have invoked the legal process as an exclusionary, discriminatory,

4   predatory and illegitimate method of harming Netlist's business.  The Eastern

5   District of California court has denied Smart Modular's frivolous motion for

6   preliminary injunction and has stayed Smart Modular's lawsuit pending the

7   completion of the reexamination of the '295 patent.

8        39.    On information and belief, Smart Modular and Smart Worldwide's

9   motive is to harm competition and to put a competitor out of business.  Their

10  conduct in suing Netlist and seeking a preliminary injunction using the '295 patent,

11  which is tainted with Smart Modular's misconduct at JEDEC and deception at the

12  Patent Office, is fraud on the market and the public.

13       **d.**    **Smart Modular and Smart Worldwide's Deceptive Statements to**

14            **the Public**

15       40.    At the direction of Smart Worldwide, Smart Modular further has

16  engaged in anticompetitive behavior by waging a public relations campaign against

17  Netlist since filing its lawsuit against Netlist, using even administrative orders from

18  the Court to issue press releases designed to harm Netlist's business and cause

19  uncertainty in the market about Netlist's products.

20       41.    For example, on September 13, 2012, Smart Modular issued a press

21  release at the direction of Smart Worldwide announcing the commencement of the

22  lawsuit and stating that Smart Modular has "asked the court for permission to file

23  an immediate motion for preliminary injunction to prevent Netlist from selling

24  HyperCloud® products in order to stop the alleged continuing infringement by

25  Netlist."  On September 25, 2012, when the Court granted Smart Modular's *ex*

26  *parte* request to file a brief exceeding a page limit by three pages, Smart Modular

27  issued a press release stating that the Court had "Authorized Filing a Motion for

28  Immediate Preliminary Injunction."  Not surprisingly, given Smart Modular's

1   deceptive statements to the market, Netlist's stock price and market capitalization

2   dropped by about half in the months after Smart Modular's lawsuit was filed.

3   Netlist's sales of HyperCloud® products also declined dramatically as a result of

4   Smart Modular's sham litigation, it baseless preliminary injunction motion, and its

5   misleading statements to the public.

6       **e.   Smart Modular and Smart Worldwide's Collusion With Other**

7           **Industry Members**

8       42.   Smart Modular and/or Smart Worldwide also have made statements to

9   Netlist indicating that their anticompetitive and deceptive campaign was perpetrated

10  by Smart Modular and/or Smart Worldwide with the help of, and possibly at the

11  behest of, other industry members.  Smart Modular and/or Smart Worldwide also

12  have made statements to Netlist that Smart Modular and Smart Worldwide's true

13  intent is to put Netlist out of business by outspending Netlist in the litigation.

14  **D.   Diablo's Unlawful Conduct**

15      43.   Diablo's unlawful conduct has taken several forms, including patent

16  infringement, trademark infringement, misappropriation of Netlist trade secrets and

17  unfair competition.

18      **a.   Diablo's Misappropriation of Netlist's Trade Secrets**

19      44.   In or about early 2008, Diablo approached Netlist expressing interest

20  in licensing Netlist's patented technology.  On or about March 13, 2008, Netlist and

21  Diablo entered into a Mutual Non-Disclosure Agreement ("NDA") for purposes of

22  discussing a collaboration whereby Diablo would develop a chipset for Netlist

23  based on Netlist's trade secret technology.  Section 2 of the NDA provides:

24
25          Receiving Party shall (i) hold all Confidential Information in
            strict confidence and not disclose such Confidential
26          Information to any third parties, (ii) protect the Confidential
            Information in the same manner as Receiving Party protects
27          its own confidential information of a similar type, but in no
            case with less than reasonable care, and (iii) not use any
28

Confidential Information for any purpose except for the
Business Purpose.  Receiving Party shall not disclose the
Confidential Information to any third party other than
persons in the direct employ of Receiving Party who have a
need to have access to and knowledge of the Confidential
Information solely for the Business Purpose.  Each Party
shall take appropriate measures by instruction and
agreement prior to disclosure to such employees to assure
against unauthorized use or disclosure.

45.   Beginning in April 2008 and thereafter, Netlist disclosed the crown jewels of Netlist's proprietary and trade secret technology to Diablo, including but not limited to the following documents and related information:  (1) the Netlist DxD/LRD Opportunity Review; (2) the Netlist Synch Mode Operation Proposal; (3) the Netlist LRD/DxD Chip – Preliminary Specification, ASIC Controller; and (4) the Netlist LRD/DxD – Preliminary Specification, Isolation Device.  Each of these documents is labeled "Netlist Confidential," and each contains information that (a) derives independent economic value from not being generally known to the public and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

46.   On or about September 10, 2008, Netlist and Diablo entered into a Development And Supply Agreement, which was later amended by a Settlement Agreement and Amendment to Development And Supply Agreement dated January 12, 2010 (collectively the "Supply Agreement") for the purpose of having Diablo design and manufacture certain products for Netlist, at Netlist's direction and using Netlist's proprietary and trade secret technology.

47.   Section 8(a) of the Supply Agreement provides in part as follows: "Each party shall treat as confidential all Confidential Information of the other party, shall not use such Confidential Information except as set forth in this Agreement, and shall use reasonable efforts not to disclose such Confidential Information to any third party."  Section 8(a) further provides:  "For purposes of

1  clarification, the Netlist Technology is the Confidential Information of Netlist and

2  may not be used for any purpose other than as set forth in this Agreement, including

3  without limitation use of such Netlist Technology to develop a chip competitive to

4  the Netlist Chipset."

5       48.    In connection with the Supply Agreement and the NDA, Netlist

6  disclosed the Netlist trade secrets to Diablo, including but not limited to the

7  documents and related information described above.  Netlist provided these

8  documents and other proprietary and trade secret know-how to Diablo pursuant to

9  and in reliance upon the protections of the Supply Agreement and the NDA.

10       49.    Notwithstanding Diablo's obligations to maintain Netlist's proprietary

11  and trade secret information in confidence, Diablo intentionally misappropriated

12  Netlist's trade secret information in designing and developing ULLtraDIMM.

13  ULLtraDIMM contains trade secret technology that was provided by Netlist to

14  Diablo in confidence under the protections of the Supply Agreement and the NDA.

15       50.    Diablo's wrongful conduct in misusing and disclosing to the public

16  Netlist's confidential and proprietary information constitutes trade secret

17  misappropriation, as alleged more fully below.

18      **b.**    **Diablo's Willful Infringement of Netlist's Trademark**

19       51.    Netlist is the owner of United States Trademark Registration No.

20  4,120,406 for the HyperCloud® name.  Netlist's trademark registration for

21  HyperCloud® is attached as Exhibit F.

22       52.    On information and belief, Diablo has infringed and is infringing the

23  HyperCloud® trademark by offering a website (http://www.diablo-

24  technologies.com/products/vtblr/) that improperly incorporates the HyperCloud®

25  name in connection with Diablo offering what purports to be its own product (the

26  "Infringing Mark").  Diablo told potential customers for its own product that

27  "Diablo has delivered the world class silicon implementation necessary to address

28  the rapidly growing memory requirements of virtualization, high-performance

1   computing and database applications <u>via the HyperCloud architecture</u>." (Emphasis

2   added.) Diablo also told potential customers that "HyperCloud breaks traditional

3   memory speed and capacity limitations faced in DDR3 based server platforms, and

4   the VT-Berlinetta chipset plays an integral part of this solution." Diablo even

5   admitted that HyperCloud® was proprietary and patented: "<u>Via proprietary and</u>

6   <u>Patented design techniques</u>, the VT-Berlinetta chipset allows interoperability with

7   RDIMMs in the same channel. This permits end users to re-use existing install

8   bases, and simply ADD HyperCloud DIMMs based on the VT-Berlinetta chipsets."

9   (Emphasis added.)

10      53.    As a result of Diablo's use of the Infringing Mark, consumers and

11   potential consumers of the products offered by Diablo through its website, as well

12   as through other channels of commerce, are likely to be misled into believing that

13   the goods and services that Diablo provides to the public originate from, or are

14   approved or otherwise sponsored by, Netlist.

15      54.    Diablo's use of the Infringing Mark is deceptive and an attempt to

16   unfairly trade on the public recognition of Netlist's registered trademark and the

17   goodwill acquired by Netlist with respect to its HyperCloud® trademark.

18      **c.    Diablo's Failure To Name the Netlist Inventors on Diablo's Patent**

19      55.    On September 14, 2009, during the collaboration between Netlist and

20   Diablo, Diablo filed patent application number 12/559,185 ("the '185 application").

21   The '185 application was published on March 18, 2010 as Publication No. US

22   2010/0070690 A1. Netlist was not aware of the '185 application at the time it was

23   filed. The '185 application issued as United States Patent No. 8,452,917 ("the '917

24   patent") on May 28, 2013 and names as inventors Maher Amer and Michael Lewis

25   Takefman. The '917 patent is attached as Exhibit G to this First Amended

26   Complaint.

27      56.    On information and belief, Diablo improperly used Netlist's

28   proprietary technology to file the '185 application and to obtain the '917 patent.

1  The '917 patent contains details of Netlist's proprietary technology that Diablo and

2  the named inventors of the '917 patent learned from Netlist under the protections of

3  the NDA and the Supply Agreement.

4       57.    The true inventor of the Netlist proprietary technology contained in the

5  '917 patent is Dr. Hyun Lee.  Dr. Lee conceived of the technology claimed in

6  multiple claims of the '917 patent.  Diablo failed to name Dr. Lee as an inventor

7  when it filed the '185 application with the Patent Office, nor did Diablo name Dr.

8  Lee at any time during the prosecution of the '185 application.  Thus, the '917

9  patent issued without the proper inventors being named on the patent.

10  <div align="center">**COUNT ONE**</div>

11  <div align="center">**Infringement of the '434 Patent**</div>

12  <div align="center">**(Against All Defendants)**</div>

13       58.    Netlist incorporates by reference the preceding allegations of its

14  Complaint.

15       59.    Netlist is the sole holder of the entire right, title and interest in the '434

16  patent.

17       60.    Defendants have infringed and continue to infringe, directly and

18  indirectly by contributing to and inducing the infringement of others, at least claim

19  1 of the '434 patent by making, using, importing, selling, and/or offering to sell

20  memory modules that are covered by the claims of the '434 patent, including but

21  not limited to ULLtraDIMM memory modules.

22       61.    On information and belief, Defendants have been on notice of and

23  aware of the '434 patent since at least August 22, 2013.

24       62.    On information and belief, Defendants have actively induced, and

25  continue to actively induce, the infringement of one or more claims of the '434

26  patent by, among other things, instructing their customers to operate the accused

27  products in a manner that infringes the claims of the '434 patent.  On information

28  and belief, Defendants intend that their customers will use the accused memory

1     modules in a manner that infringes the '434 patent.  On information and belief, use

2     of the accused memory modules in their intended manner results in infringement of

3     the '434 patent.

4          63.     On information and belief, Defendants have contributorily infringed

5     and continue to contributorily infringe the '434 patent by offering to sell and/or

6     selling within the United States and/or importing into the United States one or more

7     components of a machine, manufacture, or combination covered by the '434 patent

8     that constitute a material part of the invention, which is not a staple article or

9     commodity of commerce suitable for substantial noninfringing use.  On information

10     and belief, Defendants know that the component and/or apparatus is especially

11     made or especially adapted for use in infringing the '434 patent.

12          64.     On information and belief, Defendants have been on notice of and

13     aware of the '434 patent since at least August 22, 2013 and have nevertheless

14     continued to infringe, despite an objectively high likelihood that their actions

15     constitute infringement of the '434 patent.  Accordingly, Defendants' infringement

16     has been and continues to be willful.

17          65.     The filing of this complaint also constitutes notice to Defendants of the

18     '434 patent under 35 U.S.C. § 287.  Furthermore, on information and belief,

19     Defendants have knowledge of Netlist's patent portfolio, because Defendants Smart

20     Modular and Smart Worldwide have sought Patent Office reexamination of

21     multiple Netlist patents since at least October 2010.

22          66.     As a result of Defendants' infringement of the '434 patent, Netlist is

23     suffering irreparable harm for which it has no adequate remedy at law.  Unless

24     enjoined by this Court, this infringement will continue and will result in further

25     irreparable harm to Netlist.

26          67.     Netlist is entitled to recover damages from Defendants not less than a

27     reasonable royalty adequate to compensate for the infringement.

28     /////

## COUNT TWO

### Infringement of the '833 Patent

### (Against All Defendants)

68.    Netlist incorporates by reference the preceding allegations of its Complaint.

69.    Netlist is the sole holder of the entire right, title and interest in the '833 patent.

70.    Defendants have infringed and continue to infringe, directly and indirectly by contributing to and inducing the infringement of others, at least claim 15 of the '833 patent by making, using, importing, selling, and/or offering to sell memory modules that are covered by the claims of the '833 patent, including but not limited to ULLtraDIMM memory modules.

71.    On information and belief, Defendants have been on notice of and aware of the '833 patent since at least August 22, 2013.

72.    On information and belief, Defendants have actively induced, and continue to actively induce, the infringement of one or more claims of the '833 patent by, among other things, instructing their customers to operate the accused products in a manner that infringes the claims of the '833 patent. On information and belief, Defendants intend that their customers will use the accused memory modules in a manner that infringes the '833 patent. On information and belief, use of the accused memory modules in their intended manner results in infringement of the '833 patent.

73.    On information and belief, Defendants have contributorily infringed and continue to contributorily infringe the '833 patent by offering to sell and/or selling within the United States and/or importing into the United States one or more components of a machine, manufacture, or combination covered by the '833 patent that constitute a material part of the invention, which is not a staple article or commodity of commerce suitable for substantial noninfringing use. On information

1   and belief, Defendants know that the component and/or apparatus is especially

2   made or especially adapted for use in infringing the '833 patent.

3       74.    On information and belief, Defendants have been on notice of and

4   aware of the '833 Patent since at least August 22, 2013 and have nevertheless

5   continued to infringe, despite an objectively high likelihood that their actions

6   constitute infringement of the '833 patent.  Accordingly, Defendants' infringement

7   has been and continues to be willful.

8       75.    The filing of this complaint also constitutes notice to Defendants of the

9   '833 patent under 35 U.S.C. § 287.  Furthermore, on information and belief,

10  Defendants have knowledge of Netlist's patent portfolio, because Defendants Smart

11  Modular and Smart Worldwide have sought Patent Office reexamination of

12  multiple Netlist patents since at least October 2010.

13      76.    As a result of Defendants' infringement of the '833 patent, Netlist is

14  suffering irreparable harm for which it has no adequate remedy at law.  Unless

15  enjoined by this Court, this infringement will continue and will result in further

16  irreparable harm to Netlist.

17      77.    Netlist is entitled to recover damages from Defendants not less than a

18  reasonable royalty adequate to compensate for the infringement.

19                      **COUNT THREE**

20                **Infringement of the '501 Patent**

21                **(Against All Defendants)**

22      78.    Netlist incorporates by reference the preceding allegations of its

23  Complaint.

24      79.    Netlist is the sole holder of the entire right, title and interest in the '501

25  patent.

26      80.    Defendants have infringed and continue to infringe, directly and

27  indirectly by contributing to and inducing the infringement of others, at least claim

28  1 of the '501 patent by making, using, importing, selling, and/or offering to sell

WEST\241824038.2                    -26-              FIRST AMENDED COMPLAINT
                                                        8:13-CV-00996-DOC-JPR

1   memory modules that are covered by the claims of the '501 patent, including but

2   not limited to ULLtraDIMM memory modules.

3       81.   On information and belief, Defendants have been on notice of and

4   aware of the '501 patent since at least August 22, 2013.

5       82.   On information and belief, Defendants have actively induced, and

6   continue to actively induce, the infringement of one or more claims of the '501

7   patent by, among other things, instructing their customers to operate the accused

8   products in a manner that infringes the claims of the '501 patent.  On information

9   and belief, Defendants intend that their customers will use the accused memory

10   modules in a manner that infringes the '501 patent.  On information and belief, use

11   of the accused memory modules in their intended manner results in infringement of

12   the '501 patent.

13       83.   On information and belief, Defendants have contributorily infringed

14   and continue to contributorily infringe the '501 patent by offering to sell and/or

15   selling within the United States and/or importing into the United States one or more

16   components of a machine, manufacture, or combination covered by the '501 patent

17   that constitute a material part of the invention, which is not a staple article or

18   commodity of commerce suitable for substantial noninfringing use.  On information

19   and belief, Defendants know that the component and/or apparatus is especially

20   made or especially adapted for use in infringing the '501 patent.

21       84.   On information and belief, Defendants have been on notice of and

22   aware of the '501 patent since at least August 22, 2013 and have nevertheless

23   continued to infringe, despite an objectively high likelihood that their actions

24   constitute infringement of the '501 patent.  Accordingly, Defendants' infringement

25   has been and continues to be willful.

26       85.   The filing of this complaint also constitutes notice to Defendants of the

27   '501 patent under 35 U.S.C. § 287.  Furthermore, on information and belief,

28   Defendants have knowledge of Netlist's patent portfolio, because Defendants Smart

1    Modular and Smart Worldwide have sought Patent Office reexamination of

2    multiple Netlist patents since at least October 2010.

3        86.    As a result of Defendants' infringement of the '501 patent, Netlist is

4    suffering irreparable harm for which it has no adequate remedy at law.  Unless

5    enjoined by this Court, this infringement will continue and will result in further

6    irreparable harm to Netlist.

7        87.    Netlist is entitled to recover damages from Defendants not less than a

8    reasonable royalty adequate to compensate for the infringement.

9                          **COUNT FOUR**

10                   **Infringement of the '185 Patent**

11                     **(Against All Defendants)**

12        88.    Netlist incorporates by reference the preceding allegations of its

13   Complaint.

14        89.    Netlist is the sole holder of the entire right, title and interest in the '185

15   patent.

16        90.    Defendants have infringed and continue to infringe, directly and

17   indirectly by contributing to and inducing the infringement of others, at least claim

18   1 of the '185 patent by making, using, importing, selling, and/or offering to sell

19   memory modules that are covered by the claims of the '185 patent, including but

20   not limited to ULLtraDIMM memory modules.

21        91.    On information and belief, Defendants have been on notice of and

22   aware of the '185 Patent since at least August 22, 2013.

23        92.    On information and belief, Defendants have actively induced, and

24   continue to actively induce, the infringement of one or more claims of the '185

25   patent by, among other things, instructing their customers to operate the accused

26   products in a manner that infringes the claims of the '185 patent.  On information

27   and belief, Defendants intend that their customers will use the accused memory

28   modules in a manner that infringes the '185 patent.  On information and belief, use

1  of the accused memory modules in their intended manner results in infringement of

2  the '185 patent.

3        93.    On information and belief, Defendants have contributorily infringed

4  and continue to contributorily infringe the '185 patent by offering to sell and/or

5  selling within the United States and/or importing into the United States one or more

6  components of a machine, manufacture, or combination covered by the '185 patent

7  that constitute a material part of the invention, which is not a staple article or

8  commodity of commerce suitable for substantial noninfringing use.  On information

9  and belief, Defendants know that the component and/or apparatus is especially

10  made or especially adapted for use in infringing the '185 patent.

11        94.    On information and belief, Defendants have been on notice of and

12  aware of the '185 patent since at least August 22, 2013 and have nevertheless

13  continued to infringe, despite an objectively high likelihood that their actions

14  constitute infringement of the '185 patent.  Accordingly, Defendants' infringement

15  has been and continues to be willful.

16        95.    The filing of this complaint also constitutes notice to Defendants of the

17  '185 patent under 35 U.S.C. § 287.  Furthermore, on information and belief,

18  Defendants have knowledge of Netlist's patent portfolio, because Defendants Smart

19  Modular and Smart Worldwide have sought Patent Office reexamination of

20  multiple Netlist patents since at least October 2010.

21        96.    As a result of Defendants' infringement of the '185 patent, Netlist is

22  suffering irreparable harm for which it has no adequate remedy at law.  Unless

23  enjoined by this Court, this infringement will continue and will result in further

24  irreparable harm to Netlist.

25        97.    Netlist is entitled to recover damages from Defendants not less than a

26  reasonable royalty adequate to compensate for the infringement.

27  /////

28  /////

WEST\241824038.2               -29-            FIRST AMENDED COMPLAINT
                                                       8:13-CV-00996-DOC-JPR

## COUNT FIVE

### Infringement of the '187 Patent

### (Against All Defendants)

98.    Netlist incorporates by reference the preceding allegations of its Complaint.

99.    Netlist is the sole holder of the entire right, title and interest in the '187 patent.

100.    Defendants have infringed and continue to infringe, directly and indirectly by contributing to and inducing the infringement of others, at least Claim 26 of the '187 patent by making, using, importing, selling, and/or offering to sell memory modules that are covered by the claims of the '187 patent, including but not limited to ULLtraDIMM memory modules.

101.    On information and belief, Defendants have been on notice of and aware of the '187 patent since at least August 22, 2013.

102.    On information and belief, Defendants have actively induced, and continue to actively induce, the infringement of one or more claims of the '187 patent by, among other things, instructing their customers to operate the accused products in a manner that infringes the claims of the '187 patent.  On information and belief, Defendants intend that their customers will use the accused memory modules in a manner that infringes the '187 patent.  On information and belief, use of the accused memory modules in their intended manner results in infringement of the '187 patent.

103.    On information and belief, Defendants have contributorily infringed and continue to contributorily infringe the '187 patent by offering to sell and/or selling within the United States and/or importing into the United States one or more components of a machine, manufacture, or combination covered by the '187 patent that constitute a material part of the invention, which is not a staple article or commodity of commerce suitable for substantial noninfringing use.  On information

and belief, Defendants know that the component and/or apparatus is especially made or especially adapted for use in infringing the '187 patent.

104.   On information and belief, Defendants have been on notice of and aware of the '187 patent since at least August 22, 2013 and have nevertheless continued to infringe, despite an objectively high likelihood that their actions constitute infringement of the '187 patent.  Accordingly, Defendants' infringement has been and continues to be willful.

105.   The filing of this complaint also constitutes notice to Defendants of the '187 patent under 35 U.S.C. § 287.  Furthermore, on information and belief, Defendants have knowledge of Netlist's patent portfolio, because Defendants Smart Modular and Smart Worldwide have sought Patent Office reexamination of multiple Netlist patents since at least October 2010.

106.   As a result of Defendants' infringement of the '187 patent, Netlist is suffering irreparable harm for which it has no adequate remedy at law.  Unless enjoined by this Court, this infringement will continue and will result in further irreparable harm to Netlist.

107.   Netlist is entitled to recover damages from Defendants not less than a reasonable royalty adequate to compensate for the infringement.

## COUNT SIX

### Attempted Monopolization Under 15 U.S.C. § 2

### (Against Defendants Smart Modular and Smart Worldwide)

108.   As alleged above, Smart Modular and Smart Worldwide have willfully pursued a plan to exclude competition and obtain monopoly power in a relevant market with power to exercise control over prices.

109.   The relevant market is a technology market consisting of rank multiplication (the "Relevant Technology").  Rank multiplication is embodied in the JEDEC LRDIMM Standard.  Smart Modular and Smart Worldwide allege that the '295 patent covers the Relevant Technology.

110. The relevant geographic market for the Relevant Technology is worldwide. The United States constitutes a relevant geographic submarket in which it is proper to assess the anticompetitive effects of Smart Modular and Smart Worldwide's improper assertion of the '295 patent.

111. Consumers in the market of the Relevant Technology include manufacturers of products that incorporate the Relevant Technology and end users of those products, who necessarily deploy the Relevant Technology when they operate those products.

112. Because of the growing adoption of the LRDIMM Standard, there are no readily-available or reasonably-interchangeable substitutes for the Relevant Technology. Netlist and other manufacturers have further made substantial investments in products incorporating the Relevant Technology (the "Relevant Products"), and consumers have come to rely on the Relevant Technology.

113. At the direction of Smart Worldwide, Smart Modular is interpreting the claims of the '295 patent in a manner that would potentially preclude other companies from competing in the production and sale of the Relevant Products. Smart Modular and Smart Worldwide have sought to give credibility to the '295 patent by touting the '295 patent as essential to compliance with the LRDIMM Standard.

114. The detrimental impact of Smart Modular and Smart Worldwide's unlawful conduct and the specific injury to Netlist is evident. As a result of Smart Modular and Smart Worldwide's unlawful conduct, there have been or will be adverse competitive effects in the relevant market. Smart Modular and Smart Worldwide have sought to capitalize on the disruptive effects of, and resulting uncertainty generated by, Smart Modular's claim of patent infringement against Netlist. The inevitable impact of Smart Modular's inequitable conduct at the Patent Office, its misuse of an invalid and unenforceable patent, and its decision to file a motion for preliminary injunction against Netlist's Relevant Products, and its

1   misleading media campaign against Netlist have been to impose on consumers of

2   the Relevant Technology the burden or threat of an elevated price for the Relevant

3   Technology as a direct result of bad-faith patent enforcement.

4         115.   By engaging in this unlawful conduct, Smart Modular and Smart

5   Worldwide have further threatened to deny consumers the competitive benefits of

6   future standard-setting efforts.  Willingness to participate in future standard-setting

7   activities, including efforts to extend LRDIMM, has been or will be chilled.

8         116.   Smart Modular and Smart Worldwide have pursued a scheme with

9   specific intent to monopolize the Relevant Technology and have engaged in

10  unreasonable, anticompetitive and exclusionary conduct through activities that have

11  included, as alleged above: (i) securing the '295 patent through inequitable conduct

12  at the Patent Office and seeking to enforce the '295 patent; (ii) seeking to enforce

13  the patent against JEDEC-compliant products knowing that the patent is invalid and

14  unenforceable; (iii) asserting patent claims to give themselves control over the

15  Relevant Technology by threatening, instituting and perpetuating objectively

16  baseless litigation in bad faith; and (iv) filing a motion for preliminary injunction

17  attempting to halt the sale of Netlist's HyperCloud® products, which Smart

18  Modular and Smart Worldwide allege to be the primary competition with Smart

19  Modular's own LRDIMM products.

20        117.   Based on the facts alleged above, there was and is a dangerous

21  probability that Smart Modular and Smart Worldwide will succeed in obtaining

22  monopoly power in the Relevant Technology unless restrained from engaging in

23  further unlawful conduct.

24        118.   Smart Modular and Smart Worldwide's unlawful conduct has caused

25  injury to competition and to Netlist as creators and consumers of the Relevant

26  Technology and, unless enjoined and restrained, will cause further injury to

27  competition and to Netlist.

28  /////

WEST\241824038.2                        -33-                    FIRST AMENDED COMPLAINT
                                                                8:13-CV-00996-DOC-JPR

119.   Netlist has been injured in its business and has been threatened with further injury, including the payment of attorneys' fees and other defense costs associated with Smart Modular's patent infringement claims, as a direct and proximate result of Smart Modular and Smart Worldwide's conduct.

### COUNT SEVEN

### *Walker Process* Violation Under 15 U.S.C. § 2

### Bad Faith Enforcement of Fraudulently-Obtained Patent

### (Against Defendants Smart Modular and Smart Worldwide)

120.   Netlist incorporates by reference the preceding allegations of its Complaint.

121.   This claim seeks damages and injunctive relief against Smart Modular and Smart Worldwide for a *Walker Process* violation by reason of Smart Modular and Smart Worldwide's fraud on the Patent Office and their resulting bad faith enforcement of a fraudulently-obtained patent in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

122.   This intentional failure to disclose known and material prior art to the Patent Office constitutes fraud on the Patent Office that is actionable under Section 2 of the Sherman Antitrust Act.

123.   By reason of its fraud on the Patent Office, Smart Modular and Smart Worldwide have a dangerous probability of achieving monopoly power in the international and United States markets for rank multiplication technology.

124.   Smart Modular and Smart Worldwide's deceitful conduct has had a substantial effect on interstate (and foreign) commerce and it will continue to have such an effect as long as Smart Modular and Smart Worldwide continue to assert that the '295 patent is valid, enforceable and necessary to practice the LRDIMM Standard.

125.   As a direct and proximate result of Smart Modular and Smart Worldwide's unlawful attempted monopolization, Netlist has been injured in its

1  business and property in an amount that has yet to be determined, but will be
2  established at trial.

3         126.   Unless Smart Modular and Smart Worldwide are enjoined by this
4  Court, Smart Modular and Smart Worldwide's unlawful conduct will continue and
5  Netlist will continue to sustain injury and damages.

6                                    **COUNT EIGHT**
7                   **Lanham Act Violation—15 U.S.C. § 1114(a)**
8                         **(Against Defendant Diablo)**

9         127.   Netlist incorporates by reference the preceding allegations of its
10  Complaint.

11        128.   Netlist owns all right, title and interest in and to the HyperCloud®
12  registered trademark, as alleged above.

13        129.   Diablo is improperly and willfully infringing the HyperCloud®
14  registered trademark in interstate commerce through the advertising, promotion and
15  sale of goods under the Infringing Mark.

16        130.   Diablo's use in interstate commerce of the Infringing Mark that are
17  confusingly similar to the HyperCloud® registered trademark is likely to cause
18  confusion or deception of consumers as to the source, origin, or sponsorship of
19  Diablo's goods in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.
20  Customers are likely to purchase Diablo's goods believing them to be those of
21  Netlist or otherwise affiliated or sponsored by Netlist.

22        131.   Diablo's conduct constitutes trademark infringement in violation of
23  Section 32 of the Lanham Act, 15 U.S.C. § 1114.

24        132.   As a direct and proximate result of Diablo's conduct, Netlist has been,
25  and is likely to be, substantially injured.

26        133.   Netlist has no adequate remedy at law, and unless enjoined by this
27  Court, Diablo will continue to engage in such acts of trademark infringement, to the
28  irreparable damage and injury of Netlist.

134.   On information and belief, Diablo has engaged in the above-referenced acts of trademark infringement with full knowledge of Netlist's exclusive rights in the HyperCloud® registered trademark, and Diablo continues in such acts of intentional infringement, thus making this case exceptional and entitling Netlist to an award of treble its actual damages, plus attorneys' fees and costs in bringing and maintaining this action, pursuant to Section 35(b) of the Lanham Act, 15 U.S.C. § 1117(b).

## COUNT NINE
### Lanham Act Violation—15 U.S.C.  1125(a)
### (Against Defendant Diablo)

135.   Netlist incorporates by reference the preceding allegations of its Complaint.

136.   Netlist owns all right, title and interest in and to the HyperCloud® registered trademark, as alleged above.

137.   Diablo's infringement, as alleged above, constitutes the use of false designations of origin or false or misleading descriptions and representations of fact, which are likely to cause confusion or mistake, or to deceive consumers, as to the affiliation, connection or association of Diablo and the Infringing Mark and with Netlist, or as to the origin, sponsorship, or approval by Netlist of the goods and commercial activities offered and sold by Diablo, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

138.   Diablo's infringement, as alleged above, has been made in commercial advertising or promotion and misrepresents the nature and characteristics of Diablo's goods, in violation of 15 U.S.C. § 1125(a).

139.   On information and belief, Diablo has undertaken its infringing activities with the willful intent of deceiving and misleading the public into falsely believing that the goods offered in conjunction with the Infringing Mark are

1   associated with Netlist and therefore are deserving of the public's trust and

2   business.

3       140.   As a result of Diablo's wrongful and willful acts, as set forth herein,

4   Netlist has suffered and will continue to suffer irreparable injury which is not

5   capable of monetary determination.

6       141.   Netlist has no adequate remedy at law.

7       142.   Diablo has engaged in acts of unfair competition, false representation

8   and designation with knowledge of the exclusive rights of Netlist to its registered

9   trademark, and Diablo continues in such acts of unfair competition, intentional false

10  representation and designation, thus entitling Netlist to an award of its actual

11  damages, Diablo's profits, plus attorneys' fees and costs in bringing and

12  maintaining this action, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. §

13  1117(a).

14                              **COUNT TEN**

15  **Correction of Inventorship (35 U.S.C. § 256) and Ownership (35 U.S.C. § 262)**

16                          **(Against Defendant Diablo)**

17      143.   Netlist incorporates by reference the preceding allegations of its

18  Complaint.

19      144.   On information and belief, Diablo improperly used Netlist's

20  proprietary and trade secret technology to file a patent application, which issued as

21  the '917 patent, as alleged above.

22      145.   The Netlist Inventors communicated the conception of the '917 patent

23  to the named inventors of the '917 patent. This communication occurred before the

24  date that Diablo claims to have conceived of the alleged inventions disclosed in the

25  '917 patent. The named inventors of the '917 patent derived the subject matter

26  claimed in the '917 patent from the Netlist Inventors.

27  /////

28  /////

146.   The Netlist Inventors were not named as inventors of the '917 patent. Each of the Netlist Inventors was unaware of Diablo's patent-related activities and had no deceptive intent in not being named as inventors.

147.   Pursuant to 35 U.S.C. § 256, Netlist requests that the Court order the Patent Office to correct the inventorship of the '917 patent to identify Dr. Hyun Lee as a co-inventor of that patent.  Netlist also seeks a declaration that Netlist is a joint owner of the '917 patent under 35 U.S.C. § 262.

## COUNT ELEVEN

### Misappropriation of Trade Secrets—Civil Code § 3426 et seq.

### (Against Defendant Diablo)

148.   Netlist incorporates by reference the preceding allegations of its Complaint.

149.   At all relevant times, Netlist was in possession of valuable trade secrets as alleged above, including but not limited to information concerning Netlist's proprietary memory technology.

150.   Netlist's trade secrets, as alleged above, have tremendous economic value to Netlist.

151.   As alleged above, Netlist has made reasonable efforts to ensure that its trade secrets remain secret.

152.   On information and belief, Diablo has misappropriated and continues to misappropriate Netlist's trade secrets by engaging in the conduct alleged above. Diablo's misappropriation of Netlist's trade secrets has caused, and will continue to cause, substantial injury to Netlist consisting of, among other things, harm to its competitive business, loss of key technology useful in generating new products and loss of valuable business opportunities.

153.   As a proximate result of Diablo's misappropriation of Netlist's trade secrets, Netlist has suffered damages in an amount to be determined at trial.

/////

154.   On information and belief, Diablo's acts were willful and malicious, and Diablo misappropriated Netlist's trade secrets with a deliberate intent to injure Netlist's business and improve its own, thereby depriving Netlist of property and legal rights and otherwise causing Netlist injury.  Accordingly, Netlist is entitled to an award of exemplary damages and attorneys' fees under Civil Code sections 3426.3 and 3426.4.

155.   Diablo's wrongful conduct in disclosing and using Netlist's trade secrets, unless and until enjoined by order of this Court, will continue in the future and will result in irreparable injury to Netlist.  Among other things, Netlist is severely threatened with the loss of valuable and profitable business opportunities if Diablo's actions are not enjoined.

156.   Netlist has no adequate remedy at law for the injuries it is currently suffering and will continue to suffer in the future.  Furthermore, unless Diablo is enjoined by order of this Court, Diablo will continue to make use of the trade secrets misappropriated from Netlist.

## COUNT TWELVE
### Breach of Contract
### (Against Defendant Diablo)

157.   Netlist incorporates by reference the preceding allegations of its Complaint.

158.   Diablo's wrongful conduct, as alleged above, constitutes a material breach of the NDA and Supply Agreement between Netlist and Diablo.

159.   Diablo's breach of contract has caused and is causing damage to Netlist, in an amount to be proven at trial.

160.   Netlist is entitled to specific performance of certain provisions of the NDA and Supply Agreement, including but not limited to provisions requiring the return of Netlist's confidential information and the transfer of all right, title and interest in the '917 patent to Netlist.

## COUNT THIRTEEN

### Unfair Competition—California Bus. & Prof. Code § 17200

### (Against All Defendants)

161.   Netlist incorporates by reference the preceding allegations of its Complaint.

162.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any '"unlawful, unfair or fraudulent business act or practice."

163.   As alleged above, Defendants have engaged in unfair competition or unlawful, unfair, or fraudulent business practices in violation of the Unfair Competition law when they engaged in any one or more of the following:

a.   Smart Modular and Smart Worldwide disparaged Netlist's business and products by falsely and misleadingly alleging that Netlist's products infringe the '295 patent and by seeking to enjoin Netlist from making and selling products to consumers using a wrongfully obtained patent;

b.   Smart Modular and Smart Worldwide falsely asserted, in litigation and in public press releases, that Netlist infringed the '295 patent, which Smart Modular and Smart Worldwide knew was invalid and unenforceable;

c.   Defendants engaged in collusion with other industry participants with the specific intent of harming Netlist's business; and

d.   Diablo engaged in acts of trade secret misappropriation and trademark infringement with the specific intent of harming Netlist's business.

164.   Defendants' deceptive, fraudulent, negligent, and/or unlawful business practices are ongoing and are specifically designed to injure Netlist.

165.   Defendants have acted in bad faith while engaging in these deceptive trade practices.

166.   Netlist has been harmed by Defendants' unfair competition and deceptive trade practices.  This harm will continue or can reasonably be expected to

WEST\241824038.2

-40-

FIRST AMENDED COMPLAINT
8:13-CV-00996-DOC-JPR

1  continue as long as Defendants' acts of unfair competition are permitted to

2  continue.

3  <center>**COUNT FOURTEEN**</center>

4  <center>**Common Law Fraud**</center>

5  <center>**(Against Defendants Smart Modular and Smart Worldwide)**</center>

6  167.  Netlist incorporates by reference the preceding allegations of its

7  Complaint.

8  168.  Netlist has been a member of JEDEC since 2000 and a member of

9  several JEDEC committees, including JC-40 and JC-45.

10  169.  At all times relevant to this claim, Smart Modular, at the direction of

11  Smart Worldwide, was a member of JEDEC and a member of several JEDEC

12  committees, including JC-40 and JC-45.

13  170.  Despite its membership in several JEDEC committees and its active

14  participation in JEDEC voting activities, Smart Modular and Smart Worldwide did

15  not disclose the '295 application to the relevant JEDEC committees during the

16  eight-plus years the '295 application was pending in the Patent Office.  The '295

17  application was filed in the Patent Office on January 5, 2004.  At no time between

18  January 5, 2004 and August 27, 2012 did Smart Modular or Smart Worldwide

19  disclose the '295 application to JEDEC, as they were required to do under the

20  JEDEC Patent Policy.  As a result, specifications of several relevant JEDEC

21  standards were drafted, finalized and published, and the JEDEC committees had no

22  opportunity to consider reasonable workarounds or technical alternatives to the

23  technology purportedly disclosed in the '295 application.

24  171.  Despite Smart Modular and Smart Worldwide's failure to timely

25  disclose the '295 application and despite its failure to offer a license to Netlist on

26  reasonable and nondiscriminatory terms, Smart Modular is asserting the '295

27  against Netlist, a JEDEC member and maker of JEDEC-compliant products.

28  /////

172.   Despite their duty to disclose relevant patents and its knowledge of the proposed LRDIMM Standard, Smart Modular and Smart Worldwide intentionally failed to disclose the application for the '295 patent.  Smart Modular and Smart Worldwide failed to disclose the '295 application because they intended to induce the adoption of the LRDIMM Standard and its inclusion in various products.

173.   As a result of Smart Modular and Smart Worldwide's fraudulent failure to disclose the '295 application and subsequent attempts to assert the patent, Netlist has incurred damages and will continue to be damaged in the future.

## PRAYER FOR RELIEF

WHEREFORE, Netlist prays for the following relief:

i)      Judgment that the Netlist Asserted Patents are each valid, enforceable and infringed by Defendants;

ii)     A preliminary and permanent injunction enjoining Defendants, their officers, agents, servants, employees, subsidiaries and affiliated companies, and those persons acting in active concert or participation therewith, from engaging in the aforesaid unlawful acts of patent infringement;

iii)    An award of damages arising out of each of Defendants' acts of patent infringement, together with pre-judgment and post-judgment interest;

iv)     Judgment that damages be trebled in accordance with 35 U.S.C. § 284;

v)      An order declaring this case exceptional and awarding Netlist its attorneys' fees and costs incurred in this action, pursuant to 35 U.S.C. § 285;

vi)     An award of damages adequate to compensate Netlist for the harm it has sustained as a result of Smart Modular and Smart Worldwide's unlawful and anticompetitive conduct;

vii)    An award of treble damages under Clayton Act § 4 against Smart Modular and Smart Worldwide for their Sherman Act violations;

viii)   An award of attorneys' fees against Smart Modular and Smart Worldwide under Clayton Act §§ 4 and 16;

1          ix)      Judgment that Diablo has willfully violated Section 32 of the Federal

2    Trademark Act, 15 U.S.C. § 1114, by infringing the federally registered

3    HyperCloud® trademark;

4          x)       Judgment that Diablo has violated Section 43(a) of the Federal

5    Trademark Act, 15 U.S.C. § 1125(a)(1)(A), by engaging in federal unfair

6    competition;

7          xi)      An order directing the Patent Office to correct the inventorship of the

8    '917 patent to identify the Netlist Inventors as inventors of the '917 patent, and

9    judgment declaring that Netlist is a joint owner of the '917 patent;

10         xii)     An award of damages to compensate Netlist for Defendant Diablo's

11   acts of trade secret misappropriation;

12         xiii)    A preliminary and permanent injunction enjoining Diablo, its officers,

13   agents, servants, employees, subsidiaries and affiliated companies, and those

14   persons acting in active concert or participation therewith, from engaging in the

15   aforesaid unlawful acts of trade secret misappropriation;

16         xiv)     An award of damages to compensate Netlist for Defendant Diablo's

17   breach of contract;

18         xv)      Specific performance of certain provisions of the NDA and Supply

19   Agreement, including but not limited to provisions requiring the return of Netlist's

20   confidential information and the transfer of all right, title and interest in the '917

21   patent to Netlist;

22         xvi)     An order awarding Netlist damages and Diablo's profits pursuant to 15

23   U.S.C. § 1117(a), trebled pursuant to 15 U.S.C. § 1117(b), and statutory damages

24   pursuant to 15 U.S.C. § 1117(d);

25         xvii)    An order under California Business and Professions Code section

26   17203 that Defendants and their successors, agents, representatives, employees and

27   all persons who act in concert with Defendants, be permanently enjoined from

28   committing any acts of unfair competition;

1   xviii) Such other and further equitable or legal relief as the Court or a jury

2   deems proper.

3   **DEMAND FOR JURY TRIAL**

4   In accordance with Fed. R. Civ. P. 38(b), Netlist demands a trial by jury on

5   all issues so triable.

6

7   Dated:  August 23, 2013            **DLA PIPER LLP (US)**

8

9                                   By: _Sean C. Cunningham_

10                                      SEAN C. CUNNINGHAM
                                        STANLEY J. PANIKOWSKI
11                                      ERIN P. GIBSON
                                        RAJIV DHARNIDHARKA
12                                      RYAN W. COBB

13                                      **McANDREWS, HELD & MALLOY**

14                                      THOMAS J. WIMBISCUS
                                        GREGORY C. SCHODDE
15                                      WAYNE H. BRADLEY

16

17                                      Attorneys for Plaintiff NETLIST, INC.

18

19

20

21

22

23

24

25

26

27

28



US008001434B1

(12) **United States Patent**
Lee et al.

(10) **Patent No.:** **US 8,001,434 B1**
(45) **Date of Patent:** **Aug. 16, 2011**

(54) **MEMORY BOARD WITH SELF-TESTING CAPABILITY**

(75) Inventors: **Hyun Lee**, Ladera Ranch, CA (US); **Jayesh R. Bhakta**, Cerritos, CA (US); **Soonju Choi**, Irvine, CA (US)

(73) Assignee: **NETLIST, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 131 days.

(21) Appl. No.: **12/422,925**

(22) Filed: **Apr. 13, 2009**

**Related U.S. Application Data**

(60) Provisional application No. 61/044,801, filed on Apr. 14, 2008, provisional application No. 61/044,825, filed on Apr. 14, 2008, provisional application No. 61/044,839, filed on Apr. 14, 2008.

(51) Int. Cl.
*G01R 31/28* (2006.01)
*G11C 29/00* (2006.01)

(52) U.S. Cl. ..................................... **714/733**; 714/719

(58) Field of Classification Search ................. 714/718, 714/719, 736, 819, 733, 734, 30; 365/200, 365/201, 230.03, 189.011
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,660,675 A | 5/1972 | Andrews, Jr. |
| 3,757,235 A | 9/1973 | McCormick et al. |
| 4,305,091 A | 12/1981 | Cooper |
| 4,586,168 A | 4/1986 | Adlhoch et al. |
| 4,701,845 A | 10/1987 | Andreasen et al. |
| 4,752,741 A | 6/1988 | Kim et al. |
| 4,782,487 A | 11/1988 | Smelser |
| 4,837,743 A | 6/1989 | Chiu et al. |
| 4,885,799 A | 12/1989 | Van Horn |
| 4,903,266 A | 2/1990 | Hack |
| 4,910,597 A | 3/1990 | Harada et al. |
| 4,942,556 A | 7/1990 | Sasaki et al. |
| 4,987,321 A | 1/1991 | Toohey |
| 5,033,048 A * | 7/1991 | Pierce et al. .................. 714/719 |
| 5,051,997 A * | 9/1991 | Sakashita et al. ............. 714/732 |
| 5,138,619 A | 8/1992 | Fasang et al. |
| 5,173,906 A | 12/1992 | Dreibelbis et al. |
| 5,222,066 A | 6/1993 | Grula et al. |
| 5,241,503 A | 8/1993 | Cheng |

(Continued)

OTHER PUBLICATIONS

Der-Chang et al. *"A parallel built-in self-diagnostic method for embedded memoryarrays"*, IEEE Transactions on Computer-Aided Design of Integrated Circuits and Systems, Apr. 2002, vol. 21, Issue 4, pp. 449-465.

(Continued)

*Primary Examiner* — Phung M Chung
(74) *Attorney, Agent, or Firm* — Knobbe Martens Olson & Bear LLP

(57) **ABSTRACT**

A self-testing memory module includes a printed circuit board configured to be operatively coupled to a memory controller of a computer system and includes a plurality of memory devices on the printed circuit board, each memory device of the plurality of memory devices comprising data, address, and control ports. The memory module also includes a control module configured to generate address and control signals for testing the memory devices. The memory module includes a data module comprising a plurality of data handlers. Each data handler is operable independently from each of the other data handlers of the plurality of data handlers. Each data handler is operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices and is configured to generate data for writing to the corresponding plurality of data ports.

**35 Claims, 5 Drawing Sheets**



Exh A

US 8,001,434 B1

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,304,856 | A | 4/1994 | Rainal |
| 5,337,254 | A | 8/1994 | Knee et al. |
| 5,359,235 | A | 10/1994 | Coyle et al. |
| 5,394,037 | A | 2/1995 | Josephson et al. |
| 5,430,335 | A | 7/1995 | Tanoi |
| 5,525,917 | A | 6/1996 | Wong et al. |
| 5,841,296 | A | 11/1998 | Churcher et al. |
| 5,914,543 | A | 6/1999 | Scherpenberg et al. |
| 6,000,048 | A | 12/1999 | Krishna et al. |
| 6,044,481 | A | 3/2000 | Kornachuk et al. |
| 6,070,217 | A | 5/2000 | Connolly et al. |
| 6,169,696 | B1 | 1/2001 | Bissey |
| 6,194,959 | B1 | 2/2001 | Kamoshida et al. |
| 6,216,240 | B1 | 4/2001 | Won et al. |
| 6,467,056 | B1 | 10/2002 | Satou et al. |
| 6,560,740 | B1 | 5/2003 | Zuraski, Jr. et al. |
| 6,614,702 | B2 | 9/2003 | Lee |
| 6,721,150 | B1 | 4/2004 | Guerrero, Jr. |
| 6,812,869 | B1 | 11/2004 | Rahman et al. |
| 6,829,728 | B2 | 12/2004 | Cheng et al. |
| 6,918,072 | B2 | 7/2005 | Cowels et al. |
| 6,928,024 | B2 | 8/2005 | Pfeiffer et al. |
| 6,928,593 | B1 | 8/2005 | Halbert et al. |
| 6,930,509 | B2 | 8/2005 | Banik |
| 6,934,900 | B1 | 8/2005 | Cheng et al. |
| 7,036,064 | B1 | 4/2006 | Kebichi et al. |
| 7,053,470 | B1 | 5/2006 | Sellers et al. |
| 7,062,696 | B2 | 6/2006 | Barry et al. |
| 7,184,915 | B2 | 2/2007 | Hansquine et al. |
| 7,190,210 | B2 | 3/2007 | Azrai et al. |
| 7,203,873 | B1 | 4/2007 | Adams |
| 7,253,652 | B2 | 8/2007 | Azimi et al. |
| 7,284,166 | B2 | 10/2007 | Zappa et al. |
| 2001/0048342 | A1 | 12/2001 | Yoshida et al. |
| 2002/0000847 | A1 | 1/2002 | Taguchi |
| 2002/0131535 | A1 | 9/2002 | Huber |
| 2002/0140523 | A1 | 10/2002 | Park et al. |
| 2003/0098742 | A1 | 5/2003 | Nakagawa et al. |
| 2003/0126346 | A1 | 7/2003 | Kuo |
| 2003/0197797 | A1 | 10/2003 | Segura |
| 2003/0218491 | A1 | 11/2003 | Nagasue |
| 2004/0155702 | A1 | 8/2004 | Danielsson |
| 2004/0199843 | A1 | 10/2004 | Hansquine et al. |
| 2005/0093620 | A1 | 5/2005 | Ho et al. |
| 2005/0127989 | A1 | 6/2005 | Miyagi |
| 2005/0289423 | A1 | 12/2005 | Yabuta |
| 2006/0082383 | A1 | 4/2006 | Choi |
| 2006/0107156 | A1 | 5/2006 | Lee et al. |
| 2006/0140015 | A1 | 6/2006 | Kasamsetty |
| 2006/0144015 | A1 | 7/2006 | Cash et al. |
| 2006/0147217 | A1 | 7/2006 | Hahin et al. |
| 2006/0192653 | A1 | 8/2006 | Atkinson et al. |
| 2006/0242458 | A1 | 10/2006 | Feldman et al. |
| 2006/0262586 | A1 | 11/2006 | Solomon et al. |
| 2006/0271748 | A1 | 11/2006 | Jain et al. |
| 2007/0030814 | A1 | 2/2007 | Shin et al. |
| 2007/0058471 | A1 | 3/2007 | Rajan et al. |
| 2007/0079199 | A1 | 4/2007 | Chorn et al. |
| 2007/0109707 | A1 | 5/2007 | Honda |
| 2007/0152743 | A1 | 7/2007 | Keeth et al. |
| 2007/0204075 | A1 | 8/2007 | Rajan et al. |
| 2007/0223296 | A1 | 9/2007 | Miller et al. |

### OTHER PUBLICATIONS

Bayard "On the LTI properties of adaptive feed forward systems with tapdelay-line regressors", IEEE Transactions on Signal Processing, May 1999, vol. 47, Issue 5, pp. 1288-1296.

Mutoh et al. "EMI Noise controlling methods suitable for electric vehicle drive systems", Industrial Electronics Society, 2004, IECON 2004, Nov. 2-6, 2004, vol. 1, pp. 963-968.

Sekiguchi et al "Low-noise, high-speed datat transmission using a ringing-canceling output buffer", IEEE Journal of Solid-State Circuits, Dec. 1995, vol. 30, Issue 12, pp. 1569-1574.

* cited by examiner

**U.S. Patent**      Aug. 16, 2011      Sheet 1 of 5      US 8,001,434 B1



*FIG. 1*



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6

US 8,001,434 B1

1

# MEMORY BOARD WITH SELF-TESTING CAPABILITY

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application claims the benefit of priority from U.S. Provisional Application No. 61/044,801, filed Apr. 14, 2008, from U.S. Provisional Application No. 61/044,825, filed Apr. 14, 2008, and from U.S. Provisional Application No. 61/044,839, filed Apr. 14, 2008, each of which are incorporated in their entirety by reference herein. This application is related to U.S. patent application Ser. No. 12/422,912, filed on even date herewith and entitled "Self-Adjusting Damper", and to U.S. application Ser. No. 12/422,853, filed on even data herewith and entitled "Circuit Providing Load Isolation and Noise Reduction", both of which are incorporated in their entirety by reference herein.

## BACKGROUND

### 1. Field

The present invention relates to self-testing electronic modules and, more particularly, to self-testing electronic memory modules.

### 2. Description of the Related Art

The failure of memory components in an electronic system may result in the loss of valid data. Therefore, it is important to ensure proper memory operation in an electronic system. Memory integrated circuits ("memory chips") often go through a series of tests at various stages of system manufacture. Once memory chips are deployed in a system, they also generally go through a system level memory test each time the system is booted. In addition, memory chips may undergo a parity checking process during normal system operation.

There are typically at least three test phases which memories undergo during system manufacture. Each phase generally tests for memory defects and for the correct operation of the input/output interface. The first test phase is typically conducted by the memory chip manufacturer and generally involves checking for bit failures, correct memory access speed, etc. The second test phase is typically done by memory module manufacturers and generally involves testing the signal quality, the noise susceptibility, and the operational speed of the memory module as a single unit. The second test phase may also include checking for bit failures in individual memory chips. The third phase is usually carried out by the system manufacturer. During the third phase, the interaction of the memory subsystem with other components in the system is tested. During the third phase, the individual memory module operation is also tested again and the memory array is checked for defects. Because of the significant amount of testing that memories undergo during the manufacturing process, there is generally substantial test cost and test time associated with ensuring the proper memory operation. This test cost and test time translate into an increase in system cost and a decrease in system performance.

There are a number of memory test methodologies that employ either external test hardware, embedded self-test logic ("MBIST"), or both. However, the usefulness of these test methodologies is limited due to the high cost and other limitations associated with them. For instance, external test hardware such as automatic test equipment ("ATE") is very expensive. Moreover, the development time and cost associated with implementing MBIST is relatively high. These costs and limitations are especially significant when testing dynamic random access memory ("DRAM"). For example,

2

technological developments, such as increases in DRAM speed, may require manufacturers to upgrade ATE machines relatively frequently. In addition, MBIST in DRAM chips generally cannot be fully utilized for system level testing of memory boards.

Because of the increasing cost, complexity, and time involved with fully testing DRAM chips, DRAM manufacturers often provide "effectively tested" ("ETT") DRAM chips to memory module manufacturers at a lower price rather than providing fully tested DRAM chips. Memory module manufacturers often prefer the ETT DRAM chips mainly due to their greater availability. Memory module manufacturers who receive ETT DRAM chips then have to assume a part of the responsibility of validating the DRAM chips, adding to the complexity of the memory module test process.

## SUMMARY

In certain embodiments, a self-testing memory module is provided comprising a printed circuit board configured to be operatively coupled to a memory controller of a computer system. The memory module may further comprise a plurality of memory devices on the printed circuit board. Each memory device of the plurality of memory devices comprises data, address, and control ports. In certain embodiments, the memory module includes a control module configured to generate address and control signals for testing the memory devices and a data module comprising a plurality of data handlers. Each data handler in certain embodiments is operable independently from each of the other data handlers of the plurality of data handlers. Each data handler may be operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices and configured to generate data for writing to the corresponding plurality of data ports.

A self-testing memory module is provided in certain embodiments comprising a printed circuit board configured to be operatively coupled to a memory controller of a computer system. The memory module may further comprise a plurality of memory devices on the printed circuit board. Each memory device of the plurality of memory devices comprises data, address, and control ports in some embodiments. The memory module of certain embodiments includes a control module configured to generate address and control signals for testing the memory devices. In certain embodiments, the memory module comprises a data module comprising at least one data handler operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices and configured to generate cyclic data for writing to the corresponding plurality of data ports.

In certain embodiments, a method of self-testing a memory module includes providing a self-testing memory module. The memory module comprises a printed circuit board configured to be operatively coupled to a memory controller of a computer system. The memory module further comprises a plurality of memory devices on the printed circuit board. Each memory device of the plurality of memory devices comprising data, address, and control ports. In certain embodiments, the memory module comprises a control module configured to generate address and control signals for testing the memory devices. The memory module may further comprise a data module comprising a plurality of data handlers. Each data handler may be operable independently from each of the other data handlers of the plurality of data handlers and operatively coupled to a corresponding plurality of the data ports. The method of certain embodiments further

US 8,001,434 B1

3

includes generating, by each of the data handlers, data for writing to the corresponding plurality of data ports.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an example self-testing memory module in accordance with certain embodiments described herein.

FIG. 2 is a block diagram of an example self-testing memory module including eight memory devices and eight data handlers in accordance with certain embodiments described herein.

FIG. 3 is a block diagram of an example data handler module and an example control module in accordance with certain embodiments described herein.

FIG. 4 is a flowchart of an example method of self-testing a memory module in accordance with certain embodiments described herein.

FIG. 5 is a flow diagram illustrating the self-testing operation of an example memory module in accordance with certain embodiments described herein.

FIG. 6 is a flow diagram illustrating the self-testing operation of an example memory module in accordance with certain embodiments described herein.

## DETAILED DESCRIPTION

Certain embodiments described herein present a self-testing electronic system, such as for example, a self-testing electronic memory module. Some embodiments described herein present a self-testing memory module that is populated with ETT DRAM chips. Certain embodiments described herein present a self-testing registered dual in-line memory module ("RDIMM"). Some embodiments described herein present a self-testing RDIMM that does not require any additional pins other than the pins on the standard JEDEC RDIMM connector. For example, the memory module may utilize the address and control signals (e.g., address and control signals generated by the memory module to test the memory module) along with a test signal to enable and execute that self-testing function.

Certain embodiments described herein present a self-testing memory module that includes a control module and a data module which can generate memory addresses and data according to the JEDEC standard memory protocol.

Some embodiments described herein presents a self-testing memory module that can be configured through an I²C interface and that allows test results to be read out through the I²C interface. Certain embodiments described herein present a self-testing memory module that allows a test function to be configured, controlled, and/or executed without substantial system memory controller involvement. Some embodiments present a self-testing memory module that can be tested without any external test equipment. For example, certain embodiments present a self-testing memory module that can be tested without any system driven test procedure. Various embodiments described herein present a self-testing memory module that can be self-tested at a target system speed. Certain embodiments described herein present a self-testing memory module that can generate data (DQ) and data-strobe (DQS) signals with wave characteristics that resemble the wave characteristics of DQ and DQS signals from a system memory controller.

MBIST is commonly used to test memories embedded in application specific integrated circuits ("ASICs") or system on chip integrated circuits ("SoCs") such as, for example, advanced memory buffers ("AMBs"). The MBIST imple-

4

mentation usually includes three distinct functional blocks: the address/control generator, the data generator/checker (sometimes referred to as a signature analyzer), and the test interface controller/register ("JTAG"). The test instructions and test patterns are generally loaded to the address/control generator and the data generator/checker through the JTAG interface. The test results are generally read out through the JTAG interface.

In memory module applications, there are obstacles associated with using MBIST. One of these obstacles is the large number of signals used to interface the three MBIST functional blocks. The inter-block timing constraints can present another obstacle. In addition, the ability to control the test is limited. For example, synchronizing the address/or control signals with the data signal can be difficult. The relatively large amount of information to be gathered and stored while testing the memory presents yet another obstacle.

Unlike on an ASIC, in which the three MBIST functional blocks are in a single chip, the MBIST functional blocks on a memory module generally would be segregated into multiple chips on the memory module due to physical and electrical limitations and requirements. This makes implementing MBIST on a memory module difficult because, while there is virtually no limit on the number of available interface signals among the three MBIST functional blocks in an ASIC, the memory module can support only a limited amount of interface signals between memory chips. In addition, because the MBIST functional blocks are spread out to multiple chips on a memory module, the inter-block signal delay is generally much longer on a memory module than on an ASIC. It is also generally not feasible to implement cross-checking logic that operates the three MBIST functional blocks in lock-operational block. This is due to the limitation on the number of interface signals and to the relatively long inter-block signal delay time on a memory module versus on an ASIC.

In some cases such as where a memory module includes an AMB, the self-test logic (MBIST) implemented in the AMB includes command and address generation logic in addition to a data generator and checker. Each of these functional blocks may be implemented on a single physical AMB device (e.g., a single integrated circuit package). However, because all of the self-test command, address and data signals are combined in one physical area of the memory module, a memory module (e.g., DIMM) level routing problem can occur, making it difficult to route the self-test signals on the memory module and resulting in performance degradation and/or implementation difficulty. In addition, the data width of self-test logic of the memory module will be limited to the data width of the AMB (e.g., to the data width of the self-test logic implemented on the AMB, to the number of available ports on the AMB, etc.). As such, implementing memory module test logic on an AMB is not flexible (e.g., to changes in the data width of the memory module) and generally supports only memory modules having certain predetermined, fixed data widths.

Finally, in most cases, since an ASIC cannot be repaired, the ASIC MBIST is generally only capable of detecting and reporting the pass/fail status of memory tests. For memory module test results, on the other hand, it is generally advantageous to include both addresses of the memory locations where failures occur and the data patterns that were read back from the failed memory locations. This type of reporting can help to facilitate the repair of the memory module by, for example, allowing for the identification and replacement of failed components.

FIG. 1 is a block diagram of an example self-testing memory module 10 in accordance with certain embodiments

US 8,001,434 B1

5

described herein. The memory module 10 includes a printed circuit board 12 configured to be operatively coupled to a memory controller 14 of a computer system 16. The memory module 10 further includes a plurality of memory devices 18 on the printed circuit board (PCB) 12, each memory device 20 of the plurality of memory devices 18 comprising data, address, and control ports. The memory module 10 comprises a control module 22 configured to generate address and control signals 24 for testing the memory devices 18. The memory module 10 also includes a data module 28 comprising a plurality of data handlers 30. Each data handler 30 is operable independently from each of the other data handlers 30 of the plurality of data handlers 28 and is operatively coupled to a corresponding plurality of the data ports of one or more of the plurality of memory devices 18. For example, each of the data handlers 30 may be operatively coupled to (e.g., logically and/or electrically coupled to) the corresponding plurality of data ports. Each data handler 30 is further configured to generate data for writing to the corresponding plurality of data ports. The memory module 10 may further include an I²C interface 15 in certain embodiments.

As described more fully below, in certain embodiments the data module 28 generates test data patterns to write to the plurality of memory devices 18 of the memory module 12 and checks the data patterns read or received back from the plurality of memory devices 18 for agreement with corresponding data patterns that are expected to be read back from the plurality of memory devices 18. For example, in one embodiment, the data module 28 generates cyclic patterns to write to the plurality of memory devices 18. In some embodiments, the data module 18 also isolates the data path from the system board of the computer system 16 to the plurality of memory devices 18 while the memory module 10 is not accessed by the computer system 16. For example, the data module 28 may isolate the data path from the system board to the plurality of memory devices 18 when the memory module 10 is in a self-testing mode. The control module 22 may include, for example, a dual input register (e.g., the memory device controller 32 described more fully below) for registering address and control signals coming from either self-testing logic (e.g., from the test controller 36 described more fully below) or from the memory controller 14 on the system board. In some embodiments, during testing, the control module 22 generates address and control signals 24 associated with memory locations to be tested and the data module 28 generates corresponding test data patterns and provides them to the appropriate memory devices 20. For example, the data module 28 may receive a write command from the control module 22 and provide data to be written to certain locations in the memory devices 20 during a write operation. The data module 28 may then receive a read command to read back the data from those locations and check the read data for agreement with the expected data. If there is a mismatch between the read data and the expected data, the data module 28 may, for example, store the failure information (e.g., the failed data word) and inform the control module 22 about the failure. The control module may save the address of the memory location where the failure occurred.

In certain embodiments, the memory module 10 is configured to be operated in a test mode in which the control module 22 selectively inputs the address and control signals to the address and control ports of the plurality of memory devices 18. Moreover, in the test mode, each of the data handlers 30 write the data generated by the data handler 30 to the corresponding plurality of data ports by selectively inputting data signals to the data ports of the plurality of memory devices 18. The data module 28 and/or the control module 22 of certain

6

embodiments are configured to test the plurality of memory devices 18 at the normal operating speed of the memory devices 20. For example, the data module 28 and/or the control module 22 are configured to provide memory signals (e.g., data, address and control signals) according the operating specification of the memory devices 20. In some embodiments, the control module 22 and the data module 28 produce memory addresses, control and/or data signals according to the JEDEC standard memory protocol. In some embodiments, for example, the control module 22 and the data module 28 generate the memory interface signals with proper edge relationships based on the JEDEC standard. In certain embodiments, the test speed, for example, may be defined by the speed of the clock (e.g., the system clock). The address sequences and/or the data patterns of certain embodiments may be programmable either through the I²C interface or they may be defaulted to pre-defined values.

In certain embodiments, data module 28 is configured to generate data signals with programmable slew rates and/or with variable peak values. In one embodiment, for example, the data module 28 is also able to generate data (DQ) and data-strobe (DQS) signals with programmable slew rates and programmable peak values so that the characteristics of the signals generated by the data module 28 generally correspond to the characteristics DQ and DQS signals generated by the system memory controller 14.

In some embodiments, the data module 28 and/or the control module 22 are configured to test the plurality of memory devices 18 under non-normal conditions. For example, the data module 28 and/or control module 22 may be configured to provide signals having frequencies which are higher or lower than the normal operating frequencies of the memory devices 20.

In certain embodiments, the memory module 10 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, or 8-GB. Other memory capacities are also compatible with certain embodiments described herein. In addition, memory modules 100 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. In certain embodiments, the PCB 12 has an industry-standard form factor. For example, the PCB 12 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 12 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 12 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FBDIMM), mini-DIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. For example, in other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain embodiments, the plurality of memory devices 18 of the memory module 10 may be arranged as ranks, each rank of memory generally having a bit width. In certain embodiments, each rank may comprise an independent set of memory devices 20 of the plurality of memory devices 18 that can be accessed by the memory controller 14 to access the full bit-width of the memory bus of the memory module 10. For example, a memory module 10 in which each rank of the memory module is 64 bits wide is described as having an "x 64" organization. Similarly, a memory module 10 having

US 8,001,434 B1

7

72-bit-wide ranks is described as having an "x 72" organization. The number of memory devices 20 and corresponding memory capacity of a memory module 10 can be increased by increasing the number of memory devices 20 per rank or by increasing the number of ranks. For example, a memory module with four ranks with each rank having N 512-MB memory devices 20 has double the memory capacity of a memory module with two ranks with each rank having N 512-MB memory devices 20 and four times the memory capacity of a memory module with one rank with each rank having N 512-MB memory devices 20. During operation, the ranks of a memory module 10 may be selected or activated by control signals that are received from a component of the system (e.g., a system memory controller 14 or a local memory controller of the memory module 10). Examples of such control signals include, but are not limited to, rank-select signals, also called chip-select signals. In certain other embodiments, the memory module 10 comprises only one rank of memory devices 20.

As discussed, the PCB 12 may include at least one connector (not shown) configured to operatively couple the memory module 10 to the memory controller 14 of the computer system 16. The computer system 16 may include a host computer system. For example, the memory module 10 is electrically coupled, logically coupled, or both, with the memory controller 14. Examples of host computer systems 108 include, but are not limited to, blade systems, IU servers, personal computers (PCs), data storage systems and other applications in which space is constrained or limited. The memory controller 14 may comprise a disk controller of the computer system 16, for example. The memory controller 14 may be mounted on a system board of the host computer 16. The connector can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system 16. The connector of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory module 10 and the host system 16. For example, the connector can comprise a standard DDR2, DDR3, and other future generation edge connectors. Additionally, in certain embodiments, more than one memory module 10 is coupled to the host system 16.

The plurality of memory devices 18 on the PCB 12 may include one or more volatile memory components. For example, the plurality of memory devices 18 of certain embodiments comprises two or more dynamic random-access memory (DRAM) elements 20. Types of DRAM devices 20 compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, and synchronous DRAM (SDRAM). The memory devices 18 may comprise other types of memory elements such as static random-access memory (SRAM). In addition, volatile memory devices 20 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Memory devices 20 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (μBGA), mini-BGA (mBGA), and chip-scale packaging (CSP). The plurality of memory devices 18 may further include one or more non-volatile memory devices 20, such as, for example, flash memories. The plurality of memory devices 18 of certain embodiments may include both volatile and non-volatile memory devices 20. For example, the plurality of memory devices 18 may include one or more of DRAM, SRAM, and/or flash memory devices in some embodiments.

8

Each data handler 30 is operable independently from each of the other data handlers 30 of the plurality of data handlers 28. For example, each data handler 30 is configured to write to and/or read from the corresponding plurality of data ports of one or more of the memory devices 20 without being in communication any of the other data handlers 30 or other data ports of the memory devices 20. As such, each data handler 30 can be used to generally independently test a portion of the memory space of the memory module 10. For example, each data handler 30 may be used to independently test one memory device 20 of the memory module 10. In such a configuration, the corresponding plurality of data ports of each data handler 30 may comprise each data port of the corresponding memory device 20. In other embodiments, each data handler 30 may be used to test a segment of one memory device 20, more than one memory device 20, segments more than one memory device 20, or any combination or sub-combination thereof. Because each of the data handlers 30 is operable independently of each of the other data handlers 30, the data handlers 30 are generally modular. As such, modifications in the configuration of the memory module 10 (e.g., changes in the bit-width of the memory bus, changes in the number of memory devices 20, etc.) may be less complicated to accommodate than in other types of self-testing memory modules 10. For example, where a new memory device 20 or set of memory devices 20 is added to the memory module 10, the change may be generally accommodated by adding a corresponding data handler 30. The change may be accommodated without having to implement a major reorganization of the memory module 10 or the self-testing logic of the memory module 10, for example.

Each data handler 30 is further configured to generate data for writing to the corresponding plurality of data ports. FIG. 2 is a block diagram of an example self-testing memory module 10 including eight memory devices 20 (e.g., memory devices 40a-40h) and a data module 28 comprising eight data handlers 30 (e.g., data handlers 30a-30h) in accordance with certain embodiments described herein. Each of the memory devices 20 includes an eight bit output data word and eight corresponding data ports. In addition, the system memory bus 50 between the memory controller 14 and the example memory module 10 is 64 bits wide and each of the data handlers 30 receives an eight bit segment of the system memory bus 50. Each of the data handlers 30 is operatively coupled to a corresponding plurality of data ports 21 of a corresponding one of the memory devices 20. As such, the data handlers 30 may be operatively coupled (e.g., electrically and/or logically coupled or connected) to the eight data ports 21 of one of the corresponding memory devices 20. For example, the data handler 30a may be operatively coupled to the eight data ports 21 of the memory device 40a of FIG. 2.

The configuration shown in FIG. 2 is for the purposes of illustration and is not intended to be limiting. For example, while the example memory module 10 of FIG. 2 includes an equal number of memory devices 20 and data handlers 30, other configurations are possible. In some configurations there are more memory devices 20 than data handlers 30 or vice versa. Moreover, the one or more data handlers 30 may be operatively coupled to a subset of the data ports 21 of one the memory devices 20 instead of all of the data ports 21 of one of the memory devices 20. In other embodiments, one or more data handlers 30 may be operatively coupled to a subset or all of the data ports 21 of more than one of the memory devices 20. For example, in one embodiment, each of the data handlers 30 are operatively coupled to all of the data ports of two memory devices 20.

US 8,001,434 B1

9

In certain embodiments, the plurality of data handlers 28 comprises at least two physically separate components mounted on the PCB 12. For example, the plurality of data handlers 28 may include at least two physically separate integrated circuit packages. The physically separate integrated circuit packages are mounted on different portions of the PCB 12 in some embodiments. For example, each of the eight data handlers 30a-30h shown in FIG. 2 may include physically separate integrated circuit packages mounted on different portions of the PCB 12. While eight data handlers 30 are shown in FIG. 2, other numbers of data handlers 30 are possible including fewer or more than eight.

In certain embodiments, each of the plurality of data handlers 30 is positioned on the PCB 12 proximate to the corresponding plurality of data ports. For example, each data handler 30 of certain embodiments is positioned closer to the corresponding plurality of data ports 21 than the data handler 30 is to the other data ports 21 of the plurality of memory devices 18. For example, the data handler 30a is positioned closer to the corresponding plurality of data ports 21 of the memory device 40a than to the other data ports 21 of other memory devices 40b-40h.

FIG. 3 is a block diagram an example data module 28 and an example control module 22 in accordance with certain embodiments described herein. The control module 22 can be configured to generate address and control signals 24 for testing the plurality of memory devices 18. In some embodiments, the control module 22 includes a control mixer element 32. The control mixer element 32 may include a memory device controller 34 (e.g., a DRAM controller) and a test controller 36. In certain embodiments, the control mixer element 32 generally controls the address and the control signals for the self-testing function.

In certain embodiments, the memory device controller 34 generally pre-processes address and control information before it sends the information to a register 40. In one embodiment, the memory device controller 34 receives signals 38 (e.g., address and control signals) from the system memory controller 14 and signals 42 (e.g., address and controls signals) from the test controller 36. The control module 22 of certain embodiments is configured to selectively input to the address and control ports of the plurality memory devices 18 either the address and control signals 38 from the system memory controller 14 or the address and control signals 42 from the control module 22 (e.g., from the test controller 36). For example, the memory device controller 34 may send either the signals 38 from the system memory controller 14 or, alternatively, the signals 42 from the test controller 36, to the register 40 depending on whether the memory module 10 is in normal (non-test) mode or in a test mode, respectively. In one embodiment, the memory device controller 34 generates the address and control signals for memory device (e.g., DRAM device) operations. The test controller 36 controls the generation of the address and control signal sequences to be used during the self-testing operation of the memory module 10 and also communicates with the data module 28. The control module 22 may be implemented in the control register of the memory module 10 in certain embodiments. In various embodiments, the control module 22 includes discrete logic, one or more application-specific integrated circuit (ASICs), one or more microprocessors, one or more field-programmable gate arrays (FPGAs), or one or more computer-programmable logic device (CPLDs).

The data module 28 and the subcomponents thereof (e.g., the data handlers 30) may be in communication with one or more of the memory devices 20, the control module 22, and the memory controller 14. In certain embodiments, the data

10

module 28 comprises a plurality of data handlers 30. In other embodiments the data module 28 includes at least one data handler 30. Each of the data handlers 30 of certain embodiments comprises a switch 44. For example, the switch 44 may include a data multiplexer/demultiplexer ("data mux/demux"). The switch 44 may provide a bi-directional data multiplexer function. In certain embodiments, the switch 44 is configured to selectively input to the corresponding plurality of data ports either data signals 48 from the system memory controller 14 or data signals 50 from the data handler logic element 46. The switch 44 of certain embodiments may further be configured to receive data signals 52 (e.g., during a read operation) from the plurality of memory devices 18 and to propagate the data signals 52 to the data handler logic element 46 and/or the memory controller 14. In some embodiments, for example, the switch 44 selectively inputs the data signals 48 to be written to the plurality of memory devices 18 from the system memory controller 14 when the memory module 10 is a normal (non-test mode) mode and, alternatively, inputs the data signals 50 from the data handler logic element 46 during a test mode. While the switch 44 is shown as being included in the data handler 30 in the example of FIG. 3, other configurations are possible. For example, in other embodiments the switch 44 may be logically and/or physically separated from the data handler module 28 and/or the data handlers 30.

Each of the data handlers 30 of certain embodiments further includes a data handler logic element 46. The data handler logic element 46 of certain embodiments comprises a data generation element 54 and a verification element 56. The data generation element 54 may be configured to generate data signals (e.g., patterns of data signals) for writing to the corresponding plurality of data ports, for example. The data signals and/or patterns of data signals may be based on information (e.g., programming or configuration information) the data handler logic element 46 receives from the control module 22, for example. The data may be cyclic data in some embodiments or non-cyclic data in other embodiments. For example, the cyclic data may comprise at least one predetermined pattern of data which repeats or is cycled two or more times. In various embodiments, the data comprises one or more incrementing patterns or decrementing patterns, for example. In other embodiments, the data comprises a pattern which alternates each bit on successive memory writes. For example, a memory write comprising one or more hexadecimal "A" characters (each corresponding to a four-bit binary word of "1010") may be followed by a memory write comprising one or more hexadecimal "5" characters (each corresponding to a four-bit binary word of "0101"). The data may be generated in a variety of ways. In one embodiment, the data is generated based on a current write address value. For example, in one example configuration, on a first write cycle, hexadecimal "A's" are generated and written to even address locations and hexadecimal "5's" are generated and written to odd address locations, and on a second write cycle, "5's" are written to even addresses and "A's" are written to odd addresses, and this pattern repeats in subsequent cycles. The data may be generated based previously written data (e.g., inverting each of the bits of a previously written data word) in some embodiments. In general, any manner of generating a cyclic or otherwise deterministic data pattern may be compatible with embodiments described herein. In other embodiments, random or pseudorandom data may be generated and written to the corresponding plurality of data ports. For example, a linear feedback shift register (LFSR) may be used in some embodiments. In addition, the data patterns may be programmable. For example, the data patterns may be pro-

US 8,001,434 B1

11

grammable based on information received by the data generation element 54 from the memory controller 14 (e.g., through the control module 22), or from the control module 22.

The plurality of data handlers 30 are further configured to read data from the corresponding plurality of data ports. For example, the verification element 56 may be configured to receive data from the corresponding plurality of data ports (e.g., through the switch 44 during a test mode). The verification element 56 may further be configured to check for failures in the operation of the plurality memory devices 18 by verifying that data read from the corresponding plurality of data ports corresponds to the data generated by the data handler 30 and written to the corresponding plurality of data ports.

In certain embodiments, the verification element 56 is configured to perform the verification without storing a copy of the data written to the corresponding plurality of data ports or accessing a stored copy beyond the data read from the plurality of memory devices 18. For example, the verification element 56 does not store or access a copy of the data that is written to the corresponding plurality of data ports except for the data stored and read back from the plurality of memory devices 18. As such, the memory module 10 of certain embodiments advantageously does not require separate memory for storing duplicate copies of test data that is written to the plurality of memory devices 18 for later comparison. For example, the verification element 56 may calculate comparison data and may compares the comparison data to the data read from the corresponding plurality of data ports. In certain embodiments, the comparison data comprises data which expresses the data or values expected to be received from the plurality of memory devices 18 if the write, store, and read processes of the data using the data module 28 and the plurality of memory devices 18 are performed correctly or as expected. The calculation may be performed simultaneously or substantially simultaneously with receiving the data read from the corresponding plurality of data ports in certain embodiments. In other embodiments, the calculation is performed either before or after receiving the data. Other configurations are possible. For example, in one embodiment, the verification element 56 does store a separate copy of the data written to the corresponding plurality of data ports upon writing the data and compares the separate copy to the read data received from the plurality of memory devices 18.

The verification element 56 of certain embodiments calculates the comparison data based on the cyclic data. For example, in one embodiment, the verification element 56 calculates the comparison data in substantially the same manner that the data generation element 54 generates the data as described above (e.g., based on a current write address, using an LFSR, etc.). As such, the comparison data of certain embodiments is substantially a repeat of data written. In one example embodiment, the data handler 30 is configured (e.g., is programmed by the control module 22) to write an alternating series of "A's" and "5's" to the data ports of the corresponding plurality of data ports as described herein. For example, the data handler 30 may be configured to write one or more "A's" to the first address location of an N-word memory device 20 including the corresponding plurality of data ports. The data handler 30 may then write one or more "5's" to the second address location, one or more "A's" to the third address location and so on until the data handler 30 has written to all N memory locations. The verification element 56 of the example embodiment then calculates the comparison data based on the cyclic data written to the corresponding plurality of data ports. For example, the verification element

12

56 calculates a comparison word including one or more "A's", "5's," and "A's," respectively, to be compared to the data read from the first, second, and third address locations based on the cyclic data (e.g., based on the known cycle of the data). In some embodiments, the comparison data is calculated based on a current read address.

In certain embodiments, data associated with failures in the operation of the plurality of memory devices 18 are stored in the data module 28. For example, data read from the corresponding plurality of data ports which do not correspond to (e.g., match) the comparison data calculated by the verification element 56 may be stored in the data module. Moreover, in some embodiments, memory addresses associated with the failures in the operation of the plurality of memory devices 18 are stored in the control module 22. For example, the data handler 30 may communicate data failures (e.g., when data read from the corresponding plurality of data ports does not correspond to calculated comparison data) to the control module 22 which may then store the addresses corresponding to the data failure. In certain embodiments, the memory module 12 is configured to report failures (e.g., the failed data, the address corresponding to the memory location of the failed data, and/or expected data) via the I²C interface 15 to the memory controller 14. In addition, in certain embodiments the test controller 36 and/or the data handlers 30 may be updated through the I²C interface 15 with new data patterns and/or with alternative memory access sequences to conduct AC tests (e.g., tests of the power, current, I/O speed, etc.).

In various embodiments, the components of the data module 28 (e.g., the switch 44, the data handlers 30, the data handler logic element 46, the data generation element 54, and/or verification element 56) may include discrete logic, one or more application-specific integrated circuits (ASICs) one or more microprocessors, one or more field-programmable gate arrays (FPGAs), or one or more computer-programmable logic devices (CPLDs). Additionally, one or more of the various functional blocks (e.g., the switch 44) of the data module 28 of FIG. 3 may not be included. In some embodiments, additional functional blocks may be included. Moreover, some of the functional blocks are described as separate functional blocks for illustration purposes and may comprise one physical component. For example, in one embodiment, each of the data handlers 30 and the corresponding switch 44, data generation element 54, and verification element 56 comprise one physical component (e.g., are included in one integrated circuit package). In another embodiment, the data module 28 comprises one physical component.

Referring again to FIG. 1, a self-testing memory module 10 of certain embodiments comprises a printed circuit board (PCB) 12 and is configured to be operatively coupled to a memory controller 14 of a computer system 16. The memory module 10 further includes a plurality of memory devices 18 on the printed circuit board 12 where each memory device 20 of the plurality of memory devices 18 comprising data, address, and control ports. The memory module 10 further comprises a control module 22 configured to generate address and control signals for testing the plurality of memory devices 18. In certain embodiments, the memory module 10 further comprises a data module 28 comprising at least one data handler 30 and operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices 20. The data handler 30 is configured to generate cyclic data for writing to the corresponding plurality of data ports. In certain embodiments, there may be one data handler 30, for example. In other embodiments, there may be more than one

US 8,001,434 B1

13

data handler 30. The elements of the memory module 10 may be compatible with any of the embodiments described herein.

FIG. 4 is a flowchart of an example method 70 of self-testing a memory module 10 in accordance with certain embodiments described herein. While the method 70 is described herein by reference to the memory module 10, other memory modules, electronic systems or subsystems, and/or circuits are also compatible with the embodiments described herein. The method 70 of certain embodiments comprises providing a self-testing memory module 10 at operational block 72. The memory module 10 may comprise a printed circuit board (PCB) 12 configured to be operatively coupled to a memory controller 14 of a computer system 16. The memory module 10 may further comprise a plurality of memory devices 18 on the printed circuit board 12. Each memory device 20 of the plurality of memory devices 18 may comprise data, address, and control ports. The memory module 10 may comprise a control module 22 configured to generate address and control signals for testing the plurality of memory devices 18. The memory module 10 may further comprise a data module 28 comprising a plurality of data handlers 30. In certain embodiments, the data module 28 comprises at least one data handler 30. Each data handler 30 of certain embodiments is operable independently from each of the other data handlers 30 of the plurality of data handlers 28 and is operatively coupled to a corresponding plurality of the data ports. At operational block 74, the method 70 further comprises generating, by each of the data handlers 30, data for writing to the corresponding plurality of data ports.

FIG. 5 is a flow diagram 100 illustrating self-testing operation of an example self-testing memory module 10 in accordance with certain embodiments described herein. At operational block 110 the memory module 10 enters an idle state after power up or, in some embodiments, when the memory board of the computer system 16 is connected to a mother board or to a test board. In one embodiment, at Operational block 110, the contents of the register 40 are undefined and the controllers (e.g., the test controller 36 and the memory device controller 34) are in unknown state. After power up, the memory module 10 is reset (e.g., a reset command is executed) at operational block 111. At operational block 111, the logic of the data handler 30 (e.g., data generation element 54 and/or verification element 56) and the logic of the control mixer 32 are set to default values and/or states. For example, the memory module 10 may default to a non-test mode (e.g., normal operational mode) and the switches 44 of the data handlers 30 and the memory device controller 34 are not configured in a test mode. At operational block 112, the test mode is configured. For example, the computer system 16 (e.g., through the memory controller 14) may configure the test mode. The configuration may be through the I²C interface 15, for example, and may include configuring the test controller 36 for test mode. For example, configuring the test mode may include switching (e.g., by configuring the test controller 36) the mode of the memory module 10 from a normal operation mode to the test mode.

At operational block 113, the test mode is initiated. Initiating the test mode may comprise configuring a particular test case (e.g., particular test data or data patterns, particular write and/or read address sequences, etc.). The initiation may be achieved by activating the test controller 36 to initiate the test mode. For example, at operational block 113, the data handlers 30 and the control mixer 32 are readied (e.g., via a tester) beginning the test mode of the memory module 10. For example, the tester may comprise an ATM tester, a server, a specialized tester. The tester may ready the data handlers 30 and the control mixer through the I²C interface 15 or through

14

the control signals 38, for example. For example, the data handlers 30 are configured to input data generated by the data handlers 30 to the corresponding plurality of data ports of the plurality of memory devices 18 and the control mixer 32 is configured to input address and control signals from the test controller 36 to the plurality of memory devices 18. At operational block 113 the test controller 36 updates each of the data handlers 30 (e.g., with new data patterns, write signal characteristics, etc.).

In one embodiment, the input signal on a pin (e.g., a parity-in pin) of the memory module 10 is asserted or toggled (e.g., by the memory controller 14). For example, if the parity-in signal ("Par-in") is un-asserted (e.g., set to a "low" value), it is asserted (e.g., set to a "high" value) and held in the asserted state. Alternatively, if the parity-in signal is already in the asserted state, it may be toggled and then held in the asserted state. The memory module 10 executes the test mode (e.g., writes and reads test data patterns) at operational block 114. The memory module 10 continues executing the test mode at operational block 114 until the self-test is complete or until the memory module 10 detects a certain number of memory failures such that a failure count exceeds a preset number.

If the failure count exceeds the preset number, the memory module 10 enters operational block 115 and "errors out" of the test mode. If the self-test is completed at operational block 114 and the failure count does not exceed the preset number, the memory module 10 enters operational block 115. At operational block 115, the memory module 10 sends out a test completion indication signal (e.g., through the test controller 36 to the memory controller 14). At operational block 116, the fail status of the test may be read out through, for example, the I²C interface 15. For example, one or more address values associated with failed memory locations, and/or the data read from those locations, and/or expected data may be read. In other cases, where the test fails, the memory module 10 may report the failure to the memory controller 14 through any available signal (e.g., bidirectional data or data strobe signal) between the memory module 10 and the memory controller 14.

In some embodiments, the memory module 10 is generally interruptible. For example, the memory module 10 may exit the self-test and return to operational block 110 if the signal going into the parity-in pin is, for example, de-asserted or removed at operational block 155. In other embodiments, the interrupt signal or condition may be different and may not be a parity-in signal. For example, in one embodiment, the memory module 10 may exit the self-test and return to operational block 110 if a timer having a pre-determined count expires. When the self-testing is interrupted, the memory module 10 will return to operational block 110 and the bit failure information in the control mixer 32 and the data handler 30 becomes invalid.

FIG. 6 is a flow diagram 200 illustrating the operation of an example self-testing memory module 10 in accordance with certain embodiments described herein. For example, one or more of the operational blocks of the flow diagram 200 of FIG. 6 may correspond to one or more of the operational blocks of FIG. 5. At operational block 210, the memory module 10 may be generally inactive. For example, the testing logic (e.g., the control module 22 and/or the data module 28) may be generally inactive and the memory module 10 may default to a functional (e.g., non-test) mode. In certain embodiments, the memory module 10 executes one or more tasks which configure the self-test mode of the self-testing memory module using an I²C interface 15. For example, the memory module 200 may configure the test controller 36 through the I²C interface 15 (e.g., as described with respect to

US 8,001,434 B1

15

FIG. 5). In other embodiments, the test mode is configured using the control signals 38. For example, the test mode may be updated at operational block 211 in certain embodiments. In certain embodiments, updating the test mode comprises programming the test controller 36 with test configuration information such as test data patterns, test data sequences, test failure conditions, etc. After updating the test mode at operational block 211, the test controller 36 may then be activated through the I²C interface 15 (e.g., as described with respect to FIG. 5) in certain embodiments. Alternatively, as shown, the test controller 36 may be activated through the I²C interface 15 without first updating the test mode.

At operational block 212, the memory module test mode is ready for execution. In one embodiment, the input signal on a pin (e.g., a parity-in pin) of the memory module 10 is asserted or toggled (e.g., by the memory controller 14). For example, if the parity-in signal is low, it is asserted (e.g., set to a "high" value) and held in the asserted state. Alternatively, if the parity-in signal is already in the asserted state, it may be toggled and then held in the asserted state. At operational block 113, a set of status registers (e.g., one or more registers of the control module 22 or the data module 28) are cleared.

The memory module 200 generates address and data signals for testing the plurality of memory devices 18 at operational block 214. For example, the data generation elements 54 of the data handlers 30 may generate the data for writing to the plurality of memory devices 18 as described herein. In addition, the control module 22 may generate address and control signals for testing the plurality of memory devices 18 as described herein. At operational block 215, the memory module 10 performs a burst write function. For example, in certain embodiments, the memory module 10 writes multiple memory locations in the memory module 10 that are to be tested at operational block 215 in a relatively short amount of time (or in a burst). In certain embodiments, the memory module 10 can perform multiple write bursts at operational block 215. Next, at operational block 216, the memory module 10 performs a read & compare function. For example, in certain embodiments, the memory module 10 reads back certain memory locations at operational block 216 that have been written at operational block 215 and compares the values with certain expected data. For example, a verification element 56 of each of the data handlers 30 may calculate the expected data and/or compare the values as described herein. In some embodiments, the memory module 200 reads from multiple memory locations in the memory module 10 in a relatively short amount of time (or in a burst). In certain embodiments, the memory module 10 can execute multiple read bursts at operational block 216 as it compares the read data with expected data. In some embodiments, the memory module 200 (e.g., the data handlers 30 of the memory module 200) stores any failed read data and the associated expected data at operational block 217. In some embodiments, the memory module sends one or more failure indications to the memory controller 14 over one or more available signals between memory module 10 and the memory controller 14. For example, the I²C interface 15 or one or more bi-directional data pins (e.g., one or more of the data pins 48) may be used.

The memory module 200 stores the addresses of the memory locations associated with the failed read data using the test controller 32 at operational block 217. In other embodiments the failed read data, expected data, and the addresses of the memory locations associated with the failed read data may be stored using the test controller 32. For example, in one embodiment, the test controller 32 stores the failed read data, expected data, and the addresses of the

16

memory locations associated with the failed read data at operational block 217. In some embodiments, the test controller 32 is generally inaccessible through the I²C interface 15 during self-test operation. For example, the test controller 32 is inaccessible through the I²C interface 15 until a test failure occurs at operational block 217 or until the test completes at operational block 219. In some embodiments, when the test is complete, the test results can be read out of the memory module 10 (e.g., through the I²C interface 15). In some cases, the test can be interrupted using the I²C interface 15 or using the parity-in signal (e.g., by de-asserting the parity-in signal).

Although certain preferred embodiments and examples are discussed above, it is understood that the inventive subject matter extends beyond the specifically disclosed embodiments to other alternative embodiments and/or uses of the invention and obvious modifications and equivalents thereof. It is intended that the scope of the inventions disclosed herein should not be limited by the particular disclosed embodiments. Thus, for example, in any method or process disclosed herein, the acts or operations making up the method/process may be performed in any suitable sequence and are not necessarily limited to any particular disclosed sequence. Various aspects and advantages of the embodiments have been described where appropriate. It is to be understood that not necessarily all such aspects or advantages may be achieved in accordance with any particular embodiment. Thus, for example, it should be recognized that the various embodiments may be carried out in a manner that achieves or optimizes one advantage or group of advantages as taught herein without necessarily achieving other aspects or advantages as may be taught or suggested herein.

What is claimed is:

1. A self-testing memory module, comprising:
   a printed circuit board configured to be operatively coupled to a memory controller of a computer system;
   a plurality of memory devices on the printed circuit board, each memory device of the plurality of memory devices comprising data, address, and control ports; and
   a circuit comprising:
      a control module configured to generate address and control signals for testing the memory devices; and
      a data module comprising a plurality of data handlers, each data handler operable independently from each of the other data handlers of the plurality of data handlers and operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices and configured to generate data for writing to the corresponding plurality of data ports, wherein the circuit is configured to test the memory devices using the address and control signals generated by the control module and the data generated by the plurality of data handlers.

2. The self-testing memory module of claim 1, wherein the plurality of data handlers comprise at least two physically separate components mounted on the printed circuit board.

3. The self-testing memory module of claim 2, wherein the plurality of data handlers comprise at least two physically separate integrated circuit packages.

4. The self-testing memory module of claim 3, wherein the physically separate integrated circuit packages are mounted on different portions of the printed circuit board.

5. The self-testing memory module of claim 2, wherein each of the plurality of data handlers is positioned on the printed circuit board proximate to the corresponding plurality of data ports.

6. The self-testing memory module of claim 5, wherein each of the plurality of data handlers is positioned closer to

US 8,001,434 B1

17

the corresponding plurality of data ports than to the other data ports of the plurality of memory devices.

**7.** The self-testing memory module of claim **6,** wherein each of the data handlers is further configured to read from the corresponding plurality of data ports and further comprises a verification element for checking for failures in the operation of the memory devices by verifying that data read from the corresponding plurality of data ports corresponds to the data generated by the data handler for writing to the corresponding plurality of data ports.

**8.** The self-testing memory module of claim **7,** wherein the verification element is configured to verify that the data read from the corresponding plurality of data ports corresponds to the data generated by the data handler for writing to the corresponding plurality of data ports without storing a copy of the data generated by the data handler for writing to the corresponding plurality of data ports.

**9.** The self-testing memory module of claim **7,** wherein the verification element calculates comparison data and compares the comparison data to the data read from the corresponding plurality of data ports.

**10.** The self-testing memory module of claim **9,** wherein the data for writing to the corresponding plurality of data ports comprises cyclic data.

**11.** The self-testing memory module of claim **10,** wherein the verification element calculates the comparison data based on the cyclic data.

**12.** The self-testing memory module of claim **10,** wherein the verification element calculates the comparison data based on a current read address.

**13.** The self-testing memory module of claim **7,** wherein data associated with failures in the operation of the memory devices is stored in the data module and wherein memory addresses associated with failures in the operation of the memory devices are stored in the control module.

**14.** The self-testing memory module of claim **1,** each of the plurality of data handlers further configured to write data to the memory devices by selectively inputting to the corresponding plurality of data ports either data signals from the system memory controller or data signals from the data handler.

**15.** The self-testing memory module of claim **14,** wherein each of the plurality of data handlers comprises a switch which performs the selective inputting to the corresponding plurality of data ports.

**16.** The self-testing memory module of claim **15,** wherein the switch comprises a data multiplexer-demultiplexer.

**17.** The self-testing memory module of claim **1,** the control module further configured to selectively input to the address and control ports of the memory devices either the address and control signals from the memory controller or the address and control signals from the control module.

**18.** The self-testing memory module of claim **17,** wherein the control module further comprises a DRAM controller which performs the selective inputting of the address and control ports.

**19.** The self-testing memory module of claim **1,** wherein the memory module is configured to be operated in a test mode in which the control module selectively inputs to the address and control ports of the memory devices the address and control signals from the control module and wherein each of the data handlers write the data generated by the data handler to the corresponding plurality of data ports by selectively inputting to the data ports of the memory devices data signals from the data handler.

18

**20.** A self-testing memory module, comprising:
a printed circuit board configured to be operatively coupled to a memory controller of a computer system;
a plurality of memory devices on the printed circuit board, each memory device of the plurality of memory devices comprising data, address, and control ports; and
a circuit comprising:
    a control module configured to generate address and control signals for testing the memory devices; and
    a data module comprising at least one data handler operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices and configured to generate cyclic data for writing to the corresponding plurality of data ports wherein the circuit is configured to test the memo devices using the address and control signals generated by the control module and the cyclic data generated by the at least one data handler.

**21.** The self-testing memory module of claim **20,** wherein the at least one data handler is further configured to read data from the corresponding plurality of data ports and further comprises a verification element for checking for failures in the operation of the memory devices by verifying that data read from the corresponding plurality of data ports corresponds to the data generated by the data handler for writing to the corresponding plurality of data ports.

**22.** The self-testing memory module of claim **21,** wherein the verification element is configured to verify that the data read from the corresponding plurality of data ports corresponds to the data generated by the data handler for writing to the corresponding plurality of data ports without storing a copy of the data written to the memory devices.

**23.** The self-testing memory module of claim **22,** wherein the verification element calculates comparison data and compares the comparison data to the data read from the corresponding plurality of data ports.

**24.** The self-testing memory module of claim **23,** wherein the verification element calculates the comparison data based on the cyclic data.

**25.** The self-testing memory module of claim **23,** wherein the verification element calculates the comparison data based on a current read address.

**26.** The self-testing memory module of claim **21,** wherein data associated with failures in the operation of the memory devices is stored in the data module and wherein memory addresses associated with failures in the operation of the memory devices are stored in the control module.

**27.** The self-testing memory module of claim **20,** wherein there are at least two data handlers and each of the data handlers is operable independently from each of the other data handlers.

**28.** The self-testing memory module of claim **20,** wherein the at least one data handler is positioned on the printed circuit board proximate to the corresponding plurality of data ports.

**29.** A method of self-testing a memory module, comprising:
providing a self-testing memory module, the self-testing memory module comprising:
    a printed circuit board configured to be operatively coupled to a memory controller of a computer system;
    a plurality of memory devices on the printed circuit board, each memory device of the plurality of memory devices comprising data, address, and control ports; and
    a circuit comprising:
        a control module configured to generate address and control signals for testing the memory devices; and

US 8,001,434 B1

19

a data module comprising a plurality of data handlers, each data handler operable independently from each of the other data handlers of the plurality of data handlers and operatively coupled to a corresponding plurality of the data ports; and

generating, by the control module, address and control signals for testing the memory devices;

generating, by each of the data handlers, data for writing to the corresponding plurality of data ports; and

using the address and control signals and the generated data to test the memory devices.

30. The method of claim 29, further comprising:

reading, by each of the plurality of data handlers, data from the corresponding plurality of data ports; and

checking for failures in the operation of the memory devices by each of the plurality of data handlers by verifying that data read from the corresponding plurality of data ports corresponds to the generated data for writing to the corresponding plurality of data ports.

31. The method of claim 30, further comprising verifying that the data read from the corresponding plurality of data ports corresponds to the generated data for writing to the corresponding plurality of data ports without storing a copy of the data written to the corresponding plurality of data ports.

20

32. The method of claim 31, further comprising:

calculating comparison data; and

comparing the comparison data to the data read from the corresponding plurality of data ports.

33. The method of claim 32, wherein the data signals written to the corresponding plurality of data ports comprises cyclic data and calculating comprises calculating the data based on the cyclic data.

34. The method of claim 32, wherein the data signals written to the corresponding plurality of data ports comprises cyclic data calculating comprises calculating the data based on a current read address.

35. The method of claim 30, further comprising operating the memory module in a test mode in which the control module selectively inputs to the address and control ports of the memory devices the address and control signals from the control module and wherein each of the data handlers write the generated data to the corresponding plurality of data ports by selectively inputting to the data ports of the memory devices data signals representative of the generated data from the data handler.

\*    \*    \*    \*    \*

US008301833B1

(12) **United States Patent**
   Chen et al.

(10) Patent No.:     **US 8,301,833 B1**
(45) Date of Patent:         **Oct. 30, 2012**

(54) **NON-VOLATILE MEMORY MODULE**

(75) Inventors: **Chi-She Chen**, Walnut, CA (US);
   **Jeffrey C. Solomon**, Irvine, CA (US);
   **Scott Milton**, Irvine, CA (US); **Jayesh
   Bhakta**, Cerritos, CA (US)

(73) Assignee: **Netlist, Inc.,** Irvine, CA (US)

( * ) Notice:   Subject to any disclaimer, the term of this
   patent is extended or adjusted under 35
   U.S.C. 154(b) by 638 days.

(21) Appl. No.: **12/240,916**

(22) Filed:   **Sep. 29, 2008**

**Related U.S. Application Data**

(63) Continuation of application No. 12/131,873, filed on
   Jun. 2, 2008, now abandoned.

(60) Provisional application No. 60/941,586, filed on Jun.
   1, 2007.

(51) **Int. Cl.**
   *G06F 12/00*      (2006.01)
(52) **U.S. Cl.** ........ 711/104; 711/160; 711/161; 711/162;
                                                      710/10
(58) **Field of Classification Search** .................. 711/160,
                        711/161, 162, 104; 710/10
   See application file for complete search history.

(56)          **References Cited**

   U.S. PATENT DOCUMENTS

   4,420,821 A   12/1983  Hoffman
   4,449,205 A   5/1984   Hoffman

| | | |
|---|---|---|
| 5,519,663 A | 5/1996 | Harper, Jr. et al. |
| 6,158,015 A | 12/2000 | Klein |
| 6,336,174 B1 | 1/2002 | Li et al. |
| 6,336,176 B1 | 1/2002 | Leyda et al. |
| 6,487,623 B1 | 11/2002 | Emerson et al. |
| 6,658,507 B1 | 12/2003 | Chan |
| 6,799,244 B2 | 9/2004 | Tanaka et al. |
| 7,409,590 B2 | 8/2008 | Moshayedi et al. |
| 2002/0083368 A1 | 6/2002 | Abe et al. |
| 2004/0190210 A1 | 9/2004 | Leete |
| 2007/0192627 A1* | 8/2007 | Oshikiri ........................ 713/191 |
| 2008/0195806 A1* | 8/2008 | Cope ............................ 711/111 |

* cited by examiner

*Primary Examiner* — Midys Rojas
(74) *Attorney, Agent, or Firm* — Nixon Peabody LLP;
Khaled Shami

(57)          **ABSTRACT**

Certain embodiments described herein include a memory
system which can communicate with a host system such as a
disk controller of a computer system. The memory system
can include volatile and non-volatile memory and a controller
which are configured such that the controller backs up the
volatile memory using the non-volatile memory in the event
of a trigger condition. In order to power the system in the
event of a power failure or reduction, the memory system can
include a secondary power source which is not a battery and
may include, for example, a capacitor or capacitor array. The
memory system can be configured such that the operation of
the volatile memory is not adversely affected by the non-
volatile memory or the controller when the volatile memory is
interacting with the host system.

**30 Claims, 12 Drawing Sheets**



*Exh B*



FIG. 1

**U.S. Patent**     Oct. 30, 2012     Sheet 2 of 12     US 8,301,833 B1



FIG. 2



FIG. 3



FIG. 4A

FIG. 4B



*FIG. 4C*



FIG. 5



FIG. 6



FIG. 7



*FIG. 8*



FIG. 9



FIG. 10



FIG. 11

US 8,301,833 B1

1

# NON-VOLATILE MEMORY MODULE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 12/131,873, filed Jun. 2, 2008, which claims the benefit of U.S. Provisional Application No. 60/941,586, filed Jun. 1, 2007. Each of these applications is incorporated in its entirety by reference herein.

## BACKGROUND

Certain types of memory modules comprise a plurality of dynamic random-access memory (DRAM) devices mounted on a printed circuit board (PCB). These memory modules are typically mounted in a memory slot or socket of a computer system (e.g., a server system or a personal computer) and are accessed by the computer system to provide volatile memory to the computer system.

Volatile memory generally maintains stored information only when it is powered. Batteries have been used to provide power to volatile memory during power failures or interruptions. However, batteries may require maintenance, may need to be replaced, are not environmentally friendly, and the status of batteries can be difficult to monitor.

Non-volatile memory can generally maintain stored information while power is not applied to the non-volatile memory. In certain circumstances, it can therefore be useful to backup volatile memory using non-volatile memory.

## SUMMARY

In certain embodiments, a memory system coupled to a computer system is provided which includes a volatile memory subsystem, a non-volatile memory subsystem, and a controller operatively coupled to the non-volatile memory subsystem. The memory system can also include at least one circuit configured to selectively operatively decouple the controller from the volatile memory subsystem.

In some embodiments, a power module for providing a plurality of voltages to a memory system is described. The power module includes non-volatile and volatile memory, and the plurality of voltages include at least a first voltage and a second voltage. The power module of certain embodiments includes an input providing a third voltage to the power module and a voltage conversion element configured to provide the second voltage to the memory system. The power module also includes a first power element configured to selectively provide a fourth voltage to the conversion element. The power module further includes a second power element configured to selectively provide a fifth voltage to the conversion element. The power module can be configured to selectively provide the first voltage to the memory system either from the conversion element or from the input.

The power module can be configured to be operated in at least three states in certain embodiments. In a first state, the first voltage is provided to the memory system from the input and the fourth voltage is provided to the conversion element from the first power element. In a second, state the fourth voltage is provided to the conversion element from the first power element and the first voltage is provided to the memory system from the conversion element. In a third state, the fifth voltage is provided to the conversion element from the second power element and the first voltage is provided to the memory system from the conversion element.

2

A method of providing a first voltage and a second voltage to a memory system including volatile and non-volatile memory subsystems is provided in certain embodiments. The method includes, during a first condition, providing the first voltage to the memory system from an input power supply and providing the second voltage to the memory system from a first power subsystem. The method further includes detecting a second condition and, during the second condition, providing the first voltage and the second voltage to the memory system from the first power subsystem. The method also includes charging a second power subsystem and detecting a third condition. During the third condition, the method includes providing the first voltage and the second voltage to the memory system from the second power subsystem.

In certain embodiments, a method is provided for controlling a memory system operatively coupled to a host system and which includes a volatile memory subsystem and a non-volatile memory subsystem. The method can include operating the volatile memory subsystem at a first frequency when the memory system is in a first mode of operation in which data is communicated between the volatile memory subsystem and the host system. In certain embodiments, the method further includes operating the non-volatile memory subsystem at a second frequency when the memory system is in a second mode of operation in which data is communicated between the volatile memory subsystem and the non-volatile memory subsystem. The method can also include operating the volatile memory subsystem at a third frequency when the memory system is in the second mode of operation, the third frequency less than the first frequency.

In certain embodiments, a method is provided for controlling a memory system operatively coupled to a host system. The memory system includes a volatile memory subsystem and a non-volatile memory subsystem. In certain embodiments, the method includes communicating data words between the volatile memory subsystem and the host system when the memory system is in a first mode of operation. The method can further include transferring data words from the volatile memory subsystem to the non-volatile memory subsystem when the memory system is in a second mode of operation. Transferring each data word can include storing a first portion of the data word in a buffer, storing a second portion of the data word in the buffer, and writing the entire data word from the buffer to the non-volatile memory subsystem.

A memory system operatively coupled to a host system is provided in certain embodiments. The memory system can include a volatile memory subsystem and a non-volatile memory subsystem comprising at least 100 percent more storage capacity than does the volatile memory subsystem. The memory system includes a controller operatively coupled to the volatile memory subsystem and operatively coupled to the non-volatile memory subsystem, the controller configured to allow data to be communicated between the volatile memory subsystem and the host system when the memory system is operating in a first state and to allow data to be communicated between the volatile memory subsystem and the non-volatile memory subsystem when the memory system is operating in a second state.

A method of controlling a memory system operatively coupled to a host system is provided in certain embodiments. The memory system includes a volatile memory subsystem and a non-volatile memory subsystem. The method can include communicating data between the volatile memory subsystem and the host system when the memory system is in a first mode of operation. The method of certain embodiments further includes storing a first copy of data from the volatile

US 8,301,833 B1

3

memory subsystem to the non-volatile memory subsystem at a first time when the memory system is in a second mode of operation. The method may further include restoring the first copy of data from the non-volatile memory subsystem to the volatile memory subsystem and erasing the first copy of data from the non-volatile memory subsystem. In certain embodiments, the method also includes storing a second copy of data from the volatile memory subsystem to the non-volatile memory subsystem at a second time when the memory system is in the second mode of operation, wherein storing the second copy begins before the first copy is completely erased from the non-volatile memory subsystem.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an example memory system compatible with certain embodiments described herein.

FIG. 2 is a block diagram of an example memory module with ECC (error-correcting code) having a volatile memory subsystem with nine volatile memory elements and a non-volatile memory subsystem with five non-volatile memory elements in accordance with certain embodiments described herein.

FIG. 3 is a block diagram of an example memory module having a microcontroller unit and logic element integrated into a single device in accordance with certain embodiments described herein.

FIGS. 4A-4C schematically illustrate example embodiments of memory systems having volatile memory subsystems comprising registered dual in-line memory modules in accordance with certain embodiments described herein.

FIG. 5 schematically illustrates an example power module of a memory system in accordance with certain embodiments described herein.

FIG. 6 is a flowchart of an example method of providing a first voltage and a second voltage to a memory system including volatile and non-volatile memory subsystems.

FIG. 7 is a flowchart of an example method of controlling a memory system operatively coupled to a host system and which includes at least 100 percent more storage capacity in non-volatile memory than in volatile memory.

FIG. 8 schematically illustrates an example clock distribution topology of a memory system in accordance with certain embodiments described herein.

FIG. 9 is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including operating a volatile memory subsystem at a reduced rate in a back-up mode.

FIG. 10 schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments of a volatile memory subsystem of a memory system to a controller of the memory system.

FIG. 11 is a flowchart of an example method of controlling a memory system operatively coupled to a host system, the method including backing up and/or restoring a volatile memory subsystem in slices.

DETAILED DESCRIPTION

Certain embodiments described herein include a memory system which can communicate with a host system such as a disk controller of a computer system. The memory system can include volatile and non-volatile memory, and a controller. The controller backs up the volatile memory using the non-volatile memory in the event of a trigger condition. Trigger conditions can include, for example, a power failure, power reduction, request by the host system, etc. In order to

4

power the system in the event of a power failure or reduction, the memory system can include a secondary power source which does not comprise a battery and may include, for example, a capacitor or capacitor array.

In certain embodiments, the memory system can be configured such that the operation of the volatile memory is not adversely affected by the non-volatile memory or by the controller when the volatile memory is interacting with the host system. For example, one or more isolation devices may isolate the non-volatile memory and the controller from the volatile memory when the volatile memory is interacting with the host system and may allow communication between the volatile memory and the non-volatile memory when the data of the volatile memory is being restored or backed-up. This configuration generally protects the operation of the volatile memory when isolated while providing backup and restore capability in the event of a trigger condition, such as a power failure.

In certain embodiments described herein, the memory system includes a power module which provides power to the various components of the memory system from different sources based on a state of the memory system in relation to a trigger condition (e.g., a power failure). The power module may switch the source of the power to the various components in order to efficiently provide power in the event of the power failure. For example, when no power failure is detected, the power module may provide power to certain components, such as the volatile memory, from system power while charging a secondary power source (e.g., a capacitor array). In the event of a power failure or other trigger condition, the power module may power the volatile memory elements using the previously charged secondary power source.

In certain embodiments, the power module transitions relatively smoothly from powering the volatile memory with system power to powering it with the secondary power source. For example, the memory system may power volatile memory with a third power source from the time the memory system detects that power failure is likely to occur until the time the memory system detects that the power failure has actually occurred.

In certain embodiments, the volatile memory system can be operated at a reduced frequency during backup and/or restore operations which can improve the efficiency of the system and save power. In some embodiments, during backup and/or restore operations, the volatile memory communicates with the non-volatile memory by writing and/or reading data words in bit-wise slices instead of by writing entire words at once. In certain embodiments, when each slice is being written to or read from the volatile memory the unused slice(s) of volatile memory is not active, which can reduce the power consumption of the system.

In yet other embodiments, the non-volatile memory can include at least 100 percent more storage capacity than the volatile memory. This configuration can allow the memory system to efficiently handle subsequent trigger conditions.

FIG. 1 is a block diagram of an example memory system 10 compatible with certain embodiments described herein. The memory system 10 can be coupled to a host computer system and can include a volatile memory subsystem 30, a non-volatile memory subsystem 40, and a controller 62 operatively coupled to the non-volatile memory subsystem 40. In certain embodiments, the memory system 10 includes at least one circuit 52 configured to selectively operatively decouple the controller 62 from the volatile memory subsystem 30.

In certain embodiments, the memory system 10 comprises a memory module. The memory system 10 may comprise a printed-circuit board (PCB) 20. In certain embodiments, the

US 8,301,833 B1

5

memory system 10 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, or 8-GB. Other volatile memory capacities are also compatible with certain embodiments described herein. In certain embodiments, the memory system 10 has a non-volatile memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, 8-GB, 16-GB, or 32-GB. Other non-volatile memory capacities are also compatible with certain embodiments described herein. In addition, memory systems 10 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. In certain embodiments, PCB 20 has an industry-standard form factor. For example, the PCB 20 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 20 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 20 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FBDIMM), mini-DIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. For example, in other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain preferred embodiments, the memory system 10 is in electrical communication with the host system. In other embodiments, the memory system 10 may communicate with a host system using some other type of communication, such as, for example, optical communication. Examples of host systems include, but are not limited to, blade servers, 1U servers, personal computers (PCs), and other applications in which space is constrained or limited. The memory system 10 can be in communication with a disk controller of a computer system, for example. The PCB 20 can comprise an interface 22 that is configured to be in electrical communication with the host system (not shown). For example, the interface 22 can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system. The interface 22 of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory system 10 and the host system. For example, the interface 22 can comprise a standard 240-pin DDR2 edge connector.

The volatile memory subsystem 30 comprises a plurality of volatile memory elements 32 and the non-volatile memory subsystem 40 comprises a plurality of non-volatile memory elements 42. Certain embodiments described herein advantageously provide non-volatile storage via the non-volatile memory subsystem 40 in addition to high-performance (e.g., high speed) storage via the volatile memory subsystem 30. In certain embodiments, the first plurality of volatile memory elements 32 comprises two or more dynamic random-access memory (DRAM) elements. Types of DRAM elements 32 compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, and synchronous DRAM (SDRAM). For example, in the block diagram of FIG. 1, the first memory bank 30 comprises eight 64Mx8 DDR2 SDRAM elements 32. The volatile memory elements 32 may comprise other types of memory elements such as static random-access memory (SRAM). In addition, volatile memory elements 32 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Volatile memory elements 32

6

compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (µBGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

In certain embodiments, the second plurality of non-volatile memory elements 42 comprises one or more flash memory elements. Types of flash memory elements 42 compatible with certain embodiments described herein include, but are not limited to, NOR flash, NAND flash, ONE-NAND flash, and multi-level cell (MLC). For example, in the block diagram of FIG. 1, the second memory bank 40 comprises 512 MB of flash memory organized as four 128 Mbx8 NAND flash memory elements 42. In addition, non-volatile memory elements 42 having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Non-volatile memory elements 42 compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (µBGA), mini-BGA (mBGA), and chip-scale packaging (CSP).

FIG. 2 is a block diagram of an example memory module 10 with ECC (error-correcting code) having a volatile memory subsystem 30 with nine volatile memory elements 32 and a non-volatile memory subsystem 40 with five non-volatile memory elements 42 in accordance with certain embodiments described herein. The additional memory element 32 of the first memory bank 30 and the additional memory element 42 of the second memory bank 40 provide the ECC capability. In certain other embodiments, the volatile memory subsystem 30 comprises other numbers of volatile memory elements 32 (e.g., 2, 3, 4, 5, 6, 7, more than 9). In certain embodiments, the non-volatile memory subsystem 40 comprises other numbers of non-volatile memory elements 42 (e.g., 2, 3, more than 5).

Referring to FIG. 1, in certain embodiments, the logic element 70 comprises a field-programmable gate array (FPGA). In certain embodiments, the logic element 70 comprises an FPGA available from Lattice Semiconductor Corporation which includes an internal flash. In certain other embodiments, the logic element 70 comprises an FPGA available from another vendor. The internal flash can improve the speed of the memory system 10 and save physical space. Other types of logic elements 70 compatible with certain embodiments described herein include, but are not limited to, a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a custom-designed semiconductor device, a complex programmable logic device (CPLD). In certain embodiments, the logic element 70 is a custom device. In certain embodiments, the logic element 70 comprises various discrete electrical elements, while in certain other embodiments, the logic element 70 comprises one or more integrated circuits. FIG. 3 is a block diagram of an example memory module 10 having a microcontroller unit 60 and logic element 70 integrated into a single controller 62 in accordance with certain embodiments described herein. In certain embodiments, the controller 62 includes one or more other components. For example, in one embodiment, an FPGA without an internal flash is used and the controller 62 includes a separate flash memory component which stores configuration information to program the FPGA.

In certain embodiments, the at least one circuit 52 comprises one or more switches coupled to the volatile memory subsystem 30, to the controller 62, and to the host computer (e.g., via the interface 22, as schematically illustrated by FIGS. 1-3). The one or more switches are responsive to sig-

US 8,301,833 B1

7

nals (e.g., from the controller **62**) to selectively operatively decouple the controller **62** from the volatile memory subsystem **30** and to selectively operatively couple the controller **62** to the volatile memory subsystem **30**. In addition, in certain embodiments, the at least one circuit **52** selectively operatively couples and decouples the volatile memory subsystem **30** and the host system.

In certain embodiments, the volatile memory subsystem **30** can comprise a registered DIMM subsystem comprising one or more registers **160** and a plurality of DRAM elements **180**, as schematically illustrated by FIG. **4A**. In certain such embodiments, the at least one circuit **52** can comprise one or more switches **172** coupled to the controller **62** (e.g., logic element **70**) and to the volatile memory subsystem **30** which can be actuated to couple and decouple the controller **62** to and from the volatile memory subsystem **30**, respectively. The memory system **10** further comprises one or more switches **170** coupled to the one or more registers **160** and to the plurality of DRAM elements **180** as schematically illustrated by FIG. **4A**. The one or more switches **170** can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem **30** to the host system **150**. In certain other embodiments, as schematically illustrated by FIG. **4B**, the one or more switches **174** are also coupled to the one or more registers **160** and to a power source **162** for the one or more registers **160**. The one or more switches **174** can be selectively switched to turn power on or off to the one or more registers **160**, thereby selectively operatively coupling the volatile memory subsystem **30** to the host system **150**. As schematically illustrated by FIG. **4C**, in certain embodiments the at least one circuit **52** comprises a dynamic on-die termination (ODT) **176** circuit of the logic element **70**. For example, the logic element **70** can comprise a dynamic ODT circuit **176** which selectively operatively couples and decouples the logic element **70** to and from the volatile memory subsystem **30**, respectively. In addition, and similar to the example embodiment of FIG. **4A** described above, the one or more switches **170** can be selectively switched, thereby selectively operatively coupling the volatile memory subsystem **30** to the host system **150**.

Certain embodiments described herein utilize the non-volatile memory subsystem **40** as a flash "mirror" to provide backup of the volatile memory subsystem **30** in the event of certain system conditions. For example, the non-volatile memory subsystem **40** may backup the volatile memory subsystem **30** in the event of a trigger condition, such as, for example, a power failure or power reduction or a request from the host system. In one embodiment, the non-volatile memory subsystem **40** holds intermediate data results in a noisy system environment when the host computer system is engaged in a long computation. In certain embodiments, a backup may be performed on a regular basis. For example, in one embodiment, the backup may occur every millisecond in response to a trigger condition. In certain embodiments, the trigger condition occurs when the memory system **10** detects that the system voltage is below a certain threshold voltage. For example, in one embodiment, the threshold voltage is 10 percent below a specified operating voltage. In certain embodiments, a trigger condition occurs when the voltage goes above a certain threshold value, such as, for example, 10 percent above a specified operating voltage. In some embodiments, a trigger condition occurs when the voltage goes below a threshold or above another threshold. In various embodiments, a backup and/or restore operation may occur in reboot and/or non-reboot trigger conditions.

As schematically illustrated by FIGS. **1** and **2**, in certain embodiments, the controller **62** may comprise a microcon-

8

troller unit (MCU) **60** and a logic element **70**. In certain embodiments, the MCU **60** provides memory management for the non-volatile memory subsystem **40** and controls data transfer between the volatile memory subsystem **30** and the non-volatile memory subsystem **40**. The MCU **60** of certain embodiments comprises a 16-bit microcontroller, although other types of microcontrollers are also compatible with certain embodiments described herein. As schematically illustrated by FIGS. **1** and **2**, the logic element **70** of certain embodiments is in electrical communication with the non-volatile memory subsystem **40** and the MCU **60**. The logic element **70** can provide signal level translation between the volatile memory elements **32** (e.g., 1.8V SSTL-2 for DDR2 SDRAM elements) and the non-volatile memory elements **42** (e.g., 3V TTL for NAND flash memory elements). In certain embodiments, the logic element **70** is also programmed to perform address/address translation between the volatile memory subsystem **30** and the non-volatile memory subsystem **40**. In certain preferred embodiments, 1-NAND type flash are used for the non-volatile memory elements **42** because of their superior read speed and compact structure.

The memory system **10** of certain embodiments is configured to be operated in at least two states. The at least two states can comprise a first state in which the controller **62** and the non-volatile memory subsystem **40** are operatively decoupled (e.g., isolated) from the volatile memory subsystem **30** by the at least one circuit **52** and a second state in which the volatile memory subsystem **30** is operatively coupled to the controller **62** to allow data to be communicated between the volatile memory subsystem **30** and the non-volatile memory subsystem **40** via the controller **62**. The memory system **10** may transition from the first state to the second state in response to a trigger condition, such as when the memory system **10** detects that there is a power interruption (e.g., power failure or reduction) or a power hang-up.

The memory system **10** may further comprise a voltage monitor **50**. The voltage monitor circuit **50** monitors the voltage supplied by the host system via the interface **22**. Upon detecting a low voltage condition (e.g., due to a power interruption to the host system), the voltage monitor circuit **50** may transmit a signal to the controller **62** indicative of the detected condition. The controller **62** of certain embodiments responds to the signal from the voltage monitor circuit **50** by transmitting a signal to the at least one circuit **52** to operatively couple the controller to the volatile memory subsystem **30**, such that the memory system **10** enters the second state. For example, the voltage monitor **50** may send a signal to the MCU **60** which responds by accessing the data on the volatile memory subsystem **30** and by executing a write cycle on the non-volatile memory subsystem **40**. During this write cycle, data is read from the volatile memory subsystem **30** and is transferred to the non-volatile memory subsystem **40** via the MCU **60**. In certain embodiments, the voltage monitor circuit **50** is part of the controller **62** (e.g., part of the MCU **60**) and the voltage monitor circuit **50** transmits a signal to the other portions of the controller **62** upon detecting a power threshold condition.

The isolation or operational decoupling of the volatile memory subsystem **30** from the non-volatile memory subsystem in the first state can preserve the integrity of the operation of the memory system **10** during periods of operation in which signals (e.g., data) are transmitted between the host system and the volatile memory subsystem **30**. For example, in one embodiment during such periods of operation, the controller **62** and the non-volatile memory subsystem **40** do not add a significant capacitive load to the volatile memory system **30** when the memory system **10** is in the first state. In certain such embodiments, the capacitive

US 8,301,833 B1

9

load of the controller 62 and the non-volatile memory sub-system 40 do not significantly affect the signals propagating between the volatile memory subsystem 30 and the host system. This can be particularly advantageous in relatively high-speed memory systems where loading effects can be significant. In one preferred embodiment, the at least one circuit 52 comprises an FSA1208 Low-Power, Eight-Port, Hi-Speed Isolation Switch from Fairchild Semiconductor. In other embodiments, the at least one circuit 52 comprises other types of isolation devices.

Power may be supplied to the volatile memory subsystem 30 from a first power supply (e.g., a system power supply) when the memory system 10 is in the first state and from a second power supply 80 when the memory system 10 is in the second state. In certain embodiments, the memory system 10 is in the first state when no trigger condition (e.g., a power failure) is present and the memory system 10 enters the second state in response to a trigger condition. In certain embodiments, the memory system 10 has a third state in which the controller 62 is operatively decoupled from the volatile memory subsystem 30 and power is supplied to the volatile memory subsystem 30 from a third power supply (not shown). For example, in one embodiment the third power supply may provide power to the volatile memory subsystem 30 when the memory system 10 detects that a trigger condition is likely to occur but has not yet occurred.

In certain embodiments, the second power supply 80 does not comprise a battery. Because a battery is not used, the second power supply 80 of certain embodiments may be relatively easy to maintain, does not generally need to be replaced, and is relatively environmentally friendly. In certain embodiments, as schematically illustrated by FIGS. 1-3, the second power supply 80 comprises a step-up transformer 82, a step-down transformer 84, and a capacitor bank 86 comprising one or more capacitors (e.g., double-layer capacitors). In one example embodiment, capacitors may take about three to four minutes to charge and about two minutes to discharge. In other embodiments, the one or more capacitors may take a longer time or a shorter time to charge and/or discharge. For example, in certain embodiments, the second power supply 80 is configured to power the volatile memory subsystem 30 for less than thirty minutes. In certain embodiments, the second power supply 80 may comprise a battery. For example, in certain embodiments, the second power supply 80 comprises a battery and one or more capacitors and is configured to power the volatile memory subsystem 30 for no more than thirty minutes.

In certain embodiments, the capacitor bank 86 of the second power supply 80 is charged by the first power supply while the memory system 10 is in the first state. As a result, the second power supply 80 is fully charged when the memory system 10 enters the second state. The memory system 10 and the second power supply 80 may be located on the same printed circuit board 20. In other embodiments, the second power supply 80 may not be on the same printed circuit board 20 and may be tethered to the printed circuit board 20, for example.

When operating in the first state, in certain embodiments, the step-up transformer 82 keeps the capacitor bank 86 charged at a peak value. In certain embodiments, the step-down transformer 84 acts as a voltage regulator to ensure that regulated voltages are supplied to the memory elements (e.g., 1.8V to the volatile DRAM elements 32 and 3.0V to the non-volatile flash memory elements 42) when operating in the second state (e.g., during power down). In certain embodiments, as schematically illustrated by FIGS. 1-3, the memory module 10 further comprises a switch 90 (e.g., FET switch)

10

that switches power provided to the controller 62, the volatile memory subsystem 30, and the non-volatile memory subsystem 40, between the power from the second power supply 80 and the power from the first power supply (e.g., system power) received via the interface 22. For example, the switch 90 may switch from the first power supply to the second power supply 80 when the voltage monitor 50 detects a low voltage condition. The switch 90 of certain embodiments advantageously ensures that the volatile memory elements 32 and non-volatile memory elements 42 are powered long enough for the data to be transferred from the volatile memory elements 32 and stored in the non-volatile memory elements 42. In certain embodiments, after the data transfer is complete, the switch 90 then switches back to the first power supply and the controller 62 transmits a signal to the at least one circuit 52 to operatively decouple the controller 62 from the volatile memory subsystem 30, such that the memory system 10 re-enters the first state.

When the memory system 10 re-enters the first state, data may be transferred back from the non-volatile memory subsystem 40 to the volatile memory subsystem 30 via the controller 62. The host system can then resume accessing the volatile memory subsystem 30 of the memory module 10. In certain embodiments, after the memory system 10 enters or re-enters the first state (e.g., after power is restored), the host system accesses the volatile memory subsystem 30 rather than the non-volatile memory subsystem 40 because the volatile memory elements 32 have superior read/write character-istics. In certain embodiments, the transfer of data from the volatile memory bank 30 to the non-volatile memory bank 40, or from the non-volatile memory bank 40 to the volatile memory bank 30, takes less than one minute per GB.

In certain embodiments, the memory system 10 protects the operation of the volatile memory when communicating with the host-system and provides backup and restore capability in the event of a trigger condition such as a power failure. In certain embodiments, the memory system 10 copies the entire contents of the volatile memory subsystem 30 into the non-volatile memory subsystem 40 on each backup operation. Moreover, in certain embodiments, the entire contents of the non-volatile memory subsystem 40 are copied back into the volatile memory subsystem 30 on each restore operation. In certain embodiments, the entire contents of the non-volatile memory subsystem 40 are accessed for each backup and/or restore operation, such that the non-volatile memory subsystem 40 (e.g., flash memory subsystem) is used generally uniformly across its memory space and wear-leveling is not performed by the memory system 10. In certain embodiments, avoiding wear-leveling can decrease cost and complexity of the memory system 10 and can improve the performance of the memory system 10. In certain other embodiments, the entire contents of the volatile memory subsystem 30 are not copied into the non-volatile memory subsystem 40 on each backup operation, but only a partial copy is performed. In certain embodiments, other management capabilities such as bad-block management and error management for the flash memory elements of the non-volatile memory subsystem 40 are performed in the controller 62.

The memory system 10 generally operates as a write-back cache in certain embodiments. For example, in one embodiment, the host system (e.g., a disk controller) writes data to the volatile memory subsystem 30 which then writes the data to non-volatile storage which is not part of the memory system 10, such as, for example, a hard disk. The disk controller may wait for an acknowledgment signal from the memory system 10 indicating that the data has been written to the hard disk or is otherwise secure. The memory system 10 of certain

US 8,301,833 B1

11

embodiments can decrease delays in the system operation by indicating that the data has been written to the hard disk before it has actually done so. In certain embodiments, the memory system 10 will still be able to recover the data efficiently in the event of a power outage because of the backup and restore capabilities described herein. In certain other embodiments, the memory system 10 may be operated as a write-through cache or as some other type of cache.

FIG. 5 schematically illustrates an example power module 100 of the memory system 10 in accordance with certain embodiments described herein. The power module 100 provides power to the various components of the memory system 10 using different elements based on a state of the memory system 10 in relation to a trigger condition. In certain embodiments, the power module 100 comprises one or more of the components described above with respect to FIG. 1. For example, in certain embodiments, the power module 100 includes the second power supply 80 and the switch 90.

The power module 100 provides a plurality of voltages to the memory system 10 comprising non-volatile and volatile memory subsystems 30, 40. The plurality of voltages comprises at least a first voltage 102 and a second voltage 104. The power module 100 comprises an input 106 providing a third voltage 108 to the power module 100 and a voltage conversion element 120 configured to provide the second voltage 104 to the memory system 10. The power module 100 further comprises a first power element 130 configured to selectively provide a fourth voltage 110 to the conversion element 120. In certain embodiments, the first power element 130 comprises a pulse-width modulation power controller. For example, in one example embodiment, the first power element 130 is configured to receive a 1.8V input system voltage as the third voltage 108 and to output a modulated 5V output as the fourth voltage 110.

The power module 100 further comprises a second power element 140 can be configured to selectively provide a fifth voltage 112 to the conversion element 120. The power module 100 can be configured to selectively provide the first voltage 102 to the memory system 10 either from the conversion element 120 or from the input 106.

The power module 100 can be configured to be operated in at least three states in certain embodiments. In a first state, the first voltage 102 is provided to the memory system 10 from the input 106 and the fourth voltage 110 is provided to the conversion element 120 from the first power element 130. In a second state, the fourth voltage 110 is provided to the conversion element 120 from the first power element 130 and the first voltage 102 is provided to the memory system 10 from the conversion element 120. In the third state, the fifth voltage 112 is provided to the conversion element 120 from the second power element 140 and the first voltage 104 is provided to the memory system 10 from the conversion element 120.

In certain embodiments, the power module 100 transitions from the first state to the second state upon detecting that a trigger condition is likely to occur and transitions from the second state to the third state upon detecting that the trigger condition has occurred. For example, the power module 100 may transition to the second state when it detects that a power failure is about to occur and transitions to the third state when it detects that the power failure has occurred. In certain embodiments, providing the first voltage 102 in the second state from the first power element 130 rather than from the input 106 allows a smoother transition from the first state to the third state. For example, in certain embodiments, providing the first voltage 102 from the first power element 130 has capacitive and other smoothing effects. In addition, switching

12

the point of power transition to be between the conversion element 120 and the first and second power elements 130, 140 (e.g., the sources of the pre-regulated fourth voltage 110 in the second state and the pre-regulated fifth voltage 112 in the third state) can smooth out potential voltage spikes.

In certain embodiments, the second power element 140 does not comprise a battery and may comprise one or more capacitors. For example, as schematically illustrated in FIG. 4, the second power element 140 comprises a capacitor array 142, a buck-boost converter 144 which adjusts the voltage for charging the capacitor array and a voltage/current limiter 146 which limits the charge current to the capacitor array 142 and stops charging the capacitor array 142 when it has reached a certain charge voltage. In one example embodiment, the capacitor array 142 comprises two 50 farad capacitors capable of holding a total charge of 4.6V. For example, in one example embodiment, the buck-boost converter 144 receives a 1.8V system voltage (first voltage 108) and boosts the voltage to 4.3V which is outputted to the voltage current limiter 146. The voltage/current limiter 146 limits the current going to the capacitor array 142 to 1A and stops charging the array 142 when it is charged to 4.3V. Although described with respect to certain example embodiments, one of ordinary skill will recognize from the disclosure herein that the second power element 140 may include alternative embodiments. For example, different components and/or different value components may be used. For example, in other embodiments, a pure boost converter may be used instead of a buck-boost converter. In another embodiment, only one capacitor may be used instead of a capacitor array 142.

The conversion element 120 can comprise one or more buck converters and/or one or more buck-boost converters. The conversion element 120 may comprise a plurality of sub-blocks 122, 124, 126 as schematically illustrated by FIG. 4, which can provide more voltages in addition to the second voltage 104 to the memory system 10. The sub-blocks may comprise various converter circuits such as buck-converters, boost converters, and buck-boost converter circuits for providing various voltage values to the memory system 10. For example, in one embodiment, sub-block 122 comprises a buck converter, sub-block 124 comprises a dual buck converter, and sub-block 126 comprises a buck-boost converter as schematically illustrated by FIG. 4. Various other components for the sub-blocks 122, 124, 126 of the conversion element 120 are also compatible with certain embodiments described herein. In certain embodiments, the conversion element 120 receives as input either the fourth voltage 110 from the first power element 130 or the fifth voltage 112 from the second power element 140, depending on the state of the power module 100, and reduces the input to an appropriate amount for powering various components of the memory system. For example, the buck-converter of sub-block 122 can provide 1.8V at 2 A for about 60 seconds to the volatile memory elements 32 (e.g., DRAM), the non-volatile memory elements 42 (e.g., flash), and the controller 62 (e.g., an FPGA) in one embodiment. The sub-block 124 can provide the second voltage 104 as well as another reduced voltage 105 to the memory system 10. In one example embodiment, the second voltage 104 is 2.5V and is used to power the at least one circuit 52 (e.g., isolation device) and the other reduced voltage 105 is 1.2V and is used to power the controller 62 (e.g., FPGA). The sub-block 126 can provide yet another voltage 107 to the memory system 10. For example, the voltage 107 may be 3.3V and may be used to power both the controller 62 and the at least one circuit 52.

Although described with respect to certain example embodiments, one of ordinary skill will recognize from the

US 8,301,833 B1

13

disclosure herein that the conversion element 120 may include alternative embodiments. For example, there may be more or less sub-blocks which may comprise other types of converters (e.g., pure boost converters) or which may produce different voltage values. In one embodiment, the volatile memory elements 32 and non-volatile memory elements 42 are powered using independent voltages and are not both powered using the first voltage 102.

FIG. 6 is a flowchart of an example method 200 of providing a first voltage 102 and a second voltage 104 to a memory system 10 including volatile and nonvolatile memory subsystems 30, 40. While the method 200 is described herein by reference to the memory system 10 schematically illustrated by FIGS. 1-4, other memory systems are also compatible with embodiments of the method 200. During a first condition, the method 200 comprises providing the first voltage 102 to the memory system 10 from an input power supply 106 and providing the second voltage 104 to the memory system 10 from a first power subsystem in operational block 210. For example, in one embodiment, the first power subsystem comprises the first power element 130 and the voltage conversion element 120 described above with respect to FIG. 4. In other embodiments, other first power subsystems are used.

The method 200 further comprises detecting a second condition in operational block 220. In certain embodiments, detecting the second condition comprises detecting that a trigger condition is likely to occur. During the second condition, the method 200 comprises providing the first voltage 102 and the second voltage 104 to the memory system 10 from the first power subsystem in an operational block 230. For example, referring to FIG. 4, a switch 148 can be toggled to provide the first voltage 102 from the conversion element 120 rather than from the input power supply.

The method 200 further comprises charging a second power subsystem in operational block 240. In certain embodiments, the second power subsystem comprises the second power element 140 or another power supply that does not comprise a battery. For example, in one embodiment, the second power subsystem comprises the second power element 140 and the voltage conversion element 120 described above with respect to FIG. 4. In other embodiments, some other second power subsystem is used.

The method 200 further comprises detecting a third condition in an operational block 250 and during the third condition, providing the first voltage 102 and the second voltage 104 to the memory system 10 from the second power subsystem 140 in an operational block 250. In certain embodiments, detecting the third condition comprises detecting that the trigger condition has occurred. The trigger condition may comprise various conditions described herein. In various embodiments, for example, the trigger condition comprises a power reduction, power failure, or system hang-up. The operational blocks of the method 200 may be performed in different orders in various embodiments. For example, in certain embodiments, the second power subsystem 140 is charged before detecting the second condition.

In certain embodiments, the memory system 10 comprises a volatile memory subsystem 30 and a non-volatile memory subsystem 40 comprising at least 100 percent more storage capacity than does the volatile memory subsystem. The memory system 10 also comprises a controller 62 operatively coupled to the volatile memory subsystem 30 and operatively coupled to the non-volatile memory subsystem 40. The controller 62 can be configured to allow data to be communicated between the volatile memory subsystem 30 and the host system when the memory system 10 is operating in a first state and to allow data to be communicated between the volatile

14

memory subsystem 30 and the non-volatile memory subsystem 40 when the memory system 10 is operating in a second state.

Although the memory system 10 having extra storage capacity of the non-volatile memory subsystem 40 has been described with respect to certain embodiments, alternative configurations exist. For example, in certain embodiments, there may be more than 100 percent more storage capacity in the non-volatile memory subsystem 40 than in the volatile memory subsystem 30. In various embodiments, there may be at least 200, 300, or 400 percent more storage capacity in the non-volatile memory subsystem 40 than in the volatile memory subsystem 30. In other embodiments, the non-volatile memory subsystem 40 includes at least some other integer multiples of the storage capacity of the volatile memory subsystem 30. In some embodiments, the non-volatile memory subsystem 40 includes a non-integer multiple of the storage capacity of the volatile memory subsystem 30. In one embodiment, the non-volatile memory subsystem 40 includes less than 100 percent more storage capacity than does the volatile memory subsystem 30.

The extra storage capacity of the non-volatile memory subsystem 40 can be used to improve the backup capability of the memory system 10. In certain embodiments in which data can only be written to portions of the non-volatile memory subsystem 40 which do not contain data (e.g., portions which have been erased), the extra storage capacity of the non-volatile memory subsystem 40 allows the volatile memory subsystem 30 to be backed up in the event of a subsequent power failure or other trigger event. For example, the extra storage capacity of the non-volatile memory subsystem 40 may allow the memory system 10 to backup the volatile memory subsystem 30 efficiently in the event of multiple trigger conditions (e.g., power failures). In the event of a first power failure, for example, the data in the volatile memory system 30 is copied to a first, previously erased portion of the non-volatile memory subsystem 40 via the controller 62. Since the non-volatile memory subsystem 40 has more storage capacity than does the volatile memory subsystem 30, there is a second portion of the non-volatile memory subsystem 40 which does not have data from the volatile memory subsystem 30 copied to it and which remains free of data (e.g., erased). Once system power is restored, the controller 62 of the memory system 10 restores the data to the volatile memory subsystem 30 by copying the backed-up data from the non-volatile memory subsystem 40 back to the volatile memory subsystem 30. After the data is restored, the memory system 10 erases the non-volatile memory subsystem 40. While the first portion of the non-volatile memory subsystem 40 is being erased, it may be temporarily un-accessible.

If a subsequent power failure occurs before the first portion of the non-volatile memory subsystem 40 is completely erased, the volatile memory subsystem 30 can be backed-up or stored again in the second portion of the non-volatile memory subsystem 40 as described herein. In certain embodiments, the extra storage capacity of the non-volatile memory subsystem 40 may allow the memory system 10 to operate more efficiently. For example, because of the extra storage capacity of the non-volatile memory subsystem 40, the memory system 10 can handle a higher frequency of trigger events that is not limited by the erase time of the non-volatile memory subsystem 40.

FIG. 7 is a flowchart of an example method 300 of controlling a memory system 10 operatively coupled to a host system and which includes a volatile memory subsystem 30 and a non-volatile memory subsystem 40. In certain embodiments, the non-volatile memory subsystem 40 comprises at least 100

US 8,301,833 B1

15                                                                16

percent more storage capacity than does the volatile memory
subsystem 30 as described herein. While the method 300 is
described herein by reference to the memory system 10 sche-
matically illustrated by FIGS. 1-3, the method 300 can be
practiced using other memory systems in accordance with
certain embodiments described herein. In an operational
block 310, the method 300 comprises communicating data
between the volatile memory subsystem 30 and the host sys-
tem when the memory system 10 is in a first mode of opera-
tion. The method 300 further comprises storing a first copy of
data from the volatile memory subsystem 30 to the non-
volatile memory subsystem 40 at a first time when the
memory system 10 is in a second mode of operation in an
operational block 320.

In an operational block 330, the method 300 comprises
restoring the first copy of data from the non-volatile memory
subsystem 40 to the volatile memory subsystem 30. The
method 300 further comprises erasing the first copy of data
from the non-volatile memory subsystem 40 in an operational
block 340. The method further comprises storing a second
copy of data from the volatile memory subsystem 30 to the
non-volatile memory subsystem 40 at a second time when the
memory system 10 is in the second mode of operation in an
operational block 350. Storing the second copy begins before
the first copy is completely erased from the non-volatile
memory subsystem 40.

In some embodiments, the memory system 10 enters the
second mode of operation in response to a trigger condition,
such as a power failure. In certain embodiments, the first copy
of data and the second copy of data are stored in separate
portions of the nonvolatile memory subsystem 40. The
method 300 can also include restoring the second copy of data
from the non-volatile memory subsystem 40 to the volatile
memory subsystem 30 in an operational block 360. The
operational blocks of method 300 referred to herein may be
performed in different orders in various embodiments. For
example, in some embodiments, the second copy of data is
restored to the volatile memory subsystem 30 at operational
block 360 before the first copy of data is completely erased in
the operational block 340.

FIG. 8 schematically illustrates an example clock distribu-
tion topology 400 of a memory system 10 in accordance with
certain embodiments described herein. The clock distribution
topology 400 generally illustrates the creation and routing of
the clock signals provided to the various components of the
memory system 10. A clock source 402 such as, for example,
a 25 MHz oscillator, generates a clock signal. The clock
source 402 may feed a clock generator 404 which provides a
clock signal 406 to the controller 62, which may be an FPGA.
In one embodiment, the clock generator 404 generates a 125
MHz clock signal 406. The controller 62 receives the clock
signal 406 and uses it to clock the controller 62 master state
control logic. For example, the master state control logic may
control the general operation of an FPGA controller 62.

The clock signal 406 can also be input into a clock divider
410 which produces a frequency-divided version of the clock
signal 406. In an example embodiment, the clock divider 410
is a divide by two clock divider and produces a 62.5 MHz
clock signal in response to the 125 MHz clock signal 406. A
non-volatile memory phase-locked loop (PLL) block 412 can
be included (e.g., in the controller 62) which distributes a
series of clock signals to the non-volatile memory subsystem
40 and to associated control logic. For example, a series of
clock signals 414 can be sent from the controller 62 to the
non-volatile memory subsystem 40. Another clock signal 416
can be used by the controller logic which is dedicated to
controlling the non-volatile memory subsystem 40. For

example, the clock signal 416 may clock the portion of the
controller 62 which is dedicated to generating address and/or
control lines for the non-volatile memory subsystem 40. A
feedback clock signal 418 is fed back into the non-volatile
memory PLL block 412. In one embodiment, the PLL block
412 compares the feedback clock 418 to the reference clock
411 and varies the phase and frequency of its output until the
reference 411 and feedback 418 clocks are phase and fre-
quency matched.

A version of the clock signal 406 such as the backup clock
signal 408 may be sent from the controller to the volatile
memory subsystem 30. The clock signal 408 may be, for
example, a differential version of the clock signal 406. As
described herein, the backup clock signal 408 may be used to
clock the volatile memory subsystem 30 when the memory
system 10 is backing up the data from the volatile memory
subsystem 30 into the non-volatile memory subsystem 40. In
certain embodiments, the backup clock signal 408 may also
be used to clock the volatile memory subsystem 30 when the
memory system 10 is copying the backed-up data back into
the volatile memory subsystem 30 from the non-volatile
memory subsystem 40 (also referred to as restoring the vola-
tile memory subsystem 30). The volatile memory subsystem
30 may normally be run at a higher frequency (e.g., DRAM
running at 400 MHz) than the non-volatile memory sub-
system 40 (e.g., flash memory running at 62.5 MHz) when
communicating with the host system (e.g., when no trigger
condition is present). However, in certain embodiments the
volatile memory subsystem 30 may be operated at a reduced
frequency (e.g., at twice the frequency of the non-volatile
memory subsystem 40) without introducing significant delay
into the system during backup operation and/or restore opera-
tions. Running the volatile memory subsystem 30 at the
reduced frequency during a backup and/or restore operation
may advantageously reduce overall power consumption of
the memory system 10.

In one embodiment, the backup clock 408 and the volatile
memory system clock signal 420 are received by a multi-
plexer 422, as schematically illustrated by FIG. 8. The mul-
tiplexer 422 can output either the volatile memory system
clock signal 420 or the backup clock signal 408 depending on
the backup state of the memory system 10. For example,
when the memory system 10 is not performing a backup or
restore operation and is communicating with the host system
(e.g., normal operation), the volatile memory system clock
signal 420 may be provided by the multiplexer 422 to the
volatile memory PLL block 424. When the memory system
10 is performing a backup (or restore) operation, the backup
clock signal 408 may be provided.

The volatile memory PLL block 424 receives the volatile
memory reference clock signal 423 from the multiplexer 422
and can generate a series of clock signals which are distrib-
uted to the volatile memory subsystem 30 and associated
control logic. For example, in one embodiment, the PLL
block 424 generates a series of clock signals 426 which clock
the volatile memory elements 32. A clock signal 428 may be
used to clock control logic associated with the volatile
memory elements, such as one or more registers (e.g., the one
or more registers of a registered DIMM). Another clock sig-
nal 430 may be sent to the controller 62. A feedback clock
signal 432 is fed back into the volatile memory PLL block
424. In one embodiment, the PLL block 424 compares the
feedback clock signal 432 to the reference clock signal 423
and varies the phase and frequency of its output until the
reference clock signal 423 and the feedback clock signal 432
clocks are phase and frequency matched.

US 8,301,833 B1

17

The clock signal 430 may be used by the controller 62 to generate and distribute clock signals which will be used by controller logic which is configured to control the volatile memory subsystem 30. For example, control logic in the controller 62 may be used to control the volatile memory subsystem 30 during a backup or restore operation. The clock signal 430 may be used as a reference clock signal for the PLL block 434 which can generate one or more clocks 438 used by logic in the controller 62. For example, the PLL block 434 may generate one or more clock signals 438 used to drive logic circuitry associated with controlling the volatile memory subsystem 30. In certain embodiments, the PLL block 434 includes a feedback clock signal 436 and operates in a similar manner to other PLL blocks described herein.

The clock signal 430 may be used as a reference clock signal for the PLL block 440 which may generate one or more clock signals used by a sub-block 442 to generate one or more other clock signals 444. In one embodiment, for example, the volatile memory subsystem 30 comprises DDR2 SDRAM elements and the sub-block 442 generates one or more DDR2 compatible clock signals 444. A feedback clock signal 446 is fed back into the PLL block 440. In certain embodiments, the PLL block 440 operates in a similar manner to other PLL blocks described herein.

While described with respect to the example embodiment of FIG. 8, various alternative clock distribution topologies are possible. For example, one or more of the clock signals have a different frequency in various other embodiments. In some embodiments, one or more of the clocks shown as differential signals are single ended signals. In one embodiment, the volatile memory subsystem 30 operates on the volatile memory clock signal 420 and there is no backup clock signal 408. In some embodiments, the volatile memory subsystem 30 is operated at a reduced frequency during a backup operation and not during a restore operation. In other embodiments, the volatile memory subsystem 30 is operated at a reduced frequency during a restore operation and not during a backup operation.

FIG. 9 is a flowchart of an example method 500 of controlling a memory system 10 operatively coupled to a host system. Although described with respect to the memory system 10 described herein, the method 500 is compatible with other memory systems. The memory system 10 may include a clock distribution topology 400 similar to the one described above with respect to FIG. 8 or another clock distribution topology. The memory system 10 can include a volatile memory subsystem 30 and a non-volatile memory subsystem 40.

In an operational block 510, the method 500 comprises operating the volatile memory subsystem 30 at a first frequency when the memory system 10 is in a first mode of operation in which data is communicated between the volatile memory subsystem 30 and the host system. In an operational block 520, the method 500 comprises operating the non-volatile memory subsystem 40 at a second frequency when the memory system 10 is in a second mode of operation in which data is communicated between the volatile memory subsystem 30 and the non-volatile memory subsystem 40. The method 500 further comprises operating the volatile memory subsystem 30 at a third frequency in an operational block 530 when the memory system 10 is in the second mode of operation. In certain embodiments, the memory system 10 is not powered by a battery when it is in the second mode of operation. The memory system 10 may switch from the first mode of operation to the second mode of operation in response to a trigger condition. The trigger condition may be any trigger condition described herein such as, for example, a

18

power failure condition. In certain embodiments, the second mode of operation includes both backup and restore operations as described herein. In other embodiments, the second mode of operation includes backup operations but not restore operations. In yet other embodiments, the second mode of operation includes restore operations but not backup operations.

The third frequency can be less than the first frequency. For example, the third frequency can be approximately equal to the second frequency. In certain embodiments, the reduced frequency operation is an optional operation. In yet other embodiments, the first, second and/or third frequencies are configurable by a user or by the memory system 10.

FIG. 10 schematically illustrates an example topology of a connection to transfer data slices from two DRAM segments 630, 640 of a volatile memory subsystem 30 to a controller 62 of the memory system 10. While the example of FIG. 10 shows a topology including two DRAM segments 630, 640 for the purposes of illustration, each address location of the volatile memory subsystem 30 comprises more than the two segments in certain embodiments. The data lines 632, 642 from the first DRAM segment 630 and the second DRAM segment 640 of the volatile memory subsystem 30 are coupled to switches 650, 652 which are coupled to the controller 62 (e.g., logic element 70) of the memory system 10. The chip select lines 634, 644 and the self-refresh lines 636, 646 (e.g., CKe signals) of the first and second DRAM segments 630, 640, respectively, are coupled to the controller 62. In certain embodiments, the controller 62 comprises a buffer (not shown) which is configured to store data from the volatile memory subsystem 30. In certain embodiments, the buffer is a first-in, first out buffer (FIFO). In certain embodiments, data slices from each DRAM segment 630, 640 comprise a portion of the volatile memory subsystem data bus. In one embodiment, for example, the volatile memory subsystem 30 comprises a 72-bit data bus (e.g., each data word at each addressable location is 72 bits wide and includes, for example, 64 bits of accessible SDRAM and 8 bits of ECC), the first data slice from the first DRAM segment 630 may comprise 40 bits of the data word, and the second data slice from the second DRAM segment 640 may comprise the remaining 32 bits of the data word. Certain other embodiments comprise data buses and/or data slices of different sizes.

In certain embodiments, the switches 650, 652 can each be selectively switched to selectively operatively couple the data lines 632, 642, respectively from the first and second DRAM segments 630, 640 to the controller 62. The chip select lines 634, 644 enable the first and second DRAM segments 630, 640, respectively, of the volatile memory subsystem 30, and the self-refresh lines 636, 646 toggle the first and second DRAM segments 630, 640, respectively, from self-refresh mode to active mode. In certain embodiments, the first and second DRAM segments 630, 640 maintain stored information but are not accessible when they are in self-refresh mode, and maintain stored information and are accessible when they are in active mode.

In certain embodiments, when the memory system 10 is backing up the volatile memory system 30, data slices from only one of the two DRAM segments 630, 640 at a time are sent to the controller 62. For example, when the first slice is being written to the controller 62 during a back-up, the controller 62 sends a signal via the CKe line 636 to the first DRAM segment 630 to put the first DRAM segment 630 in active mode. In certain embodiments, the data slice from the first DRAM segment 630 for multiple words (e.g., a block of words) is written to the controller 62 before writing the sec-

US 8,301,833 B1

19

20

ond data slice from the second DRAM segment **640** to the controller **62**. While the first data slice is being written to the controller **62**, the controller **62** also sends a signal via the CKe line **646** to put the second DRAM segment **640** in self-refresh mode. Once the first data slice for one word or for a block of words is written to the controller **62**, the controller **62** puts the first DRAM segment **630** into self-refresh mode by sending a signal via the CKe line **636** to the first DRAM segment **640**. The controller **62** also puts the second DRAM segment **640** into active mode by sending a signal via the CKe line **646** to the DRAM segment **640**. The second slice for a word or for a block of words is written to the controller **62**. In certain embodiments, when the first and second data slices are written to the buffer in the controller **62**, the controller **62** combines the first and second data slices **630**, **640** into complete words or blocks of words and then writes each complete word or block of words to the non-volatile memory subsystem **40**. In certain embodiments, this process is called "slicing" the volatile memory subsystem **30**.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the non-volatile memory elements **42** write each backed-up data word to the controller **62** which writes a first slice of the data word to the volatile memory subsystem **30** and then a second slice of the data word to the volatile memory subsystem **30**. In certain embodiments, slicing the volatile memory subsystem **30** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **30** during a backup operation.

FIG. 11 is a flowchart of an example method **600** of controlling a memory system **10** operatively coupled to a host system and which includes a volatile memory subsystem **30** and a non-volatile memory subsystem **40**. Although described with respect to the memory system **10** described herein with respect to FIGS. 1-3 and 10, the method **600** is compatible with other memory systems. The method **600** comprises communicating data words between the volatile memory subsystem **40** and the host system when the memory system **10** is in a first mode of operation in an operational block **610**. For example, the memory system **10** may be in the first mode of operation when no trigger condition has occurred and the memory system is not performing a backup and/or restore operation or is not being powered by a secondary power supply.

In an operational block **620**, the method further comprises transferring data words from the volatile memory subsystem **30** to the non-volatile memory subsystem **40** when the memory system **10** is in a second mode of operation. In certain embodiments, each data word comprises the data stored in a particular address of the memory system **10**. The memory system **10** may enter the second mode of operation, for example, when a trigger condition (e.g., a power failure) occurs. In certain embodiments, transferring each data word comprises storing a first portion (also referred to as a slice) of the data word in a buffer in an operational block **622**, storing a second portion of the data word in the buffer in an operational block **624**, and writing the entire data word from the buffer to the non-volatile memory subsystem **40** in an operational block **626**.

In one example embodiment, the data word may be a 72 bit data word (e.g., 64 bits of accessible SDRAM and 8 bits of ECC), the first portion (or "slice") may comprise 40 bits of the data word, and the second portion (or "slice") may comprise the remaining 32 bits of the data word. In certain embodiments, the buffer is included in the controller **62**. For example, in one embodiment, the buffer is a first-in, first-out

buffer implemented in the controller **62** which comprises an FPGA. The method **600** may generally be referred to as "slicing" the volatile memory during a backup operation. In the example embodiment, the process of "slicing" the volatile memory during a backup includes bringing the 32-bit slice out of self refresh, reading a 32-bit block from the slice into the buffer, and putting the 32-bit slice back into self-refresh. The 40-bit slice is then brought out of self-refresh and a 40-bit block from the slice is read into a buffer. Each block may comprise a portion of multiple words. For example, each 32-bit block may comprise 32-bit portions of multiple 72-bit words. In other embodiments, each block comprises a portion of a single word. The 40-bit slice is then put back into self-refresh in the example embodiment. The 32-bit and 40-bit slices are then combined into a 72-bit block by the controller **62** and ECC detection/correction is performed on each 72-bit word as it is read from the buffer and written into the non-volatile memory subsystem (e.g., flash).

In some embodiments, the entire data word may comprise more than two portions. For example, the entire data word may comprise three portions instead of two and transferring each data word further comprises storing a third portion of each data word in the buffer. In certain other embodiments, the data word may comprise more than three portions.

In certain embodiments, the data may be sliced in a restore operation as well as, or instead of, during a backup operation. For example, in one embodiment, the non-volatile memory elements **40** write each backed-up data word to the controller **62** which writes a first portion of the data word to the volatile memory subsystem **30** and then a second portion of the data word to the volatile memory **30**. In certain embodiments, slicing the volatile memory subsystem **30** during a restore operation may be performed in a manner generally inverse to slicing the volatile memory subsystem **30** during a backup operation.

The method **600** can advantageously provide significant power savings and can lead to other advantages. For example, in one embodiment where the volatile memory subsystem **30** comprises DRAM elements, only the slice of the DRAM which is currently being accessed (e.g., written to the buffer) during a backup is configured in full-operational mode. The slice or slices that are not being accessed may be put in self-refresh mode. Because DRAM in self-refresh mode uses significantly less power than DRAM in full-operational mode, the method **600** can allow significant power savings. In certain embodiments, each slice of the DRAM includes a separate self-refresh enable (e.g., CKe) signal which allows each slice to be accessed independently.

In addition, the connection between the DRAM elements and the controller **62** may be as large as the largest slice instead of as large as the data bus. In the example embodiment, the connection between the controller **62** and the DRAM may be 40 bits instead of 72 bits. As a result, pins on the controller **62** may be used for other purposes or a smaller controller may be used due to the relatively low number of pin-outs used to connect to the volatile memory subsystem **30**. In certain other embodiments, the full width of the data bus is connected between the volatile memory subsystem **30** and the controller **62** but only a portion of it is used during slicing operations. For example, in some embodiments, memory slicing is an optional operation.

Various embodiments of the present invention have been described above. Although this invention has been described with reference to these specific embodiments, the descriptions are intended to be illustrative of the invention and are not intended to be limiting. Various modifications and applica-

US 8,301,833 B1

21

tions may occur to those skilled in the art without departing from the true spirit and scope of the invention as defined in the appended claims.

What is claimed is:

1. A method for controlling a memory system operatively coupled to a host system, the memory system including a volatile memory subsystem and a non-volatile memory subsystem, the method comprising:

operating the volatile memory subsystem at a first clock frequency when the memory system is in a first mode of operation in which data is communicated between the volatile memory subsystem and the host system;

operating the non-volatile memory subsystem at a second clock frequency when the memory system is in a second mode of operation in which data is communicated between the volatile memory subsystem and the non-volatile memory subsystem; and

operating the volatile memory subsystem at a third clock frequency when the memory system is in the second mode of operation, the third clock frequency being less than the first clock frequency.

2. The method of claim 1, wherein the third clock frequency is substantially equal to the second clock frequency.

3. The method of claim 1, wherein the memory system is not powered by a battery when it is in the second mode of operation.

4. The method of claim 1, wherein the memory system switches from the first mode of operation to the second mode of operation in response to a trigger condition.

5. The method of claim 4, wherein the trigger condition comprises a power failure condition.

6. The method of claim 1, wherein the memory system further comprises a printed circuit board and the volatile memory subsystem and the non-volatile memory subsystem are located on the printed circuit board.

7. The method of claim 1, wherein data communicated between the volatile memory subsystem and the non-volatile memory subsystem is intermediate data from a host computer system computation.

8. The method of claim 1, wherein data communicated between the volatile memory subsystem and the non-volatile memory subsystem is backup data from a backup operation.

9. The method of claim 8, wherein the backup operation is conducted at repeating time intervals.

10. The method of claim 9, wherein the backup operation is initiated in response to a trigger event.

11. The method of claim 1, wherein the second mode of operation comprises a backup operation in which data is communicated from the volatile memory subsystem to the non-volatile memory subsystem.

12. The method of claim 1, wherein the second mode of operation comprises a restore operation in which data is communicated from the non-volatile memory subsystem to the volatile memory subsystem.

13. The method of claim 1, wherein one or more of the first, second or third clock frequencies is configurable by the memory system.

14. The method of claim 1, wherein one or more of the first, second or third clock frequencies is configurable by a user.

15. A memory system operatively coupled to a host system, the memory system comprising:

a volatile memory subsystem operable at a first clock frequency when the memory system is in a first mode of

22

operation in which data is communicated between the volatile memory subsystem and the host system; and

a non-volatile memory subsystem operable at a second clock frequency when the memory system is in a second mode of operation in which data is communicated between the volatile memory subsystem and the non-volatile memory subsystem,

the volatile memory subsystem further being operable at a third clock frequency when the memory system is in the second mode of operation, the third clock frequency being less than the clock first frequency.

16. The memory system of claim 15, further comprising:

a controller configured to decouple the non-volatile memory subsystem from the volatile memory subsystem in the first mode of operation and to couple the non-volatile memory subsystem to the volatile memory subsystem in the second mode of operation.

17. The memory system of claim 15, further comprising a plurality of power supplies and a switch configured to selectively deliver power from the plurality of power supplies to the volatile memory subsystem and the non-volatile memory subsystem as a function of the mode of operation.

18. The memory system of claim 15, wherein the third clock frequency is substantially equal to the second clock frequency.

19. The memory system of claim 15, wherein the memory system is not powered by a battery when it is in the second mode of operation.

20. The memory system of claim 15, wherein the memory system switches from the first mode of operation to the second mode of operation in response to a trigger condition.

21. The memory system of claim 20, wherein the trigger condition comprises a power failure condition.

22. The memory system of claim 15, wherein the memory system further comprises a printed circuit board and the volatile memory subsystem and the non-volatile memory subsystem are located on the printed circuit board.

23. The memory system of claim 15, wherein data communicated between the volatile memory subsystem and the non-volatile memory subsystem is intermediate data from a host computer system computation.

24. The memory system of claim 15, wherein data communicated between the volatile memory subsystem and the non-volatile memory subsystem is backup data from a backup operation.

25. The memory system of claim 24, wherein the backup operation is conducted at repeating time intervals.

26. The memory system of claim 25, wherein the backup operation is initiated in response to a trigger event.

27. The memory system of claim 15, wherein the second mode of operation comprises a backup operation in which data is communicated from the volatile memory subsystem to the non-volatile memory subsystem.

28. The memory system of claim 15, wherein the second mode of operation comprises a restore operation in which data is communicated from the non-volatile memory subsystem to the volatile memory subsystem.

29. The memory system of claim 15, wherein one or more of the first, second or third clock frequencies is configurable by the memory system.

30. The memory system of claim 15, wherein one or more of the first, second or third clock frequencies is configurable by a user.

*   *   *   *   *



US008359501B1

(12) **United States Patent**
Lee et al.

(10) Patent No.: **US 8,359,501 B1**
(45) Date of Patent: ***Jan. 22, 2013**

(54) **MEMORY BOARD WITH SELF-TESTING CAPABILITY**

(75) Inventors: **Hyun Lee**, Ladera Ranch, CA (US);
**Jayesh R. Bhakta**, Cerritos, CA (US);
**Soonju Choi**, Irvine, CA (US)

(73) Assignee: **Netlist, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/183,253**

(22) Filed: **Jul. 14, 2011**

**Related U.S. Application Data**

(63) Continuation of application No. 12/422,925, filed on Apr. 13, 2009, now Pat. No. 8,001,434.

(60) Provisional application No. 61/044,801, filed on Apr. 14, 2008, provisional application No. 61/044,825, filed on Apr. 14, 2008, provisional application No. 61/044,839, filed on Apr. 14, 2008.

(51) **Int. Cl.**
**G11C 29/00** (2006.01)

(52) **U.S. Cl.** ...................................... **714/719**; 714/718

(58) **Field of Classification Search** .................. 714/718, 714/719, 736, 733, 734, 738, 819; 365/201
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,660,675 A | 5/1972 | Andrews, Jr. | |
| 3,757,235 A | 9/1973 | McCormick et al. | |
| 4,305,091 A | 12/1981 | Cooper | |
| 4,586,168 A | 4/1986 | Adlhoch et al. | |
| 4,701,845 A | 10/1987 | Andreasen et al. | |
| 4,752,741 A | 6/1988 | Kim et al. | |
| 4,782,487 A | 11/1988 | Smelser | |
| 4,837,743 A | 6/1989 | Chiu et al. | |
| 4,885,799 A | 12/1989 | Van Horn | |
| 4,903,266 A | 2/1990 | Hack | |
| 4,910,597 A | 3/1990 | Harada et al. | |
| 4,942,556 A | 7/1990 | Sasaki et al. | |
| 4,958,346 A * | 9/1990 | Fujisaki ........................ 714/720 |
| 4,987,321 A | 1/1991 | Toohey | |
| 5,033,048 A | 7/1991 | Pierce et al. | |
| 5,051,997 A | 9/1991 | Sakashita et al. | |
| 5,138,619 A | 8/1992 | Fasang et al. | |
| 5,173,906 A | 12/1992 | Dreibelbis et al. | |

(Continued)

OTHER PUBLICATIONS

Der-Chang et al. "*A parallel built-in self-diagnostic method for embedded memory arrays*", IEEE Transactions on Computer-Aided Design of Integrated Circuits and Systems, Apr. 2002, vol. 21, Issue 4, pp. 449-465.

(Continued)

*Primary Examiner* — Phung M Chung

(57) **ABSTRACT**

A self-testing memory module includes a printed circuit board configured to be operatively coupled to a memory controller of a computer system and includes a plurality of memory devices on the printed circuit board, each memory device of the plurality of memory devices comprising data, address, and control ports. The memory module also includes a control module configured to generate address and control signals for testing the memory devices. The memory module includes a data module comprising a plurality of data handlers. Each data handler is operable independently from each of the other data handlers of the plurality of data handlers. Each data handler is operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices and is configured to generate data for writing to the corresponding plurality of data ports.

20 Claims, 5 Drawing Sheets



Exh C

**US 8,359,501 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,222,066 A | 6/1993 | Grula et al. |
| 5,241,503 A | 8/1993 | Cheng |
| 5,304,856 A | 4/1994 | Rainal |
| 5,337,254 A | 8/1994 | Knee et al. |
| 5,359,235 A | 10/1994 | Coyle et al. |
| 5,394,037 A | 2/1995 | Josephson et al. |
| 5,430,335 A | 7/1995 | Tanoi |
| 5,525,917 A | 6/1996 | Wong et al. |
| 5,841,296 A | 11/1998 | Churcher et al. |
| 5,914,543 A | 6/1999 | Scherpenberg et al. |
| 6,000,048 A | 12/1999 | Krishna et al. |
| 6,044,481 A | 3/2000 | Kornachuk et al. |
| 6,070,217 A | 5/2000 | Connolly et al. |
| 6,169,696 B1 | 1/2001 | Bissey |
| 6,194,959 B1 | 2/2001 | Kamoshida et al. |
| 6,216,240 B1 | 4/2001 | Won et al. |
| 6,467,056 B1 | 10/2002 | Satou et al. |
| 6,560,740 B1 | 5/2003 | Zuraski, Jr. et al. |
| 6,614,702 B2 | 9/2003 | Lee |
| 6,681,358 B1 * | 1/2004 | Karimi et al. .............. 714/733 |
| 6,721,150 B1 | 4/2004 | Guerrero, Jr. |
| 6,812,869 B1 | 11/2004 | Rahman et al. |
| 6,829,728 B2 | 12/2004 | Cheng et al. |
| 6,910,162 B2 * | 6/2005 | Co et al. .................. 714/718 |
| 6,918,072 B2 | 7/2005 | Cowles et al. |
| 6,928,024 B2 | 8/2005 | Pfeiffer et al. |
| 6,928,593 B1 | 8/2005 | Halbert et al. |
| 6,930,509 B2 | 8/2005 | Banik |
| 6,934,900 B1 | 8/2005 | Cheng et al. |
| 7,036,064 B1 | 4/2006 | Kebichi et al. |
| 7,053,470 B1 | 5/2006 | Sellers et al. |
| 7,062,696 B2 | 6/2006 | Barry et al. |
| 7,184,915 B2 | 2/2007 | Hansquine et al. |
| 7,190,210 B2 | 3/2007 | Azrai et al. |
| 7,203,873 B1 | 4/2007 | Adams |
| 7,253,652 B2 | 8/2007 | Azimi et al. |
| 7,284,166 B2 | 10/2007 | Zappa et al. |
| 7,774,667 B2 * | 8/2010 | Saito et al. .............. 714/733 |
| 2001/0048342 A1 | 12/2001 | Yoshida et al. |
| 2002/0000847 A1 | 1/2002 | Taguchi |

| | | |
|---|---|---|
| 2002/0131535 A1 | 9/2002 | Huber |
| 2002/0140523 A1 | 10/2002 | Park et al. |
| 2003/0098742 A1 | 5/2003 | Nakagawa et al. |
| 2003/0126346 A1 | 7/2003 | Kuo |
| 2003/0197797 A1 | 10/2003 | Segura |
| 2003/0218491 A1 | 11/2003 | Nagasue |
| 2004/0155702 A1 | 8/2004 | Danielsson |
| 2004/0199843 A1 | 10/2004 | Hansquine et al. |
| 2005/0093620 A1 | 5/2005 | Ho et al. |
| 2005/0127989 A1 | 6/2005 | Miyagi |
| 2005/0280423 A1 | 12/2005 | Yabuta |
| 2006/0082383 A1 | 4/2006 | Choi |
| 2006/0107156 A1 | 5/2006 | Lee et al. |
| 2006/0140015 A1 | 6/2006 | Kasamsetty |
| 2006/0144015 A1 | 7/2006 | Cash et al. |
| 2006/0147217 A1 | 7/2006 | Hahin et al. |
| 2006/0192653 A1 | 8/2006 | Atkinson et al. |
| 2006/0242458 A1 | 10/2006 | Feldman et al. |
| 2006/0262586 A1 | 11/2006 | Solomon et al. |
| 2006/0271748 A1 | 11/2006 | Jain et al. |
| 2007/0030814 A1 | 2/2007 | Shin et al. |
| 2007/0058471 A1 | 3/2007 | Rajan et al. |
| 2007/0079199 A1 | 4/2007 | Chorn et al. |
| 2007/0109707 A1 | 5/2007 | Honda |
| 2007/0152743 A1 | 7/2007 | Kceth et al. |
| 2007/0204075 A1 | 8/2007 | Rajan et al. |
| 2007/0223296 A1 | 9/2007 | Miller et al. |

## OTHER PUBLICATIONS

Bayard "On the LTI properties of adaptive feed forward systems with tapdelay-line regressors", IEEE Transactions on Signal Processing, May 1999, vol. 47, Issue 5, pp. 1288-1296.

Mutoh et al. "EMI Noise controlling methods suitable for electric vehicle drive systems", Industrial Electronics Society, 2004, IECON 2004, Nov. 2-6, 2004, vol. 1, pp. 963-968.

Sekiguchi et al "Low-noise, high-speed datat transmission using a ringing-canceling output buffer", IEEE Journal of Solid-State Circuits, Dec. 1995, vol. 30, Issue 12, pp. 1569-1574.

* cited by examiner

Case4:13-cv-05962-YGR   Document5   Filed08/23/13   Page88 of 98



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6

US 8,359,501 B1

1

**MEMORY BOARD WITH SELF-TESTING CAPABILITY**

CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 12/422,925, filed Apr. 13, 2009, now U.S. Pat. No. 8,001,434, which claims the benefit of priority from US. Provisional Application No. 61/044,801, filed Apr. 14, 2008, US. Provisional Application No. 61/044,825, filed Apr. 14, 2008, and US. Provisional Application No. 61/044, 839, filed Apr. 14, 2008. Each of the foregoing applications is incorporated in their entirety by reference herein. This application is related to U.S. patent application Ser. No. 12/422, 912, filed on Apr. 13, 2009 and entitled "Self-Adjusting Damper," which is still pending at the United States Patent and Trademark Office, and to U.S. application Ser. No. 12/422,853, filed on Apr. 13, 2009, and entitled "Circuit Providing Load Isolation and Noise Reduction", now U.S. Pat. No. 8,154,901, both of which are incorporated in their entirety by reference herein.

BACKGROUND

1. Field

The present invention relates to self-testing electronic modules and, more particularly, to self-testing electronic memory modules.

2. Description of the Related Art

The failure of memory components in an electronic system may result in the loss of valid data. Therefore, it is important to ensure proper memory operation in an electronic system. Memory integrated circuits ("memory chips") often go through a series of tests at various stages of system manufacture. Once memory chips are deployed in a system, they also generally go through a system level memory test each time the system is booted. In addition, memory chips may undergo a parity checking process during normal system operation.

There are typically at least three test phases which memories undergo during system manufacture. Each phase generally tests for memory defects and for the correct operation of the input/output interface. The first test phase is typically conducted by the memory chip manufacturer and generally involves checking for bit failures, correct memory access speed, etc. The second test phase is typically done by memory module manufacturers and generally involves testing the signal quality, the noise susceptibility, and the operational speed of the memory module as a single unit. The second test phase may also include checking for bit failures in individual memory chips. The third phase is usually carried out by the system manufacturer. During the third phase, the interaction of the memory subsystem with other components in the system is tested. During the third phase, the individual memory module operation is also tested again and the memory array is checked for defects. Because of the significant amount of testing that memories undergo during the manufacturing process, there is generally substantial test cost and test time associated with ensuring the proper memory operation. This test cost and test time translate into an increase in system cost and a decrease in system performance.

There are a number of memory test methodologies that employ either external test hardware, embedded self-test logic ("MBIST"), or both. However, the usefulness of these test methodologies is limited due to the high cost and other limitations associated with them. For instance, external test hardware such as automatic test equipment ("ATE") is very

2

expensive. Moreover, the development time and cost associated with implementing MBIST is relatively high. These costs and limitations are especially significant when testing dynamic random access memory ("DRAM"). For example, technological developments, such as increases in DRAM speed, may require manufacturers to upgrade ATE machines relatively frequently. In addition, MBIST in DRAM chips generally cannot be fully utilized for system level testing of memory boards.

Because of the increasing cost, complexity, and time involved with fully testing DRAM chips, DRAM manufacturers often provide "effectively tested" ("ETT") DRAM chips to memory module manufacturers at a lower price rather than providing fully tested DRAM chips. Memory module manufacturers often prefer the ETT DRAM chips mainly due to their greater availability. Memory module manufacturers who receive ETT DRAM chips then have to assume a part of the responsibility of validating the DRAM chips, adding to the complexity of the memory module test process.

SUMMARY

In certain embodiments, a self-testing memory module is provided comprising a printed circuit board configured to be operatively coupled to a memory controller of a computer system. The memory module may further comprise a plurality of memory devices on the printed circuit board. Each memory device of the plurality of memory devices comprises data, address, and control ports. In certain embodiments, the memory module includes a control module configured to generate address and control signals for testing the memory devices and a data module comprising a plurality of data handlers. Each data handler in certain embodiments is operable independently from each of the other data handlers of the plurality of data handlers. Each data handler may be operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices and configured to generate data for writing to the corresponding plurality of data ports.

A self-testing memory module is provided in certain embodiments comprising a printed circuit board configured to be operatively coupled to a memory controller of a computer system. The memory module may further comprise a plurality of memory devices on the printed circuit board. Each memory device of the plurality of memory devices comprises data, address, and control ports in some embodiments. The memory module of certain embodiments includes a control module configured to generate address and control signals for testing the memory devices. In certain embodiments, the memory module comprises a data module comprising at least one data handler operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices and configured to generate cyclic data for writing to the corresponding plurality of data ports.

In certain embodiments, a method of self-testing a memory module includes providing a self-testing memory module. The memory module comprises a printed circuit board configured to be operatively coupled to a memory controller of a computer system. The memory module further comprises a plurality of memory devices on the printed circuit board. Each memory device of the plurality of memory devices comprising data, address, and control ports. In certain embodiments, the memory module comprises a control module configured to generate address and control signals for testing the memory devices. The memory module may further comprise a data module comprising a plurality of data han-

US 8,359,501 B1

3

dlers. Each data handler may be operable independently from each of the other data handlers of the plurality of data handlers and operatively coupled to a corresponding plurality of the data ports. The method of certain embodiments further includes generating, by each of the data handlers, data for writing to the corresponding plurality of data ports.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an example self-testing memory module in accordance with certain embodiments described herein.

FIG. 2 is a block diagram of an example self-testing memory module including eight memory devices and eight data handlers in accordance with certain embodiments described herein.

FIG. 3 is a block diagram of an example data handler module and an example control module in accordance with certain embodiments described herein.

FIG. 4 is a flowchart of an example method of self-testing a memory module in accordance with certain embodiments described herein.

FIG. 5 is a flow diagram illustrating the self-testing operation of an example memory module in accordance with certain embodiments described herein.

FIG. 6 is a flow diagram illustrating the self-testing operation of an example memory module in accordance with certain embodiments described herein.

## DETAILED DESCRIPTION

Certain embodiments described herein present a self-testing electronic system, such as for example, a self-testing electronic memory module. Some embodiments described herein present a self-testing memory module that is populated with ETT DRAM chips. Certain embodiments described herein present a self-testing registered dual in-line memory module ("RDIMM"). Some embodiments described herein present a self-testing RDIMM that does not require any additional pins other than the pins on the standard JEDEC RDIMM connector. For example, the memory module may utilize the address and control signals (e.g., address and control signals) generated by the memory module to test the memory module) along with a test signal to enable and execute a self testing function.

Certain embodiments described herein present a self-testing memory module that includes a control module and a data module which can generate memory addresses and data according to the JEDEC standard memory protocol.

Some embodiments described herein present a self-testing memory module that can be configured through an I²C interface and that allows test results to be read out through the I²C interface. Certain embodiments described herein present a self-testing memory module that allows a test function to be configured, controlled, and/or executed without substantial system memory controller involvement. Some embodiments present a self-testing memory module that can be tested without any external test equipment. For example, certain embodiments present a self-testing memory module that can be tested without any system driven test procedure. Various embodiments described herein present a self-testing memory module that can be self-tested at a target system speed. Certain embodiments described herein present a self-testing memory module that can generate data (DQ) and data-strobe (DQS) signals with wave characteristics that resemble the wave characteristics of DQ and DQS signals from a system memory controller.

4

MBIST is commonly used to test memories embedded in application specific integrated circuits ("ASICs") or system on chip integrated circuits ("SoCs") such as, for example, advanced memory buffers ("AMBs"). The MBIST implementation usually includes three distinct functional blocks: the address/control generator, the data generator/checker (sometimes referred to as a signature analyzer), and the test interface controller/register ("JTAG"). The test instructions and test patterns are generally loaded to the address/control generator and the data generator/checker through the JTAG interface. The test results are generally read out through the JTAG interface.

In memory module applications, there are obstacles associated with using MBIST. One of these obstacles is the large number of signals used to interface the three MBIST functional blocks. The inter-block timing constraints can present another obstacle. In addition, the ability to control the test is limited. For example, synchronizing the address/or control signals with the data signal can be difficult. The relatively large amount of information to be gathered and stored while testing the memory presents yet another obstacle.

Unlike on an ASIC, in which the three MBIST functional blocks are in a single chip, the MBIST functional blocks on a memory module generally would be segregated into multiple chips on the memory module due to physical and electrical limitations and requirements. This makes implementing MBIST on a memory module difficult because, while there is virtually no limit on the number of available interface signals among the three MBIST functional blocks in an ASIC, the memory module can support only a limited amount of interface signals between memory chips. In addition, because the MBIST functional blocks are spread out to multiple chips on a memory module, the inter-block signal delay is generally much longer on a memory module than on an ASIC. It is also generally not feasible to implement cross-checking logic that operates the three MBIST functional blocks in look-operational block. This is due to the limitation on the number of interface signals and to the relatively long inter-block signal delay time on a memory module versus on an ASIC.

In some cases such as where a memory module includes an AMB, the self-test logic (MBIST) implemented in the AMB includes command and address generation logic in addition to a data generator and checker. Each of these functional blocks may be implemented on a single physical AMB device (e.g., a single integrated circuit package). However, because all of the self-test command, address and data signals are combined in one physical area of the memory module, a memory module (e.g., DIMM) level routing problem can occur, making it difficult to route the self-test signals on the memory module and resulting in performance degradation and/or implementation difficulty. In addition, the data width of self-test logic of the memory module will be limited to the data width of the AMB (e.g., to the data width of the self-test logic implemented on the AMB, to the number of available ports on the AMB, etc.). As such, implementing memory module test logic on an AMB is not flexible (e.g., to changes in the data width of the memory module) and generally supports only memory modules having certain predetermined, fixed data widths.

Finally, in most cases, since an ASIC cannot be repaired, the ASIC MBIST is generally only capable of detecting and reporting the pass/fail status of memory tests. For memory module test results, on the other hand, it is generally advantageous to include both addresses of the memory locations where failures occur and the data patterns that were read back from the failed memory locations. This type of reporting can

US 8,359,501 B1

5

help to facilitate the repair of the memory module by, for example, allowing for the identification and replacement of failed components.

FIG. 1 is a block diagram of an example self-testing memory module 10 in accordance with certain embodiments described herein. The memory module 10 includes a printed circuit board 12 configured to be operatively coupled to a memory controller 14 of a computer system 16. The memory module 10 further includes a plurality of memory devices 18 on the printed circuit board (PCB) 12, each memory device 20 of the plurality of memory devices 18 comprising data, address, and control ports. The memory module 10 comprises a control module 22 configured to generate address and control signals 24 for testing the memory devices 18. The memory module 10 also includes a data module 28 comprising a plurality of data handlers 30. Each data handler 30 is operable independently from each of the other data handlers 30 of the plurality of data handlers 28 and is operatively coupled to a corresponding plurality of the data ports of one or more of the plurality of memory devices 18. For example, each of the data handlers 30 may be operatively coupled to (e.g., logically and/or electrically coupled to) the corresponding plurality of data ports. Each data handler 30 is further configured to generate data for writing to the corresponding plurality of data ports. The memory module 10 may further include an I2C interface 15 in certain embodiments.

As described more fully below, in certain embodiments the data module 28 generates test data patterns to write to the plurality of memory devices 18 of the memory module 12 and checks the data patterns read or received back from the plurality of memory devices 18 for agreement with corresponding data patterns that are expected to be read back from the plurality of memory devices 18. For example, in one embodiment, the data module 28 generates cyclic patterns to write to the plurality of memory devices 18. In some embodiments, the data module 18 also isolates the data path from the system board of the computer system 16 to the plurality of memory devices 18 while the memory module 10 is not accessed by the computer system 16. For example, the data module 28 may isolate the data path from the system board to the plurality of memory devices 18 when the memory module 10 is in a self-testing mode. The control module 22 may include, for example, a dual input register (e.g., the memory device controller 32 described more fully below) for registering address and control signals coming from either self-testing logic (e.g., from the test controller 36 described more fully below) or from the memory controller 14 on the system board. In some embodiments, during testing, the control module 22 generates address and control signals 24 associated with memory locations to be tested and the data module 28 generates corresponding test data patterns and provides them to the appropriate memory devices 20. For example, the data module 28 may receive a write command from the control module 22 and provide data to be written to certain locations in the memory devices 20 during a write operation. The data module 28 may then receive a read command to read back the data from those locations and check the read data for agreement with the expected data. If there is a mismatch between the read data and the expected data, the data module 28 may, for example, store the failure information (e.g., the failed data word) and inform the control module 22 about the failure. The control module may save the address of the memory location where the failure occurred.

In certain embodiments, the memory module 10 is configured to be operated in a test mode in which the control module 22 selectively inputs the address and control signals to the address and control ports of the plurality of memory devices

6

18. Moreover, in the test mode, each of the data handlers 30 write the data generated by the data handler 30 to the corresponding plurality of data ports by selectively inputting data signals to the data ports of the plurality of memory devices 18. The data module 28 and/or the control module 22 of certain embodiments are configured to test the plurality of memory devices 18 at the normal operating speed of the memory devices 20. For example, the data module 28 and/or the control module 22 are configured to provide memory signals (e.g., data, address and control signals) according the operating specification of the memory devices 20. In some embodiments, the control module 22 and the data module 28 produce memory addresses, control and/or data signals according to the JEDEC standard memory protocol. In some embodiments, for example, the control module 22 and the data module 28 generate the memory interface signals with proper edge relationships based on the JEDEC standard. In certain embodiments, the test speed, for example, may be defined by the speed of the clock (e.g., the system clock). The address sequences and/or the data patterns of certain embodiments may be programmable either through the I2C interface or they may be defaulted to pre-defined values.

In certain embodiments, data module 28 is configured to generate data signals with programmable slew rates and/or with variable peak values. In one embodiment, for example, the data module 28 is also able to generate data (DQ) and data-strobe (DQS) signals with programmable slew rates and programmable peak values so that the characteristics of the signals generated by the data module 28 generally correspond to the characteristics DQ and DQS signals generated by the system memory controller 14.

In some embodiments, the data module 28 and/or the control module 22 are configured to test the plurality of memory devices 18 under non-normal conditions. For example, the data module 28 and/or control module 22 may be configured to provide signals having frequencies which are higher or lower than the normal operating frequencies of the memory devices 20.

In certain embodiments, the memory module 10 has a memory capacity of 512-MB, 1-GB, 2-GB, 4-GB, or 8-GB. Other memory capacities are also compatible with certain embodiments described herein. In addition, memory modules 100 having widths of 4 bytes, 8 bytes, 16 bytes, 32 bytes, or 32 bits, 64 bits, 128 bits, 256 bits, as well as other widths (in bytes or in bits), are compatible with embodiments described herein. In certain embodiments, the PCB 12 has an industry-standard form factor. For example, the PCB 12 can have a low profile (LP) form factor with a height of 30 millimeters and a width of 133.35 millimeters. In certain other embodiments, the PCB 12 has a very high profile (VHP) form factor with a height of 50 millimeters or more. In certain other embodiments, the PCB 12 has a very low profile (VLP) form factor with a height of 18.3 millimeters. Other form factors including, but not limited to, small-outline (SO-DIMM), unbuffered (UDIMM), registered (RDIMM), fully-buffered (FBDIMM), mini-DIMM, mini-RDIMM, VLP mini-DIMM, micro-DIMM, and SRAM DIMM are also compatible with certain embodiments described herein. For example, in other embodiments, certain non-DIMM form factors are possible such as, for example, single in-line memory module (SIMM), multi-media card (MMC), and small computer system interface (SCSI).

In certain embodiments, the plurality of memory devices 18 of the memory module 10 may be arranged as ranks, each rank of memory generally having a bit width. In certain embodiments, each rank may comprise an independent set of memory devices 20 of the plurality of memory devices 18 that

US 8,359,501 B1

7                                                                                                8

can be accessed by the memory controller **14** to access the full bit-width of the memory bus of the memory module **10**. For example, a memory module **10** in which each rank of the memory module is 64 bits wide is described as having an "x 64" organization. Similarly, a memory module **10** having a 72-bit-wide ranks is described as having an "x 72" organization. The number of memory devices **20** and corresponding memory capacity of a memory module **10** can be increased by increasing the number of memory devices **20** per rank or by increasing the number of ranks. For example, a memory module with four ranks with each rank having N 512-MB memory devices **20** has double the memory capacity of a memory module with two ranks with each rank having N 512-MB memory devices **20** and four times the memory capacity of a memory module with one rank with each rank having N 512-MB memory devices **20**. During operation, the ranks of a memory module **10** may be selected or activated by control signals that are received from a component of the system (e.g., a system memory controller **14** or a local memory controller of the memory module **10**). Examples of such control signals include, but are not limited to, rank-select signals, also called chip-select signals. In certain other embodiments, the memory module **10** comprises only one rank of memory devices **20**.

As discussed, the PCB **12** may include at least one connector (not shown) configured to operatively couple the memory module **10** to the memory controller **14** of the computer system **16**. The computer system **16** may include a host computer system. For example, the memory module is electrically coupled, logically coupled, or both, with the memory controller **14**. Examples of host computer systems **108** include, but are not limited to, blade servers, 1U servers, personal computers (PCs), data storage systems and other applications in which space is constrained or limited. The memory controller **14** may comprise a disk controller of the computer system **16**, for example. The memory controller **14** may be mounted on a system board of the host computer **16**. The connector can comprise a plurality of edge connections which fit into a corresponding slot connector of the host system **16**. The connector of certain embodiments provides a conduit for power voltage as well as data, address, and control signals between the memory module **10** and the host system **16**. For example, the connector can comprise a standard DDR2, DDR3, and other future generation edge connectors. Additionally, in certain embodiments, more than one memory module **10** is coupled to the host system **16**.

The plurality of memory devices **18** on the PCB **12** may include one or more volatile memory components. For example, the plurality of memory devices **18** of certain embodiments comprises two or more dynamic random-access memory (DRAM) elements **20**. Types of DRAM devices **20** compatible with certain embodiments described herein include, but are not limited to, DDR, DDR2, DDR3, and synchronous DRAM (SDRAM). The memory devices **18** may comprise other types of memory elements such as static random-access memory (SRAM). In addition, volatile memory devices **20** having bit widths of 4, 8, 16, 32, as well as other bit widths, are compatible with certain embodiments described herein. Memory devices **20** compatible with certain embodiments described herein have packaging which include, but are not limited to, thin small-outline package (TSOP), ball-grid-array (BGA), fine-pitch BGA (FBGA), micro-BGA (µBGA), mini-BGA (mBGA), and chip-scale packaging (CSP). The plurality of memory devices **18** may further include one or more non-volatile memory devices **20**, such as, for example, flash memories. The plurality of memory devices **18** of certain embodiments may include both volatile and non-volatile memory devices **20**. For example, the plurality of memory devices **18** may include one or more of DRAM, SRAM, and/or flash memory devices in some embodiments.

Each data handler **30** is operable independently from each of the other data handlers **30** of the plurality of data handlers **28**. For example, each data handler **30** is configured to write to and/or read from the corresponding plurality of data ports of one or more of the memory devices **20** without being in communication any of the other data handlers **30** or other data ports of the memory devices **20**. As such, each data handler **30** can be used to generally independently test a portion of the memory space of the memory module **10**. For example, each data handler **30** may be used to independently test one memory device **20** of the memory module **10**. In such a configuration, the corresponding plurality of data ports of each data handler **30** may comprise each data port of the corresponding memory device **20**. In other embodiments, each data handler **30** may be used to test a segment of one memory device **20**, more than one memory device **20**, segments more than one memory device **20**, or any combination or sub-combination thereof. Because each of the data handlers **30** is operable independently of each of the other data handlers **30**, the data handlers **30** are generally modular. As such, modifications in the configuration of the memory module **10** (e.g., changes in the bit-width of the memory bus, changes in the number of memory devices **20**, etc.) may be less complicated to accommodate than in other types of self-testing memory modules **10**. For example, where a new memory device **20** or set of memory devices **20** is added to the memory module **10**, the change may be generally accommodated by adding a corresponding data handler **30**. The change may be accommodated without having to implement a major reorganization of the memory module **10** or the self-testing logic of the memory module **10**.

Each data handler **30** is further configured to generate data for writing to the corresponding plurality of data ports. FIG. 2 is a block diagram of an example self-testing memory module **10** including eight memory devices **20** (e.g., memory devices **40a-40h**) and a data module **28** comprising eight data handlers **30** (e.g., data handlers **30a-30h**) in accordance with certain embodiments described herein. Each of the memory devices **20** includes an eight bit output data word and eight corresponding data ports. In addition, the system memory bus **50** between the memory controller **14** and the example memory module **10** is 64 bits wide and each of the data handlers **30** receives an eight bit segment of the system memory bus **50**. Each of the data handlers **30** is operatively coupled to a corresponding plurality of data ports **21** of a corresponding one of the memory devices **20**. As such, the data handlers **30** may be operatively coupled (e.g., electrically and/or logically coupled or connected) to the eight data ports **21** of one of the corresponding memory devices **20**. For example, the data handler **30a** may be operatively coupled to the eight data ports **21** of the memory device **40a** of FIG. 2.

The configuration shown in FIG. 2 is for the purposes of illustration and is not intended to be limiting. For example, while the example memory module **10** of FIG. 2 includes an equal number of memory devices **20** and data handlers **30**, other configurations are possible. In some configurations there are more memory devices **20** than data handlers **30** or vice versa. Moreover, the one or more data handlers **30** may be operatively coupled to a subset of the data ports **21** of one of the memory devices **20** instead of all of the data ports **21** of one of the memory devices **20**. In other embodiments, one or more data handlers **30** may be operatively coupled to a subset or all of the data ports **21** of more than one of the memory

US 8,359,501 B1

9

devices 20. For example, in one embodiment, each of the data handlers 30 are operatively coupled to all of the data ports of two memory devices 20.

In certain embodiments, the plurality of data handlers 28 comprises at least two physically separate components mounted on the PCB 12. For example, the plurality of data handlers 28 may include at least two physically separate integrated circuit packages. The physically separate integrated circuit packages are mounted on different portions of the PCB 12 in some embodiments. For example, each of the eight data handlers 30a-30h shown in FIG. 2 may include physically separate integrated circuit packages mounted on different portions of the PCB 12. While eight data handlers 30 are shown in FIG. 2, other numbers of data handlers 30 are possible including fewer or more than eight.

In certain embodiments, each of the plurality of data handlers 30 is positioned on the PCB 12 proximate to the corresponding plurality of data ports. For example, each data handler 30 of certain embodiments is positioned closer to the corresponding plurality of data ports 21 than the data handler 30 is to the other data ports 21 of the plurality of memory devices 18. For example, the data handler 30a is positioned closer to the corresponding plurality of data ports 21 of the memory device 40a than to the other data ports 21 of the other memory devices 40b-40h.

FIG. 3 is a block diagram an example data module 28 and an example control module 22 in accordance with certain embodiments described herein. The control module 22 can be configured to generate address and control signals 24 for testing the plurality of memory devices 18. In some embodiments, the control module 22 includes a control mixer element 32. The control mixer element 32 may include a memory device controller 34 (e.g., a DRAM controller) and a test controller 36. In certain embodiments, the control mixer element 32 generally controls the address and the control signals for the self-testing function.

In certain embodiments, the memory device controller 34 generally pre-processes address and control information before it sends the information to a register 40. In one embodiment, the memory device controller 34 receives signals 38 (e.g., address and control signals) from the system memory controller 14 and signals 42 (e.g., address and controls signals) from the test controller 36. The control module 22 of certain embodiments is configured to selectively input to the address and control ports of the plurality memory devices 18 either the address and control signals 38 from the system memory controller 14 or the address and control signals 42 from the control module 22 (e.g., from the test controller 36). For example, the memory device controller 34 may send either the signals 38 from the system memory controller 14 or, alternatively, the signals 42 from the test controller 36, to the register 40 depending on whether the memory module 10 is in normal (non-test) mode or in a test mode, respectively. In one embodiment, the memory device controller 34 generates the address and control signals for memory device (e.g., DRAM device) operations. The test controller 36 controls the generation of the address and control signal sequences to be used during the self-testing operation of the memory module 10 and also communicates with the data module 28. The control module 22 may be implemented in the control register of the memory module 10 in certain embodiments. In various embodiments, the control module 22 includes discrete logic, one or more application-specific integrated circuit (ASICs), one or more microprocessors, one or more field-programmable gate arrays (FPGAs), or one or more computer-programmable logic device (CPLDs).

10

The data module 28 and the subcomponents thereof (e.g., the data handlers 30) may be in communication with one or more of the memory devices 20, the control module 22, and the memory controller 14. In certain embodiments, the data module 28 comprises a plurality of data handlers 30. In other embodiments the data module 28 includes at least one data handler 30. Each of the data handlers 30 of certain embodiments comprises a switch 44. For example, the switch 44 may include a data multiplexer/demultiplexer ("data mux/demux"). The switch 44 may provide a bi-directional data multiplexer function. In certain embodiments, the switch 44 is configured to selectively input to the corresponding plurality of data ports either data signals 48 from the system memory controller 14 or data signals 50 from the data handler logic element 46. The switch 44 of certain embodiments may further be configured to receive data signals 52 (e.g., during a read operation) from the plurality of memory devices 18 and to propagate the data signals 52 to the data handler logic element 46 and/or the memory controller 14. In some embodiments, for example, the switch 44 selectively inputs the data signals 48 to be written to the plurality of memory devices 18 from the system memory controller 14 when the memory module 10 is a normal (non-test mode) mode and, alternatively, inputs the data signals 50 from the data handler logic element 46 during a test mode. While the switch 44 is shown as being included in the data handler 30 in the example of FIG. 3, other configurations are possible. For example, in other embodiments the switch 44 may be logically and/or physically separated from the data handler module 28 and/or the data handlers 30.

Each of the data handlers 30 of certain embodiments further includes a data handler logic element 46. The data handler logic element 46 of certain embodiments comprises a data generation element 54 and a verification element 56. The data generation element 54 may be configured to generate data signals (e.g., patterns of data signals) for writing to the corresponding plurality of data ports, for example. The data signals and/or patterns of data signals may be based on information (e.g., programming or configuration information) the data handler logic element 46 receives from the control module 22, for example. The data may be cyclic data in some embodiments or non-cyclic data in other embodiments. For example, the cyclic data may comprise at least one predetermined pattern of data which repeats or is cycled two or more times. In various embodiments, the data comprises one or more incrementing patterns or decrementing patterns, for example. In other embodiments, the data comprises a pattern which alternates each bit on successive memory writes. For example, a memory write comprising one or more hexadecimal "A" characters (each corresponding to a four-bit binary word of "1010") may be followed by a memory write comprising one or more hexadecimal "5" characters (each corresponding to a four-bit binary word of "0101"). The data may be generated in a variety of ways. In one embodiment, the data is generated based on a current write address value. For example, in one example configuration, on a first write cycle, hexadecimal "A's" are generated and written to even address locations and hexadecimal "5's" are generated and written to odd address locations, and on a second write cycle, "5's" are written to even addresses and "A's" are written to odd addresses, and this pattern repeats in subsequent cycles. The data may be generated based previously written data (e.g., inverting each of the bits of a previously written data word) in some embodiments. In general, any manner of generating a cyclic or otherwise deterministic data pattern may be compatible with embodiments described herein. In other embodiments, random or pseudorandom data may be generated and

US 8,359,501 B1

**11**

written to the corresponding plurality of data ports. For example, a linear feedback shift register (LFSR) may be used in some embodiments. In addition, the data patterns may be programmable. For example, the data patterns may be programmable based on information received by the data generation element **54** from the memory controller **14** (e.g., through the control module **22**), or from the control module **22**.

The plurality of data handlers **30** are further configured to read data from the corresponding plurality of data ports. For example, the verification element **56** may be configured to receive data from the corresponding plurality of data ports (e.g., through the switch **44** during a test mode). The verification element **56** may further be configured to check for failures in the operation of the plurality memory devices **18** by verifying that data read from the corresponding plurality of data ports corresponds to the data generated by the data handler **30** and written to the corresponding plurality of data ports.

In certain embodiments, the verification element **56** is configured to perform the verification without storing a copy of the data written to the corresponding plurality of data ports or accessing a stored copy beyond the data read from the plurality of memory devices **18**. For example, the verification element **56** does not store or access a copy of the data that is written to the corresponding plurality of data ports except for the data stored and read back from the plurality of memory devices **18**. As such, the memory module **10** of certain embodiments advantageously does not require separate memory for storing duplicate copies of test data that is written to the plurality of memory devices **18** for later comparison. For example, the verification element **56** may calculate comparison data and may compares the comparison data to the data read from the corresponding plurality of data ports. In certain embodiments, the comparison data comprises data which expresses the data or values expected to be received from the plurality of memory devices **18** if the write, store, and read processes of the data using the data module **28** and the plurality of memory devices **18** are performed correctly or as expected. The calculation may be performed simultaneously or substantially simultaneously with receiving the data read from the corresponding plurality of data ports in certain embodiments. In other embodiments, the calculation is performed either before or after receiving the data. Other configurations are possible. For example, in one embodiment, the verification element **56** does store a separate copy of the data written to the corresponding plurality of data ports upon writing the data and compares the separate copy to the read data received from the plurality of memory devices **18**.

The verification element **56** of certain embodiments calculates the comparison data based on the cyclic data. For example, in one embodiment, the verification element **56** calculates the comparison data in substantially the same manner that the data generation element **54** generates the data as described above (e.g., based on a current write address, using an LFSR, etc.). As such, the comparison data of certain embodiments is substantially a repeat of the data written. In one example embodiment, the data handler **30** is configured (e.g., is programmed by the control module **22**) to write an alternating series of "A's" and "5's" to the data ports of the corresponding plurality of data ports as described herein. For example, the data handler **30** may be configured to write one or more "A's" to the first address location of an N-word memory device **20** including the corresponding plurality of data ports. The data handler **30** may then write one or more "5's" to the second address location, one or more "A's" to the third address location and so on until the data handler **30** has

**12**

written to all N memory locations. The verification element **56** of the example embodiment then calculates the comparison data based on the cyclic data written to the corresponding plurality of data ports. For example, the verification element **56** calculates a comparison word including one or more "A's", "5's", and "A's", respectively, to be compared to the data read from the first, second, and third address locations based on the cyclic data (e.g., based on the known cycle of the data). In some embodiments, the comparison data is calculated based on a current read address.

In certain embodiments, data associated with failures in the operation of the plurality of memory devices **18** are stored in the data module **28**. For example, data read from the corresponding plurality of data ports which do not correspond to (e.g., match) the comparison data calculated by the verification element **56** may be stored in the data module. Moreover, in some embodiments, memory addresses associated with the failures in the operation of the plurality of memory devices **18** are stored in the control module **22**. For example, the data handler **30** may communicate data failures (e.g., when data read from the corresponding plurality of data ports does not correspond to calculated comparison data) to the control module **22** which may then store the addresses corresponding to the data failure. In certain embodiments, the memory module **12** is configured to report failures (e.g., the failed data, the address corresponding to the memory location of the failed data, and/or expected data) via the I²C interface **15** to the memory controller **14**. In addition, in certain embodiments the test controller **36** and/or the data handlers **30** may be updated through the I²C interface **15** with new data patterns and/or with alternative memory access sequences to conduct AC tests (e.g., tests of the power, current, I/O speed, etc.).

In various embodiments, the components of the data module **28** (e.g., the switch **44**, the data handlers **30**, the data handler logic element **46**, the data generation element **54**, and/or verification element **56**) may include discrete logic, one or more application-specific integrated circuits (ASICs) one or more microprocessors, one or more field-programmable gate arrays (FPGAs), or one or more computer-programmable logic devices (CPLDs). Additionally, one or more of the various functional blocks (e.g., the switch **44**) of the data module **28** of FIG. **3** may not be included. In some embodiments, additional functional blocks may be included. Moreover, some of the functional blocks are described as separate functional blocks for illustration purposes and may comprise one physical component. For example, in one embodiment, each of the data handlers **30** and the corresponding switch **44**, data generation element **54**, and verification element **56** comprise one physical component (e.g., are included in one integrated circuit package). In another embodiment, the data module **28** comprises one physical component.

Referring again to FIG. **1**, a self-testing memory module **10** of certain embodiments comprises a printed circuit board (PCB) **12** and is configured to be operatively coupled to a memory controller **14** of a computer system **16**. The memory module **10** further includes a plurality of memory devices **18** on the printed circuit board **12** where each memory device **20** of the plurality of memory devices **18** comprising data, address, and control ports. The memory module **10** further comprises a control module **22** configured to generate address and control signals for testing the plurality of memory devices **18**. In certain embodiments, the memory module **10** further comprises a data module **28** comprising at least one data handler **30** and operatively coupled to a corresponding plurality of the data ports of one or more of the memory devices **20**. The data handler **30** is configured to generate cyclic data