1   FABIO E. MARINO (SBN 183825)
    fmarino@mwe.com
2   L. KIERAN KIECKHEFER (SBN 251978)
    kkieckhefer@mwe.com
3   JUDITH S.H. HOM (SBN 203482)
    jhom@mwe.com
4   NITIN GAMBHIR (SBN 259906)
    ngambhir@mwe.com
5   BARRINGTON DYER (SBN 264762)
    bdyer@mwe.com
6   TERI H.P. NGUYEN (SBN 267498)
    thpnguyen@mwe.com
7   McDERMOTT WILL & EMERY LLP
    275 Middlefield Road, Suite 100
8   Menlo Park, CA  94025-4004
    Telephone:    650 815 7400
9   Facsimile:     650 815 7401

10   Attorneys for Defendant and Counterclaim-Plaintiff
     DIABLO TECHNOLOGIES, INC.

11

12                   UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                        OAKLAND DIVISION

15

16   NETLIST, INC., a Delaware corporation,        CASE NO.  4:13-cv-05962 YGR

17          Plaintiff and Counterclaim-Defendant,  **DEFENDANT AND COUNTERCLAIM-
                                                    PLAINTIFF DIABLO TECHNOLOGIES,
18          vs.                                     INC.'S ANSWER, AFFIRMATIVE
                                                    DEFENSES, COUNTERCLAIMS, AND
19   DIABLO TECHNOLOGIES, INC., a                   JURY DEMAND**
     Canadian corporation,
20
            Defendant and Counterclaim-Plaintiff.
21

22

23

24

25

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   Pursuant to Federal Rule of Civil Procedure 12, Defendant and Counterclaim-Plaintiff

2   Diablo Technologies, Inc. ("Diablo") hereby answers Plaintiff and Counterclaim-Defendant

3   Netlist, Inc.'s ("Netlist") Second Amended Complaint (Dkt. No. 146) ("SAC"), asserts

4   affirmative defenses, and brings counterclaims, as set forth below.

5   **ANSWER**

6   Unless specifically admitted herein, Diablo denies the allegations in the SAC.  Diablo

7   specifically answers the numbered paragraphs in the SAC as set forth below.

8   **NATURE OF THE ACTION**

9   1.   In paragraph 1, Netlist's averments state legal conclusions to which no response is

10   required, and they should be deemed denied.

11   **PARTIES**

12   2.   Diablo is without knowledge or information sufficient to form a belief as to the

13   truth of averments contained in paragraph 2 of the SAC, and therefore denies the averments.

14   3.   Diablo admits that is a Canadian corporation with its principal place of business at

15   80 Aberdeen Street, Suite 401, Ottawa, Ontario, K1S 5R5, Canada.  Diablo also admits that it was

16   founded in 2003.  Diablo denies all other averments in paragraph 3 of the SAC.

17   **JURISDICTION AND VENUE**

18   4.   The averments in paragraph 4 of the SAC state legal conclusions to which no

19   answer is required, and they should be deemed denied.

20   5.   Diablo admits that it is subject to personal jurisdiction in this District.  Diablo

21   denies the remaining averments contained in paragraph 5 of the SAC.

22   6.   The averments in paragraph 6 of the SAC state legal conclusions to which no

23   answer is required, and they should be deemed denied.

24   7.   Diablo admits that assignment to this Division is proper.

25   **GENERAL ALLEGATIONS**

26   A.   **Netlist's Development of HyperCloud® Memory Module and DxD/LRD**
      **Technology**

27

28   8.   Diablo denies the averments contained in paragraph 8 of the SAC.

9.      Diablo is without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 9 of the SAC, and therefore denies them.

10.     Diablo is without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 10 of the SAC, and therefore denies them.

11.     Diablo is without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 11 of the SAC, and therefore denies them.

12.     Diablo is without knowledge or information sufficient to form a belief as to the truth of the averments contained in paragraph 12 of the SAC, and therefore denies them.

**B.      The Agreements Between Netlist and Diablo**

13.     Diablo denies the averments contained in paragraph 13 of the SAC.

14.     Diablo denies the averments contained in paragraph 14 of the SAC.

15.     Diablo admits that Netlist and Diablo entered into a Non-Disclosure Agreement, but denies the remaining averments contained in paragraph 15 of the SAC.

16.     Diablo denies the averments contained in paragraph 16 of the SAC.

17.     Diablo denies the averments contained in paragraph 17 of the SAC.

18.     Diablo admits that its engineering team met with Dr. Lee in Canada, but denies the remaining averments contained in paragraph 18 of the SAC.

19.     Diablo admits that Netlist and Diablo entered into a Development and Supply Agreement ("Supply Agreement") (Dkt. No. 146-2) on or about September 10, 2008, but denies the remaining averments contained in paragraph 19 of the SAC.

20.     Diablo denies the averments contained in paragraph 20 of the SAC.

21.     Diablo denies the averments contained in paragraph 21 of the SAC.

**C.      Diablo's Use of Confidential Netlist Information for Patent Applications**

22.     Diablo denies the averments contained in paragraph 22 of the SAC.

23.     Diablo denies the averments contained in paragraph 23 of the SAC.

24.     Diablo admits that Netlist and Diablo executed a Settlement Agreement and Amendment Development and Supply Agreement ("Settlement Agreement") on or about January 12, 2010, but denies the remaining averments contained in paragraph 24 of the SAC.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

25.    Diablo denies the averments contained in paragraph 25 of the SAC.

26.    Diablo denies the averments contained in paragraph 26 of the SAC.

**D.    The VT-Berlinetta LR and Diablo's Infringement of Netlist's HyperCloud® Trademark**

27.    Diablo denies the averments contained in paragraph 27 of the SAC.

28.    Diablo denies the averments contained in paragraph 28 of the SAC.

29.    Diablo denies the averments contained in paragraph 29 of the SAC.

30.    Diablo denies the averments contained in paragraph 30 of the SAC.

31.    Diablo denies the averments contained in paragraph 31 of the SAC.

32.    Diablo denies the averments contained in paragraph 32 of the SAC.

33.    Diablo denies the averments contained in paragraph 33 of the SAC.

34.    Diablo denies the averments contained in paragraph 34 of the SAC.

**E.    ULLtraDIMM**

35.    Diablo denies the averments contained in paragraph 35 of the SAC.

36.    Diablo denies the averments contained in paragraph 36 of the SAC.

37.    Diablo denies the averments contained in paragraph 37 of the SAC.

38.    Diablo admits that it entered into a business relationship with Smart Storage as announced in May 2013, but denies the remaining averments contained in paragraph 38 of the SAC.

39.    Diablo denies the averments contained in paragraph 39 of the SAC.

40.    Diablo denies the averments contained in paragraph 40 of the SAC.

**COUNTERCLAIM COUNT I**
**(Correction of Inventorship (35 U.S.C. § 256) and Ownership (35 U.S.C. § 262))**

41.    Diablo incorporates its answers to paragraphs 1 through 40 of the SAC as if fully set forth herein.

42.    Diablo denies the averments contained in paragraph 42 of the SAC.

43.    Diablo denies the averments contained in paragraph 43 of the SAC.

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

44.     Diablo admits that neither Dr. Lee nor Thomas Bryan was named an inventor on the '917 patent.  Diablo is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in paragraph 44 of the SAC, and therefore denies the averments.

45.     Diablo is without knowledge or information sufficient to form a belief as to the truth of averments contained in paragraph 45 of the SAC, and therefore denies the averments.

46.     The averments in paragraph 46 of the SAC state legal conclusions to which no answer is required, and they should be deemed denied.

**COUNTERCLAIM COUNT II**
**(Breach of Contract (NDA))**

47.     Diablo incorporates its answers to paragraphs 1 through 46 of the SAC as if fully set forth herein.

48.     Diablo denies the averments contained in paragraph 48 of the SAC.

49.     Diablo denies the averments contained in paragraph 49 of the SAC.

50.     Diablo denies the averments contained in paragraph 50 of the SAC.

51.     Diablo denies the averments contained in paragraph 51 of the SAC.

**COUNTERCLAIM COUNT III**
**(Breach of Contract (Supply Agreement))**

52.     Diablo incorporates its answers to paragraphs 1 through 51 of the SAC as if fully set forth herein.

53.     Diablo denies the averments contained in paragraph 53 of the SAC.

54.     Diablo denies the averments contained in paragraph 54 of the SAC.

55.     Diablo denies the averments contained in paragraph 55 of the SAC.

56.     Diablo denies the averments contained in paragraph 56 of the SAC.

**COUNTERCLAIM COUNT IV**
**(Lanham Act Violation—15 U.S.C. § 1114(a))**

57.     Diablo incorporates its answers to paragraphs 1 through 56 of the SAC as if fully set forth herein.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

- 4 -

58.     The averments in paragraph 58 of the SAC state legal conclusions to which no answer is required, and they should be deemed denied.

59.     Diablo is without knowledge or information sufficient to form a belief as to the truth of averments contained in paragraph 59 of the SAC, and therefore denies the averments.

60.     Diablo denies the averments contained in paragraph 60 of the SAC.

61.     Diablo denies the averments contained in paragraph 61 of the SAC.

62.     Diablo denies the averments contained in paragraph 62 of the SAC.

63.     Diablo denies the averments contained in paragraph 63 of the SAC.

64.     Diablo denies the averments contained in paragraph 64 of the SAC.

65.     Diablo denies the averments contained in paragraph 65 of the SAC.

## COUNTERCLAIM COUNT V
### (Lanham Act Violation—15 U.S.C. § 1125(a))

66.     Diablo incorporates its answers to paragraphs 1 through 65 of the SAC as if fully set forth herein.

67.     Diablo denies the averments contained in paragraph 67 of the SAC.

68.     Diablo denies the averments contained in paragraph 68 of the SAC.

69.     Diablo denies the averments contained in paragraph 69 of the SAC.

70.     Diablo denies the averments contained in paragraph 70 of the SAC.

71.     Diablo denies the averments contained in paragraph 71 of the SAC.

72.     Diablo denies the averments contained in paragraph 72 of the SAC.

73.     Diablo denies the averments contained in paragraph 73 of the SAC.

## COUNTERCLAIM COUNT VI
### (Misappropriation of Trade Secrets—Civil Code § 3426 *et seq.*)

74.     Diablo incorporates its answers to paragraphs 1 through 73 of the SAC as if fully set forth herein.

75.     Diablo denies the averments contained in paragraph 75 of the SAC.

76.     Diablo is without knowledge or information sufficient to form a belief as to the truth of averments contained in paragraph 76 of the SAC, and therefore denies the averments.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

77. Diablo is without knowledge or information sufficient to form a belief as to the truth of averments contained in paragraph 77 of the SAC, and therefore denies the averments.

78. Diablo denies the averments contained in paragraph 78 of the SAC.

79. Diablo denies the averments contained in paragraph 79 of the SAC.

80. Diablo denies the averments contained in paragraph 80 of the SAC.

81. Diablo denies the averments contained in paragraph 81 of the SAC.

82. Diablo denies the averments contained in paragraph 82 of the SAC.

## COUNTERCLAIM COUNT VII
### (Unfair Competition—California Bus. & Prof. Code § 17200)

83. Diablo incorporates its answers to paragraphs 1 through 82 of the SAC as if fully set forth herein.

84. The allegations in paragraph 84 of the SAC state legal conclusions to which no answer is required, so Diablo denies them.

85. Diablo denies the averments contained in paragraph 85 of the SAC.

86. Diablo denies the averments contained in paragraph 86 of the SAC.

87. Diablo denies the averments contained in paragraph 87 of the SAC.

88. Diablo denies the averments contained in paragraph 88 of the SAC.

## PRAYER FOR RELIEF

89. Diablo denies that Netlist is entitled to any relief at all. Diablo specifically denies that Nelist is entitled to the relief sought in the Prayer for Relief in the SAC. Netlist is not entitled to a preliminary or permanent injunction, an award of damages and/or reasonable royalties and/or lost profits, an award of restitution and/or disgorgement, an award of attorneys' fees, costs, interest, or any other type of recovery or relief from Diablo, including specific performance of any contractual agreement or correction of inventorship on the '917 patent. Netlist's SAC should be dismissed with prejudice, judgment on all of Netlist's claims should be entered for Diablo, and Netlist should take nothing.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURY DEMAND

90.    Diablo admits that Netlist demands a trial by jury.  Diablo also demands a trial by jury.

## AFFIRMATIVE DEFENSES

91.    Diablo alleges and asserts the following affirmative defenses to the SAC.  In addition to the affirmative defenses described below and subject to its responses above, Diablo specifically reserves all rights to allege additional affirmative defenses that become known through the course of discovery.

### FIRST AFFIRMATIVE DEFENSE
**(Waiver, Acquiescence and/or Consent)**

92.    Netlist's claims are barred, in whole or in part, by the doctrines of waiver, acquiescence and/or consent, including but not limited to its claim for Correction of Inventorship and Ownership under 35 U.S.C. §§ 256, 262.

### SECOND AFFIRMATIVE DEFENSE
**(Unclean Hands)**

93.    Netlist's claims are barred, in whole or in part, by the doctrine of unclean hands, including its claim for Correction of Inventorship and Ownership under 35 U.S.C. §§ 256, 262 and well as its claims for trade secret misappropriation, breach of contract, and unfair competition.

### THIRD AFFIRMATIVE DEFENSE
**(Laches)**

94.    Netlist's claims are barred, in whole or in part, by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE
**(License)**

95.    Netlist's claims against Diablo are precluded to the extent that Diablo has an express or implied license to any of the technology that Netlist alleges it has rights to under the NDA or Supply Agreement.  Specifically, Diablo identifies Section 2(e) of the Supply Agreement as giving rise to a non-exclusive, fully-paid, royalty-free license to Netlist's intellectual property such that Diablo cannot be liable for the allegations in the SAC.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

### FIFTH AFFIRMATIVE DEFENSE
**(Estoppel)**

96.     Netlist's claims are barred to the extent that Netlist is estopped (including equitable estoppel), in whole or in part, from seeking relief or asserting any of the claims alleged in the SAC.

### SIXTH AFFIRMATIVE DEFENSE
**(Failure to State a Claim)**

97.     The SAC fails to state a claim upon which relief can be granted.

### SEVENTH AFFIRMATIVE DEFENSE
**(Conduct Not "Unlawful")**

98.     Netlist's claims are barred because any alleged conduct of Diablo was not "unlawful," within the meaning of Business and Professions Code § 17200 or otherwise.

### EIGHTH AFFIRMATIVE DEFENSE
**(Conduct Not "Unfair")**

99.     Netlist's claims are barred because any alleged conduct of Diablo was not "unfair," within the meaning of Business and Professions Code § 17200 or otherwise.

### NINTH AFFIRMATIVE DEFENSE
**(Conduct Constitutes Fair Competition)**

100.     Netlist's claims are barred, in whole or in part, because Diablo's alleged conduct constitutes fair competition.

### TENTH AFFIRMATIVE DEFENSE
**(Conduct Not "Fraudulent" Nor "Likely to Mislead")**

101.     Netlist's claims are barred because any alleged conduct of Diablo was not "fraudulent" nor "likely to mislead" the general public within the meaning of Business and Professions Code § 17200 or otherwise.

### ELEVENTH AFFIRMATIVE DEFENSE
**(No Trade Secrets at Issue)**

102.     Netlist's trade secret misappropriation claims are barred, in whole or in part, because the information allegedly misappropriated does not constitute trade secrets.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

### TWELTH AFFIRMATIVE DEFENSE
**(Alleged Trade Secrets Obtained by Proper Means)**

103.    Netlist's trade secret appropriation claims are barred, in whole or in part, in that Diablo obtained the alleged trade secrets by proper means or independently developed them.

### THIRTEENTH AFFIRMATIVE DEFENSE
**(Alleged Trade Secrets Known or Readily Available)**

104.    Netlist's trade secret appropriation claims are barred, in whole or in part, in that the alleged trade secrets were known by or readily available to the relevant industry and/or by persons who could obtain economic benefit from the information and were in the public domain.

### FOURTEENTH AFFIRMATIVE DEFENSE
**(Alleged Damages Resulted from Plaintiff's Actions or Omissions)**

105.    Netlist's claims are barred, in whole or in part, because any damages resulted from Netlist's own negligence, lack of reasonable care, lack of due diligence, recklessness or assumption of the risk.

### FIFTEENTH AFFIRMATIVE DEFENSE
**(Statute of Limitations)**

106.    Netlist's claims are barred, in whole or in part, by reason of the applicable statutes of limitations.

### SIXTEENTH AFFIRMATIVE DEFENSE
**(Alternative Proximate Cause of Plaintiff's Alleged Damages)**

107.    Netlist's claims do not confer financial liability on Diablo because no act or omission of Diablo was a substantial factor in bringing about the damages alleged in the SAC and was not a contributing cause thereof, but was superseded by the acts or omissions of Netlist and/or third persons not parties to this action, which were independent, intervening, and the proximate cause of any damages allegedly suffered by Netlist.

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Speculative Damages)

108.    Netlist is not entitled to any damages because any alleged damages are speculative, uncertain, and not foreseeable.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

109.    Netlist's claims are barred, in whole or in part, because recovery on such claims would result in unjust enrichment to Netlist.

## NINTEENTH AFFIRMATIVE DEFENSE
### (No Injunctive Relief)

110.    Netlist's claims for injunctive relief are barred because there exists and adequate remedy at law and Netlist's claims otherwise fail to meet the requirements for such relief.

## DIABLO'S COUNTERCLAIMS

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Diablo asserts the following Counterclaims against Netlist:

## NATURE OF THE ACTION

111.    This is an action about baseless claims brought by Netlist against Diablo's Memory Channel Storage ("MCS") technology which was developed independently from the Netlist HyperCloud memory module.  HyperCloud and MCS are completely different products and the MCS technology falls demonstrably outside the bounds of Netlist's alleged intellectual property—patents, trademarks, trade secrets or otherwise.  The evidence in this case will show that Diablo's technology, which achieves a write latency that outperforms all existing flash storage devices on the market, simply does not need and, therefore, does not use the Rank Multiplication/Load Reduction technology ("DxD/LRD") used in the HyperCloud.

112.    Diablo's counterclaims arise from the contractual obligations the parties agreed to in the Supply Agreement between the parties of September 2008 ("Supply Agreement"), following prolonged discussions between Netlist and Diablo engineers.  The Supply Agreement

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1  memorializes the separation of the parties' intellectual property rights.  Both parties were

2  assigned distinct intellectual property rights for their separate contributions.

3       113.  In the SAC, however, Netlist awarded itself all credit for "breakthrough memory

4  module architecture" (SAC ¶ 1), but evidence marshaled in support of Diablo's counterclaims

5  will show that it was Diablo's own design that allowed the HyperCloud products to work.

6  Because Diablo developed and patented its implementation—which Netlist initially rejected—the

7  Supply Agreement rightfully gave Diablo all intellectual property rights flowing from its

8  implementation efforts.

9       114.  The allegations in the SAC thus constitute a brazen effort by Netlist to claim

10  ownership, direction, and control over products and underlying design principles that in fact

11  belong to Diablo.  Netlist's overreaching mischaracterization in the SAC of the dealings between

12  the parties, constitutes a breach of its contractual obligations, usurps Diablo's intellectual

13  property rights, and constitutes a calculated attempt to damage Diablo's reputation in the

14  marketplace.  Diablo seeks, among other remedies, damages and equitable relief arising out of

15  Netlist's breach of the Supply Agreement; relief under California's statute prohibiting unfair

16  competition in the form of an award of attorneys' fees and an injunction, and judgment in its

17  favor on all issues raised in the SAC.

18                **THE PARTIES**

19       115.  Counterclaimant Diablo is a Canadian corporation with its principal place of

20  business at 80 Aberdeen Street, Suite 401, Ottawa, Ontario, K1S 5R5, Canada and Silicon Valley

21  offices at 2099 Gateway Place, San Jose, CA 95110.  Since its founding in 2003, Diablo has been

22  a leader in developing both volatile and non-volatile computer memory architectures.  In

23  servicing original equipment manufacturers, Diablo is one of only a handful of mixed-signal

24  companies to succeed in delivering a low power Advanced Memory Buffer where most

25  companies abandoned similar efforts in the face of technical obstacles.  Diablo has won numerous

26  awards for its innovation in memory system interface products, including its flagship MCS

27  technology, frequently partnering with global technology leaders to overcome limitations in

28  traditional memory and storage architectures to meet the demands of modern data processing.

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

116.    On information and belief, counterdefendant Netlist is a Delaware corporation with its principal place of business at 175 Technology Drive, Irvine, California 92618. Since its introduction in 2009, Netlist has offered for sale HyperCloud memory modules, a product consisting of multiple ranks of DRAM. Over that time, Netlist's revenues have been primarily tied to the declining sales of the HyperCloud and other memory modules. Having failed to turn a profit, Netlist has turned to litigation as a primary revenue source. In particular, as explained in its SEC filings of June 2014, Netlist's current plan is to generate revenue through selling or licensing its technology. Thus, over the last few years Netlist's business focus has shifted away from selling products and towards operating more as a patent assertion entity.

## JURISDICTION AND VENUE

117.    This Court has supplemental jurisdiction over counterclaims arising under California law pursuant to 28 U.S.C. § 1367(a).

118.    Netlist transacts business in this judicial District, including the sale and offering for sale of its products. By bringing its Complaint against Diablo in this Court, Netlist has consented to the Court's jurisdiction. Diablo has sufficient contacts with this judicial District to subject itself to the jurisdiction of this Court. Personal jurisdiction and venue over Diablo's counterclaims are therefore proper in this Court.

## FACTUAL ALLEGATIONS

A.    **Diablo's Independent Development of a Synchronous Architecture for Netlist's Desired Chipsets**

119.    Prior to its engagement with Diablo, Netlist compiled two specification documents outlining a desired memory module architecture. The two Netlist specifications, (1) "LRD/DxD Chip – Preliminary Specification; LRD/DxD ASIC Controller," and (2) "Preliminary LRD/DxD Chip Specification; LRD/DxD Isolation Device," (collectively, "the Netlist Specifications") depicted an aspirational design which, as it turns out, could not be implemented.

120.    With these Specifications in hand, Netlist approached many companies requesting assistance in developing devices according to its Specifications because Netlist lacked sufficient

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1  experience or internal capability to develop the custom mixed-signal Application Specific

2  Integrated Circuits ("ASICs") described in the Netlist Specifications.

3        121.    In early 2008, Diablo and Netlist began discussing Netlist's desire to implement its

4  Specifications directed to DxD/LRD technology.  In order for Diablo to assess whether it could

5  build the chipset, Netlist provided the Netlist Specifications to Diablo.  On March 13, 2008,

6  Netlist and Diablo entered into a Mutual Non-Disclosure Agreement ("NDA") to facilitate

7  continued discussions regarding building Netlist's desired chipset.

8        122.    The Netlist Specifications described, at a high-level, an architecture for load

9  reduction chipset configured to operate with industry-standard DDR3 technology.  Shortly after

10  receipt of the Netlist Specifications, Diablo's engineering team realized that Netlist's proposed

11  design was incomplete, fatally flawed, and could not reasonably be expected to work.  Thus, as

12  soon as Netlist disclosed its proprietary materials, Diablo came to the realization that Netlist's

13  request was more aspirational than realistic.

14        123.    In an effort to gather additional information and to clarify how to approach the

15  missing design elements, Diablo engineers met with Dr. Hyun Lee, Netlist's Chief Architect.  At

16  that meeting, Dr. Lee reiterated a continued desire for an implementation conforming to Netlist's

17  proposed architecture, which required unrealistically low latency.  Dr. Lee's position at the

18  meeting reinforced the Diablo technical team's understanding that the Netlist Specifications were

19  not technically feasible.

20        124.    Shortly after the meeting with Dr. Lee, Diablo engineers Maher Amer and Mike

21  Takefman began discussing alternative solutions.  In particular, while the Netlist Specifications

22  proposed asynchronous circuits (with an unrealistically small delay relative to the system clock

23  period), the Diablo team favored an synchronous architecture (with one cycle of clock delay from

24  the system clock).  Also missing from the Netlist proposed design was any consideration of how

25  the desired chipset would interact with the BIOS (the basic input/output system that is essential to

26  the operation of a server) of the host system.  The evidence will demonstrate that Diablo's

27  implementation efforts resulted in a wholesale re-design, including but not limited to, repairing

28

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

1    the ID data path, maintaining interfaces and control methods that would be inter-operable with

2    other suppliers' parts, and stabilizing interactions with the BIOS.

3        125.    The Diablo engineers continued to meet with Dr. Lee from May to August 2008.

4 Based in large part on the ideas generated by Maher Amer and Mike Takefman, Diablo continued

5 on its redesign effort. In order to achieve the functionality requested by Netlist, Diablo added

6 circuits known as "flip-flops," as well as the accompanying clock generation circuitry, on the

7 controlling data line going into the card and on the data lines leaving the card. In designing this

8 mechanism that allowed data to be properly available to/from the host, the Diablo engineers

9 understood that the data would be delayed by a clock cycle. Dr. Lee, however, was adamant that

10 the Netlist Specifications did not allow for a clock cycle of delay. These differences in opinions

11 were longstanding; throughout Diablo's dealings with Dr. Lee, he did not support the

12 synchronous design proposed by Diablo, preferring the unworkable asynchronous with no clock

13 delays and an unrealistic asynchronous propagation delay through the ID device.

14        126.    By late August 2008, Diablo had compiled its own specification (the "Diablo

15 Specification") which described a new design that would result in a working product. *See, e.g.,*

16 VT-Berlinetta RD Product Specification (dated August 26, 2008) (attached hereto as Exhibit A).

17 Diablo presented the Diablo Specification to Netlist at a meeting in August 2008. This 57-page

18 document sets forth detailed product requirements, complete with a System Overview, Detailed

19 Feature Description, and Timing Diagrams.

20        127.    In order to meet stringent system timing requirements in the Diablo Specification,

21 Diablo executed a custom design from the ground up. Through its internal efforts, Diablo

22 designed and built out analog and digital circuits that would achieve the tight timing requirements

23 across all system conditions. The undertaking demonstrated Diablo's sophistication in complex

24 analog configuration, as well as verification techniques—all of which is highly proprietary and

25 protected by Diablo's patents and/or trade secrets. Further, the Diablo Specification embodied

26 Diablo's independent implementation efforts, not the flawed design described in the Netlist

27 Specifications.

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1    128.    The provisional patent application that Diablo filed in September 2008, U.S.

2  Provisional Application No. 61/136,550, as well as the subsequently filed non-provisional

3  applications, contained claims directed to ideas Diablo came up with during the design and

4  implementation of the Diablo Specification.  The concepts disclosed within Provisional

5  Application No. 61/136,550 did not reflect the Netlist Specifications nor the architecture

6  advocated for by Dr. Lee.  To the contrary, the synchronous architecture on which Diablo sought

7  and received patent protection, was substantially different from Netlist's proposed architecture.

8  Because Dr. Lee and Netlist did not contribute to and, in fact actively opposed Diablo's design,

9  only Maher Amer and Mike Takefman were named as inventors.

10    **B.    The Separation of Netlist and Diablo Intellectual Property Rights in the September 2008 Supply Agreement**

11

12    129.    On September 10, 2008, Netlist and Diablo executed a Development and Supply

13  Agreement ("Supply Agreement") pursuant to which Diablo would design and manufacture

14  products to sell to Netlist.  The terms of the Supply Agreement evidence the parties' mutual intent

15  to separate their intellectual property rights to correspond to each parties' contributions as set

16  forth in their respective Specifications.  For Diablo, this included all intellectual property relating

17  to implementation efforts, with no restrictions on Diablo's ability to later rely upon or re-use its

18  own know-how.

19    130.    The Netlist Specifications and the Diablo Specification naturally form the

20  foundation for the rights contracted for in the Supply Agreement because these materials were

21  prepared *before* signing the Supply Agreement.

22    131.    The Supply Agreement, on its face, repeatedly distinguishes between intellectual

23  property corresponding to the asynchronous architecture proposed by Netlist and intellectual

24  property corresponding to implementation of the load reduction chipsets by Diablo.  Because

25  Diablo's Specifications were developed by its own personnel and memorialized in its own,

26  separate documents, Diablo's protectable intellectual property cannot be conflated with the

27  unworkable asynchronous architecture proposed in the Netlist Specifications.

28

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

132.     In Section 7 of the Supply Agreement, titled "Intellectual Property Rights," Diablo is assigned ownership over all "implementation" intellectual property that it created, including "improvements."  Subsection (a) states:

> 7.   **Intellectual Property Rights**.
>
>      (a)     Diablo.  All rights, title and interest in and to the design and development of the Diablo Standard Register and Diablo's Implementation of the Netlist Chipset; and any improvement, update, modification or additional parts thereof, and all of Diablo's Intellectual Property Rights embodied in the Diablo Standard Register, shall at all times remain the sole and exclusive property of Diablo.  For purposes of this Agreement, "Implementation" shall mean the development of a silicon chip set using the Netlist Technology (including without limitation the packaging) which will meet NetList's Architecture requirements.

133.     In the following subsection, Netlist is separately provided with its own intellectual property rights, which are limited to the high-level concepts of "Load Reduction", and "Rank Multiplication" and "DIMM topology":

> (b)     Netlist.  All rights, title and interest in and to the design and development of the underlying Architecture of the Netlist Chipset, the Netlist Technology and all Intellectual Property Rights embodied in the Netlist Technology, any improvement, update, modification or additional parts thereof, shall at all times remain the sole and exclusive property of Netlist.  For purposes of this Agreement, "Architecture" shall mean system architecture with regard to Load Reduction and Rank Multiplication modules and DIMM topology.

134.     Thus, based on a plain reading of Section 7 of the Supply Agreement, the parties separated their intellectual property rights based on, at a minimum, a joint recognition that the synchronous design used during implementation was distinct from the asynchronous architecture proposed by Netlist.  And, the differences between the two sets of intellectual property rights is solidified through the reference in subsection 7(a) to the Diablo Standard Register, which embodies implementation technology belonging solely to Diablo.  Section 7(b) likewise limits Netlist to intellectual property rights in the "Architecture," narrowly defined as "system architecture with regard to Load Reduction and Rank Multiplication modules and DIMM topology."

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

135. The opening Recitals of the Supply Agreement also support the mutual intent to separate Netlist's abstract proposal from Diablo's tangible implementation:

> Whereas, Netlist desires to have certain products designed and manufactured by Diablo for sale to Netlist; and Diablo has the capability of designing and manufacturing such products and desires to do so for sale to Netlist.

136. The language of the recital demonstrates that while Netlist had lofty "desires," Diablo had the "capability" to design and manufacture the desired products. In other words, without Diablo, Netlist's desires would be left unmet because Netlist could not design the chipsets itself. Indeed, within the Recital there is an express acknowledgement that Diablo had the technical expertise to execute tasks that Netlist could not complete.

137. The separation of the parties' intellectual property rights is also consistent with Section 9 of the Supply Agreement where the parties agreed to their respective indemnity obligations. In conferring on Diablo indemnification obligations for claims brought against Netlist based on any "patent, copyright, trademark, trade secret, make work right or other intellectual property right of any third party by the Products as used or distributed within the scope of the Agreement," the agreement acknowledged that work done within the scope of the agreement would confer on Diablo distinct intellectual property rights from Netlist that would be protectable by, *inter alia*, patents and trade secrets.

138. Netlist and Diablo also made distinct financial contributions under the terms of the contract to fund their respective intellectual property rights. Diablo raised $20 million from third party investors between 2008 and 2010 to fund its participation in the program and the development of the intellectual property it was to own.

139. Accordingly, as the parties contracted for in September 2008, Diablo received rights in intellectual property relating to the chipset implementation and subsequent improvements. Because all "rights, title and interest in the design and development of the Diablo Standard Register and Diablo's Implementation of the Netlist Chipset" are at all times "the sole and exclusive property of Diablo," any unauthorized use of technology falling within the Diablo Standard Register is a breach of the Supply Agreement. Netlist's continued use of Diablo's

technology in its HyperCloud Memory Module[1] constituted infringement of Diablo's patents and misappropriation of its trade secrets. Further, because the MCS products use only Diablo's protectable intellectual property, Diablo is not liable for the claims Netlist asserted in the SAC.

**C.**     **Netlists's Disclosure of Diablo's Proprietary Intellectual Property to a Third Party**

140.     During the 2008 discussions between Netlist and Diablo that led up to the execution of the Supply Agreement, Netlist suggested that it had lined up another silicon company to be a second source of products but would not say who the second vendor was. The "Market Share" definition in Section 1 of the Supply Agreement and the corresponding provision in Section 3(e), were included as a result of Netlist's professed intention to work with another vendor to independently develop and make its own version of the chipset as is common in the industry. Because Diablo sought to accommodate its customer, it assented to the requested "Market Share" language.

141.     Diablo did not anticipate that Netlist would lift Diablo's implementation designs— the intellectual property Diablo had exclusive rights to under the Supply Agreement—and provide it to a third party unauthorized to copy Diablo's ideas.

142.     Specifically, after the parties agreed that the chipsets be manufactured according to the Diablo Specification, Netlist requested that Diablo provide it to Netlist in a Word document. Diablo complied.

143.     Diablo would later learn that Netlist misused these documents to commission a third party design services and manufacturing provider to produce a derivative, unauthorized version of the chipset Diablo designed. In so learning, Diablo also ascertained that it was not an independent second supplier who was working up the design as Netlist had previously indicated. Rather, Netlist re-packaged Diablo's design and used the third party design services and manufacturing provider for back end production.

---

[1] Despite Netlist's use of Diablo's patented technology and trade secrets in the HyperCloud Memory Module, the HyperCloud Memory Module is technically distinct from Diablo's products and is not interchangeable or a comparable substitute for the MCS technology embodied in ULLtraDIMM.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

144.    In disclosing Diablo's proprietary intellectual property to a third party, so that the third party could copy Diablo's patented and trade secret protected implementation methods, Netlist breached both the NDA and the Supply Agreement.

**D.    The Terms of the Settlement Agreement Evidence Diablo's Intellectual Property Rights for Its Implementation Efforts**

145.    The parties amended the Supply Agreement on January 12, 2010.  *See* Settlement Agreement and Amendment to Development and Supply Agreement ("Settlement Agreement") (attached hereto as Exhibit B).  The Recitals in the Settlement Agreement memorialize an intent to resolve disputes that had emerged since entering into the Supply Agreement in September 2008.

146.    The parties agreed to settle their disputes "in consideration of the promises and the mutual agreements hereinafter set forth."  Part of the consideration that Netlist agreed to in exchange for the terms of the Release and Covenant Not to Sue was to order 100,000 chipsets from Diablo.  *See* Settlement Agreement, Section 10.

147.    Netlist's willingness to buy the chipsets is significant.  As detailed above, Netlist had passed off Diablo's Specification to a third party design services and manufacturing provider as its own to secure a second source of derivative products.  After Netlist outfitted the aforementioned provider with Diablo's technical know-how, it had little incentive to buy any chipsets from Diablo.  Yet, Netlist agreed to a "Production Incentive" that committed Netlist to "place a non-cancellable, pre-paid Purchase Order for 100,000 chipsets" at a cost of $15 per set.  Indeed, Netlist followed through on its purchase commitment in an effort to appease Diablo who, by this point in time, had become aware that Netlist was commissioning the third party provider to manufacture products based on Diablo's patented and trade secret protected technology.

148.    Netlist's non-cancellable order stands out in unique contradiction to the claims in the SAC.  If, as Netlist alleges in this suit, it owned all intellectual property, including the VT Berlinetta chipset, it would not have had to pay Diablo to obtain a release and covenant not to sue.  Instead, the purchase of the 100,000 chipsets was an acknowledgement that Diablo

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

1  maintained its own intellectual property rights, rights that demanded compensation before Diablo

2  would grant a Release of potential claims.

3      **E.     Netlist Filed the SAC Against Diablo in Breach of Its Obligations Under the**
           **Supply Agreement**

4

5      149.    Netlist's filing of the SAC on March 21, 2014 breached the terms of the Supply

6  Agreement in overstating the scope of the technology it had rights in.  As previously stated in

7  paragraphs 129 to 139, Diablo was assigned ownership of all intellectual property relating to

8  "implementation."  Netlist agreed to these terms and, at least in September 2008, recognized that

9  the Netlist Specifications did not extend to "implementation."

10     150.    In paragraphs 17 and 18 of the SAC, however, Netlist disregarded its contractual

11  obligations in reciting the scope of its protectable technology.  Specifically, Netlist alleged that in

12  a presentation Netlist sent Diablo on April 29, 2008, it detailed "the functionality, architecture,

13  and underlined implementation of HyperCloud® technology."  SAC ¶ 17 (emphasis added).  Similarly, in

14  the following paragraph, Netlist incorrectly states that "Netlist's engineers taught Diablo many novel

15  aspects of Netlist's proprietary DxD and LRD technologies, as well as design details and

16  implementation strategies developed for the HyperCloud® chipset."  SAC ¶ 18 (emphasis added).

17     151.    In alleging that it disclosed the HyperCloud implementation or implementation

18  strategies to Diablo, and relying on these statements in bringing a claim for, among other things,

19  trade secret misappropriation, Netlist violated the plain language of Section 7(a) of the Supply

20  Agreement.  It is beyond dispute that the Supply Agreement conveys all intellectual property

21  rights relating to "implementation" or "development of a silicon chip set," to Diablo.

22     152.    On information and belief, Netlist compounds its overreach by incorporating the

23  technology referenced in paragraphs 17 and 18 of the SAC in its Trade Secret Disclosure dated

24  March 19, 2014.[2]  For example, in the same paragraph Netlist lays claim to "implementation" of

25

26

27  [2]  During the September 22, 2014 case management conference, the Court ordered Netlist to
    amend its Trade Secret Disclosure because it had concerns with the lack of specificity of the
28  current disclosure.

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

HyperCloud product, it references the very documents that provided the basis for its Trade Secret

Disclosure.  *See* SAC ¶ 17 (identifying powerpoint presentations).

153.    In serving Diablo with a Trade Secret Disclosure that included "implementation"

or "implementation strategies," Netlist wrongly accused Diablo of misappropriating technology

for which Diablo owns all intellectual property rights in under the Supply Agreement.

154.    For Netlist to claim intellectual property rights in "implementation"—through the

Trade Secret Disclosure, the SAC, or otherwise—is an overt breach of the Supply Agreement.

Such a breach of contract occurred in filing the SAC because Netlist states with particularity that

it had an ownership interest in the technology belonging to Diablo under the terms of the contract.

SAC ¶¶ 17, 18.

**F.      Netlist's Interference with Diablo's Customers and Potential Customers**

155.    In filing the instant lawsuit and through its dealings with other original equipment

manufacturers within the industry, Netlist has engaged in a campaign of interference with

Diablo's current and prospective customers.

156.    By leveling unfounded accusations about Diablo in public statements and private

discussions, Netlist knowingly endeavors to disrupt Diablo's business and undercut its potential

for future opportunities.

157.    Diablo expects that, through the discovery process, the evidence will unveil that

Netlist's claims are not based in fact and that Netlist's decision to litigate this case was a

calculated effort to influence the dynamics of ongoing and future customer relationships.  Indeed,

one such calculated interference with Diablo's customer has already been uncovered.

**COUNTERCLAIM COUNT I**
**(Breach of Contract (Supply Agreement) by Netlist)**

158.    The allegations of Paragraphs 1 through 110 of the Answer and Paragraphs 111

through 157 of the Counterclaims are incorporated as if fully set forth herein.

159.    Diablo has performed all of its obligations to Netlist except those obligations

Diablo was excused from performing or has a license to perform under the terms of the Supply

Agreement.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

160.     Netlist's wrongful conduct, as alleged above in the Factual Allegation section, including but not limited to paragraphs 129 through 154, constitutes a material breach of the Supply Agreement between Netlist and Diablo.

161.     Diablo has suffered damage to its business as a result of the breaches of the Supply Agreement by Netlist and/or the NDA, as alleged herein.  The damages are as yet to be determined and will be based on the evidence shown at trial.

**COUNTERCLAIM COUNT II**
**(Unfair Competition Under California Bus. & Prof. Code § 17200 *et seq*. by Netlist)**

162.     The allegations of Paragraphs 1 through 110 of the Answer and Paragraphs 111 through 161 of the Counterclaims are incorporated as if fully set forth herein.

163.     Diablo is informed and believes that Netlist has engaged and continues to engage in a continuing pattern of wrongful acts in violation of California Business & Professions Code section 17200 *et seq*., including, but not limited to, unlawful and unfair business practices in violation of Diablo's contractual rights under the Supply Agreement.

164.     As set forth above in greater detail in paragraphs 129 through 154, Netlist continues to use, without authorization, Diablo's trade secrets and patented technology in its HyperCloud Memory Module and related products.

165.     As set forth above in greater detail in paragraphs 140 through 144, Netlist is also liable for the unauthorized disclosure of Diablo's trade secrets and patented technology to the third party design services and manufacturing provider to second source its products.

166.     As set forth above in greater detail in paragraphs 155 through 157, Netlist has interfered and will continue to interfere with Diablo's relationships with current or prospective customers.

167.     Netlist's unlawful and unfair competition against Diablo has been and continues to be willful, intentional, and in bad faith.

168.     As a direct and proximate result of Netlist's wrongful acts in violation of Cal. Bus. & Prof. Code §§ 172 *et seq*., Diablo has suffered and will continue to suffer substantial irreparable harm.  Diablo is informed and believes that Netlist intends to continue its unlawful

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1  and unfair competition toward Diablo in an ultimate effort to harm Diablo's business.  Diablo's

2  remedy at law is not by itself adequate to compensate Diablo for the harm that has been and will

3  continue to be inflicted by Netlist.  Diablo therefore seeks injunctive relief and attorneys' fees in

4  accordance with California law.

5    169.  As a direct and proximate result of Netlist's wrongful acts in violation of Cal. Bus.

6  & Prof. Code §§ 172 *et seq.*, Netlist has been unjustly enriched in an amount not yet ascertained.

7  As a result, Diablo is entitled to an award of equitable restitution for Netlist's unjust enrichment,

8  in an amount to be determined at trial.

9                                    **PRAYER FOR RELIEF**

10   WHEREFORE, Diablo prays for judgment as follows:

11   a.    A judgment in favor of Diablo denying Netlist all relief requested in its SAC in

12  this action and dismissing Netlist's Complaint with prejudice;

13   b.    A judgment in favor of Diablo on all of its Counterclaims;

14   c    A judgment that Netlist take nothing by its SAC;

15   d.    An award of damages to be determined at trial;

16   e.    An award of interest, costs, and disbursements;

17   f.    An injunction barring Netlist from further violations of the Supply Agreement

18  and/or from further competitive harm to Diablo pursuant to California Bus. & Prof. Code §

19  17200;

20   g.    A declaration that this case is exceptional and an award to Diablo for all of its

21  reasonable costs and expenses of litigation, including attorneys' fees and expert witness fees;

22   h.    Such other and further relief as this Court deems just and proper.

23                                  **DEMAND FOR JURY TRIAL**

24   In accordance with Rule 38 of the Federal Rules of Civil Procedure, Diablo respectfully

25  demands a jury trial as to all issues triable by jury.

26

27

28

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR

1   Dated:  September 24, 2014                    Respectfully submitted,

2                                                 McDERMOTT WILL & EMERY LLP

3                                                 By:*/s/ Fabio E. Marino*
                                                      Fabio E. Marino
4

5                                                 Attorneys for Defendant and Counterclaim
                                                  Plaintiff DIABLO TECHNOLOGIES, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

- 24 -

ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND JURY DEMAND
CASE NO. 4:13-CV-05962 YGR