Benjamin K. Riley (CA Bar No. 112007)
briley@bzbm.com
Robert H. Bunzel (CA Bar No. 99395)
rbunzel@bzbm.com
W. Paul Schuck (CA Bar No. 203717)
pschuck@bzbm.com
Sony B. Barari (CA Bar No. 243379)
sbarari@bzbm.com
Simon R. Goodfellow (CA Bar No. 246085)
sgoodfellow@bzbm.com
**BARTKO, ZANKEL, BUNZEL & MILLER**
One Embarcadero Center, Suite 800
San Francisco, California  94111
Telephone:  (415) 956-1900
Facsimile:  (415) 956-1152

Thomas J. Wimbiscus (*Pro Hac Vice*)
twimbiscus@mcandrews-ip.com
Gregory C. Schodde (*Pro Hac Vice*)
gschodde@mcandrews-ip.com
Wayne H. Bradley (*Pro Hac Vice*)
wbradley@mcandrews-ip.com
**McANDREWS, HELD & MALLOY**
500 West Madison Street, 34th Floor
Chicago, IL  60661
Telephone:  (312) 775-8000
Facsimile:  (312) 775-8100

Attorneys for Plaintiff
NETLIST, INC.

Sean C. Cunningham (CA Bar No. 174931)
sean.cunningham@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA  92101-4297
Telephone:  (619) 699-2700
Facsimile:   (619) 699-2701

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NETLIST, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DIABLO TECHNOLOGIES, INC., <br><br> Defendant. | Case No. 4:13-cv-05962 YGR <br> (Related Case No. 4:13-cv-05889 YGR) <br><br> **NETLIST'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM IN SUPPORT** <br><br> Date:        December 2, 2014 <br> Time:        2:00 p.m. <br><br> Courtroom 1, 4th Floor <br> The Honorable Yvonne Gonzalez Rogers |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on December 2, 2014, at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 1, 4th Floor, of the above-captioned Court, located at 1301 Clay Street, Oakland, 94612, Plaintiff Netlist, Inc. ("Netlist") will move this Court for an order for a preliminary injunction against Defendant Diablo Technologies, Inc. ("Diablo"). This motion is based on this notice of motion and the supporting memorandum; the declarations and exhibits filed herewith; all pleadings and papers on file in this action; and such other matters as the Court may consider.

DATED:  October 6, 2014

BARTKO, ZANKEL, BUNZEL & MILLER
McANDREWS, HELD & MALLOY
DLA PIPER LLP (US)


By:  _____/s/ Benjamin K. Riley_____
                Benjamin K. Riley

Attorneys for Plaintiff
NETLIST, INC.

2458.000/852584.3

# TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................................1

II.    STATEMENT OF FACTS ..................................................................................................2

    A.   Netlist's HyperCloud® Technology .......................................................................2

    B.   The Contracts Between Netlist and Diablo..............................................................3

    C.   Diablo's Breaches/Misappropriation .......................................................................6

    D.   Trade Secret Misappropriation Summary ................................................................9

    E.   Netlist's Current Products .......................................................................................10

    F.   Netlist's Irreparable Harm .....................................................................................12

III.   LEGAL ARGUMENT.......................................................................................................14

    A.   Preliminary Injunction Standard ...........................................................................14

    B.   Netlist is Overwhelmingly Likely to Succeed on the Merits .................................14

        1.   Diablo Repeatedly Breached Its Contracts ................................................15

        2.   Diablo's Breach of Contract Constitutes Unfair Competition.......................................................................................................18

        3.   Diablo Misappropriated Netlist's Trade Secrets........................................19

    C.   Netlist Has Suffered And Will Suffer Irreparable Harm .......................................21

    D.   The Balance of Equities Favors Netlist .................................................................24

    E.   The Public Interest Inquiry Tips Heavily in Favor of Netlist ................................24

IV.    CONCLUSION..................................................................................................................25

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-i-

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ....................................................................................14

*American Trucking Associations, Inc. v. City of Los Angeles*
559 F.3d 1046 (9th Cir. 2009) ....................................................................................14

*Berryman v. Merit Prop. Mgmt.*
152 Cal.App.4th 1544 (2007) ....................................................................................18

*Benda v. Grand Lodge of IAM*
584 F.2d 308 (9th Cir. 1978) ....................................................................................14

*Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*
20 Cal.4th 163 (1999) ....................................................................................18, 19

*Courtesy Temporary Services, Inc. v. Comacho*
222 Cal.App.3d 1278 (1990) ....................................................................................15

*CyberMedia, Inc. v. Symantec Corp.*
19 F. Supp. 2d 1070 (N.D. Cal. 1998) ....................................................................................23

*GlobeSpan, Inc. v. O'Neill*
151 F. Supp. 2d 1229 (C.D. Cal. 2001) ....................................................................................19

*Kewanee Oil Co. v. Bicron Corp.*
416 U.S. 470 (1974) ....................................................................................24

*Leiva-Perez v. Holder*
640 F.3d 962 (9th Cir. 2011) ....................................................................................14

*Marolda v. Symantec Corp.*
672 F. Supp. 2d 992 (N.D. Cal. 2009) ....................................................................................18

*Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*
319 F.Supp.2d 1059 (C.D. Cal. 2003) ....................................................................................18, 19

*Pyro Spectaculars North, Inc. v. Souza*
861 F. Supp. 2d 1079 (E.D. Cal. 2012) ....................................................................................22, 23, 24

*Regal Knitwear Co. v. N.L.R.B.*
324 U.S. 9 (1945) ....................................................................................23

*Sammartano v. First Judicial District Court*
303 F.3d 959 (9th Cir. 2002) ....................................................................................24

BARTKO ZANKEL BUNZEL
A PROFESSIONAL LAW CORPORATION
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-ii-

*Scotts Co. v. United indus. Corp.*
315 F.3d 264 (9th Cir. 2002) ........................................................................................24

*Simula, Inc. v. Autoliv, Inc.*
175 F.3d 716 (9th Cir. 1999) ........................................................................................21

*Singer Mgmt. Consultants, Inc. v. Milgram*
650 F.3d 223 (3d Cir. 2011)..........................................................................................14

*Spring Design, Inc. v. Barnesandnoble.com, LLC*
2010 WL 5422556 (N.D.Cal. Dec.27, 2010) .....................................................18, 19

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co.*
240 F.3d 832 (9th Cir. 2001) .................................................................................22, 23

*Univ. of Tex. V. Camenisch*
451 U.S. 390 (1981)......................................................................................................14

*Vinyl Interactive, LLC v. Guarino*
2009 WL 1228695 (N.D. Cal. 2009) ...........................................................................24

*Wilson v. Watt*
703 F.2d 395 (9th Cir. 1983) .......................................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) ..................................................................................................14, 24

**Statutes**

Cal. Bus. & Prof. Code
§ 17200.................................................................................................................18, 19
§ 17203.........................................................................................................................22

Cal. Civ. Code
§ 1641............................................................................................................................17
§ 3426 *et seq.* ...............................................................................................................19
§ 3426.1(a)....................................................................................................................21
§ 3426.1(b)....................................................................................................................20
§ 3426.1(d)....................................................................................................................19
§ 3426.2.........................................................................................................................22

**Other Authorities**

FED. R. CIV. P. 65(b) ...........................................................................................................14

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-iii-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

## I. **INTRODUCTION**

Although this case concerns cutting-edge computer memory technology and competing products, fundamentally it is about flagrant and repeated breaches of contract and theft of ideas. Diablo agreed to receive Netlist's confidential specifications and supporting information about its HyperCloud® distributed DxD/LRD technology and to build Netlist's design in silicon. The parties agreed that Netlist would retain all rights to the Netlist Chipset built by Diablo and to the underlying technology. Diablo received the rights to make and sell a DDR3 Standard Register (with the DxD/LRD capability physically disabled), up to 30% market share of the chipsets sold by Netlist, and any silicon implementation techniques Diablo developed.

But as soon as it completed the Netlist HyperCloud® project, Diablo launched its own project to build a competing "TeraDIMM" Memory channel module on the foundation of the Netlist Technology and specifications. ████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████ Under the parties' contract, Diablo had no right to use the designs and technology from the Netlist Chipset, especially to build a competing DDR3 module for the computer's Memory channel.

Diablo also built two prototype products for its TeraDIMM module: the MegaDIMM and the ████████████. In blatant breach of the contract, Diablo actually used Netlist's RD and ID chips in both devices, allowing Diablo to develop software and firmware and to test and debug the module ████████████ prior to its own Rush and Bolt chips being ready. These breaches allowed Diablo to improperly bypass approximately ████████ in normal development time. Finally, the Rush and Bolt chips built for Diablo's TeraDIMM module — now sold by SanDisk as the ULLtraDIMM — incorporate at least 15 Netlist Trade Secrets, wrongfully misappropriated by Diablo. The Rush and Bolt chips are the heart and engine of the ULLtraDIMM, and their continued use should be enjoined.

These breaches and theft have caused and will continue to cause acute, continuing and

-1-

irreparable harm to Netlist. Besides the HyperCloud® module, Netlist sells another product which offers data capacity and storage on the Memory channel (the NVvault® module) and is developing a new module based on the HyperCloud® technology and trade secrets (the HyperVault) expected to be available in 2015. Each sale of an ULLtraDIMM module forecloses a sale of the NVvault® module. Diablo's wrongful claim to the intellectual property rights associated with the ULLtraDIMM has caused major companies to refuse to partner or contract with Netlist on its NVvault® and HyperVault projects, infecting the market against Netlist and foreclosing major business opportunities.

This Court should issue a preliminary injunction enjoining Diablo, Smart Storage and SanDisk from any further manufacture, use, sale or distribution of the Diablo Rush and Bolt chips and of any ULLtraDIMM module containing these chips, and order the recall of all ULLtraDIMM modules shipped to date.

## II. STATEMENT OF FACTS

### A. Netlist's HyperCloud® Technology

Founded in 2000, Netlist established itself as a creator of unique memory module technologies, with many of its products being supplied to major manufacturers such as Apple, Dell, IBM and HP. (Declaration of Chuck Hong ("Hong Dec."), at ¶4, filed herewith.) In 2003, Netlist launched an intensive research and development effort targeting a novel computer server memory technology ultimately embodied in its HyperCloud® memory module: a revolutionary dual in-line memory module ("DIMM") utilizing an innovative chipset to dramatically increase the memory capacity and system performance of existing computer servers. (*Id.*, ¶¶16, 18.) An industry standard had been set for a Registered DIMM ("RDIMM"), which attached to the computer's Memory channel (as opposed to the slower data storage channel), and included a Standard Register attached to at least one rank of physical DRAM volatile memory. (*Id.*, ¶8.) *See* Figure 1 (reprinted from the Expert Report of Kenneth A. Jansen ("Jansen Report"), attached to the Declaration of W. Paul Schuck, filed herewith.

Netlist's HyperCloud® module appears to the computer system as a standard RDIMM with two ranks of DRAM memory, but is actually a proprietary Load Reduced DIMM ("LRDIMM") with four ranks of DRAM memory. (Hong Dec., ¶20.) The signature technological breakthroughs that enabled the HyperCloud® advancements included the use of load reduction ("LRD") and rank multiplication

-2-

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

("DxD") technologies and related proprietary chipset architectures which Netlist collectively considers to be its core Trade Secrets. (*Id.*, ¶¶21, 22.) Even though the HyperCloud® module provides higher performance and higher density, it operates in a standard DDR3 RDIMM socket located on the computer's Memory channel (also referred to as the Memory slot). (*Id.*, ¶18.)

By 2008, after four years and $20 million of effort, Netlist developed the array of critical technologies for its new HyperCloud® memory modules and chipsets. (Hong Dec., ¶28.) Instead of using a Standard Register, Netlist's DxD/LRD architecture distributed the data signal and control tasks among a proprietary module controller — the "ASIC" (which includes Standard Register functionality) — and nine isolation devices — the "ISwitches". Netlist was the first company to design and insert these custom ISwitch isolation devices in a DIMM. (*Id.*, ¶19.) See Figure 2 attached. The HyperCloud® module required no change in the computer CPU's Basic Input/Output System (BIOS) and met the then-industry data transfer standard of DDR3 yet allowed greater capacity and faster performance. (*Id.*, ¶18.)

**B.    The Contracts Between Netlist and Diablo**

In early 2008, Netlist sought a vendor to produce its HyperCloud® memory modules and chipsets in silicon. (Hong Dec., ¶23.)[1] Netlist considered various approaches to sourcing the silicon implementation work, but ultimately engaged with two vendors: Diablo and Toshiba. (*Id.*)

Diablo pitched itself as a seasoned, mixed signal design team with expertise in analog and digital circuit design, although as of 2008 it had produced few products, and had built nothing for DDR3. (Hong Dec., ¶24; Diablo Product Roadmap, Declaration of Benjamin K. Riley ("Riley Dec."), filed herewith, Ex. 1 at p. 10.)[2] Diablo had concluded that the DxD/LRD technology was needed to meet DDR3 performance, and wanted a license from Netlist to develop a DDR3 RDIMM register incorporating Netlist's DxD/LRD technology. Netlist refused to license the DxD/LRD technology to Diablo, and proposed Diablo build a DDR3 register with DxD/LRD enabled exclusively for Netlist; in

---

[1] It is standard industry practice for chip design companies to architect and design their products, and then outsource the lower level silicon implementation to vendors. (Hong Dec., ¶23.)

[2] Unless otherwise referenced, "Ex. __" refers to the exhibits attached to the Riley Declaration.

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

return Netlist guaranteed Diablo a share of the DxD/LRD registers sold by Netlist.  (Hong Dec., ¶¶24, 25.)

On March 20, 2008, Netlist and Diablo entered into a Mutual Non-Disclosure Agreement ("NDA") to discuss possible collaboration between the two companies.  (Hong Dec., ¶26.)  The NDA set forth that its purpose was for Netlist and Diablo to:

> [E]xchange certain Confidential Information … for the limited and exclusive purpose of exploring the possibility of having Diablo embed elements of Netlist's proprietary and patented DxD/LRD technology into Diablo products, for Netlist's exclusive use (the 'Business Purpose').

(Hong Dec., Ex. 4 at ¶A.)  The NDA also fully protected the broad array of "Confidential Information" that would be exchanged between the parties, including "any and all information concerning Disclosing Party, or its business, that is disclosed by Disclosing Party to Receiving Party, whether orally or in writing," such as any "confidential, trade secret or proprietary information."  (*Id*. at ¶1.)  Diablo was under an obligation not to disclose *any* of Netlist's Trade Secrets or other "Confidential Information," not just the DxD/LRD technology.

Starting in April 2008, Netlist provided to Diablo extensive documentation, including two detailed specifications and a PowerPoint presentation — all marked Netlist Confidential — fully setting forth the HyperCloud® memory module and chipset-related Trade Secrets.  (Declaration of Hyun Lee ("Lee Dec), filed herewith, ¶8 and Exs. 1-3.)  In 2008 and 2009, Dr. Hyun Lee, Netlist's Chief Technical Officer and the Architect of the HyperCloud® design, met with Diablo engineers in at least 11 face-to-face meetings, over 25 days, plus had extensive email correspondence and telephone calls.  *(Id.,* ¶¶9, 10.)  Dr. Lee taught Diablo's engineers various aspects of Netlist's technologies concerning both the standard DDR3 chipsets/modules and the Netlist Trade Secrets.  (*Id.*, ¶¶11-33.)

On September 10, 2008, Netlist and Diablo executed the Development and Supply Agreement (the "Supply Agreement")[3] — a standard type of agreement for a vendor to implement a chip

---

[3]  In the parties' first draft from June, Diablo proposed that Diablo, not Netlist, own all rights to the finished Product.  (Ex. 2, section 7(a).)  Netlist rejected this language, and limited Diablo's rights to the Diablo Standard Register.  (Ex. 3.)  Diablo countered by adding language that it would own all rights to the Netlist Chipset, but Netlist also rejected this language and limited Diablo's rights to the Diablo Standard Register plus "Diablo's implementation of the Netlist Chipset."  (Ex. 4.)  The definition of Implementation was added to the next draft.  (Ex. 5.)  This draft also clarified in Section 8(a) that "the

-4-

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

NETLIST'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:13-cv-05962 YGR

architecture and design in silicon — with two main objectives:  (1) that Diablo would implement in silicon and manufacture a DDR3-capable chipset for Netlist — *i.e.*, the Netlist Chipset — integrating Netlist's know-how relating to DDR3 standard chipsets and also many of Netlist's Trade Secrets; and (2) that Diablo would retain rights to a standard chip — the Diablo Standard Register derived from the Netlist Chipset but with the DxD/LRD functionality physically disabled.  (Hong Dec., Ex. 5.)

The Supply Agreement carefully defines the parties' respective intellectual property rights and demonstrates Diablo's breaches of contract in this case.  It defined the <u>Netlist Technology</u> to include Netlist's DxD/LRD technology "know-how" "developed prior to the Effective Date and provided to Diablo."  (*Id.* at p. 1.)  It then defined the two Products that each party would own <u>after</u> the project:

> '<u>Netlist Chipset</u>' shall mean a DDR3 proprietary chip set solution consisting of a DDR3 standard register (**with DxD/LRD physically enabled**) <u>and</u> set of isolation devices utilizing the Netlist Technology …

> '<u>Diablo Standard Register</u>' or '<u>Register</u>' shall mean a DDR3 industry standard register derivative of Netlist Chipset **with either or both of DxD/LRD functionality physically disabled**.  (*Id.* at p. 2; emphasis added.)

Section 2(e) granted Diablo a license to use the Netlist Technology to *make* the Products.  But the Netlist Chipset and Netlist Technology were reserved exclusively for Netlist:

> Diablo shall not sell or manufacture any device constituting the Netlist Chipset or Netlist Technology to or for any person except Netlist; provided that Diablo will be allowed to make, have made, use, design, manufacture, distribute and sell to any third party the Diablo Standard Register.

Section 7, Intellectual Property Rights, confirms Netlist's ownership of the Netlist Chipset and the underlying Netlist Technology, while Diablo owned the Diablo Standard Register and silicon implementation techniques it developed:

> (a) <u>Diablo</u>.  All rights, title and interest in and to the design and development of the Diablo Standard Register and Diablo's Implementation of the Netlist Chipset; and any improvement, update, modification or additional parts thereof, and all of Diablo's Intellectual Property Rights embodied in the Diablo Standard Register, shall at all times remain the sole and exclusive property of Diablo.  For purposes of this Agreement, "Implementation" shall mean the development of a silicon chip set using the Netlist Technology (including without limitation the packaging) which will meet Netlist's Architecture requirements.

Netlist Technology is the Confidential Information of Netlist and may not be used for any purpose other than as set forth in this Agreement, including without limitation use of such Netlist Technology to develop a chip competitive to the Netlist Chipset."  (*Id.*)

BARTKO ZANKEL BUNZEL

One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

-5-

(b) <u>Netlist</u>. All rights, title and interest in and to the design and development of the underlying Architecture of the Netlist Chipset, the Netlist Technology and all Intellectual Property Rights embodied in the Netlist Technology, any improvement, update, modification or additional parts thereof, shall at all times remain the sole and exclusive property of Netlist. For purposes of this Agreement, "Architecture" shall mean system architecture with regard to Load Reduction and Rank Multiplication modules and DIMM topology.

Section 8(d) of the Supply Agreement set forth a broad duty of "Nondisclosure and Nonuse" of the other party's Confidential Information, while Section 8(a) concludes: "For purposes of clarification, the Netlist Technology is the Confidential Information of Netlist and may not be used for any purpose other than as set forth in this Agreement, including without limitation use of such Netlist Technology <u>to develop a chip competitive to the Netlist Chipset</u>." (*Id.*, emphasis added.)

In sum, the Netlist Chipset and all of Netlist Technology taught to Diablo from the ASIC and ISwitch specifications and by Dr. Hyun Lee remained exclusively owned by Netlist. Diablo may sell a Diablo Standard Register (with the DxD/LRD functionality physically disabled) with no supporting isolation devices, and retain any circuit improvements it developed in implementing Netlist's design in silicon. But Diablo had no other right to use Netlist's Technology or Trade Secrets.

**C.    Diablo's Breaches/Misappropriation**

a.    *Improper Patent Filings.*  On September 15, 2008, less than one week after signing the Supply Agreement, Diablo filed a provisional patent application with the U.S. PTO, and later filed additional patent applications. (Hong Dec., ¶¶37, 45.) Each of these applications was based on and includes confidential technical information that Netlist had provided to Diablo. (*Id.*, at ¶38.)

b.    *Diablo's Delayed Contractual Performance.*  Diablo failed to meet its obligations to deliver samples of the HyperCloud® chipset by the end of 2008. In 2009, Netlist demanded that Diablo perform; Diablo responded by demanding that Netlist commit to ordering more of the HyperCloud® chipset. (Hong Dec., ¶¶40, 41.) To secure the delivery of its HyperCloud® chipset, in January 2010 Netlist executed a Settlement Agreement and Amendment to Development and Supply Agreement with Diablo ("Settlement Agreement"). (Hong Dec., Ex. 7.) Besides addressing the parties' disagreements over supply commitment and the delivery of products, the Settlement Agreement released both Diablo and Netlist from any breaches of the Supply Agreement *prior* to the January 12, 2010 effective date.

-6-

NETLIST'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:13-cv-05962 YGR

Diablo finally completed the silicon implementation of the HyperCloud® chipset in March 2010.  (Hong Dec., ¶¶46-48.)  However, due to Diablo's breaches in its delivery requirements, the HyperCloud® module substantially missed the market window for its product specifications.  (*Id.*)

       c.    *Diablo's TeraDIMM*.  Diablo finished its design and production work for Netlist's HyperCloud® module in approximately mid-2010.

---

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

---

[4] "**ASIC**" is the name of the module controller architected and designed by Netlist for the HyperCloud®. As built, Diablo referred to the Netlist ASIC module controller as the "**RD**."  Diablo calls its TeraDIMM module controller the "**Rush**".  "**ISwitch**" is the name of the isolation switch architected and designed by Netlist for the HyperCloud®.  As built, Diablo referred to Netlist's ISwitch isolation device as the "**ID**".  Diablo calls its TeraDIMM isolation switch the "**Bolt**".

    NETLIST'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:13-cv-05962 YGR

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1  ██████████████████████████████████████████████████

2  ████████████████████████████████████████████

3  ██████████████████████████████████████████████

4  ██████████████████████████████████████████████

5  ██████████████████████████████████████████████

6  ████████████████████████████████

7     █████████████████████████████████████████████

8  ██████████████████████████████████████████████████

9  ██████████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ██████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████

13 ██████████████████████████████████████████████████

14 ████████████████████████████████  These uses of the Netlist LRD/DxD Technology, ████████████

15 ███████████████████████████████████████████, breached the NDA and Supply

16 Agreement and misappropriated Netlist's Trade Secrets.

17      d.     *Diablo's MegaDIMM*.  During July 2011, ████████████████████████████████

18 █████████████████████████  The MegaDIMM was an early prototype of the TeraDIMM used for testing

19 before the physical Rush module controller and Bolt isolation devices had been built.  But instead of

20 the Rush and Bolt chips, the MegaDIMM used ███████████ and <u>Netlist's RD and ID chips</u>. ████████

21 ██████████████████████████████████████████████████

22 ████████████████████████████████████████████

23 ██████████████████████████████████████████

24 ████████████████████████████████████████

25 ██████████████████████████████████████████

26 ██████████████████████████████████████████████████

27 ████████████████████████████████████████████

28

-8-



f.      *The TeraDIMM and ULLtraDIMM*.  The name of Diablo's TeraDIMM was

changed to ULLtraDIMM when Diablo began to work with Smart Storage in 2013.  While the

ULLtraDIMM uses standard Flash memory instead of DRAM, like the HyperCloud®, the

ULLtraDIMM follows the DDR3 standard, plugs into a standard RDIMM Memory slot, and

electrically appears to the computer system as a standard RDIMM with DRAM.  (Jansen Report at 16-

17, 22.)  But the heart and engine of the ULLtraDIMM are the Rush and Bolt chips manufactured by

Diablo based on the Netlist RD and ID chips and the Netlist Technology.  The ULLtraDIMM went on

sale to the public in June 2014, from IBM under the brand name eXFlash.  (Hong Dec., at ¶66.)

**D.      Trade Secret Misappropriation Summary**

The Expert Report of Kenneth Jansen, attached to the Declaration of W. Paul Schuck, defines

the most relevant terms applicable to the technology, describes the basic technology, explains the

context of Diablo's breaches of contract and trade secret theft, and then compares 15 of the Netlist

---

[5] Tape out describes when the physical design on a chip is completed and the generation of the mask set can begin.  The mask set is then used to make the physical chips.

-9-

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

Trade Secrets misappropriated by the ULLtraDIMM and the Bolt and Rush chips. Mr. Jansen's Report is organized by five areas: (1) Intercepting System Commands or Control Signals; (2) Chipset Operation Modes, Configuration and Control; (3) Write Leveling Operations; (4) Termination and ODT Control; and (5) Register Rank Controller and Modifying Control Information.

For each area, Mr. Jansen describes the Subject and Motivation for the Trade Secrets, and then (in the bold boxes) compares each Trade Secret (as taught by the Netlist specifications) against the Diablo technical specifications where the Trade Secret is discussed and implemented. Mr. Jansen also describes his electrical tests of an ULLtraDIMM module purchased on the market, further establishing use of the Trade Secrets. At the end of each subsection, Mr. Jansen compares the specific Trade Secret against Diablo's implementation of that Trade Secret in the ULLtraDIMM, explaining the similar uses. At the end of each of the five sections, Mr. Jansen's states his conclusions on how the specific Trade Secrets are incorporated in the ULLtraDIMM.

As opposed to repeating Mr. Jansen's conclusions here, we request that the Court first review the Introduction to Mr. Jansen's Report, from pages 2 to 19, for background. Then each of the asserted Trade Secrets are discussed starting on page 20. The key sections to review are the conclusions for each Trade Secret following the bold boxes, and the summary, bullet-point conclusions at the end of each of the five sections. (*See* Jansen Report at 22-23, 39, 44, 53 and 58.)

**E.    Netlist's Current Products**

Between 2002 and 2006, Netlist made a specialized RDIMM product and a PowerEdge RAID Controller ("PERC"), used for data recovery purposes and located on the computer's Storage channel. (Hong Dec., ¶50.) The PERC product was essentially a controller with DRAM attached to a lithium battery to prevent DRAM data loss during a power failure. (*Id.*) Netlist sold nearly $88 million of this product. (*Id.*)

By 2006, Dell was looking to eliminate the battery from the PERC. (Hong Dec., ¶51.) Netlist proposed a "hybrid" data recovery product that was a combination of Flash memory and DRAM attached to a Super Capacitor instead of a battery. (*Id.*) Netlist successfully developed this hybrid data recovery product, which attached to the computer's storage channel and ultimately named NVvault®, and sold about $50 million of this product between 2007 and 2014 to Dell and others. (*Id.*)

-10-

Beginning in about 2006 — when it was writing its design specifications for the HyperCloud® memory module — Netlist developed a version of the NVvault® product which, like the HyperCloud® module, attached to the computer's Memory channel (dramatically increasing the speed at which data could be accessed), including both DRAM and Flash.  (Hong Dec., ¶¶51-53.)  In 2012, ███████ requested a sample of this new NVvault® product; Netlist worked with Intel for three years to develop a "software BIOS patch" so Intel CPUs would recognize and work with the combined DRAM and Flash module.  (*Id.* at ¶54.)

Netlist shipped this new Memory channel NVvault® product to ███████ for testing in March 2014, and expects that production quantities will ship ███████████████, with tens of thousands of units sold annually for the next five years.  (*Id.* at ¶55.)  This product provides both the data recovery benefits of the earlier model NVvault® plus the "data acceleration" of the HyperCloud® module and the ULLtraDIMM.  (*Id.*)

Netlist now is developing a new Memory channel product internally called "HyperVault," which combines the best aspects of both the HyperCloud® DxD/LRD technologies and the NVvault® technologies.  (Hong Dec., ¶56.)  The HyperVault product will use the distributed HyperCloud® DxD/LRD architecture with the Netlist proprietary ASIC module controller and the nine ISwitch isolation devices.  (*Id.*)  Like the HyperCloud® and ULLtraDIMM modules, the HyperVault module will attach to the computer's Memory slot and appear to the system as a JEDEC standard DIMM with DRAM.  (*Id.*)  However, like the NVvault® product, the HyperVault product will be a hybrid memory device, with both DRAM and Flash memory.  (*Id.*)  The HyperVault product will provide similarly fast performance as DRAM but at about 1/20th the cost due to the cheaper Flash.  (*Id.* at ¶57.)

The HyperVault product will be a huge advance in high performance data acceleration, and should dominate the market for big data computing for such applications as ███████████████. (Hong Dec., ¶57.)  This product will compete directly with the ULLtraDIMM and should reduce demand for the ULLtraDIMM because of the HyperVault's much faster performance, added storage capacity, and additional capabilities.  (*Id.*)  Netlist anticipates completing a prototype of the HyperVault product ███████████████, with product being ready to ship in the ███████████████.  (*Id.* at ¶58.)

-11-

**F.     Netlist's Irreparable Harm**

The HyperCloud® module, the NVvault® product, the ULLtraDIMM, and the HyperVault module each provide access to frequently needed or "hot" data on the very fast Memory channel of the computer.  While they do it in different ways — through DRAM (the HyperCloud® module), through primarily Flash (the ULLtraDIMM), or through DRAM and Flash (NVvault® and HyperVault modules) — they each occupy precisely the same real estate, *i.e.*, the DIMM sockets in a server, and each provide the data acceleration through the Memory channel demanded by today's "big data computing."  (Hong Dec., ¶67.)

Diablo's improper use of the Netlist RD and ID chips and use of the Netlist Trade Secrets in the Rush and Bolt chips for the ULLtraDIMM has harmed Netlist in multiple, serious and irreparable respects, including:  (a) lost NVvault® product sales; (b) lost business and partnership opportunities for the NVvault® module; (c) lost business and partnership opportunities for the HyperVault module; and (d) marketplace confusion and suspicion concerning ownership of the HyperCloud® technology.  (*See* Hong Dec., ¶¶69 to 86, for a full description of the facts supporting Netlist's irreparable harm.)

*Lost NVvault® Product Sales.*  Both Netlist's NVvault® product and the ULLtraDIMM module are sold in part for data recovery purposes (since they both contain non-volatile Flash) and for data storage and acceleration.  (*See* Hong Dec., Ex. 12 (SanDisk ad touting the data storage and data recovery benefits of the ULLtraDIMM).)  Companies that purchase an ULLtraDIMM product will not need an NVvault® product for either data recovery or data acceleration.  Big data companies that want greater storage will be more inclined to buy the ULLtraDIMM.  In sum, every time an ULLtraDIMM product is sold or used, it forecloses a sale or use of the NVvault® product.  (*Id.*, ¶73.)

Computer companies and industry research firms have recognized the competitive nature of Netlist's NVvault® module and the ULLtraDIMM.  Within two days of each other, press releases were issued promoting both the NVvault® and the ULLtraDIMM for Supermicro's latest server.  (Hong Dec., Ex. 13.)  The Storage Network Industry Association recently published a report asking "How does an NVDIMM [*i.e.*, hybrid memory products such as the NVvault® and the HyperVault modules] compare to an … UltraDIMM," stating that despite their "apples and oranges" technical differences,

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

"one should acknowledge that these solutions do compete for the same real estate." (*Id.*, Ex. 14 at p. 7.)

*Lost Opportunities for the NVvault® module.* While it was working with Intel and ███ to develop a new NVvault® product, Netlist also contacted many other companies, including IBM and ███, about business and partnership opportunities. Ultimately IBM worked with Diablo and Smart Storage to develop/sell the ULLtraDIMM product under the name "eXFlash," depriving Netlist of the opportunity to partner with IBM on the NVvault®. (Hong Dec., ¶¶77-79.)

*Lost Opportunities For the HyperVault Module.* Netlist also has contacted companies such as ███████████████ to discuss development and partnering opportunities for Netlist's HyperVault product. On December 5, 2013, Netlist met with ███ to discuss the HyperVault; the meeting was going well until Netlist discussed the HyperCloud® technology and the Netlist HyperCloud® intellectual property used by Diablo in the ULLtraDIMM. With the discussion of the dispute with Diablo, ███ specifically terminated the meeting, indicating it would not proceed with any relationship with Netlist because of the disputed technology. (Hong Dec., ¶81, and Ex. 17.) Netlist has tried to restart the discussions with ███, but ███ has refused. (*Id.*, ¶81.) ███, which is also considering both parties' products, is similarly concerned about the disputed IP. (*Id.*, ¶82.)

*Marketplace Confusion.* As demonstrated by the terminated ███ meeting, the computer marketplace, including both OEMs and particularly the big data customers such as ███████████ ███, are confused and/or suspicious about whether the HyperCloud® technology is owned by Netlist or Diablo. This confusion and suspicion is irreparably harming Netlist by foreclosing business opportunities for its NVvault® and HyperVault products. (Hong Decl., ¶83.)

The harm caused by Diablo's breaches of contract and theft of trade secrets is acute, continuing and becoming more irreparable every day. Winning a large computer OEM customer means locking in their business for years, potentially equating to months or years of business and sales of millions of units. Conversely, it is very difficult to regain lost customers. (Hong Dec., ¶84.) While Diablo and SanDisk started selling the ULLtraDIMM memory module with IBM in June 2014, they have also announced a relationship with Supermicro. And a news story published on September 17, 2014, stated that Huawei, a large Chinese-based server manufacturer, has now agreed to offer the ULLtraDIMM

-13-

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL MILLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

with its servers (Hong Dec., Ex. 19), observing that adding Huawei as a provider of the ULLtraDIMM

with IBM (Lenovo) and Supermicro "completes a hat trick."

### III.   LEGAL ARGUMENT

#### A.   Preliminary Injunction Standard

The Court may grant preliminary injunctive relief in order to prevent "immediate and

irreparable injury." FED. R. CIV. P. 65(b).  To establish a right to a preliminary injunction, a plaintiff

must demonstrate that:  (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm

absent preliminary relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the

public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *American Trucking

Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1054 (9th Cir. 2009).

Provided that the plaintiff makes a threshold showing of irreparable harm and a likelihood of

success on the merits, a stronger showing of one element may offset a weaker showing of another.

*Alliance for Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-33 (9th Cir. 2011); *see also Leiva-Perez v.

Holder,* 640 F.3d 962, 966 (9th Cir. 2011).  The *Winter* factors are evaluated on a sliding scale:

"serious questions going to the merits, and a balance of hardships that tips sharply toward the plaintiff

can support issuance of preliminary injunction, so long as the plaintiff also shows that there is a

likelihood of the irreparable injury and that the injunction is in the public interest." *Alliance for Wild

Rockies,* 632 F.3d at 1134-35.

#### B.   Netlist is Overwhelmingly Likely to Succeed on the Merits

To obtain a preliminary injunction, a plaintiff must show a likelihood of prevailing on the

merits. *Wilson v. Watt,* 703 F.2d 395 (9th Cir. 1983).  The moving party need not conclusively prove

its case, and "likelihood" does not mean "more likely than not." *Univ. of Tex. V. Camenisch,* 451 U.S.

390, 395 (1981); *Leiva-Perez,* 640 at 966; *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223,

229 (3d Cir. 2011).  A reasonable probability — a "fair chance" of success — is the standard for

granting preliminary injunctive relief. *Benda v. Grand Lodge of IAM,* 584 F.2d 308, 315 (9th Cir.

1978).  Netlist can demonstrate an overwhelming probability of success on the merits of its claims.

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1

### 1.     Diablo Repeatedly Breached Its Contracts

Diablo has blatantly breached the NDA and the Supply Agreement, and improperly used

Netlist's Confidential Information and its ID and RD chips.

*See*

*Courtesy Temporary Services, Inc. v. Comacho*, 222 Cal.App.3d 1278, 1287 (1990) ("negative

research" is protectable as trade secret.)

NETLIST'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:13-cv-05962 YGR

1
[REDACTED]

2
[REDACTED]

3
[REDACTED]

4
[REDACTED]

5
[REDACTED]

6   • Finally, as detailed in the Jansen Report and in the next section, the Rush and Bolt chips

7   use at least 15 Netlist Trade Secrets, all in violation of the NDA and the Supply Agreement.

8   Each of these actions breached the NDA and Supply Agreement. As this Court has already

9   recognized, the parties' NDA and the Supply Agreement fully covered all "'Confidential Information'

10   that might be exchanged between the parties." (Order Denying Motion to Dismiss (Dkt. 183, at 8).)

11   This Confidential Information includes the Netlist Technology (including the technical details of the

12   Netlist ASIC and ISwitch specifications provided to Diablo) and the intellectual property in the Netlist

13   Chipset (including the RD and ID chips built by Diablo for Netlist). Any use or disclosure of this

14   Confidential Information — in the MegaDIMM [REDACTED] or in building the Rush and Bolt

15   chips from the foundation of the Netlist RD and ID chips — "would be contrary to the terms of the

16   NDA and the Supply Agreement." (Dkt. 183, at 8.)

17   The Supply Agreement clarifies that the Netlist Chipset, the Netlist Technology and all

18   Intellectual Property embodied therein "remain the sole and exclusive property of Netlist" (Hong Dec.,

19   Ex. 5, Supply Agreement, Section 7(b)), and that "Diablo shall not sell or manufacture any device

20   constituting the Netlist Chipset or Netlist Technology to or for any person except Netlist." (*Id.*, Section

21   2(e)(ii).) Diablo obtained only the right to make the Diablo Standard Register "with either or both of

22   DxD/LRD functionality physically disabled" and its Implementation techniques for the Netlist Chipset

23   in silicon. (*Id*., Definitions and Section 7(a).) As clarified in Section 8, "the Netlist Technology is the

24   Confidential Information of Netlist and may not be used for any purpose other than as set forth in this

25   Agreement, including without limitation use of such Netlist Technology to develop a chip competitive

26   to the Netlist Chipset." (Supply Agreement, Hong Dec., Ex. 5, Section 8(a).)

27   Diablo will apparently make two arguments to justify its breaches. First, Diablo will argue that

28   it had the right to use <u>both</u> the RD and ID chips since it could use a Diablo Standard Register with

-16-

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL MILLER
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1   DxD/LRD functionality physically disabled, and since in its view the TeraDIMM is not enabled for

2   DxD/LRD.  While Netlist disputes the DxD/LRD argument, there is a more fundamental flaw.  The

3   Diablo Standard Register only includes the RD chip — physically disabled — but does not include the

4   ID chip used by Diablo in the MegaDIMM and the ███████████████████████████████████.

5   An industry Standard Register comprises <u>one</u> standard DDR3 chip; it does not include the isolation

6   devices (ISwitch/ID) designed by Netlist.  (Compare Figures 1 and 2; Hong Dec., ¶31; Jansen Report at

7   10.)  The isolation devices were a custom feature first added by Netlist in its HyperCloud® architecture,

8   and never were part of a Standard Register.  (Hong Dec., ¶19.)

9        Also, the language of the Supply Agreement provides that the Netlist Chipset includes <u>both</u> "a

10   DDR3 standard register (with DxD/LRD physically enabled) <u>and</u> a set of isolation devices."  (Emphasis

11   added.)  But the Diablo Standard Register is defined as only "a DDR3 industry standard register

12   derivative of the Netlist Chipset."  Thus, Diablo only had the right to use the RD chip (if it were

13   physically disabled), but not the ID chip.  To prove this point, ██████████████████████████

14   ████████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████████████

17   ███████████████████████████ Diablo had no right to make any use of the Netlist ID chip.

18        Second, Diablo will argue that its right to silicon Implementation techniques under Section 7(a)

19   of the Supply Agreement somehow gave it complete access and rights to the ID chip and its design.

20   Not so.  First, California Civil Code section 1641 provides that "the whole of a contract is to be taken

21   together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the

22   other."  Diablo's unreasonably broad interpretation of the Implementation clause would eviscerate

23   Netlist's otherwise clear rights to:  the Netlist Technology; the Netlist Chipset and the Intellectual

24   Property rights contained therein (Section 7(b)); the prohibition against Diablo's "sale or manufacture

25   [of] any device constituting the Netlist Chipset or Netlist Technology" (Section 2.(e)(ii)); and the bar

26   against using the "Netlist Technology to develop a chip competitive to the Netlist Chipset (Section

27

28

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

-17-

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL MILLER
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

8(a.)."[6]  This construction also ignores the Supply Agreement's limited definition of Implementation: "the development of a silicon chip set using the Netlist Technology."  (Section 7(a).)  The only reasonably practicable way to read the Implementation clause is that Diablo may reuse any silicon circuit implementation techniques it developed in building the Netlist Chipset, but otherwise gave Diablo no right to use or copy the intellectual property design and know-how embodied in the Netlist Chipset or Technology.  (Hong Dec., ¶33; Jansen Report at 14.)  And in no event could Diablo use the Netlist Technology or Chipset, or even any Implementation techniques it developed, to develop the TeraDIMM/ULLtraDIMM:  which now wrongfully competes with the HyperCloud® module (and the NVvault® and HyperVault modules) for memory and storage functionality on the Memory channel.

Diablo repeatedly and flagrantly breached the NDA and the Supply Agreement, and Netlist is likely to prevail on these claims.

### 2.    Diablo's Breach of Contract Constitutes Unfair Competition

California's Unfair Competition Law, Business & Professions Code section 17200, broadly prohibits any "unlawful, unfair or fraudulent act[s] or 'practice[s]."  Cal. Bus. & Prof. Code § 17200. *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1004-05 (N.D. Cal. 2009).  "Under its 'unlawful' prong, the UCL borrows violations of other laws ... and makes those unlawful practices actionable under the UCL."  *Berryman v. Merit Prop. Mgmt.*, 152 Cal.App.4th 1544, 1554 (2007).

A breach of contract claim may "form the basis of a section 17200 claim if the breach itself is 'unlawful, unfair, or fraudulent."  *Spring Design, Inc. v. Barnesandnoble.com, LLC*, 2010 WL 5422556, at *9 (N.D.Cal. Dec. 27, 2010) (citing *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal.App.4th 638, 645 (2008)); *see also Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*, 319 F.Supp.2d 1059, 1073 (C.D. Cal. 2003).  Courts have found that where a breach of contract underlies a section 17200 claim, unfairness under the UCL must "be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition."  *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 186–87 (1999); *see also Marolda v. Symantec Corp.*, 672 F.

---

[6] Diablo's argument on Implementation would grant it rights which were specifically <u>rejected</u> in the parties' negotiation of the Supply Agreement.  (*See* Exhibits 2 and 3 rejecting Diablo's demands for rights to the finished product or the final Chipset.)

Supp. 2d 992, 1004-05 (N.D. Cal. 2009).  It is sufficient if the threat or harm to competition arises out of an ongoing breach wherein the two contracting business are competing against each other.  *Cel–Tech*, 20 Cal.4th at 186–87 (1999); *Nat'l Rural,* 319 F.Supp. 2d at 1073.  Netlist and Diablo both compete with products sold for use on the <u>very same computer server slot</u>:  the DDR3 DIMM Memory channel (Hong Dec., ¶¶67-86).  The impact on competition is clear.

This District has recently held that a breach of a nondisclosure agreement — where the breach "involved the misappropriation and misuse of Plaintiff's proprietary information" — violates section 17200 by virtue of "[Defendant's] breach of the parties' NDA and misappropriation of trade secrets." *Spring Design*, 2010 WL 5422556, at *9.  And this Court has already found that "the Section 17200 claim remains viable on the other alleged bases:  (1) that 'Diablo materially breached both the NDA and the Supply Agreement with Netlist …'"  (Dkt. 183, at 9.)  Netlist is also likely to succeed on its Section 17200 claim.

### 3.      Diablo Misappropriated Netlist's Trade Secrets

Netlist's trade secret claim is brought under the California Uniform Trade Secrets Act ("CUTSA"), Civil Code section 3426 *et seq.*  Netlist must establish that it is likely to prove:  "(1) the existence of subject matter which is capable of protection as a trade secret; (2) that the secret was disclosed to the defendant under circumstance giving rise to an obligation not to use or disclose the secret to the detriment of the disclosure; and (3) the defendant either used the trade secret or disclosed it to a third party."  *GlobeSpan, Inc. v. O'Neill*, 151 F. Supp. 2d 1229, 1235 (C.D. Cal. 2001).

#### a.      Netlist's Trade Secrets

Section 3426.1(d) defines a "trade secret" as:

> Information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

The Trade Secrets defined by Netlist qualify for protection under the CUTSA.  The Trade Secrets constitute computer hardware, firmware and software methods and techniques to implement

-19-

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

Netlist's HyperCloud® DxD/LRD distributed architecture.  (Jansen Report at 18.)  These computer

methods and techniques were invented by Netlist and have been carefully maintained as secret and

confidential (Lee Dec., ¶7; Hong Dec., ¶¶10-14); they have been shared only with Diablo and other

contractors, under the strict confidentiality provisions of non-disclosure agreements and the Diablo

Supply Agreement.  (*Id*.)  Netlist uses more than reasonable efforts to maintain the secrecy of its Trade

Secrets by, among other things, marking documents containing the information with confidentiality

warnings, instructing employees to treat the information as confidential, restricting access to the

information, and requiring the use of strict non-disclosure agreements when conveying the confidential

information to third party contractors or others.  (*Id*.)

Next, the Netlist Trade Secret techniques remain trade secrets since they are not known to the

public or others who can obtain economic value from their disclosure or use.  (Lee Dec., ¶7.)  Netlist's

expert, Kenneth Jansen, has confirmed that the Netlist Trade Secrets misappropriated by Diablo remain

trade secret and confidential and are not generally known or used in the computer RDIMM and

LRDIMM markets and product segments.  (Jansen Report at 18.)

Finally, these Trade Secrets provide actual independent economic value to Netlist by enabling

the functionality of Netlist's HyperCloud® DxD/LRD distributed architecture.  Netlist sold over $6

million of its HyperCloud® module (Hong Dec., ¶48), and expects to start selling its HyperVault

module in 2015, quickly ramping up to high sales volume in 2016, in large part due to the DxD/LRD

distributed architecture facilitated by the Netlist Trade Secrets.  (*Id*., ¶58.)

**b.      Diablo's Duty Not To Use or Disclose the Trade Secrets**

As relevant to Diablo, Civil Code section 3426.1(b) defines "misappropriation" as follows:

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who: …

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: …

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. …

Diablo's conduct constitutes "misappropriation" because Diablo used and disclosed Netlist's trade

secrets, without consent, knowing it had acquired those trade secrets under the strict confidentiality and

-20-

NETLIST'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:13-cv-05962 YGR

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL MILLER
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1   use restrictions of the NDA and Supply Agreement.[7]  Diablo was therefore under a duty to maintain the

2   secrecy and limit the use of the Trade Secrets.  It could not use the Trade Secrets for any purpose other

3   than expressly provided in the Supply Agreement, and could not use the Trade Secrets to develop its

4   own chips for a competitive new DIMM Memory channel module.

5                              **c.      Diablo Stole the Trade Secrets**

6          As discussed, the documents establish that Diablo first used the Netlist Trade Secrets from the

7   distributed HyperCloud® architecture ███████████████████████████████████

8   ████████████████████████████████████████

9   ████████████████████████████████

10  ██████████████████████████████

11  ████████████████████████████████

12  ████████████████████████████████

13  ████████████████████████

14  █████████████████████████████

15  ██████████████████████████████████

16  ██████████████████████████████

17  ████████████████████████████████████

18  ██████████████████████████

19         The Jansen Report establishes that these breaches of the NDA and Supply Agreement led to the

20  misappropriation and use in the Rush and Bolt chips of 15 Netlist Trade Secrets.  As a result, Diablo

21  obtained an enormous strategic and economic foothold in the memory module industry to the detriment

22  of Netlist, saving between ████████████ in development time.  (Jansen Report at 16.)  Netlist is

23  likely to succeed on its trade secret claim.

24         **C.      Netlist Has Suffered And Will Suffer Irreparable Harm**

25         To establish a right to a preliminary injunction, a plaintiff must demonstrate "a significant threat

26  of irreparable injury."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 724 (9th Cir. 1999).  Courts

27

---

28  [7] In addition, Diablo's breach of its duty to maintain the secrecy of Netlist's Trade Secrets constitutes "improper means" of acquiring the Trade Secrets under Section 3426.1(a).

NETLIST'S MOTION FOR PRELIMINARY INJUNCTION
                                        Case No. 4:13-cv-05962 YGR

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    universally recognize that evidence of (i) lost business or business opportunities, and (ii) damage to

2    goodwill satisfy the requirement for irreparable harm.  *See, e.g., Stuhlbarg Int'l Sales Co., Inc. v. John*

3    *D. Brush and Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective

4    customers or goodwill certainly supports a finding of the possibility of irreparable harm"); *Pyro*

5    *Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079, 1093 (E.D. Cal. 2012) (lost customers and

6    damage to goodwill warrant entering "an injunction specifically focused on preventing misuse of

7    [Pyro's] trade secrets").

8           Netlist's right to issuance of an injunction is supported by both the parties' contract and the law.

9    In the NDA, Diablo agreed "that the unauthorized disclosure or use of such Confidential Information

10   would cause irreparable harm and significant injury, the degree of which may be difficult to ascertain,"

11   giving Netlist "the right to seek an immediate injunction enjoining any breach. . . ."  (See Hong Dec.,

12   Ex. 4 at § 6.)  Similarly, Section 8(d) of the Supply Agreement provides that any breach of the

13   Confidential Information section of the Supply Agreement — including the prohibition that Diablo not

14   use the Netlist Technology "for any purpose other than as set forth in this Agreement," including

15   building a competitive chip — may cause irreparable injury to the nonbreaching party," entitling Netlist

16   to injunctive relief.  (*Id.*, Ex. 5 at § 8(d).)  Civil Code section 3426.2 provides that "actual . . .

17   misappropriation [of a trade secret] may be enjoined," adding that "an injunction shall be terminated

18   when the trade secret has ceased to exist, but the injunction may be continued for an additional period

19   of time in order to eliminate commercial advantage that otherwise would be derived from the

20   misappropriation."  Business & Professions Code section 17203 also provides for an injunction against

21   unfair competition.

22          The evidence overwhelmingly supports the issuance of an injunction.  As summarized above

23   and explained in more detail in the accompanying Declaration of Chuck Hong at paragraphs 69 through

24   86, Netlist has suffered and will continue to suffer irreparable harm unless the Court enjoins Diablo,

25   Smart Storage and SanDisk, and those acting in concert with them, from making, using, selling or

26   distributing the Rush and Bolt chips.

27          First, Netlist has lost and will lose NVvault® product sales to Diablo's ULLtraDIMM product.

28   Building on Diablo's breaches of contract and use of the Netlist Trade Secrets, the ULLtraDIMM

BARTKO ZANKEL BUNZEL
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Phone (415) 956-1900 • Fax (415) 956-1152

-22-

product effectively leapfrogged the NVvault® product in the marketplace.  It is clear that both potential customers (such as Supermicro) and independent research firms understand that the NVvault® and the ULLtraDIMM are competitive products on the computer server's Memory channel/slot.  (*See* Hong Dec., ¶¶72-76 and Exs. 13-15, attached thereto.)  For every ULLtraDIMM sold, there is one less potential sale of a NVvault®.  Such lost sales warrant injunctive relief.  *See, e.g., Pyro Spectaculars*, 861 F. Supp. 2d at 1093.

Second, Netlist has also lost and will continue to lose potential business and partnership opportunities for the NVvault® product, including with IBM.  (*See* Hong Dec., ¶¶77-79.)  These lost business opportunities support a finding of irreparable harm.  *Stuhlbarg*, 240 F.3d at 841.

Third, Netlist has been stymied in developing partnership opportunities for its new HyperVault product. ███████ was unwilling to continue with what had been favorable discussions regarding the HyperVault product once it learned of the disputed HyperCloud® technology, and ███████ is similarly reluctant to proceed.  (*See* Hong Dec., ¶¶81, 82.)

Fourth, the ongoing uncertainty regarding ownership of the technology at issue has created confusion in the marketplace regarding the rightful ownership of the HyperCloud® technology, has caused companies not to partner with, invest in or buy from Netlist, and has or will ruin Netlist's hard-earned good will.  (*See* Hong Dec., ¶83.)  Absent injunctive relief from this Court, Diablo's locking in years of business from large customers such as IBM, Supermicro and Huawei will likely result in years of lost business for Netlist.  (*Id.*, ¶85.)

Diablo, its partners Smart Storage and SanDisk, and all those in concert with them (*Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945)) should be immediately enjoined from any further manufacture, use, sale or distribution of the ULLtraDIMM memory module with any Rush and Bolt chips or any of Netlist's Trade Secrets.  Diablo, Smart Storage and SanDisk should also be ordered to recall any ULLtraDIMM modules that have been previously sold.  *See CyberMedia, Inc. v. Symantec Corp.*, 19 F.Supp.2d 1070, 1079 (N.D. Cal. 1998).  A proposed Order Granting Injunction is submitted herewith.

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL-MILLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-23-

BARTKO ZANKEL BUNZEL
BARTKO ZANKEL BUNZEL MILLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

### D.   The Balance of Equities Favors Netlist

In determining the balance of equities, courts look to "the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (9th Cir. 2002); *accord Winter*, 555 U.S. at 24 (2008).   The harm that Netlist will continue to incur from Diablo's theft far outweighs any detriment to Diablo of being held to its contract.

Netlist invented the HyperCloud® Technology and its associated Netlist Technology and Trade Secrets, and provided them to Diablo in good faith, so Diablo could implement the Netlist Chipset in silicon, subject to strict contracts that directed what Diablo could and could not do with the information.  From day one until now, Diablo has breached the parties' contracts and stolen Netlist's Trade Secrets.  Netlist has lost unmeasurable market opportunities with its NVvault® product, and will continue to incur losses to its market position with the NVvault® product and its upcoming HyperVault module.  In just the last two months, two new major computer companies have indicated they will supply the ULLtraDIMM with their server products.  The detriment of an injunction to Diablo and its partners Smart Storage and SanDisk is simply the deserved result of having to adhere to the Supply Agreement.

Netlist has diligently pursued its rights and filed this motion as soon as it could reasonably evaluate and establish its claims (Riley Dec., ¶¶2-14), and thus the equities sharply favor Netlist.

### E.   The Public Interest Inquiry Tips Heavily in Favor of Netlist

"The public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *Sammartano v. First Judicial District Court,* 303 F.3d 959, 974 (9th Cir. 2002).  There is a clear public interest in enjoining breach of confidentiality and trade secret theft.  *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) ("It is hard to see how the public would be benefitted by disclosure of customer lists"); *Pyro Spectaculars, supra*, 861 F. Supp. 2d at 1092 ("the state also has a strong policy in favor of protecting trade secrets").  There is also a public interest in preventing the manufacture or sale of stolen technology so as to ensure fair competition.  *Vinyl Interactive, LLC v. Guarino*, 2009 WL 1228695, at *8 (N.D. Cal. 2009) ("the third prong of the requested injunction, which simply enjoins

-24-

Eddy from using Vinyl's proprietary information, would further the public's interest in prohibiting unfair competition").

**IV.**      **CONCLUSION**

Netlist respectfully requests that this Court enter a Preliminary Injunction against any further manufacture, use, sale or distribution of the Rush and Bolt chips, including in the ULLtraDIMM.

DATED:  October 6, 2014                    **BARTKO, ZANKEL, BUNZEL & MILLER**
                                           **McANDREWS, HELD & MALLOY**
                                           **DLA PIPER LLP (US)**

                                           By:  _____*/s/Benjamin K. Riley*_____
                                                      Benjamin K. Riley

                                           Attorneys for Plaintiff
                                           NETLIST, INC.

# ATTACHMENT 1



**Figure 1 — RDIMM with Standard Register**



**Figure 2 — Netlist HyperCloud® Architecture**



