Exhibit A-9

1  LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
3  655 West Broadway, Suite 1900
   San Diego, CA 92101
4  Telephone: 619/231-1058
   619/231-7423 (fax)
5  darrenr@lerachlaw.com
   davew@lerachlaw.com
6     – and –
   SAMUEL H. RUDMAN
7  DAVID A. ROSENFELD
   MARIO ALBA, JR.
8  58 South Service Road, Suite 200
   Melville, NY 11747
9  Telephone: 631/367-7100
   631/367-1173 (fax)
10 srudman@lerachlaw.com
   drosenfeld@lerachlaw.com
11 malba@lerachlaw.com

12 Attorneys for Plaintiff

13 [Additional counsel appear on signature page.]

14            UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16                 SOUTHERN DIVISION

17 BRUCE BELODOFF, Individually and   )  **VIA FAX**
   On Behalf of All Others Similarly  )
18 Situated,                          )  No.   **SACV07-677 DOC (MLGx)**
                                      )
19                       Plaintiff,   )  CLASS ACTION
                                      )
20       vs.                          )  COMPLAINT FOR VIOLATIONS OF
                                      )  FEDERAL SECURITIES LAWS
21 NETLIST, INC., CHUN K. HONG and    )
   LEE KIM,                           )
22                                    )
                       Defendants.    )
23 _____  )  DEMAND FOR JURY TRIAL

24

25

26

27

28

1 │ Plaintiff makes the following allegations, except as to allegations specifically
2 │ pertaining to plaintiff and plaintiff's counsel, based upon the investigation undertaken
3 │ by plaintiff's counsel, which investigation included analysis of publicly available
4 │ news articles and reports, public filings, securities analysts' reports and advisories
5 │ about Netlist, Inc. ("Netlist" or the "Company"), press releases and other public
6 │ statements issued by the Company, and media reports about the Company, and
7 │ believes that substantial additional evidentiary support will exist for the allegations set
8 │ forth herein after a reasonable opportunity for discovery.

9 │                      **JURISDICTION AND VENUE**

10 │    1.    The claims asserted herein arise under and pursuant to Sections 11 and 15
11 │ of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77k and 77o].

12 │    2.    This Court has jurisdiction of this action pursuant to Section 22 of the
13 │ Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

14 │    3.    Venue is properly laid in this District pursuant to Section 22 of the
15 │ Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of
16 │ herein occurred in substantial part in this District.

17 │    4.    In connection with the acts and conduct alleged in this Complaint,
18 │ defendants, directly or indirectly, used the means and instrumentalities of interstate
19 │ commerce, including the mails and telephonic communications and the facilities of the
20 │ NASDAQ Stock Market ("NASDAQ"), a national securities exchange.

21 │                       **NATURE OF THE ACTION**

22 │    5.    This is a securities class action on behalf of a class consisting of all
23 │ persons other than defendants who purchased the common stock of Netlist pursuant
24 │ and/or traceable to the Company's initial public offering on or about November 29,
25 │ 2006 through April 17, 2007, seeking to pursue remedies under the Securities Act of
26 │ 1933 (the "Securities Act"). This action concerns the initial public offering of Netlist
27 │ common stock which took place on or about November 29, 2006 (the "IPO" or the
28 │ "Offering").

- 1 -

## PARTIES

1

2      6.      Plaintiff Bruce Belodoff purchased Netlist common stock, as set forth in

3   the certification attached hereto and incorporated herein by reference, pursuant and/or

4   traceable to the Company's IPO, and was damaged thereby.

5      7.      Defendant Netlist engages in the design, manufacture, and sale of

6   memory subsystems for the server, computing, and communications markets in the

7   United States. The Company's headquarters are located at 475 Goddard, Irvine, CA

8   92618.

9      8.      (a)      Defendant Chun K. Hong ("Hong") was, at all relevant times,

10  Chairman of the Board, Chief Executive Officer and President of Netlist.  Hong

11  signed the Registration Statement.

12              (b).      Defendant Lee Kim ("Kim") was, at all relevant times, Chief

13  Financial Officer, Principal Accounting Officer, Vice President and Secretary of

14  Netlist. Kim signed the Registration Statement.

15              (c)      Defendants Hong and Kim are collectively referred to herein as the

16  "Individual Defendants."

17     9.      By reason of their management positions and their ability to make public

18  statements in the name of Netlist, the Individual Defendants were and are controlling

19  persons, and had the power and influence to cause (and did cause) Netlist to engage in

20  the conduct complained of herein.

21              ## PLAINTIFF'S CLASS ACTION ALLEGATIONS

22     10.      Plaintiff brings this action as a class action pursuant to Federal Rules of

23  Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all persons other than

24  defendants who purchased the common stock of Netlist pursuant and/or traceable to

25  the Company's IPO on or about November 29, 2006 through April 17, 2007.

26  Excluded from the Class are defendants herein, members of the immediate family of

27  each of the defendants, any person, firm, trust, corporation, officer, director or other

28  individual or entity in which any defendant has a controlling interest or which is

- 2 -

1  related to or affiliated with any of the defendants, and the legal representatives, agents,
2  affiliates, heirs, successors-in-interest or assigns of any such excluded party.

3        11.    The members of the Class are so numerous that joinder of all members is
4  impracticable. Netlist sold 6.25 million shares of common stock in the IPO. The
5  precise number of Class members is unknown to plaintiff at this time but is believed
6  to be in the thousands. In addition, the names and addresses of the Class members can
7  be ascertained from the books and records of Netlist or its transfer agent or the
8  underwriters to the IPO. Notice can be provided to such record owners by a
9  combination of published notice and first-class mail, using techniques and a form of
10 notice similar to those customarily used in class actions arising under the federal
11 securities laws.

12       12.    Plaintiff will fairly and adequately represent and protect the interests of
13 the members of the Class. Plaintiff has retained competent counsel experienced in
14 class action litigation under the federal securities laws to further ensure such
15 protection and intends to prosecute this action vigorously.

16       13.    Plaintiff's claims are typical of the claims of the other members of the
17 Class because plaintiff's and all the class members' damages arise from and were
18 caused by the same false and misleading representations and omissions made by or
19 chargeable to defendants. Plaintiff does not have any interests antagonistic to, or in
20 conflict with, the Class.

21       14.    A class action is superior to other available methods for the fair and
22 efficient adjudication of this controversy. Since the damages suffered by individual
23 class members may be relatively small, the expense and burden of individual litigation
24 make it virtually impossible for the class members to seek redress for the wrongful
25 conduct alleged. Plaintiff knows of no difficulty that will be encountered in the
26 management of this litigation that would preclude its maintenance as a class action.

27

28

1    15.    Common questions of law and fact exist as to all members of the Class
2 and predominate over any questions affecting solely individual members of the Class.
3 Among the questions of law and fact common to the Class are:

4          (a)    Whether the federal securities laws were violated by defendants'
5 acts as alleged herein;

6          (b)    Whether the Prospectus and Registration Statement issued by
7 defendants to the investing public in connection with the IPO negligently omitted
8 and/or misrepresented material facts about Netlist and its business; and

9          (c)    The extent of injuries sustained by members of the Class and the
10 appropriate measure of damages.

11                    **SUBSTANTIVE ALLEGATIONS**

12    16.    Defendant Netlist "designs and manufactures high performance memory
13 subsystems for the server, high performance computing and communications markets.
14 The company's memory subsystems are developed for applications in which memory
15 plays a key role in enabling overall system performance. These applications include
16 tower servers, rack-mounted servers, blade servers, high performance computing
17 clusters, engineering workstations and telecommunication switches."

18    17.    On November 20, 2006, Netlist filed a Form S-1/A Registration
19 Statement (the "Registration Statement") with the SEC for the IPO.

20    18.    On November 30, 2006, the Prospectus (the "Prospectus") with respect to
21 the IPO, which forms part of the Registration Statement, became effective and 6.25
22 million shares of Netlist's common stock were sold to the public at $7 per share,
23 thereby raising more than $43 million.

24    19.    As part of the IPO, certain insiders, including defendant Hong, sold
25 shares to the public. Collectively, the insiders sold over $6.5 million worth of Netlist
26 common stock. The chart below illustrates the shares sold by these insiders.

27

28

| Insider | Shares | Price | Proceeds |
|---|---|---|---|
| Chun K. Hong | 531,250 | $7.00 | $3,718,750.00 |
| Christopher Lopes | 93,750 | $7.00 | $656,250.00 |
| Jayesh Bhakta | 93,750 | $7.00 | $656,250.00 |
| Jae Dong Lee | 93,750 | $7.00 | $656,250.00 |
| Paik Ki Hong | 93,750 | $7.00 | $656,250.00 |
| Devon Park | 31,250 | $7.00 | $218,750.00 |
| Total: | 937,500 | | $6,562,500.00 |

20.     The Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

21.     The Prospectus portrayed Netlist in a highly positive light stating in pertinent part as follows:

> We design and manufacture high performance memory subsystems. We sell our subsystems to original equipment manufacturers, or OEMs, in the server, high performance computing and communications markets. Within these markets, we target applications in which memory plays a key role in enabling overall system performance. Our memory subsystems are incorporated into multiple platforms at International Business Machines Corporation, or IBM, Dell Inc., Gateway, Inc., Lenovo Group Limited, or Lenovo, and Hewlett-Packard Company.

22.     With regard to the Company's key customers, the Prospectus stated in pertinent part as follows:

> We primarily market and sell our products to leading OEMs in the server, high performance computing and communications markets. Our memory subsystems are incorporated into multiple platforms at IBM, Dell, Gateway, Lenovo and Hewlett-Packard. Sales to IBM, Dell and Lenovo generated approximately 20%, 35% and 13%, respectively, of

- 5 -

1   our net sales in fiscal 2005, and 41%, 36% and 2%, respectively, of our

2   net sales in the first nine months of fiscal 2006.

3        23.    The Prospectus also represented how the Company would achieve its

4   goal in becoming the leader in its industry. In this regard, the Prospectus stated in

5   pertinent part as follows:

6        Our objective is to be the leading provider of high performance memory

7        subsystems. Key elements of our strategy include:

8        •    Further Sales Penetration of Existing Customers. We have

9             established deep relationships, and qualified our products, with

10            leading OEMs. Our current OEM customers have a large and

11            diverse portfolio of system platforms that require high

12            performance memory subsystems. We believe we have an

13            attractive opportunity to provide them with memory solutions for

14            a greater number of their existing and future platforms.

15       •    Establish Relationships with New Customers. We will continue to

16            dedicate significant sales and marketing resources to establish new

17            relationships with industry-leading OEMs for whom memory

18            subsystem performance is a key determinant of overall system

19            performance.

20       •    Target New Applications and Product Opportunities. We currently

21            rely on the server market for most of our revenues. We intend to

22            develop additional memory solutions, using both volatile

23            (DRAM) memory, which does not retain data after system power

24            is shut off, and non-volatile (flash) memory, which does, based on

25            our core technology capabilities. In particular, we intend to

26            develop flash memory solutions to penetrate the communications,

27            industrial and embedded systems markets.

28

- 6 -

1        •   Continue to Invest in the Development of Proprietary Technology.
2             We intend to actively expand our intellectual property portfolio
3             and engineering capabilities by investing in research and
4             development. One targeted area of technology development is the
5             design of custom logic ICs that can be used in memory modules to
6             provide value-added features.

7        •   Establish International Operations and Manufacturing
8             Capabilities. We plan to establish a manufacturing facility in
9             China during the first half of 2007. We believe that this will allow
10            us to better support leading OEMs with design and manufacturing
11            sites in China, lower our production costs and provide access to
12            new pools of engineering talent.

13      24.    The statements referenced above in ¶¶21-23 were each inaccurate
14   statements of material fact because they failed to disclose that, at the time of the IPO:

15          (a)    two of the Company's primary customers, Dell and IBM, were
16   over inventoried with product and would be reducing their purchases in the future
17   until they worked through their inventory;

18          (b)    the Company was experiencing declining margins due to, among
19   other things, an unfavorable sales mix of products; and

20          (c)    the Company's new products were having difficulty gaining
21   market acceptance.

22      25.    The Prospectus purported to warn that Netlist's performance and growth
23   was subject to certain risks. In this regard, the Prospectus stated in pertinent part as
24   follows:

25         Our three largest customers comprised approximately 68% and 79% of
26         our net sales for fiscal 2005 and the first nine months of fiscal 2006,
27         respectively, and the loss of, or a significant reduction in sales to, any
28         one of these customers could materially harm our business.

1    Sales to Dell, IBM and Lenovo represented 35%, 20% and 13%,
2    respectively, of our net sales in fiscal 2005, and 36%, 41% and 2%,
3    respectively, of our net sales in the first nine months of fiscal 2006. We
4    expect that sales to Dell and IBM will continue to represent a significant
5    percentage of our net sales for at least the next 12 months. We do not
6    have long-term agreements with these three customers, or with any other
7    customer. Any one of these three customers could decide at any time to
8    discontinue, decrease or delay their purchase of our products. In
9    addition, the prices that these three customers pay for our products are
10   subject to negotiation and could change at any time. The loss of either
11   Dell or IBM as a customer, or a significant reduction in sales to either of
12   them, would significantly reduce our net sales and adversely affect our
13   operating results.

14   Our ability to maintain or increase our net sales to our key customers
15   depends on a variety of factors, many of which are beyond our control.
16   These factors include the customers' continued sales of servers and other
17   computing systems that incorporate our memory subsystems and the
18   customers' continued use of our products in their systems.

19   Because of these and other factors, we cannot assure you that net sales to
20   these customers will continue or that the amount of such net sales will
21   reach or exceed historical levels in any future period. Because these
22   customers account for a substantial portion of our net sales, the failure of
23   any one of these customers to pay on a timely basis would negatively
24   impact our cash flow.

25                          *        *        *

26   The markets in which we compete are cyclical in nature, and any future
27   downturn could adversely affect our business.

28

                                  - 8 -

1 | The markets in which we compete and in which our customers operate
2 | have been cyclical and are characterized by wide fluctuations in product
3 | supply and demand. These markets have experienced significant
4 | downturns, often connected with, or in anticipation of, maturing product
5 | cycles, reductions in technology spending and declines in general
6 | economic conditions. These downturns have been characterized by
7 | diminished product demand, production overcapacity, high inventory
8 | levels and the erosion of average selling prices. As a result, our sales will
9 | likely decline during these periods. In addition, if we are unable to
10 | control our expenses adequately in response to reduced net sales, our
11 | results of operations would be negatively impacted.

12 |                          *     *     *

13 | The price of DRAM ICs is volatile, and excess inventory of DRAM ICs,
14 | other components, and finished products could adversely affect our gross
15 | margin.
16 | The prices of our products are adjusted periodically based largely on the
17 | market price of DRAM ICs, which constituted more than 82% and 74%
18 | of the total cost of our memory subsystems sold during fiscal 2005 and
19 | the first nine months of fiscal 2006, respectively. Once our prices with a
20 | customer are negotiated, we are generally unable to revise pricing with
21 | that customer until our next regularly scheduled price adjustment.
22 | Consequently, we are exposed to the risks associated with the volatility
23 | of the price of DRAM ICs during that period. If the market price for
24 | DRAM ICs increases, we generally cannot pass this price increase on to
25 | our customers for products purchased under an existing purchase order.
26 | As a result, our cost of sales could increase and our gross margins could
27 | decline. Alternatively, if there is a decline in the price of DRAM ICs, we
28 |

1    will need to reduce our selling prices for subsequent purchase orders,
2    which may result in a decline in our expected net sales.
3    Customer demand for our products, and thus DRAM ICs, can be difficult
4    to estimate because we do not have long-term commitments from our
5    customers, and our customers may cancel or defer purchase orders for
6    any reason. If we overestimate customer demand, we will have excess
7    inventory of DRAM ICs. If there is a subsequent decline in the price of
8    DRAM ICs, the value of our inventory will fall. As a result, we may
9    need to write-down the value of our DRAM IC inventory, which may
10    result in a significant decrease in our gross margin and financial
11    condition. If we underestimate customer demand, we will not have
12    sufficient inventory of DRAM ICs to manufacture our products. This
13    will lead to delays in the delivery of our products, which could cause
14    order cancellations, the loss of customers and a decrease in our net sales.
15                              *      *      *
16    We may lose our competitive position if we are unable to timely and
17    cost-effectively develop new or enhanced products that meet our
18    customers' requirements and achieve market acceptance.
19    Our industry is characterized by intense competition, rapid technological
20    change, evolving industry standards and rapid product obsolescence.
21    Evolving industry standards and technological change or new,
22    competitive technologies could render our existing products obsolete.
23    Accordingly, our ability to compete in the future will depend in a large
24    part on our ability to identify and develop new or enhanced products on a
25    timely and cost–effective basis, and to respond to changing customer
26    requirements. In order to develop and introduce new or enhanced
27    products, we need to:
28

- identify and adjust to the changing requirements of our current and potential customers;

- identify and adapt to emerging technological trends and evolving industry standards in our markets;

- design and introduce cost-effective, innovative and performance-enhancing features that differentiate our products from those of our competitors;

- develop relationships with potential suppliers of components required for these new or enhanced products;

- qualify these products for use in our customers' products; and

- develop and maintain effective marketing strategies.

Our product development efforts are costly and inherently risky. It is difficult to foresee changes or developments in technology or anticipate the adoption of new standards. Moreover, once these things are identified, if at all, we will need to hire the appropriate technical personnel, develop the product and identify and eliminate design flaws. As a result, we may not be able to successfully develop new or enhanced products, or we may experience delays in the development and introduction of new or enhanced products. Delays in product development and introduction could result in the loss of, or delays in generating, net sales and the loss of market share, as well as damage to our reputation. Even if we develop new or enhanced products, they may not meet our customers' requirements or gain market acceptance. Accordingly, we cannot assure you that our future product development efforts will result in the development of new or enhanced products or that such products will achieve market acceptance.

\* \* \*

1    Our lack of a significant backlog of unfilled orders, and the difficulty

2    inherent in forecasting customer demand, makes it difficult to forecast

3    our short-term production requirements to meet that demand.

4    We do not have long-term purchase agreements with our customers.

5    Instead, our customers generally place purchase orders no more than two

6    weeks in advance of their desired delivery date, and these purchase

7    orders generally have no cancellation or rescheduling penalty provisions.

8    This fact, combined with the quick turn-around times that apply to each

9    order, makes it difficult to forecast our production needs and allocate

10   production capacity efficiently. Our production expense levels are based

11   in part on our forecasts of our customers' future product requirements

12   and to a large extent are fixed in the short term. As a result, we likely

13   will be unable to adjust spending on a timely basis to compensate for any

14   unexpected shortfall in those orders. Any significant shortfall of

15   customer orders in relation to our expectations could hurt our operating

16   results, cash flows and financial condition. Also, any rapid increases in

17   production required by our customers could strain our resources and

18   reduce our margins. If such a rapid increase were to occur at any given

19   time, we may not have sufficient short-term manufacturing capacity to

20   meet our customers' immediate demands.

21   We attempt to forecast the demand for the DRAM ICs and other

22   components needed to manufacture our products. Lead times for

23   components vary significantly and depend on various factors, such as the

24   specific supplier and the demand and supply for a component at a given

25   time. If we underestimate customer demand or if we have not provided

26   for sufficient manufacturing capacity, we would not be able to

27   manufacture a sufficient quantity of our products and could forego sales

28   opportunities, lose market share and damage our customer relationships.

1    26.    These warnings were inadequate and not meaningful because at the time

2  of the IPO, Netlist was then (i) experiencing weaker demand for its products because

3  prior to the IPO it had shipped excessive product to its primary customers including

4  Dell and IBM and those customers were over inventoried with product; (ii)

5  experiencing declining margins; and (iii) having difficulty convincing new and

6  existing customers to order its new products.

7    27.    On February 1, 2007, Netlist issued a press release announcing its fourth

8  quarter and year end results for 2006, the period ended December 30, 2006. For the

9  quarter, the Company reported revenues of $42.0 million, gross margin of 16.2

10  percent and net income of $2.0 million, or $0.12 per diluted share. Defendant Hong,

11  commenting on the results, stated, in pertinent part, as follows:

12    We are encouraged with both the quarterly and yearly financial results,

13    not only because they represent strong growth and profitability, but also

14    because they result from stronger demand in our target markets. They

15    also reflect our ability to rapidly apply the Company's resources and

16    intellectual property to opportunities these markets offer and our ability

17    to deliver the quality that these markets demand.

18    Demand for Netlist memory subsystems grew in 2006, as customer

19    requirements for higher-capacity, faster, more compact and cooler-

20    running memory components continue to outstrip the capabilities of most

21    suppliers. Gross margins improved due to a combination of improving

22    product mix and more efficient utilization of our manufacturing capacity.

23    In addition, operating profitability improved as our OEM-focused

24    business model allowed us to realize revenue growth rates in excess of

25    incremental investment in R&D and sales and marketing.

26    From a revenue standpoint, we continued to make progress throughout

27    the year by further penetrating our current OEM customers, adding new

28    customers, and broadening our market coverage through the continuing

- 13 -

1     development of new memory technologies. We attribute this growth and

2     ongoing progress to our belief that Netlist is well positioned in the high-

3     performance  memory  subsystem  sector.  We  own  proprietary

4     technologies that, with continuing investment and the addition of larger-

5     scale manufacturing capacity in China, will enable us to realize the

6     opportunities offered by current and anticipated demand in our markets.

7     28.    With regard to the Company's outlook for the first quarter of 2007, the

8  press release continued, in pertinent part, as follows:

9         For the first quarter of 2007, Netlist estimates net sales will be in the

10        range of $40 to $42 million, and gross margin will be approximately the

11        same as the fourth quarter of 2006. Fully diluted earnings per share for

12        the first quarter are estimated to be in the range of $0.07 to $0.08 per

13        share, including estimated stock-based compensation expense of

14        $300,000.

15        29.    Then, on April 16, 2007, Netlist issued a press release announcing that

16  revenues and earnings for the first quarter of 2007 would be lower than its previous

17  guidance — given about two and a half months ago. The Company also announced

18  weak guidance for the second quarter of 2007. The press release stated, in pertinent

19  part, as follows:

20        The Company expects to report net sales of approximately $37 million to

21        $38 million, versus the previous guidance of $40 million to $42 million,

22        and fully diluted earnings per share of approximately $0.02 to $0.03 per

23        share, including estimated stock-based compensation expense of

24        $325,000, versus the previous guidance of $0.07 to $0.08 per share. The

25        Company expects gross margin for the quarter will be approximately

26        14.5 percent.

27        Chief Executive Officer Chuck Hong commented: "Our operating results

28        for the first quarter were adversely impacted by the oversupply of

- 14 -

1    DRAM during the quarter which in turn affected the pricing and gross

2    margin on some of the lower-ASP, high-volume products in our

3    portfolio. We also experienced lower than expected volume of high-end

4    products from two large customers due to reduced demand across those

5    customers' server platforms into which our products are incorporated.

6    Finally, our operating expenses increased as we invested in our sales,

7    marketing and engineering teams consistent with our long-term strategy

8    of expanding within current customers and into new markets.

9    "While we are disappointed in our estimated results for the first quarter,

10   we remain committed to our long-term strategy of developing high-

11   performance memory subsystems that offer a superior value proposition

12   to our OEM customers and targeting new application markets," added

13   Hong. "We are adequately capitalized and well positioned to push

14   forward with numerous programs that will bring high-end memory

15   subsystem products to market though our OEM customer platforms in

16   the second half of 2007 and we expect to return to a pattern of growth

17   and growing margins as those products come on line."

18   Outlook for the Second Quarter of 2007

19   Based on continued softness in the DRAM market, ramp up costs related

20   to our new manufacturing facility in China and continued incremental

21   investment in sales, marketing and R&D, Netlist estimates that second

22   quarter 2007 net sales will be in the range of $34 million to $36 million,

23   and gross margin will be in the range of 13 to 14 percent. Fully diluted

24   earnings per share for the second quarter are estimated to be in the range

25   of breakeven to $0.02 per share, including estimated stock-based

26   compensation expense of $350,000.

27       30.    In response to the announcement about the Company's revised guidance,

28   on April 17, 2007, the price of Netlist stock declined precipitously falling from $5.97

- 15 -

1  per share to $4.29 per share – approximately 40% below the IPO price – on heavy

2  trading volume.

### COUNT I

**Violations of Section 11 of the Securities Act
Against All Defendants**

31.    Plaintiff repeats and realleges each and every allegation contained above.

32.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

33.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

34.    Netlist is the registrant for the IPO.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

35.    As issuer of the shares, Netlist is strictly liable to plaintiff and the Class for the misstatements and omissions.

36.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

37.    By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

38.    Plaintiff acquired Netlist shares pursuant to the Registration Statement.

39.    Plaintiff and the Class have sustained damages.  The value of Netlist common stock has declined substantially subsequent to and due to defendants' violations.

- 16 -

40.     At the times it purchased Netlist shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to April 16, 2007. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this Complaint.

## COUNT II

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

41.     Plaintiff repeats and realleges each and every allegation contained above.

42.     This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

43.     Each of the Individual Defendants was a control person of Netlist by virtue of his position as a director and/or senior officer of Netlist. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Netlist.

44.     Each of the Individual Defendants was a culpable participant in the violation of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.     Declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

- 17 -

1      B.     Awarding plaintiff and other members of the Class damages together

2 with interest thereon;

3      C.     Awarding plaintiff and other members of the Class their costs and

4 expenses of this litigation, including reasonable attorneys' fees, accountants' fees and

5 experts' fees and other costs and disbursements; and

6      D.     Awarding plaintiff and other members of the Class such other and further

7 relief as may be just and proper under the circumstances.

8                           **JURY DEMAND**

9       Plaintiff hereby demands a trial by jury.

10 DATED: June 8, 2007                 LERACH COUGHLIN STOIA GELLER
11                                         RUDMAN & ROBBINS LLP
                                   DARREN J. ROBBINS
12                                    DAVID C. WALTON

13

14                                    DAVID C. WALTON

15                                    655 West Broadway, Suite 1900
                                   San Diego, CA 92101
16                                    Telephone: 619/231-1058
                                   619/231-7423 (fax)
17

18                                    LERACH COUGHLIN STOIA GELLER
                                     RUDMAN & ROBBINS LLP
                                   SAMUEL H. RUDMAN
19                                    DAVID A. ROSENFELD
                                   MARIO ALBA, JR.
20                                    58 South Service Road, Suite 200
                                   Melville, NY 11747
21                                    Telephone: 631/367-7100
                                   631/367-1173 (fax)
22

23                                    LAW OFFICES OF CURTIS V.
                                   TRINKO, LLP
24                                    CURTIS V. TRINKO
                                   16 West 46th Street, 7th Floor
25                                    New York, NY 10036
                                   Telephone: 212/490-9550
26                                    212/986-0158 (fax)

27                                    Attorneys for Plaintiff
S:\Cpt\Draft\Securities\Cpt Neilist.doc

28

-18-

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, BRUCE BELODOFF ("Plaintiff"), hereby certify as follows:

1.     Plaintiff has reviewed the complaint prepared for me concerning Netlist, Inc. ("Netlist"), brought under federal securities laws, and have authorized the filing of such an action.

2.     Plaintiff did not purchase or otherwise acquire the securities of Netlist that are the subject of this action at the direction of plaintiff's counsel, or in order to participate in this private action, or in any other litigation brought under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including providing testimony at a deposition and/or at trial, if necessary.

4.     Plaintiff's transactions in the securities that are the subject of this litigation during the class period set forth in the complaint are as follows:

        a).     Plaintiff purchased 2,000 shares of Netlist, Inc. on February 13, 2007 at $ 8.89 per share; and

        b).     Plaintiff still holds these shares.

5.     During the three years prior to the date hereof, plaintiff has not filed an action in which he has sought to serve, or has served as a representative party for a class in an action filed under the federal securities laws.

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond his pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.    Executed this $30$ day of May, 2007 at Tampa, Florida.

BRUCE BELODOFF

* indicates settlement date.