# Exhibit A-13

10-K 1 a2214084z10-k.htm 10-K

Use these links to rapidly review the document
TABLE OF CONTENTS
PART IV
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 29, 2012

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                   to

Commission file number 001-33170



# NETLIST, INC.
(Exact name of registrant as specified in its charter)

| Delaware | 95-4812784 |
|---|---|
| State or other jurisdiction of incorporation or organization | (I.R.S. employer Identification No.) |

**51 Discovery, Suite 150**
**Irvine, CA 92618**
(Address of principal executive offices) (Zip Code)

**(949) 435-0025**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.001 per share | The NASDAQ Global Market |

Securities registered pursuant to Section 12(g) of the Act:

**None**

DIABLO-NL_0237664

(Title of class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐      Accelerated filer ☐      Non-accelerated filer ☐      Smaller reporting company ☒
                                                        (Do not check if a
                                                        smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

The aggregate market value of the registrant's common stock held by non-affiliates, based on the closing price of the registrant's common stock as reported on The NASDAQ Global Market on June 29, 2012, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $52.2 million. For purposes of this calculation, it has been assumed that all shares of the registrant's common stock held by directors, executive officers and shareholders beneficially owning five percent or more of the registrant's common stock are held by affiliates. The treatment of these persons as affiliates for purposes of this calculation is not conclusive as to whether such persons are, in fact, affiliates of the registrant.

The number of shares outstanding of the registrant's common stock, as of the latest practicable date:

Common Stock, par value $0.001 per share
30,366,553 shares outstanding at March 25, 2013

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the definitive Proxy Statement for the registrant's Annual Meeting of Stockholders for 2013 have been incorporated by reference into Part III of this Annual Report on Form 10-K.

DIABLO-NL_0237665

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| PART I | | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 9 |
| Item 2 | Properties | 29 |
| Item 3 | Legal Proceedings | 29 |
| PART II | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 30 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 31 |
| Item 8 | Financial Statements and Supplementary Data | 45 |
| Item 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 45 |
| Item 9A | Controls and Procedures | 45 |
| Item 9B | Other Information | 46 |
| PART III | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 47 |
| Item 11 | Executive Compensation | 47 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 47 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 47 |
| Item 14 | Principal Accounting Fees and Services | 47 |
| PART IV | | |
| Item 15 | Exhibits, Financial Statement Schedules | 48 |
| SIGNATURES | | 52 |
| INDEX TO EXHIBITS | | |
| Exhibit 21.1 | | |
| Exhibit 23 | | |
| Exhibit 24.1 | | |
| Exhibit 31.1 | | |
| Exhibit 31.2 | | |
| Exhibit 32 | | |

Unless the context otherwise requires, references to the "Company," "Netlist," "we," "us" or "our" refer to Netlist, Inc. and its subsidiaries.

The registered trademarks of Netlist, Inc. and its subsidiaries include: HyperCloud® and NVvault™. Other trademarks used in this Report are the property of their respective owners.

DIABLO-NL_0237666

In addition, because the qualification process is both product-specific and platform-specific, our existing customers sometimes require us to requalify our products, or to qualify our new products, for use in new platforms or applications. For example, as our OEM customers transition from prior generation DDR2 DRAM architectures to current generation DDR3 DRAM architectures, we must design and qualify new products for use by those customers. In the past, the process of design and qualification has taken up to six months to complete, during which time our net sales to those customers declined significantly. After our products are qualified, it can take several months before the customer begins production and we begin to generate net sales from such customer.

Likewise, when our memory component vendors discontinue production of components, it may be necessary for us to design and qualify new products for our customers. Such customers may require of us or we may decide to purchase an estimated quantity of discontinued memory components necessary to ensure a steady supply of existing products until products with new components can be qualified. Purchases of this nature may affect our liquidity. Additionally, our estimation of quantities required during the transition may be incorrect, which could adversely impact our results of operations through lost revenue opportunities or charges related to excess and obsolete inventory.

We must devote substantial resources, including design, engineering, sales, marketing and management efforts, to qualify our products with prospective customers in anticipation of sales. Significant delays in the qualification process, such as those experienced with our HyperCloud® product, could result in an inability to keep up with rapid technology change or new, competitive technologies. If we delay or do not succeed in qualifying a product with an existing or prospective customer, we will not be able to sell that product to that customer, which may result in our holding excess and obsolete inventory and harm our operating results and business.

***Sales to a limited number of customers represent a significant portion of our net sales and the loss of, or a significant reduction in sales to, any one of these customers could materially harm our business.***

Sales to certain of our OEM customers have historically represented a substantial majority of our net sales. Approximately 60% and 18% of our net sales in year ended December 29, 2012 were to two of our customers. Approximately 70% of our net sales in the year ended December 31, 2011 were to one of our customers. We currently expect that sales to major OEM customers will continue to represent a significant percentage of our net sales for the foreseeable future. We do not have long-term agreements with our OEM customers, or with any other customer. Any one of these customers could decide at any time to discontinue, decrease or delay their purchase of our products. In addition, the prices that these customers pay for our products could change at any time. The loss of any of our OEM customers, or a significant reduction in sales to any of them, could significantly reduce our net sales and adversely affect our operating results.

Our ability to maintain or increase our net sales to our key customers depends on a variety of factors, many of which are beyond our control. These factors include our customers' continued sales of servers and other computing systems that incorporate our memory subsystems and our customers' continued incorporation of our products into their systems. Because of these and other factors, net sales to these customers may not continue and the amount of such net sales may not reach or exceed historical levels in any future period. Because these customers account for a substantial portion of our net sales, the failure of any one of these customers to pay on a timely basis would negatively impact our cash flow. In addition, while we may not be contractually obligated to accept returned products, we may determine that it is in our best interest to accept returns in order to maintain good relations with our customers. As we describe in more detail elsewhere in this Report, we have experienced a significant decline in sales of NVvault™ sales to our primary customer. This reduction in sales has had, and is expected to continue to have, a significant impact on our revenues and gross profit.

14

DIABLO-NL_0237681

delay, scale back or eliminate some or all of our research and development programs, or to reduce or cease operations.

*Liquidity*

We incurred net losses of approximately $14.0 million and $5.6 million for the year ended December 29, 2012 and December 31, 2011, respectively, and had an accumulated deficit of approximately $86.7 million at December 29, 2012. In addition, we used cash in operating activities of approximately $7.0 million and $7.4 million for the years ended December 29, 2012 and December 31, 2011, respectively. As a result of continuing losses, we are out of compliance with the tangible net worth debt covenant during the fourth quarter of 2012. We have initiated discussions with Silicon Valley Bank to waive the violations and amend the credit agreement.

In addition to renegotiating the credit agreement with Silicon Valley Bank, we are evaluating potential financing opportunities and alliances or other partnership agreements with entities interested in our technologies. We are also planning to reduce expenses, continue efforts to qualify new and enhanced products with our OEM customers, and protect our intellectual property.

If adequate working capital is not available when needed, we may be required to significantly modify our business model and operations to reduce spending to a sustainable level. It could cause us to be unable to execute our business plan, take advantage of future opportunities, or respond to competitive pressures or customer requirements. It may also cause us to delay, scale back or eliminate some or all of our research and development programs, or to reduce or cease operations. While there is no assurance that we can meet our revenue forecasts or successfully negotiate the terms of the credit agreement with Silicon Valley Bank, we anticipate that we can successfully execute our plans and continue operations for at least the next twelve months.

*Off-Balance Sheet Arrangements.*

We do not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. In addition, we do not have any undisclosed borrowings or debt, and we have not entered into any synthetic leases. We are, therefore, not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

**Item 8.    Financial Statements and Supplementary Data**

The financial statements and supplementary data required by this item are included in Part IV, Item 15 of this Report.

**Item 9.    Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.    Controls and Procedures**

**Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Exchange Act, as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and our principal financial officer concluded that our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by us in reports we file or

45

DIABLO-NL_0237713