# EXHIBIT 1
# REDACTED VERSION

FABIO E. MARINO (SBN 183825)
fmarino@mwe.com
L. KIERAN KIECKHEFER (SBN 251978)
kkieckhefer@mwe.com
JUDITH S.H. HOM (SBN 203482)
jhom@mwe.com
NITIN GAMBHIR (SBN 259906)
ngambhir@mwe.com
BARRINGTON DYER (SBN 264762)
bdyer@mwe.com
TERI H.P. NGUYEN (SBN 267498)
thpnguyen@mwe.com
NATALIE BENNETT (*Pro Hac Vice*)
nbennett@mwe.com
McDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025-4004
Telephone:    650 815 7400
Facsimile:    650 815 7401

Attorneys for Defendant and Counterclaim-Plaintiff
DIABLO TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NETLIST, INC., a Delaware corporation, | CASE NO.  4:13-cv-05962 YGR (Related Case No. 4:13-cv-05889 YGR) |
| Plaintiff and Counterclaim-Defendant, | **DEFENDANT DIABLO TECHNOLOGIES, INC.'S OPPOSITION TO PLAINTIFF NETLIST, INC.'S MOTION FOR A PRELIMINARY INJUNCTION** |
| vs. | |
| DIABLO TECHNOLOGIES, INC., a Canadian corporation, | |
| Defendant and Counterclaim-Plaintiff. | Date:      December 2, 2014<br>Time:      2:00 P.M.<br>Ctrm:      1, 4th Floor<br>Judge:    Hon. Yvonne G. Rogers |

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................. 1

III.   NETLIST HAS NOT SHOWN LIKELIHOOD OF SUCCESS ON THE MERITS ........ 4

       A.     Netlist Has Not Carried its Burden on the Trade Secret Misappropriation
              Allegations ........................................................................................... 4

              1.     The Netlist and Diablo Architectures......................................... 4
              2.     The Netlist and Diablo Architectures Are Fundamentally Different ......... 5

       B.     Netlist Has Not Demonstrated Possession of Trade Secrets .................. 8

                     a.     ██████ Disclosed a Distributed LRD/DXD Architecture to
                            Diablo in 2007............................................................... 10

                     b.     The LRD/DXD Architecture is Disclosed in the '185 Patent ....... 11

                     c.     Netlist Disclosed the LRD/DXD Architecture as Early as
                            2008............................................................................. 11

                     d.     The LRD/DXD Architecture Could be Reverse Engineered ....... 12

       C.     Netlist Has Not Carried its Burden in Demonstrating Any Independent
              Economic Value in the Alleged Benefits of its Trade Secrets ............... 13

       D.     Netlist Has Not Shown Likelihood of Success on the Merits for the
              Allegations of Breach of Contract...................................................... 14
              1.     The Supply Agreement Only Contemplates Injunctive Relief Where
                     There is Misuse of Confidential Information............................... 14

IV.    NETLIST HAS NOT MET ITS BURDEN IN DEMONSTRATING THAT IT
       WILL SUFFER IRREPARABLE HARM ................................................................ 16

       A.     Netlist Waited Almost Three Years To Move For A Preliminary Injunction....... 16

       B.     Netlist's Claims for Irreparable Harm Are Implausible......................... 17
              1.     Netlist Does Not Compete with Diablo's Chips or the
                     ULLtraDIMM ............................................................................ 17
              2.     The Hong Declaration is Insufficient to Establish Irreparable Harm ...... 18
              3.     Netlist Overreaches in Seeking Relief for Hypothetical Harm................. 20
              4.     Netlist's Litigious Business Model is the Cause of Lost
                     Partnerships............................................................................. 21

V.     THE BALANCE OF THE EQUITIES TIPS SHARPLY IN FAVOR OF DIABLO....... 21
              1.     Diablo Would Experience Extreme Harm if Enjoined ................. 21
              2.     Netlist Failed to Show that the Injunction Would Remove the
                     Irreparable Harm ..................................................................... 22

VI.    THE PUBLIC INTEREST WEIGHS AGAINST AN INJUNCTION ............................ 23

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

**TABLE OF CONTENTS**
**(continued)**

Page

VII.   THE SCOPE OF THE REQUESTED RELIEF IS IMPERMISSIBLY
       OVERBROAD ........................................................................................................ 24

VIII.  CONCLUSION ....................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)......................................................................17

*Aevoe Corp. v. AE Tech Co.*,
   727 F.3d 1375 (Fed. Cir. 2013)......................................................................24

*Agency Solutions.Com, LLC v. TriZetto Group, Inc.*,
   819 F.Supp.2d 1001 (E.D. Cal. 2011)..............................................................8

*American Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985)........................................................................20

*Atlantic Research Marketing Sys. Inc. v. Troy*,
   659 F.3d 1345 (Fed. Cir. 2011)......................................................................11

*Bates v. United Parcel Serv., Inc.*,
   511 F.3d 974 (9th Cir. 2007)..........................................................................21

*Belodoff v. Netlist*,
   No. 07-cv-677 (C.D. Cal. July 3, 2007) .........................................................19

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   No. 10-cv-3428, 2013 WL 890126 (N.D. Cal. Jan. 10, 2013)..........................12, 24

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   No. 10-cv-3428-PSG (N.D. Cal. Jan. 10, 2013) .............................................21

*Brunnen v. Mission Ranch*,
   No. 97-cv-20668, 1998 WL 34032533 (Nov. 24, 1998).................................16

*Burgos v. Cate*,
   No. CIV S-09-3276-MCE-CMK-P, 2012 U.S. Dist. LEXIS 82877 (E.D. Cal.
   June 14, 2012) (adopted at 2012 U.S. Dist. LEXIS 113750)..........................24

*Cartridge Twins, LLC v. Wildwood Franchising, Inc.*,
   No. 09-cv-01857, 2009 WL 1690728 (June 16, 2009) ...................................22

*Craigslist, Inc. v. Naturemarket, Inc.*,
   694 F. Supp.2d 1039 (N.D. Cal. 2010) ..........................................................14

*DVD Copy Control Ass'n, Inc. v. Bunner*,
   116 Cal. App. 4th 241 (2004)..........................................................................12

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

1

## <u>TABLE OF AUTHORITIES</u>
## <u>CONTINUED</u>

2

3                                                                                        **Page(s)**

4    **Cases**

5    *Equal Emp't Opportunity Comm'n v. Arabian Am. Oil Co.*,
         499 U.S. 244 (1991) ...................................................................................................25
6

7    *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*,
         415 U.S. 423 (1974) ...................................................................................................21

8    *Hynix Semiconductor Inc. v. Rambus, Inc.*,
         609 F. Supp. 2d 951 (N.D. Cal. Feb. 23, 2009) .......................................................25
9

10   *Innospan Corp. v. Intuit, Inc.*,
         No. 10-cv-4422, 2010 WL 5157157 (N.D. Cal. Dec. 3, 2010)............................3, 17
11

12   *Japan Line Ltd. v. Cnty. of L.A*,
         441 U.S. 434 (1979) ...................................................................................................25

13   *Jobscience, Inc. v. CVPartners, Inc.*,
         No. 13-cv-4519, 2014 WL 852477 (N.D. Cal. Feb. 28, 2014) .................................10
14

15   *Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
         941 F.2d 970 (9th Cir. 1991)......................................................................................25
16

17   *Logtale, Ltd. v. IKOR, Inc.*,
         No. 11–5452, 2012 WL 6044876 (N.D. Cal. Dec. 5, 2012) ......................................11

18   *Marlyn Nutraceuticals. Inc. v. Mucos Pharma GmbH & Co.*,
         571 F.3d 873 (9th Cir. 2009)......................................................................................25
19

20   *Marshall v. Rain*,
         No. 04cv403, 2008 WL 3851551 (S.D. Cal. Aug. 15, 2008)................................2, 24
21

22   *Mazurek v. Armstrong*,
         520 U.S. 968 (1997) .....................................................................................................3

23   *Open Text, S.A. v. Box, Inc.*,
         No. 5:13-cv-4910, ---F.Supp.2d ----, 2014 WL 1389065 (N.D. Cal. Apr. 9,
24       2014) .....................................................................................................................16, 17

25   *Park Village Apt. Tenants v. Mortimer Howard Trust*,
         636 F.3d 1150 (9th Cir. 2011)...............................................................................24, 25
26

27   *Perfect 10, Inc. v. Google, Inc.*,
         653 F.3d 976 (9th Cir. 2011).......................................................................3, 4, 22, 23

28

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

**TABLE OF AUTHORITIES**
**CONTINUED**

Page(s)

**Cases**

*Phelps v. Mimms,*
No. 1:14-cv-251, 2014 WL 2197563 ................................................................24

*Polimaster Ltd. v. Raw Sys., Inc.,*
No. 05-cv-1887, 2005 WL 2171911 (N.D. Cal. Sept. 6, 2005) ................................12

*Protech Diamond Tools, Inc. v. Liao,*
No. 08-cv-3684, 2009 WL 1626587 (N.D. Cal. June 8, 2009) ................................17

*Rita Med. Sys., Inc. v. Resect Med., Inc.,*
No. 05-cv-3291, 2007 WL 161049 (N.D. Cal. Jan. 17, 2007) ..................................6

*Sammartano v. First Judicial District Court,*
303 F.3d 959 (9th Cir. 2002) ......................................................................23

*Sigma Chem. Co. v. Harris,*
794 F.2d 371 (8th Cir. 1986) ......................................................................24

*Silvaco Data Sys. v. Intel Corp.,*
184 Cal.App.4th 210 (6th Dist. 2010) ........................................................4, 15

*Social Apps. LLC v. Zynga,*
No. 4:11-cv-4910-YGR, 2012 WL 2203063 (N.D. Cal. June 14, 2012) ............................9, 10

*Spring Design, Inc. v. Barnesandnoble.com, LLC,*
No. 09-cv-05185, 2010 WL 5422556 (N.D. Cal. Dec. 27, 2010) ..............................13

*SRI Int'l v. Acoustic Imaging Tech. Corp.,*
No. 92-cv-5015, 1993 WL 356896 (N.D. Cal. Sept. 3, 1993) ................................16

*Sunbelt Rentals Inc. v. Victor,*
No. 13-cv-4240, 2014 WL 492364 (N.D. Cal. Feb. 5, 2014) ................................4, 20

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.,*
609 F.3d 975 (9th Cir. 2010) ........................................................................3

*Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.,*
550 F.3d 770 (9th Cir. 2008) ......................................................................25

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7, 129 S. Ct. 365 (2008) ..........................................................3, 21, 22

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

# TABLE OF AUTHORITIES
## CONTINUED

Page(s)

**Cases**

*Young v. Third & Mission Assocs., LLC*,
No. 14-cv-3627, 2014 WL 4382997 (N.D. Cal. Sept. 4, 2014) ................................24

**Statutes**

Cal. Civ. Code § 3426.1(b) ....................................................................................13

Cal. Civ. Code § 2019.210 ......................................................................................2

California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 ................................4

**Other Authorities**

Fed. R. Civ. Proc. 65(d) ..........................................................................................2

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

## I.      INTRODUCTION

In its Second Amended Complaint, Netlist relied heavily on an anonymous "whistleblower" letter claiming that Diablo's Rush and Bolt chips were essentially copies of the ███████████████████████ chips Diablo had previously developed under contract with Netlist.  Having failed to substantiate these allegations,[1] Netlist has now abandoned its previous contention that Diablo used ██████ in the accused product and laid claim—instead—to any "chipset" in a DIMM that sits in the Memory Channel, a sweepingly broad concept that was neither disclosed to Diablo nor one that Netlist can claim as its trade secret. This "shifting sands" approach to trade secrets identification not only runs contrary to established principles of California law, but creates serious questions as to the merits of Netlist's allegations. Indeed, Netlist's hastily brought trade secrets allegations seem to be primarily motivated by the prospect of financial gain: while Diablo's Memory Channel Storage (MCS) technology[2] has gathered universal praise and market acceptance, Netlist's products have experienced a steady and seemingly irreversible financial decline ever since the company went public in 2006.  These financial difficulties forced Netlist to shift its business model towards monetizing its IP, a fact Netlist has publicly acknowledged.  In line with its new business plan, Netlist has obtained financing from a patent assertion entity, Fortress Capital, secured by the proceeds from this case. Netlist's preliminary injunction motion against Diablo and its customers is designed to gain leverage towards Netlist's anticipated pay-day.

---

[1]  The letter identified two former Diablo employees, Mr. John Vincent and Mr. Sujoy Ray, as sources for verifying the copying allegations.  Both Mr. Vincent and Mr. Ray, who were not employed by Diablo at the time of the relationship with Netlist and are now impartial third parties, flatly denied any allegation of copying by Diablo of Netlist's technology.  Exh. A-3 as attached to the Bennett Decl. (Vincent Dep. Tr.) at 95:17-22; 201:2-4; Exh. A-4 as attached to the Bennett Decl. (Ray Dep. Tr.) at 64:15-20; 205:13-15.

[2]  Throughout its Motion, Netlist incorrectly refers to the ULLtraDIMM as a Diablo product.  In fact, Diablo only makes the Rush and Bolt chips.  Diablo's customer, Smart Storage (now owned by Sandisk) uses the Rush and Bolt chips (together referred to as Memory Channel Storage (MCS)) purchased from Diablo as components of the ULLtraDIMM.  Unlike the exclusive relationship Diablo had with Netlist for the development of the HyperCloud, there is no exclusivity between Diablo and Smart Storage/Sandisk for the MCS technology.  Because Diablo and its customers engage in arm's length transactions, Diablo is free to sell MCS to any other third party.  *See* Paillard Decl. ¶16.

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

Against this background, it is not surprising that Netlist's Motion (Dkt. No. 190) (hereinafter, "Motion") predictably meets none of the elements required for granting such an extraordinary remedy. First, Netlist's misappropriation claim fails to comport with the law because Netlist has not sufficiently disclosed a trade secret under California Code of Civil Procedure § 2019.210. In addition, what Netlist now identifies as its trade secrets were never in fact disclosed to Diablo and Netlist's expert improperly compared these undisclosed "trade secrets" to the accused products. Netlist has also failed to show that, even if it were in possession of a trade secret, a misappropriation occurred. Diablo did not use the LRD/DXD Specifications in the development of the Rush and Bolt chips and these chips do not operate according to the LRD/DXD Specifications given to Diablo: indeed, months of discovery by Netlist have failed to provide any evidence of misappropriation. In any event, Diablo was in possession of the broad "trade secrets" now identified by Netlist many months before any disclosure by Netlist. By the time Diablo entered into an NDA with Netlist, it had already been in discussions with ███ for months on the design of an LRD/DXD chipset for a DDR3 DIMM and thus was fully aware of the information Netlist now claims as its trade secret. Netlist's breach of contract claims (premised on the presence of and misappropriation of trade secrets) also fail under both the letter and spirit of the Supply Agreement. On the likelihood of success prong, Netlist simply cannot make the law fit the facts of this case.

On the irreparable harm prong, Netlist's analysis is similarly baseless. First, Netlist unreasonably delayed bringing these allegations for over three years. When Netlist finally did bring a lawsuit, it waited an additional thirteen months before seeking an injunction; these are not the actions of party facing irreparable harm. Most egregiously, however, Netlist's Motion is devoid of any evidence of competition with Diablo. The only harm Netlist alleges is from competition with Diablo's customers, none of which are a party to this lawsuit or subject to an injunction. "Under Federal Rule of Civil Procedure 65(d), an injunction binds only the 'parties to the action, their officers, agents, servants, employees, and attorneys' . . . . The Court has no authority to issue a preliminary injunction [against] non-parties." *Marshall v. Rain*, No. 04cv403, 2008 WL 3851551, at *1 (S.D. Cal. Aug. 15, 2008). But, even if the Court were to consider

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

Netlist's irreparable harm arguments, there is no basis to suggest that the ULLtraDIMM—a Flash storage device—is usurping sales of NVvault—a volatile DRAM memory device with flash backup.

There is likewise no substance to the position that the ULLtraDIMM's recent entry into the market caused Netlist's past market woes or could cause them going forward. Netlist knows (and has identified in its SEC filings) who its competitors are, and they do not include either Diablo or Smart Storage. Given the multiple competitive fronts, Netlist does not even attempt to show how any perceived harms would dissipate with the exclusion of the ULLtraDIMM: this is fatal to Netlist's Motion as the Ninth Circuit has denied a preliminary injunction in analogous circumstances. *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011).

Netlist's empty accusations tip the equities sharply in favor of denying the request for an injunction. Netlist cavalierly ignores the extreme prejudice Diablo would suffer if an injunction were improvidently granted in this case.In seeking an inappropriate worldwide injunction against third parties not even named in this suit, Netlist overplays its hand. Finally, public interest weighs against granting preliminary injunctions that would adversely affect blameless third parties, as is the case here. Based on this record, the Court should not entertain any relief, let alone the overbroad remedy sought by Netlist.

## II.    LEGAL STANDARDS FOR CONSIDERING AN APPLICATION FOR A PRELIMINARY INJUNCTION

"A preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Innospan Corp. v. Intuit, Inc.*, No. 10-cv-4422, 2010 WL 5157157, at *1 (N.D. Cal. Dec. 3, 2010) (internal citation omitted); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008). The moving party bears the burden of demonstrating that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter*, 55 U.S. at 20). A preliminary injunction should not be granted unless the movant, *by a clear and convincing showing*, carries the burden of persuasion, *Mazurek*

1   *v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted) (emphasis added), including a

2   demonstration that there is sufficient causal connection between the irreparable harm and

3   plaintiff's business that the requested injunction would put an end to the alleged harm. *See*

4   *Perfect 10*, 653 F.3d at 981.

5   **III.   NETLIST HAS NOT SHOWN LIKELIHOOD OF SUCCESS ON THE MERITS**

6          **A.   Netlist Has Not Carried its Burden on the Trade Secret Misappropriation
              Allegations**

7

8          To prove trade secret misappropriation, the burden is on the plaintiff to demonstrate that it

9   (1) "owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret

10  through improper means, and (3) the defendant's actions damaged the plaintiff." *Sunbelt Rentals*

11  *Inc. v. Victor*, No. 13-cv-4240, 2014 WL 492364, at *5 (N.D. Cal. Feb. 5, 2014) (quoting

12  *CytoDyn of New Mexico, Inc. v. Amerimmune Pharms., Inc.*, 160 Cal. App. 4th 288, 297 (2008)).

13  Absent meeting all three of these prongs under the California Uniform Trade Secrets Act

14  ("CUTSA"), Cal. Civ. Code § 3426, Netlist cannot demonstrate a likelihood of success.

15         In order to demonstrate trade secret misappropriation, Netlist must demonstrate some

16  reliance on or incorporation of the LRD/DXD distributed architecture in Diablo's products.

17  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal.App.4th 210, 224 (6th Dist. 2010) (explaining that a

18  misappropriating "use" of a secret occurs only when one directly exploits the secret for

19  advantage, *e.g.*, by incorporating the secret into the manufacturing technique/product).  Netlist

20  proffers no such evidence that its alleged trade secrets were ever referenced to or otherwise relied

21  upon during the independent development of Diablo's Rush and Bolt chips.

22              **1.   The Netlist and Diablo Architectures**

23         The documents Netlist provided to Diablo in April 2008 describe the basic architecture of

24  a chipset to perform rank multiplication (DXD) and load reduction (LRD) between two or more

25  ranks of DRAMs.  *See* Exh. F-2 as attached to the Declaration of Michael Takefman ("Takefman

26  Decl.") (ASIC Specification); Exh. F-3 as attached to the Takefman Decl. (ISwitch Specification)

27  (collectively, "LRD/DXD Specifications").  The Netlist LRD/DXD Specifications ████████

28  ████████████████████████████████████████████████████████████

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    ███████:

2        **1.    Overview**



9    Exh. F-2 as attached to the Takefman Decl. (ASIC Specification) at 1.

10        Diablo's Rush and Bolt chips *use a different, independently developed* architecture,

11   derived from the JEDEC DDR3 standard, that enables the integration of a large amount of

12   nonvolatile memory into the host DDR3 main memory system.  Exh. F-9 as attached to the

13   Takefman Decl. (TeraDIMM Specification) at 3.

14        **2.    The Netlist and Diablo Architectures Are Fundamentally Different**

15        Netlist's purported "trade secrets" are limited to specific sections contained in the

16   LRD/DXD Specifications. *See* Exhs. F-2 and F-3 as attached to the Takefman Decl.; Exh. A-5 as

17   attached to the Declaration of Natalie A. Bennett ("Bennett Decl.") (Response to Diablo ROG

18   No. 9) (stating that "all of the Netlist Trade Secrets were substantially set forth and reduced to

19   writing" in the LRD/DXD Specifications).  Netlist touts the LRD/DXD Specifications as its

20   "crown jewels."  (Dkt. No. 146 at ¶ 16) ("The two documents . . . described in extensive detail

21   core specifications of Netlist's DXD and LRD technologies.").

22        Netlist cannot make the required showing because its proposed LRD/DXD architecture

23   (even if it could be made to work) does not overlap with the Rush and Bolt for clear cut technical

24   reasons:

25   - The Rush and Bolt-based ULLtraDIMM is a hard drive used for long term storage of
     information, while the LRD/DXD-based HyperCloud relies on multiple ranks of
26     DRAM to provide low-latency high throughput temporary memory. *See* Declaration
     of Joseph McAlexander III ("McAlexander Decl.") at ¶¶ 98, 227-228.
27
     - The HyperCloud both increases the number of ranks of DRAMs (rank multiplication)
28     and reduces the electrical load on the system bus (load reduction). *See* ASIC

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

Specification at 3.  The ULLtraDIMM, on the other hand, has no ranks of DRAMs and, consequently, no ISwitches or ASICs controlling access to them.  McAlexander Decl. ¶ 115.

- The Rush chip in the ULLtraDIMM is a device with considerably more complex logic than the RD chip.  The Rush uses 100 times more gates: the ULLtraDIMM has 4 million gates, while the RD has 40 thousand gates.  Exh. D-1 as attached to the Badalone Decl. (Badalone Dep. Tr.) at 259:13-17; Exh. C-8 to the Declaration of James E. Malackowski ("Malackowski Decl.") (Oct. 27, 2014 Interview with R. Badalone).

- Since the ULLtraDIMM has no DRAM, it requires changes to the BIOS[3] to plug into a DIMM slot.  The HyperCloud does not require any changes to the BIOS.  McAlexander Decl. ¶ 99.

Netlist has not put forward any evidence that the Rush and Bolt chips used in the ULLtraDIMM, a product first sold in 2014, use any know-how disclosed in the 2008 LRD/DXD Specifications.  As Mr. McAlexander explains, the only pertinent evidence presented in Netlist's Motion is that the ULLtraDIMM runs on a DDR3 architecture that does not perform rank multiplication/load reduction and does not use the "ASIC" or "ISwitches" described in the LRD/DXD Specifications.  *See generally* McAlexander Decl. ¶¶ 115-116, 128-206.  Netlist did not disclose to Diablo and, therefore, is not entitled to, a categorical right to any chipset interfacing with the DDR3 memory channel.

### 3.    Diablo Did Not Use the LRD/DXD Specifications in Developing the Rush and Bolt Chips

Netlist has "the burden of establishing that [Diablo] did not independently derive trade-secret information."  *Rita Med. Sys., Inc. v. Resect Med., Inc.*, No. 05-cv-3291, 2007 WL 161049, at *8 (N.D. Cal. Jan. 17, 2007) (citing *Sargent Fletcher*, 110 Cal. App. 4th at 1669).  The only evidence Netlist presents is that it provided the LRD/DXD Specifications to Diablo and that some Diablo engineers who had worked on the design and development of the RD and ID chips used in the HyperCloud also worked on the Rush and Bolt chips.  *See* Motion at 7-8.  Yet, Netlist cites no evidence that Diablo actually used the LRD/DXD Specifications to develop the Rush and Bolt chips.  The anonymous "whistleblower" letter identifies two former Diablo employees as being

---

[3]  BIOS refers to the "Basic Input/Output System," the very first program that a computer runs upon startup.

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

able to confirm that Diablo copied Netlist's trade secrets in developing the Rush and Bolt chips.[4]

However, when Netlist deposed the two former Diablo employees John Vincent and Sujoy Ray

they flatly denied the whistleblower's allegations:

> Q.  What information do you have about Diablo stealing Netlist's detailed architecture and
>      design?
> A.  None, I do not believe that's the case.
> Q.  Why is that?
> A.  The architecture of the TeraDIMM is not the same as the architecture for the Netlist
>      product.

Exh. A-3 as attached to the Bennett Decl. (Vincent Dep. Tr.) at 95:17-22.

> Q.  Can you verify that Diablo copied Netlist's technology?
> A.  No, I cannot.
> Q.  Did you have an understanding at any time while you were working at Diablo that
>      Diablo was copying Netlist's technology?
> A.  No, I was not.

Exh. A-4 as attached to the Bennett Decl. (Ray Dep. Tr.) at 64:15-20.  Similarly, Diablo

engineers also testified that Diablo did not copy, refer to, or use the Netlist LRD/DXD

Specifications (or any other Netlist's confidential information) to develop the Rush and Bolt

chips:

> Q:  And in doing technical specification for what became the Rush, what RD documents
>      did you consult?
> A.  None.

Exh. F-1 as attached to the Takefman Decl. (Takefman Dep. Tr.) at 190:16-17.

> Q.  What documents relating to the Netlist technology did you review?
> A.  I do not believe I ever reviewed any documents that specifically related to the
>      Netlist product or the Netlist engagement.

Exh. A-3 as attached to the Bennett Decl. (Vincent Dep. Tr.) at 68:1-5.

> Q.  Did you ever review any documents at Diablo that had the name Netlist on it?
> A.  No.
> Q.  Did you ever review any schematics or design specifications for the Netlist ID
>      or RD chips?
> A.  No.

---

[4]  Pursuant to Local Rule 7-3(a), Diablo objects the anonymous "whistleblower" letter, Exhibit 11
to the Hong declaration.  (Dkt. No. 192-11).  The objectionable exhibit, which assumes the truth
of the matters contained therein, is inadmissible hearsay and cannot be offered to prove the truth
of the matter asserted.  FRE 801, 802.  The anonymous letter further lacks foundation, is not
authenticated, and is factually erroneous.

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    Exh. A-4 as attached to the Bennett Decl. (Ray Dep. Tr.) at 64:15-20.  This makes sense because

2    Diablo had no reason to refer to the LRD/DXD Specifications, as the Rush and Bolt chips follow

3    the JEDEC DDR3 standard and not the LRD and/or DXD techniques.  Takefman Decl. ¶13.  In

4    fact, in all instances where the asserted trade secrets do not follow the standard, the Rush and Bolt

5    chips continue to follow the JEDEC standard.  McAlexander Decl. ¶ 117.  In other words, any

6    similarities between the Rush and Bolt and the alleged trade secrets are where both follow the

7    JEDEC standard, but that only shows that Diablo followed an industry standard, not the Netlist

8    LRD/DXD Specifications.

9         **B.    Netlist Has Not Demonstrated Possession of Trade Secrets**

10            **1.    Netlists's Expert Report Fails to Analyze the Actual Disclosures Set**
               **Forth in in the Netlist Specifications**

11

12        Netlist's initial trade secret disclosure offered only general concepts that required

13   supplementation.[5]  Dkt. No. 258, 9/22/14 Hearing Transcript at 6-7.  Notwithstanding the Court's

14   express concerns, Netlist continues to rely on the exact same disclosures (albeit reduced in

15   number from 61 to 15) in its Motion.[6]  Netlist then exacerbated the deficiencies in its disclosures

16   in filing this Motion: rather than comparing the actual language of the LRD/DXD Specifications

17   to the accused chips, Netlist's expert only used the trade secret disclosures written by Netlist's

18   counsel to perform his analysis.

19

20   [5]  A district court can reject a claim that information is a trade secret *sua sponte* if the information
     is not identified by the claimant with sufficient particularity to allow the court to determine what
21   the information is.  *Agency Solutions.Com, LLC v. TriZetto Group, Inc*., 819 F.Supp.2d 1001,
     1017 (E.D. Cal. 2011) (internal citation omitted).
22
     [6]  Diablo met and conferred with counsel for Netlist on October 27, 2014 regarding the
23   deficiencies of Netlist's Second Amended Trade Secrets Disclosures.  At that time counsel for
     Netlist confirmed, *inter alia*, that the remaining 15 trade secrets did not add any new details and
24   relied on the same language as previous disclosures.  In the Second Amended Trade Secrets
     Disclosures Netlist differentiated between bolded and non-bolded text, with the bolded text
25   corresponding to the alleged trade secrets and the non-bolded text being exemplary.  Netlist
     confirmed that the two specification documents cited in the Second Amended Disclosures were
26   the only documents Netlist believes identify these trade secrets and it could not further define the
     trade secrets beyond how the trade secrets are identified in those documents.  Diablo continues to
27   maintain that Netlist's Second Amended Trade Secrets Disclosures are deficient but will further
     confer with Netlist in hopes of informally resolving this dispute.
28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   It is well established under California law that a description of the category, or even of the

2   subcategories of information within a category, does not comply with the requirement *to identify*

3   *the actual matter that is claimed to be a trade secret.* *Social Apps. LLC v. Zynga*, No. 4:11-cv-

4   4910-YGR, 2012 WL 2203063, at *4 (N.D. Cal. June 14, 2012) (demanding the narrow

5   disclosure of concrete technical advancements such as "describing the actual architecture,"

6   "identif[ying] a specific file name or source code line numbers," or "a specific statement of where

7   the icon can be found in the materials provided to [defendant]"). Netlist's expert, who does not

8   claim to have been previously qualified as an expert by any court, performs an incorrect analysis

9   by setting aside the actual LRD/DXD Specifications in favor of high level *abstractions* drafted by

10  Netlist's counsel. As Mr. McAlexander explains in his Report, the disclosures that Mr. Jansen

11  uses in his analysis materially deviate from the LRD/DXD Specifications. *See* McAlexander

12  Decl. ¶¶ 107-113. And Mr. Jansen does not offer a contrary opinion in his Report. These

13  categorical descriptions are substantially broader than the *actual language or diagrams* of the

14  LRD/DXD Specifications disclosed to Diablo. For example, ████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ████████████████████   had Mr. Jansen performed the correct comparison, he would have had no

19  choice but to confirm Mr. McAlexander's opinion that there was no misappropriation. *See*

20  McAlexander Decl. ¶ 119.

21      In essence, Netlist treats its high-level descriptions of the alleged trade secrets as if they

22  were patent claims and then proceeds to construe the terms used in those high-level descriptions

23  in complete disregard for the context, the LRD/DXD Specifications, in which they were drafted.

24  While such an approach would be improper even in a patent case, trade secret law does not

25  tolerate efforts to abstract out the details of what was actually disclosed to Diablo to fashion a

---

[7]   According to the LRD/DXD Specifications, an ████████████████████████████████

████████████████████████████████████████████████████████████████████████

*See* McAlexander Decl. ¶¶ 89-90.

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

1  viable misappropriation theory.  *Social Apps*, 2012 WL 2203063, at *4 ("[p]atent law protects

2  ideas, concept and design; trade secret protects factual, empirical data.") (internal citation

3  omitted); *Jobscience, Inc. v. CVPartners, Inc.*, No. 13-cv-4519, 2014 WL 852477, at *5 (N.D.

4  Cal. Feb. 28, 2014).

5       In *Jobscience*, the Court recognized that it is all too easy "to allege theft of trade secrets

6  with vagueness, then take discovery into the defendants' files, and then cleverly specify whatever

7  happens to be there as having been trade secrets stolen from plaintiff."  *Id*.  This is precisely what

8  has happened here: Netlist is treating its trade secrets disclosures as the proverbial "nose of wax"

9  in an attempt to come up with a theory of misappropriation that would save its case.  But Netlist's

10  "shifting sands" approach to trade secret identification is expressly prohibited under California

11  law and Netlist has not established a likelihood of success on the merits for its trade secret claims.

12           **2.      The Details of the Netlist LRD/DXD Specifications Were Not Secret
13                  when Diablo Built the Rush and Bolt Chips**

14       Netlist contends misappropriation occurred in 2011 when Diablo wrote and released

15  specifications for the Rush and Bolt chips. Motion at 7-8.  The misappropriation allegations also

16  fail because the alleged trade secrets were already known to Diablo and/or in the public domain at

17  the time of the alleged misappropriation.

18           **a.      █████████ Disclosed a Distributed LRD/DXD Architecture █**
19

20       Diablo first learned of the load reduction and rank multiplication concepts described in the

21  LRD/DXD Specifications through ███████████████.  As detailed in the declarations

22  of Cedric Paillard and Riccardo Badalone, ████████████████████████████

23  ████████████████████████████████████████████  five

24  months before Netlist shared the alleged trade.  Declaration of Cedric Paillard ("Paillard Decl.")

25  ¶¶4-5; Exh. D-3 as attached to the Declaration of Riccardo Badalone ("Badalone Decl.") (Micron

26  ML-DIMM Proposal); *see also* Paillard Depo at 151:13-152:7; 157:20-158:18 ████████████

27  ████████████████████████████████████████████████████

28  ██████████████████; Badalone Decl. ¶¶4-7.  As explained in Mr.

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   McAlexander's Report, the ███████████████████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████████████ *E.g.*, Exh. D-2 ███████████ ███ ████████ ; Exh. D-4 ██ ███

4   ████████████ Exh. D-2 as attached to the Badalone Decl. (Diablo Presentation Jan. 30,

5   2007); *See generally* McAlexander Decl. ¶¶125-127,128-206.  Netlist cannot claim trade secret

6   protection for concepts that were already known by Diablo. *Logtale, Ltd. v. IKOR, Inc.*, No. 11–

7   5452, 2012 WL 6044876 , at *7 (N.D. Cal. Dec. 5, 2012) ("when information is generally known

8   in the trade and already used by good faith competitors, it is not a protectable trade secret and

9   injunction should not issue") (internal citation and quotation marks omitted).

10                          **b.      The LRD/DXD Architecture is Disclosed in the '185 Patent**

11           Netlist also disclosed the contents of the LRD/DXD Specifications in 2010 when it filed

12   U.S. Patent No. 8,516,185[8] describing the same technology as the alleged trade secrets.  Exh. A-2

13   as attached to the Bennett Decl. (Lee Dep. Tr.) at 224:14-16; 225:4-227:11 (testifying that '185

14   patent resulted from Netlist's work on the HyperCloud).  Mr. McAlexander explains that the

15   details in the LRD/DXD Specifications do not extend beyond the '185 patent disclosure.  *See*

16   McAlexander Decl. ¶¶ 214-216.  It is firmly established that subject matter that is disclosed in a

17   patent cannot be a trade secret. *Atlantic Research Marketing Sys. Inc. v. Troy*, 659 F.3d 1345,

18   1357 (Fed. Cir. 2011).

19                          **c.      Netlist Disclosed the LRD/DXD Architecture as Early as 2008**

20           There is also compelling evidence that Netlist's dealings with Texas Istruments (TI)

21   resulted in public dissemination of the LRD/DXD architecture Netlist now claims as its trade

22   secret. *See* McAlexander Decl. ¶ 218. (outlining the technical similarities between the TI

23   presentation and Netlist's LRD/DXD Specifications).  In October 2008, a TI representative gave a

24   presentation to members of a JEDEC subcommittee (a computer memory industry standards

25   group), which Netlist admitted describes the LRD/DXD architecture.  Exh. A-2 as attached to the

26   Bennett Decl. (Lee Dep. Tr.) at 217:15-219:7; Exh. A-1 as attached to the Bennett Decl. (Hong

27   ───────────────────

28   [8]  The '185 patent entered the public domain through publication, which occurred before any
     alleged misappropriation of the alleged trade secrets by Diablo.

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

Dep. Tr.) at 69:12-19.  Specifically, ████████████████████████████

████████████████████████████████████████████████████████.  Exh. F-

8 as attached to the Takefman Decl. ███████████████; *See* McAlexander Decl. ¶ 218.

After the meeting, ██'s representative emailed the presentation to over 100 members of the

JEDEC subcommittee.  Netlist, who had shared its design with ██ in discussing a potential

collaboration, sued ██ in a California court (which was subsequently settled).  Exh. A-6 as

attached to the Bennett Decl. (Complaint in Case No. 108-cv-127991).  This public disclosure to

JEDEC members in 2008, years before any alleged misappropriation by Diablo, makes it unlikely

that Netlist will be able to establish that the contents of the LRD/DXD Specifications are entitled

to trade secret protection.  *Polimaster Ltd. v. Raw Sys., Inc.*, No. 05-cv-1887, 2005 WL 2171911,

at *4 (N.D. Cal. Sept. 6, 2005) (finding protections unavailable because the alleged trade secret

was available online); *DVD Copy Control Ass'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 251

(2004) (holding that a trade secret under CUTSA must disclose information that is "valuable

because it was unknown to others").

### d.       The LRD/DXD Architecture Could be Reverse Engineered

Netlist has the burden of showing that it was misappropriation, not independent

derivation, that guided the Rush/Bolt design choices.  *Brocade Commc'ns Sys., Inc. v. A10

Networks, Inc.*, No. 10-cv-3428, 2013 WL 890126, at *10, n.119 (N.D. Cal. Jan. 10, 2013)

(internal citation omitted) (explaining that a trade secret "does not offer protection against

discovery by fair and honest means, such as by independent invention, accidental disclosure, or

by so-called reverse engineering.").  Given that the only product that embodies the LRD/DXD

Specifications, the HyperCloud, was offered for sale starting in late 2009, Exhs. A-7, A-8 as

attached to the Bennett Decl. (Netlist Press Releases), there was ample time for competitors to

independently derive the alleged "secrets" through reverse engineering before any alleged

misappropriation by Diablo.  *See* McAlexander Decl. ¶ 226.  The only evidence in the record

supports the conclusion that after the HyperCloud went on sale, any similarities in subsequently

developed products could be the result of independent derivation.  *See* McAlexander Decl. ¶ 218,

226.  Diablo's expert has consulted with teardown specialists at Chipworks, a company that has

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

reverse engineered thousands of chips, to conclude that it would have taken only six months to uncover any design details of the HyperCloud once it became available on the market. *See* McAlexander Decl. ¶ 226. Thus, it would have been possible for any company to lawfully derive the details of the LRD/DXD Specifications without any misappropriation. *See* Cal. Civ. Code § 3426.1(b) ("Reverse engineering or independent derivation alone shall not be considered improper means."); *See* McAlexander Decl. ¶ 226. Even though Diablo did not use (and had no reason to use, as discussed above) the LRD/DXD Specification in preparing the Rush/Bolt Specifications, it would have been entitled to deconstruct components made available to the public. As a result, it is unlikely that Netlist will be able to show that Diablo could not have independently derived the alleged trade secrets.

**C.    Netlist Has Not Carried its Burden in Demonstrating Any Independent Economic Value in the Alleged Benefits of its Trade Secrets**

The final element of trade secret misappropriation is a showing that the information alleged to be a trade secret has independent economic value. *Spring Design, Inc. v. Barnesandnoble.com, LLC*, No. 09-cv-05185, 2010 WL 5422556, at *4 (N.D. Cal. Dec. 27, 2010). To have independent value, a trade secret must be "sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Id.* at *4 (quoting *Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal.App.4th 547, 564 (Cal. Ct. App. 2007)). Here, Netlist has not supported its claim with evidence that the contents of the LRD/DXD Specifications are economically valuable. To the contrary, the only concrete evidence is that the Netlist products

Netlist admitted that the alleged trade secrets did not contribute to the commercial success of the ███████████████████████████████████████ In fact, in opposing a Preliminary Injunction brought against Netlist, one of Netlist's co-founders testified that ████████████████████████████████████████████████ Exh. C-30 as

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   attached to the Malackowski Decl. (Lopes Declaration in Civil Action No. 2:12-cv-2319 (E.D.

2   Cal. Nov. 30, 2012)) at ¶ 16.  And, not only do the Rush and Bolt chips not embody the

3   LRD/DXD Specifications, *see generally* McAlexander Decl. ¶¶ 115-116, 128-206, but the

4   HyperCloud was a complete commercial failure for years before the ULLtraDIMM became

5   available to customers in June 2014.  Malackowski Decl. ¶¶41-43.  The evidence compels a

6   singular conclusion: Netlist's "crown jewels" described in the LRD/DXD Specifications have no

7   independent economic value.

8         **D.     Netlist Has Not Shown Likelihood of Success on the Merits for the Allegations**
          **of Breach of Contract**

9

10               **1.     The Supply Agreement Only Contemplates Injunctive Relief Where**
                 **There is Misuse of Confidential Information**

11

12         As a threshold matter, the Supply Agreement does not support the possibility of injunctive

13   relief for breaches other than improper disclosure of confidential information.  *See* Supply

14   Agreement at 7.  To the extent Netlist may argue that any breach of the Agreement—no matter

15   how insignificant—would give rise to an extraordinary remedy, such argument would be

16   contradicted both by the plain language of section 8(d) and precedent requiring that an injunction

17   match the scope of the relief identified in the contract.  *Craigslist, Inc. v. Naturemarket, Inc.*, 694

18   F. Supp.2d 1039, 1062 (N.D. Cal. 2010) (finding that an "injunction must be narrowly tailored to

19   remedy only the specific harms shown by a plaintiff, rather than to enjoin all possible breaches of

20   the law") (citing *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)).

21         In fact, the use of permissive "may" language in section 8(d) limits the potential remedy

22   of injunctive relief to situations where there is demonstrable irreparable harm:

23         Any breach of the *restrictions contained in this Section* [Confidential Information]
           is a breach of this Agreement which *may cause irreparable harm* to the

24         nonbreaching party.  Any such breach shall entitle the nonbreaching party to
           injunctive relief in addition to all legal remedies.

25

26   (Dkt. No. 192-5 at 7) (Supply Agreement) (emphasis added).  Netlist focuses on alleged breaches

27   surrounding Diablo's development of the ████████████████████████████

28   Motion at 15, but any such breach is not worthy of an injunction since those prototype products

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1    were never offered for sale and could not have given rise to irreparable harm.[9]

2        The breach of contract arguments must rise or fall with the allegations of trade secret

3    misappropriation.  Because section 8(d) of the Agreement provides for injunctive relief only in

4    the most limited of circumstances—where the non-breaching party can establish misuse of

5    confidential information—the Court need not analyze the breach of contract allegations if the

6    Court agrees with Diablo that there is no misappropriation.  The unfair competition claims

7    similarly fall with the breach of contract claims.  *See* Motion at 18-19 (emphasizing that the

8    breach of contract claim forms the basis for allegations under section 17200).

9        **2.    Diablo Contracted to Use Its Own Know-How to Develop Subsequent**
         **Products, Including the Rush and Bolt Chips**

10

11       Before Diablo engaged with Netlist, it was already working on designs that would later be

12   incorporated in the VT-Berlinetta Specifications.  Badalone Decl. ¶¶4-7.  When Diablo began

13   working with Netlist, it continued to use and protect its own resources to overcome the technical

14   obstacles in the LRD/DXD Specifications.  For example, Diablo has at all times protected its

15   rights to use its implementation solutions.  The parties agreed that Diablo would have sole and

16   exclusive rights to "any improvement, update, modification, or additional parts" of "a silicon chip

17   set using the Netlist Technology."[10]  Supply Agreement, Section 7(a).  During and after its work

18   on the RD and ID chips, Diablo had a right to use its implementation IP so long as it physically

19   disabled load reduction, rank multiplication, or both.  Indeed, witnesses from both parties agree as

20   to the scope of Diablo's implementation rights.  *See* Exh. A-2 as attached to the Bennett Decl.

21   (Lee Dep. Tr.) at 106:22-107:10; Exh. E-1 as attached to the Paillard Decl. (Paillard Dep. Tr.) at

22   112:9-113:13; 114:6-23; 133:9-21; 137:14-138:1; 261:12-22; Exh. D-1 as attached to the

23   Badalone Decl. (Badalone Dep. Tr.) at 68:5-18; 86:14-87:4; 121:2-5; Exh. A-1 as attached to the

24   Bennett Decl. (Hong Dep. Tr.) at 109:22-110:10.  Diablo's strong intellectual property rights

25

26   _____

27   [9]  Furthermore, it is well settled that simply using a product that embodies a trade secret is not a
     misappropriation of the trade secret.  *See Silvaco*, 184 Cal.App.4th at 224.
     [10] It is undisputed that the defined term "Netlist Technology" encompasses the alleged trade
28   secrets asserted in this case.

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

under the Agreement drove its willingness to invest ████████ into developing the ████████████████████████ Badalone Decl. ¶8.

As explained in detail in Diablo's counterclaims, Diablo had every right to use the ██████ under the Supply Agreement in developing the MegaDIMM and TeraDIMM Lite prototypes because the LRD and DXD functionalities in those chips were physically disabled when those boards were manufactured.  McAlexander Decl. ¶ 210; Exh. D-1 as attached to the Badalone Decl. (Badalone Dep. Tr.) at 82:10-85:5; 198:10-201:25; 203:9-11.  In any event, the use of the ██████████████████████ would not constitute trade secret misappropriation or a breach of confidentiality provisions, the only causes of action that could provide a basis for injunctive relief.

## IV.   NETLIST HAS NOT MET ITS BURDEN IN DEMONSTRATING THAT IT WILL SUFFER IRREPARABLE HARM

### A.   Netlist Waited Almost Three Years To Move For A Preliminary Injunction

Netlist was not diligent in filing this motion.  Netlist brought this action against Diablo on August 23, 2013, (Dkt. No. 5) (Civil Action No. 8:13-cv-996 (C.D. Cal.)), waiting more than thirteen months to request injunctive relief, a delay that, on its own, is sufficient to deny the motion.  *Open Text, S.A. v. Box, Inc.*, No. 5:13-cv-4910, ---F.Supp.2d ----, 2014 WL 1389065, at *17-*18 (N.D. Cal. Apr. 9, 2014) (explaining that delay in filing for a preliminary injunction undercuts the argument for irreparable harm); *Brunnen v. Mission Ranch*, No. 97-cv-20668, 1998 WL 34032533, at *2 (Nov. 24, 1998) (plaintiff's delay of one year "demonstrates that there is not a threat of irreparable injury"); *SRI Int'l v. Acoustic Imaging Tech. Corp.*, No. 92-cv-5015, 1993 WL 356896, at *4 (N.D. Cal. Sept. 3, 1993) (internal citation omitted) (describing where a delay of even less than one year suggested there was, in fact, in irreparable injury).

Accordingly, even if the Court were to consider only the time Netlist waited *during the pendency of this lawsuit*, Netlist's lack of diligence warrants a finding of no irreparable harm.  But the delay extends far beyond the filing of this action.  Netlist's counsel, in fact, first made allegations of breach of the Supply Agreement, violation of the CUTSA, unfair competition, and claims arising under the Patent Act in a letter to Diablo's CEO dated November 28, 2011, nearly

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

1    three years prior to filing this Motion.  Exh. A-19 as attached to the Bennett Decl. (DLA Notice

2    Letter).

3          The accusations in the 2011 letter closely track the allegations contained in Netlist's

4    August 2013 complaint.  Even though HyperCloud, the only product that used the alleged trade

5    secrets, was still actively being sold at that time, Netlist decided not to seek injunctive relief.

6    Three years later, this unexplained delay cannot be overlooked.  Courts in this and other districts

7    routinely deny preliminary injunction motions under similar circumstances.  *Innospan*, 2010 WL

8    5157157, at *2 (noting that after the long delay plaintiff's "excuses are beside the point");

9    *Protech Diamond Tools, Inc. v. Liao*, No. 08-cv-3684, 2009 WL 1626587, at *6 (N.D. Cal. June

10   8, 2009) ("Courts typically decline to grant preliminary injunctions in the face of unexplained

11   delay of more than two months.") (quoting *Gidatex, S.R.L. v. Campaniello Imports, Ltd.*, 13

12   F.Supp.2d 417, 419 (S.D.N.Y. 1998)).

13         **B.      Netlist's Claims for Irreparable Harm Are Implausible**

14               **1.      Netlist Does Not Compete with Diablo's Chips or the ULLtraDIMM**

15         Netlist has not alleged or otherwise submitted any evidence that it competes with Diablo's

16   products, the Rush and Bolt chips.  The lack of competition is therefore undisputed.  By solely

17   focusing on the ULLtraDIMM, a product sold by a Diablo customer, and failing to even allege

18   that the Rush or Bolt chips are competitive products, Netlist cannot prove irreparable harm by

19   clear and convincing evidence.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694

20   F.3d 1312, 1337-38 (Fed. Cir. 2012) (assessing the undisputed lack of competition between the

21   parties and concluding that any potential loss would inflict monetary, not irreparable, harm).

22         Moreover, there is no credible evidence establishing that a customer purchasing the

23   ULLtraDIMM would consider purchasing the NVvault and this discrepancy is fatal to Netlist's

24   assertion that NVvault competes with the ULLtraDIMM in the marketplace.[11]  *See Open Text*,

---

[11]  Netlist's Motion pivots between the HyperCloud, the NVvault, and the HyperVault, but only
the NVvault is salient here.  In response to an interrogatory asking which products embodied the
alleged trade secrets, Netlist conceded that only the HyperCloud utilized the LRD/DXD
technology in the 2008 Specifications.  Exh. A-5 as attached to the Bennett Decl. (Response to
Diablo ROG No. 8).  Since Netlist admits that the NVvault *does not embody the alleged trade
secrets*, Netlist's position that products that do *not* embody the LRD/DXD concepts could give

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   2014 WL 1389065, at *15 (finding that without evidence showing actual market share and some

2   evidence showing loss of sales in the relevant market, the Court cannot determine whether the

3   parties meaningfully compete).  The only pertinent evidence compels the opposite conclusion:

4   that Diablo's customers *would not* consider Netlist as an alternative supplier.  Exh. G, Declaration

5   of Michael Lakowicz ("Lakowicz Decl.") ¶¶ 5-6.

6        Netlist does not explain how a DRAM memory device could be competitive with a Flash

7   storage device that will not work as a DRAM.  *See* Malackowski Decl. ¶¶11.  As explained by

8   Diablo's expert, these technical distinctions are crucial.  *See* McAlexander Decl. ¶¶ 227-229.

9   Netlist does not even attempt to substantiate its CEO's implausible conclusion that "[f]or every

10  ULLtraDIMM sold, there is one less potential sale of a NVvault."  Motion at 23.  To do so would

11  demand that Netlist attempt to explain away the inherent differences between volatile memory

12  solutions (DRAM) and non-volatile storage solutions (Flash).  *See* McAlexander Decl. ¶¶ 19, 67,

13  227-229 .

14       Neither Diablo nor its customers have ever considered the NVvault and the ULLtra

15  DIMM in the same competitive space.[12]  Paillard Decl. ¶ 12; Lakowicz Decl. ¶¶ 5-6.  For

16  example, Diablo's competitive research materials never reference Netlist as a potential

17  competitor.  Malackowski Decl. ¶¶36-39; Paillard Decl. ¶12; *e.g.,* Exh. E-3 as attached to the

18  Paillard Decl. (January 2014 Competitive Summary: PCIe SSDs).  Diablo instead focuses its

19  energies on vendors such as ███████████████████████ and others who supply

20  customers with Peripheral Component Interconnect Express ("PCIe") storage devices.  *See*

21  Paillard Decl. ¶¶12-14.

22            **2.     The Hong Declaration is Insufficient to Establish Irreparable Harm**

23       For the irreparable harm analysis, Netlist's sole evidence regarding the alleged

24  competition is the declaration of its CEO, Chuck Hong.[13]  Yet, Mr. Hong's statements regarding

25  rise to irreparable harm is untenable.

26  [12] The only evidence in the record is that SuperMicro chose to support *both* the NVvault and the
    ULLtraDIMM.  By supporting both products, Supermicro signals that the two products serve
27  different purposes and appeal to customers for different reasons.  *See* Hong Decl. ¶74.

    [13] Diablo objects to Mr. Hong's speculative and unsupported opinions.  (Dkt. No. 192).  In
28  particular, Mr. Hong lacks personal knowledge as to the statements he made, testifying in his

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1   Netlist's market prospects and financial performance forecasts have been subject of substantial

2   dispute over the years.  In 2007, for example, Netlist's shareholders sued Netlist and Mr. Hong

3   personally for Securities Act violations based in part on being misled regarding the Company's

4   financial outlook by Mr. Hong.  *See* Exh. A-9 as attached to the Bennett Decl. (*Belodoff v. Netlist*,

5   No. 07-cv-677 (C.D. Cal. July 3, 2007)).  Mr. Hong and Netlist agreed to pay $2.6 million dollars

6   to settle those claims.  Exh. A-11 as attached to the Bennett Decl. (2009 Netlist 10-K Form) at F-

7   30.

8         Mr. Hong made unsubstantiated statements in his declaration.  He said that it was the use

9   of the Rush and Bolt chips in the ULLtraDIMM that

10  ███████████████ Hong. Decl. ¶69.  This is contradicted by contemporaneous evidence

11  indicating that Netlist has been unable to generate profits for many years prior.  Malackowski

12  Decl. ¶¶42-45.  It is undisputed that every year since the Netlist's initial public offering has ended

13  in financial loss, and by the end of 2012, Netlist was operating at a net loss of $14 million and an

14  accumulated deficit of $86.7 million.  *E.g.*, Exh. A-14 as attached to the Bennett Decl. (2012

15  Netlist 10-K Form) at 45; *see also* Exh. A-10 as attached to the Bennett Decl. (2008 Netlist 10-K

16  Form) at 12; Exh. A-13 as attached to the Bennett Decl. (2011 Netlist 10-K Form) at 10; Exh. A-

17  15 as attached to the Bennett Decl. (2013 Netlist 10-K Form) at 11.  For example, the

18  HyperCloud product generated sales of no more than $6 million after requiring $65 million in

19  research and development costs.  Exh. A-1 as attached to the Bennett Decl. (Hong Dep. Tr.) at

20  44:2-16; 45:1-4███████████████████.  And Diablo recently

21  learned that the HyperCloud—heralded as a "breakthrough" in Netlist's Motion—████████

22  ███.  Exh. A-2 as attached to the Bennett Decl. (Lee Dep. Tr.) at 211:17-23.  The NVvault has

23  fared no better.[14] ████████████████████

24  ─────────────────────────────────────────────

25  deposition that he relied on briefings from other people to arrive at opinions expressed in the
    declaration. *See e.g.*, Hong Depo. Tr. 29:5-15; 30:10-31:13; 59:1-60:20; 77:11-79:17; 125:9-

26  129:15; 131:24-133:12; 133:13-134:22.
    [14] ████████████████████████

27  ████████████████████████████

28  ████████████████████████████
                                        Malackowski Decl. ¶42.
                                        DIABLO'S OPPO TO NETLIST'S MOTION
           FOR A PRELIM. INJUNCTION
                                        CASE NO. 4:13-CV-05962 YGR

1 ████████████████████████████████████████████████████████

2 ████████████. Exh. A-15 as attached to the Bennett Decl. (2013 Netlist 10-K Form) at 3.

3 Although Mr. Hong's declaration conveniently ignores this steady decrease in demand for the

4 NVvault, Netlist's SEC filings attribute the loss to competition from Intel, which remains a

5 competitor today. Exh. A-14 as attached to the Bennett Decl. (2012 Netlist 10-K Form) at 14;

6 Exh. A-15 as attached to the Bennett Decl. (2013 Netlist 10-K Form) at 3.

7 Where, as here, the entire foundation of the irreparable harm case rests on Mr. Hong's

8 overly optimistic projections and the omission of salient financial details, the evidence is less than

9 reliable. *American Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir.

10 1985) (rejecting a showing of injury to competition because the affidavits of interested executives

11 were "conclusory and without sufficient support in facts"); *see also Sunbelt Rentals*, 2014 WL

12 492364, at *10 ("Speculative injury does not constitute irreparable injury.").

### 3. Netlist Overreaches in Seeking Relief for Hypothetical Harm

14 Netlist has not suffered any cognizable harm for the anticipated HyperVault product,

15 either. The basic reality is that the HyperVault is nothing more than "slideware," a product

16 Netlist hopes to be able to offer at some point in the future. In the Motion, Netlist makes

17 forward-looking references to what the HyperVault *will do*, Motion at 1, but these projections are

18 mere conjecture. Mr. Hong's deposition revealed that ████████████████████████

19 ████████████████████



27

28 At this juncture, without a ████████████████████████████████████

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    ███████████████████████████  Netlist has no assurance that its hypothetical product will work,

2    let alone be sold.  There is thus no "concrete or particularized harm" warranting injunctive relief.

3    *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

4             **4.      Netlist's Litigious Business Model is the Cause of Lost Partnerships**

5             Netlist also maintains, based solely on Mr. Hong's declaration, that this litigation has

6    generated "uncertainty" causing it to lose business.  Motion at 23; Hong Decl. ¶¶81-82 (Dkt. No.

7    192).  This position is without merit for the simple reason that it is at least equally as likely that it

8    was Netlist's reputation as an IP monetization entity that has created apprehension amongst

9    Toshiba, Samsung, and others that Netlist is an untrustworthy business partner.  Indeed, it was

10   Netlist who took it upon itself to tell customers and/or suppliers about its ongoing IP dispute with

11   Diablo.  *See* Exh. A-1 as attached to the Bennett Decl. (Hong Dep. Tr.) at 133:13-134:22.

12   Netlist's subjective perceptions do not warrant the drastic remedy it seeks.  *Winter*, 129 S. Ct. at

13   375-76 ("[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is

14   inconsistent with our characterization of injunctive relief as an extraordinary remedy").

15   **V.      THE BALANCE OF THE EQUITIES TIPS SHARPLY IN FAVOR OF DIABLO**

16            **1.      Diablo Would Experience Extreme Harm if Enjoined**

17            The purpose of preliminary injunctive relief is to preserve the *status quo* and prevent

18   irreparable harm "just so long as is necessary to hold a hearing, and no longer."  *Granny Goose*

19   *Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974); *see also Brocade Commc'ns*

20   *Sys., Inc. v. A10 Networks, Inc.*, No. 10-cv-3428-PSG (N.D. Cal. Jan. 10, 2013).  The balance of

21   the equities does not justify granting a temporary injunction to Netlist when this case is set for

22   trial in July 2015, yet the requested relief would ███████████████████

23   ███████████████████████████████████████████████

24   ███████████████████████████████████

25   ███████████  Badalone Decl. ¶9.  Netlist has not acted with immediacy in bringing this Motion

26   and has not identified any circumstances that warrant imposing an injunction now rather than

27   after a full determination at trial.  The equities cannot tip in Plaintiff's favor when Netlist has not

28   shown that its likely harm in the absence of an injunction outweighs the likely harm to defendant

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1  if an injunction is issued. *Cartridge Twins, LLC v. Wildwood Franchising, Inc.*, No. 09-cv-

2  01857, 2009 WL 1690728, at *2 (June 16, 2009).

3        **2.    Netlist Failed to Show that the Injunction Would Remove the**
                 **Irreparable Harm**
4

5        The balancing of the equities further weighs against an injunction because, even if

6  granted, the preliminary injunction would not remove the purported competitive harm. In *Perfect*

7  *10, Inc. v Google*, the Ninth Circuit affirmed the district court's rejection of evidence of

8  irreparable harm because plaintiff had "not established that the requested injunction would

9  forestall [the perceived harm]." 653 F.3d 976, 981 (9th Cir. 2011); *Winter*, 555 U.S. at 19-20.

10 Here, Netlist alleges that it will "continue to suffer irreparable harm," Motion at 22, but this will

11 remain true regardless of whether an injunction is granted.

12       Netlist asserts, without any supporting evidence, that the ULLtraDIMM and the NVvault

13 are the only two players in the market. Hong Decl. ¶72. This is contradicted by the fact that

14 Netlist has identified its primary competitors to the SEC[15] and has admitted that "[t]he [server

15 memory module] market is dominated by several large manufacturers: ███████████

16 ██████████████████████████████████████████████

17 ██████████████████████████████████████████████

18 ██████████████████████████████████████████

19 ████████████████ at ¶ 16. Even if the ULLtraDIMM were enjoined, Netlist would

20 continue to endure competitive pressure from traditional competitors like ██████████

21 ██████████████████████████████████ Paillard Decl. ¶14;

22 Exh. A-16 as attached to the Bennett Decl. (FQ1 Netlist 2012 Earnings Call) at 6-7; Exh. A-11 as

23 attached to the Bennett Decl. (2009 Netlist 10-K Form) at 14; Exh. A-13 as attached to the

24 Bennett Decl. (2011 Netlist 10-K Form) at14; Exh. A-15 as attached to the Bennett Decl. (2013

25 ────────────────────
   [15]  In its SEC filings, Netlist names DRAM suppliers Samsung, Hynix, and Micron as
26 competitors. Exh. A-15 as attached to the Bennett Decl. (2013 Netlist 10-K Form) at 6-7. Netlist
   also consistently identified "memory module providers" STEC, SMART Modular Technologies,
27 Agigatech, and Viking Interworks as competitors. *Id.*; *see also* Exh. A-1 as attached to the
   Bennett Decl. (Hong Dep. Tr.) at 57:12-23 (identifying same competitors for NVvault). Netlist
28 has never listed Diablo as a competitor in its SEC filings.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1  Netlist 10-K Form) at 17 (acknowledging its competitors' capability to offer customers "products

2  with comparable or superior performance at a lower price").  Given the dominant role of these

3  other suppliers in the server memory module market, Netlist's low market share will remain

4  unchanged even if the Rush and Bolt chips were excluded, tipping the equities against granting

5  injunctive relief.  *See Perfect 10*, 653 F.3d at 982 (requiring plaintiff to show a causal nexus

6  between irreparable harm to plaintiff's business and the harm caused by defendant).

7  **VI.    THE PUBLIC INTEREST WEIGHS AGAINST AN INJUNCTION**

8          "The public interest inquiry primarily addresses [the] impact on non-parties rather than

9  parties."  *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002).  Here,

10  in addition to enjoining Diablo and its customers, Netlist seeks to disrupt an entire ecosystem of

11  persons, entities, distributors, resellers, and end-users of devices that contain Rush/Bolt chipsets.

12  Netlist's proposed injunction would not only require Diablo to provide notice to "all persons or

13  entities that have previously received, have distributed, have sold, or have used, or are presently

14  receiving, using, distributing or selling" the Rush/Bolt chipsets, but to demand a *total recall* of

15  "the Rush and Bolt integrated circuits . . . including any such Rush and Bolt integrated circuits

16  contained in or provided along with the ULLtraDIMM module, the IBM eXFlash module, or any

17  other product, and ***to return all such circuits and modules to Diablo or SanDisk***."  Netlist's

18  Proposed Order (Dkt. No. 202-1) at ¶ 2 (emphasis added).

19          This would unnecessarily disrupt the commercial well-being of countless other companies

20  and end-users that depend on such high-performance Flash memory modules for servers and

21  storage systems.  At a time when Netlist has no viable products and has, in fact, shifted its

22  business model towards monetizing its IP with Fortress Capital,[16] Netlist offers nothing in return.

23  Exh. A-5 as attached to the Bennett Decl. (Response to Diablo ROG No. 8).

24

25

---

26  [16]  *See* Exh. A-1 as attached to the Bennett Decl. (Hong Dep. Tr.) at 33:10-13; 138:5-140:11;

27  141:22-142:21; Exh. A-17 as attached to the Bennett Decl. (FQ2 Netlist 2013 Earnings Call) at 4
   ("The Fortress financing is a major step in that process…. it represents a validation of our

28  portfolio and provides us with important financial and strategic resources to execute an aggressive
   patent monetization strategy.").

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### VII.   THE SCOPE OF THE REQUESTED RELIEF IS IMPERMISSIBLY OVERBROAD

Netlist is not entitled to an injunction.  But even if it were, Netlist's proposed injunction is impermissibly overbroad.  First, "[i]njunctive relief . . .  must be tailored to remedy the *specific harm alleged.*"  *Park Village Apt. Tenants v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (italics original) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)).  Netlist's proposed injunction is worded so broadly that it would impermissibly enjoin the use of information it placed in the public domain (*see infra* III.B.2.b−c) or use of techniques that were independently derived (*see infra* III.B.2.d).  *Brocade*, 2013 WL 890126, at *10; *Sigma Chem. Co. v. Harris*, 794 F.2d 371, 375 (8th Cir. 1986).

Second, Netlist impermissibly seeks to enjoin non-parties, such as Smart Storage, SanDisk, and IBM.  *See, e.g., Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375, 1384 (Fed. Cir. 2013) ("Whether it does so expressly or not, however, a court generally may not enjoin a non-party to the action before it."); *Young v. Third & Mission Assocs., LLC*, No. 14-cv-3627, 2014 WL 4382997, at *4 (N.D. Cal. Sept. 4, 2014) (denying motion and holding that "the preliminary injunction sought is massively overbroad, seeking, *inter alia*, to enjoin a non-party . . ."); *Phelps v. Mimms*, No. 1:14-cv-251, 2014 WL 2197563, at *pin (E.D. Cal. May 23, 2014) ("[T]he Court lacks jurisdiction to issue or enforce an injunction against a non-party."); *Burgos v. Cate*, No. CIV S-09-3276-MCE-CMK-P, 2012 U.S. Dist. LEXIS 82877, at *1-2 (E.D. Cal. June 14, 2012) (adopted at 2012 U.S. Dist. LEXIS 113750) ("[T]his court has no jurisdiction to issue an order against individuals who are not parties to a suit pending before it.").  Because the Court "may not attempt to determine the rights of persons not before the court," a preliminary injunction may not issue against Smart Storage, SanDisk, or IBM.  *See Marshall*, 2008 WL 3851551, at *1.

Third, Diablo, a Canadian company, designs its Rush/Bolt chipsets in Canada, not the United States.  Diablo then manufactures/sells the chipsets in Asia.  Netlist knows this and yet Netlist wants the Court to regulate Diablo's foreign activities through a worldwide injunction. Such an untoward request to regulate a Canadian company's activities in sovereignties beyond the United States border violates international law and comity, especially where proscription is rooted

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1   in state law.  In fact, not only is "[t]here [ ] a presumption against extraterritoriality in U.S. laws,"

2   but the power to regulate matters implicating foreign relations, including international trade secret

3   protection, is exclusively vested in the federal government, not the states.  *Equal Emp't*

4   *Opportunity Comm'n v. Arabian Am. Oil Co.*, 499 U.S. 244, 261-78 (1991) ("The Supreme Court

5   has stated that U.S. law is presumed to have no extraterritorial effect unless a contrary intent of

6   Congress is found."); *Japan Line Ltd. v. Cnty. of L.A*, 441 U.S. 434, 456 (1979) ("This case

7   concerns foreign commerce.  Even a slight overlapping of tax—a problem that might be deemed

8   *de minimis* in a domestic context—assumes importance when sensitive matters of foreign

9   relations and national sovereignty are concerned.").  *Lamb-Weston, Inc. v. McCain Foods, Ltd.*,

10  the only case Netlist cites, did not address the propriety of extraterritorial application of state

11  trade secret law.  941 F.2d 970, 974 (9th Cir. 1991).  There is no evidence that Congress intended

12  injunctions to regulate extraterritorial commercial activities.

13      Fourth, Netlist's proposed injunction would require Diablo to issue a Notice of Recall

14  demanding the return all accused devices.  This would be a mandatory injunction to compel

15  performance of an act, which the courts generally disfavor absent evidence of extreme or very

16  serious damage, which is simply not present here.  *Park Village*, 636 F.3d at 1160 ("An

17  injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility

18  of some remote future injury,' or a 'conjectural or hypothetical' injury); *Transwestern Pipeline*

19  *Co. v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 550 F.3d 770, 776 (9th Cir. 2008);

20  *Marlyn Nutraceuticals. Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)

21  (quotation omitted).  Indeed, they are "not issued in doubtful cases."  *Park Village*, 636 F.3d at

22  1160; *Hynix Semiconductor Inc. v. Rambus, Inc.*, 609 F. Supp. 2d 951, 969 (N.D. Cal. Feb. 23,

23  2009) (affirming that the purpose of an injunction is not to punish).

## VIII.  CONCLUSION

25      For all of the foregoing reasons, Diablo respectfully requests the Court deny Netlist's

26  Motions for a Preliminary Injunction.

27

28

DIABLO'S OPPO TO NETLIST'S MOTION
FOR A PRELIM. INJUNCTION
CASE NO. 4:13-CV-05962 YGR

1    Dated:  October 28, 2014                        Respectfully submitted,

2                                                     McDERMOTT WILL & EMERY LLP

3                                                     By: /s/ Fabio E. Marino

4                                                         Fabio E. Marino

5                                                     Attorneys for Defendant and Counterclaim-
                                                      Plaintiff DIABLO TECHNOLOGIES, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

- 26 -                              DIABLO'S OPPO TO NETLIST'S MOTION
                                    FOR A PRELIM. INJUNCTION
                                    CASE NO. 4:13-CV-05962 YGR