UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**NETLIST, INC**,

Plaintiff,

v.

**DIABLO TECHNOLOGIES, INC.,**

Defendant.

Case No. 13-cv-05962-YGR

**ORDER GRANTING SPECIAL MOTION TO STRIKE**

Re: Dkt. No. 232

On March 21, 2014, Plaintiff Netlist, Inc.'s ("Netlist") filed its Second Amended Complaint. (Dkt. No. 146, "SAC".) Defendant, and here Counterclaimant, Diablo Technologies, Inc. ("Diablo") moved to dismiss certain claims in the SAC. The Court ordered the motion granted in part and denied in part. (Dkt. No. 183.) Thereafter, on September 24, 2014, Diablo filed its answer to the SAC and, in that same document, alleged its counterclaims. (Dkt. No. 186). The counterclaims are for: (1) breach of the Supply Agreement; and (2) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code section 17200 *et seq*. Netlist, here both Plaintiff and Counter-defendant, has filed a special motion to strike the counterclaims of Diablo pursuant to California Code of Civil Procedure Section 425.16. (Dkt. No. 232.)

Having considered the papers submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby **GRANTS** the motion.[1] Netlist has shown that Diablo's counterclaims arise from protected speech, specifically Netlist's SAC. Diablo has failed to meet its evidentiary burden to show a probability of prevailing on the merits of its counterclaims.

---

[1] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument. Accordingly, the Court **VACATES** the hearing set for **January 13, 2015**.

## I. BACKGROUND

In early 2008, Diablo and Netlist began discussing Netlist's desire to implement its DxD/LRD Specifications in silicon. (Counterclaims at ¶ 121.) On September 10, 2008, Diablo and Netlist entered into a Development and Supply Agreement ("Supply Agreement"), and the agreement set forth the Diablo's commitment to implement the Netlist Technology, as defined therein, as well as setting forth the parties' respective intellectual properties rights growing out of the relationship. (*Id.* ¶¶ 116, 120; SAC, Dkt. No. 146 at Exh. 2 [Supply Agreement].)

A dispute subsequently arose between the parties, which was resolved by a Settlement Agreement and Amendment to the Development and Supply Agreement ("Settlement Agreement") dated January 12, 2010. (Counterclaims, ¶ 145, Exh. B.) Pursuant to the Settlement Agreement, Netlist agreed to purchase 100,000 chipsets from Diablo. (Counterclaims, ¶ 146; Exh. B at § 10.) And, as part of the Settlement Agreement, Diablo specifically released Netlist from liability resulting from any disclosure of Diablo's confidential information and from any prior improper use of Diablo intellectual property:

> Diablo hereby fully releases and forever discharges Netlist . . . from any and all claims, causes of action, debts, liabilities, rights to damages, collection, reimbursement, costs, expenses, attorneys' fees, and rights to injunctive relief, known or unknown, relating to any alleged breach of [the Supply Agreement], by such party prior to the Amendment Effective Date, including but not limited to any allegation by Diablo that Netlist made improper use of any Diablo Confidential Information or any other technology encompassed within Diablo's Intellectual Property Rights.

(Settlement Agreement at § 2(i).) The Settlement Agreement also included a covenant not to sue:

> Diablo further covenants and agrees that it will not assert any claim or take any action against Netlist . . . now or in the future, based on Netlist's marketing or sale of products that utilize chips procured from companies other than Diablo, only with respect to the following claims: 1) any claim that Netlist or any customer or business partner of Netlist is using any Confidential Information of Diablo, provided that Netlist and Netlist's customers and business partners undertake reasonable precautions to maintain the confidentiality of Diablo's Confidential Information; 2) any claim for patent infringement based on an invention arising as a consequence of work performed under this Agreement; or 3) that

> Netlist or its customers or business partners are otherwise using technology developed by Diablo as a consequence of worked[sic] performed under [the Supply Agreement]. Diablo hereby expressly waives and releases any rights it may have at law or in equity to take any legal action or other action as described in this paragraph against Netlist, its customers or its business partners. . . .

(Settlement Agreement at § 2(ii).)

Netlist alleged its original claims for misappropriation of trade secrets and breach of contract herein against Diablo on August 23, 2013. (Dkt. No. 5, First Amended Complaint.) Netlist amended those allegations in its March 21, 2014 SAC. In its Counterclaims, Diablo alleges that "Netlist's filing of the SAC on March 21, 2014 breached the terms of the Supply Agreement in overstating the scope of the technology it had rights in." (Counterclaims ¶149.) Diablo describes its Counterclaims as "an action about baseless claims brought by Netlist against Diablo's Memory Channel Storage ('MCS') technology which was developed independently from the Netlist HyperCloud memory module." (Counterclaims at ¶ 111.) The allegations in the Counterclaims fall under three general headings: (1) unauthorized use of Diablo's technology by Netlist (Counterclaims at ¶ 139); (2) disclosure of Diablo's technology by Netlist to third parties, by which Netlist "re-packaged Diablo's design and used [a] third party design services and manufacturing provider for back end production," in breach of the Supply Agreement (*id.*, ¶¶ 143, 144); and (3) interference with Diablo's customers and potential customers by filing the SAC and making statements about the litigation to Diablo's customers and potential business partners (*id.*, ¶¶ 155-57).

## II.  ANALYSIS

Netlist brings this motion seeking to strike the counterclaims under section 425.16 of the California Code of Civil Procedure. Netlist argues that Diablo has based its counterclaims on constitutionally protected speech, specifically the allegations of the SAC, and that the counterclaims are subject to a special motion to strike pursuant to California Code of Civil Procedure Section 425.16. Diablo alleges three purported breaches of the Supply Agreement: (i) unauthorized use of Diablo's technology; (ii) disclosure of Diablo confidential information to a third-party; and (iii) interference with Diablo's customers and potential business partners by

3

alleging facts contrary to the SAC.  (Counterclaims at ¶¶ 129-154.)  Of the three alleged bases for the breach of contract claim, Netlist argues that the first two were expressly released by the parties' Settlement Agreement (attached to Diablo's counterclaims as Exhibit B) and the last (filing of the SAC itself) is barred by the litigation privilege pursuant to California Civil Code Section 47.  Netlist further contends that the UCL claim, which relies on the same allegations, fails for the same reason.

California enacted section 425.16 to curtail "strategic lawsuits against public participation," known as "SLAPP" actions, finding "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances."  Cal.Civ.Proc.Code § 425.16(a).  This Court, sitting in diversity, follows the California courts' two-step process for analyzing an anti-SLAPP motion.  *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010).

On the first prong, the moving party must make "a threshold showing ... that the act or acts of which the plaintiff complains were taken 'in furtherance of the right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute."  *Equilon Enters., LLC v. Consumer Cause, Inc.,* 29 Cal.4th 53, 67 (2002) (quoting Cal. Code Civ. Proc. § 425.16(b)(1)).  The moving party does so by showing that an act underlying the claims to be stricken fits one of the categories spelled out in section 425.16(e). *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002) (citing *Braun v. Chronicle Publishing Co.*, 52 Cal.App.4th 1036, 1043 (1997).)

"[I]t is the *principal thrust* or *gravamen* of the...action that determines whether the anti-SLAPP statute applies."  *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181, 188 (2003) (emphasis in original).  If a claim is based on both protected and unprotected activity, it is subject to striking under section 425.16 unless the protected conduct is "merely incidental" to the unprotected conduct.  *Graham-Sult v. Clainos*, 756 F.3d 724, 735 (9th Cir. 2014) (*quoting Wallace v. McCubbin*, 196 Cal.App.4th 1169, 1187 (2011).)

Once the moving party has met its burden on the first prong, the burden shifts to the complainant to show that there is a probability of prevailing on its claims.  *Navellier,* 29 Cal.4th at

4

88.   The statute focuses not on the form of the plaintiff's claim, but the underlying nature of the defendant's activity giving rise to the asserted liability. *Tuchscher Dev. Enters., Inc. v. San Diego Unified Port Dist.*, 106 Cal. App. 4th 1219, 1232 (2003).

### A.  Protected Activity

Here, the Court looks first to whether Netlist has established that Diablo's claims arise from protected speech or petitioning activity. To put it simply, any statement made in a complaint filed with a court would fall squarely within the purview of "petitioning activity." If this were not plain enough, section 425.16(e) specifies activities that fall within the meaning of the phrase "act in furtherance of a person's right of petition or free speech" to include:

> "any written or oral statement or writing made before a … judicial proceeding…, any written or oral statement or writing made in connection with an issue under consideration or review by a…judicial body…."

Cal. Civ. Proc. Code § 425.16(e); ); *see also Dove Audio, Inc. v. Rosenfeld, Meyer & Susman,* 47 Cal.App.4th 777, 784 (1996) (under section 425.16, "'[t]he constitutional right to petition...includes the basic act of filing litigation or otherwise seeking administrative action'") (quoting *Ludwig v. Superior Court,* 37 Cal.App.4th 8, 19 (1995) [Civil Code § 47]). In addition to communication in the litigation, communications related to, preparatory to, or in anticipation of litigation, are protected speech for purposes of section 425.16. *See Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (1999).

Here, Diablo expressly premises its Counterclaims on the allegations in Netlist's SAC. (*See* Counterclaims, ¶¶ 113, 114, 148, 149-54, 155, 157.) The gravamen of Diablo's Counterclaims is that Netlist should not have alleged what it alleged in the SAC. Diablo alleges that Netlist has "overstated" the technology it retained under the Supply Agreement, and has thereby violated the Supply Agreement, citing specific paragraphs of the Second Amended Complaint as the source of those overstatements. (Counterclaims ¶¶ 150, 151.) Diablo further alleges: (1) a breach of the Supply Agreement based on Netlist's inclusion of certain statements in its Trade Secret Disclosure in this action (*id.*, ¶¶ 152, 153); and (2) interference with Diablo's customer relationships based upon Netlist's "filing the instant lawsuit and through its dealings

5

1    with other original equipment manufacturers within the industry." (*Id.*, ¶ 155.) Finally, Diablo

2    alleges that it expects to prove "Netlist's claims are not based in fact and that Netlist's decision to

3    litigate this case was a calculated effort to influence the dynamics of ongoing and future customer

4    relationships." (*Id.*, ¶ 157.) In sum, all of Diablo's counterclaims hinge on the filing of the

5    litigation, documents filed in the litigation, and Netlist's communication to others that the

6    litigation is pending.

7    Diablo's argument that the Counterclaims are not based on the filing of the SAC itself, but

8    on the statements therein and the dissemination of information about the lawsuit to Diablo's

9    potential business partners is a distinction without a difference. Statements made "*in connection

10   with*" litigation are covered as protected conduct under section 425.16, even if they are made to

11   third parties and not directly in the litigation itself. *Neville v. Chudacoff*, 160 Cal. App. 4th 1255,

12   1263 (2008). The principal thrust of the allegations in the Counterclaims is communications in

13   and about the underlying Second Amended Complaint. Netlist has met its burden on the first

14   prong of the anti-SLAPP motion standard.

15   **B.     Probability of Prevailing**

16   Turning to the second prong, Diablo must put forward evidence to show that it is likely to

17   prevail on its Counterclaims in order to avoid dismissal. The standard on the second prong

18   requires that Diablo state a legally sufficient claim and support that claim with a sufficient prima

19   facie evidentiary showing to sustain a favorable judgment. *See Nygard, Inc. v. Uusi-Kerttula*, 159

20   Cal. App. 4th 1027, 1044 (2008). The standard applied for an anti-SLAPP motion—probability of

21   prevailing on the merits—presents a higher burden than the plausibility standard applied for a

22   motion to dismiss. If Diablo cannot plead a plausible cause of action, then it cannot meet the

23   probability of success on the merits standard as a matter of law. *Hilton*, 599 F.3d at 902 (finding

24   that a defendant who was unsuccessful on a motion to dismiss could still prevail on the anti-

25   SLAPP motion to strike because the plaintiff may state "a legal claim" but may not have "facts to

26   support it").

27   Again, the allegations in the counterclaims fall under three general headings: (1)

28   unauthorized use of Diablo's technology (Counterclaims at ¶ 139); (2) unauthorized disclosure to

third parties (*id.*, ¶¶ 143, 144); and (3) interference with Diablo's customers and potential customers by filing the SAC and making statements about the litigation to Diablo's customers and potential business partners (*id.*, ¶¶ 155-57). However, Netlist's argument that the unauthorized use and disclosure allegations are all precluded by the 2010 Settlement Agreement between the parties went unanswered in Diablo's opposition.[2] The Court takes Diablo's lack of opposition to concede that claims based upon the alleged unauthorized use and disclosure of Diablo's technology (Counterclaims at ¶¶ 139-144) do not form the basis for its breach of contract or UCL Counterclaims. Moreover, based Diablo's own allegations, Netlist's alleged provision of Diablo's technology to a third party occurred prior to the Settlement Agreement, and therefore was the subject of the release. (Counterclaims ¶ 147 ["Diablo… by this point in time, had become aware that Netlist was commissioning the third party provider to manufacture products based on Diablo's patented and trade secret protected technology"].) It is the allegations of interference that form the gravamen of the counterclaims.

Both the allegations of the Counterclaims and the evidence offered by Diablo in opposition to the motion demonstrate that they are barred by the litigation privilege stated in California Civil Code section 47. Section 47 provides absolute immunity from claims based upon "publications" made as part of a judicial proceeding. Cal. Civ. C. § 47(b). "The 'principal purpose' of the litigation privilege 'is to afford litigants and witnesses…the utmost freedom of access to the courts without fear of being harassed subsequently by derivative'" claims. *Wentland v. Wass*, 126 Cal. App. 4th 1484, 1492 (2005) (quoting *Silberg v. Anderson,* 50 Cal.3d 205, 213 (1990)) (litigation privilege applies to breach of contract claim if such application furthers the policies underlying the privilege); *see also Feldman v. 1100 Park Lane Associates*, 160 Cal. App. 4th 1467, 1486 (2008) (section 47 has been held to apply to claims of interference with contract and unfair competition) (citing cases). The litigation privilege has been interpreted broadly by the California courts, and

---

[2] Diablo responds only briefly to say that "Netlist's *interfering* activities…primarily occurred over the course of the past year" and therefore were not subject to the release in the Settlement Agreement. (Oppo. at 12:22-13:1, emphasis supplied.) The only "interfering" activities that Diablo offers in evidence occurring in "the past year" are the filing of the SAC and other companies' reactions to that filing. Diablo does not directly address the issue of unauthorized use or disclosure by Netlist in its opposition to the instant motion.

applies to any communication made in connection with judicial proceedings.  *Feldman v. 1100 Park Lane Associates*, 160 Cal. App. 4th 1467, 1485 (2008).

That the claims are barred by the litigation privilege is underscored by the evidence Diablo offers here.  To meet its evidentiary burden, Diablo submits the declarations of Riccardo Badalone, Chief Executive Officer of Diablo, and Cedric Paillard, Vice President of Business Development.  Badalone declares that Netlist has engaged in a "smear campaign" and has made misrepresentations about Diablo's technology, leading to lost or delayed opportunities with certain potential partners.  (Supp. Badalone Dec. ¶¶ 5-7.)  Badalone avers that other companies have indicated that they were concerned about the allegations Netlist made in the lawsuit and told Badalone "it was good to see" Diablo making counterclaims against Netlist.  (*Id.* at ¶ 10.)  Paillard avers that the counterclaims are not based on the filing of the SAC, but that the SAC was "a triggering event that left Diablo with no practical options other than to litigate and correct the public record."  (Supp. Paillard Dec. ¶ 7.)  Paillard declares that Netlist's public misrepresentations have imposed burdens on Diablo to "comba[t] the effects of Netlist's interference when they would rather be focusing on their core business."  (Supp. Paillard Dec. ¶ 15.)

The evidence offered by Diablo does no more than indicate that Netlist has communicated to others about the allegations in the SAC.  Statements to third parties about the litigation are privileged under section 47.  To be privileged under section 47, a statement must be "reasonably relevant" to pending or contemplated litigation.  *Neville v. Chudacoff*, 160 Cal. App. 4th 1255, 1266 (2008).  In *Neville*, the court determined that letters sent by an employer to a former employee's customers, accusing the employee of breach of contract and misappropriation of trade secrets, was covered by the litigation privilege because it directly related to the claims the employer intended to bring in litigation.  *Id.* at 1266-70.  The evidence offered by Diablo to indicates that the "smear campaign" and "misrepresentations" were nothing more than privileged statements about the allegations in the SAC.

In sum, Diablo has failed to meet its burden to show that it is likely to prevail on its Counterclaims since the allegations and the evidence establish that the claims are barred by the

litigation privilege.

### III. CONCLUSION

For the foregoing reasons, Netlist's Special Motion to Strike pursuant to section 425.16 is **GRANTED**. Accordingly, Diablo's counterclaims are hereby **STRICKEN**. Netlist is entitled to mandatory and reasonable attorneys' fees and costs pursuant to California Code of Civil Procedure Section 425.16(c). *See Vargas v. City of Salinas,* 200 Cal.App.4th 1331, 1340 (2011) (an award of attorneys' fees to a prevailing defendant on a SLAPP motion is mandatory).

The parties are directed to meet and confer on the amount of attorneys' fees and costs. No later than **January 30, 2015**, the parties shall file a joint statement concerning the attorneys' fees and costs at issue which either: (1) states the stipulated amount to which the parties have agreed; or (2) sets forth a stipulated briefing schedule for a motion to determine the attorneys' fees and costs.

This terminates Docket No. 232.

**IT IS SO ORDERED**.

Date: January 12, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**