UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NETLIST, INC.,**<br><br>　　　Plaintiff,<br><br>　　vs.<br><br>**DIABLO TECHNOLOGIES, INC.,**<br><br>　　　Defendant. | Case No.: 13-cv-5962 YGR<br><br>**ORDER REGARDING PROFFERS AND EXTRINSIC EVIDENCE RELATED TO CONTRACT INTERPRETATION** |

On January 26, 2015, Diablo Technologies, Inc. ("Diablo") submitted its Motions In Limine to Exclude Certain Evidence and Testimony (Dkt. No. 303-9). Diablo's second motion in limine (MIL No. 2) sought to exclude: "(1) Netlist's current interpretation of the Supply Agreement; (2) post-contract emails confirming Netlist's alleged understanding of the Supply Agreement; and (3) Chuck Hong's (or any other Netlist witness) testimony that Netlist's interpretation of the Supply Agreement conforms to the industry standard for supply agreements." (*Id.* at 6.) Diablo contends that each of these categories of evidence is inadmissible extrinsic evidence.

In the course of oral argument on the proper scope of extrinsic evidence to be admitted, the Court inquired of the parties as to which terms, if any, in the contract at issue they contend are ambiguous or the proper subject of extrinsic evidence as to their meaning. The parties have now submitted proffers and responses and the Court has heard additional argument. Diablo has identified five terms as ambiguous and the proper subject of extrinsic evidence, and Netlist, while maintaining that the Supply Agreement is not ambiguous, identified one provision as a possible subject of extrinsic evidence.

The Court has carefully reviewed the parties' submissions and re-reviewed the language of the Supply Agreement in light of the parties' arguments. The Court finds that Diablo's proffers do not establish that the identified terms of the Supply Agreement are reasonably susceptible of the meanings Diablo asserts. Consequently, their meanings are not the proper subject of extrinsic evidence.

In light of Netlist's position in its proffer, and the Court's determination that no party has identified any terms the Court considers ambiguous, the Court **ORDERS** that neither party may offer extrinsic evidence as to the meaning or proper interpretation of the Supply Agreement. While the parties may offer evidence on whether the terms of the agreement were performed or breached, evidence offered solely for purposes of defining the terms therein will not be permitted.

Finally, based on the foregoing, the Court **ORDERS** that Diablo's MIL No. 2 is **DENIED AS MOOT**. The Court's reasoning follows:

**I.    APPLICABLE LEGAL PRINCIPLES**

Under California law, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968). If a contract is "reasonably susceptible" to the meaning claimed, any relevant evidence may be offered so that "the Judge be placed in the position of those whose language [s]he is to interpret." Cal. Civ. Pro. Code § 1860.

The Court engages in a two-step process to determine whether to admit extrinsic evidence. First, the court "provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' *i.e.*, whether the language is 'reasonably susceptible' to the interpretation urged by a party." *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992). "If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract." *Id.*; *see also Pacific Gas & Elec. Co.*, 69 Cal. 2d at 40 ("If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is

2

fairly susceptible of either one of the two interpretations contended for…' extrinsic evidence relevant to prove either of such meanings is admissible."); *see also F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010). In other words, evidence is only admissible for contract interpretation purposes to the extent it is relevant to proving a meaning to which the disputed provision is reasonably susceptible. *Skilstaff, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012); *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 39-40 (1968).

Further, in contracts between two parties within an industry, "particular expressions may, by trade usage, acquire a different meaning in reference to the subject matter of a contract…and parol evidence is admissible to establish the trade usage even though the words in their ordinary or legal meaning are entirely unambiguous. *Hayter Trucking, Inc. v. Shell W. E&P, Inc.*, 18 Cal. App. 4th 1, 15 (1993).

Where the interpretation of contractual language turns on a question of the credibility of *conflicting* extrinsic evidence, interpretation of the language is not solely a judicial function…it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of a contract. *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912-13 (1998). "The court must settle the proper interpretation of a contract as a matter of law even when conflicting inferences can be drawn from undisputed extrinsic evidence, or where that extrinsic evidence renders the contract language susceptible to more than one reasonable interpretation." *F.B.T. Productions, LLC v. Aftermath Records*, 827 F.Supp.2d 1092, 1102 (C.D. Cal. 2011). It is only where there is a conflict in the admissible and relevant extrinsic evidence that a "jury must resolve the factual conflict." *Id.* When there is a conflict in the extrinsic evidence, the California courts have suggested that the proper procedure would be for the trial court to require the jury to make special findings on the disputed subjects of extrinsic evidence, and then base its interpretation of the contract on those findings. *Id.* citing *Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc.*, 176 Cal. App. 3d 886, 892, n. 4 (1986).

Here, the Court is at the first step of the process: looking to the proffered evidence to determine whether there is any ambiguity in the contract language such that the contract is reasonably susceptible to the interpretation urged by the proffering party.

## II. THE PARTIES' PROFFERS

Netlist argues that the Supply Agreement is clear, but that Section 7(a) might potentially be susceptible of more than one meaning if read in isolation. Section 7(a) reads:

> (a) Diablo. All rights, title and interest in and to the design and development of the Diablo Standard Register and Diablo's Implementation of the Netlist Chipset; and any improvement, update, modification or additional parts thereof, and all of Diablo's Intellectual Property Rights embodied in the Diablo Standard Register, shall at all times remain the sole and exclusive property of Diablo. For purposes of this Agreement, "Implementation" shall mean the development of a silicon chip set using the Netlist Technology (including without limitation the packaging) which will meet Netlist's Architecture requirements.

(Supply Agreement §7(a).) Essentially, Netlist offers an argument that, if the Court were to find some ambiguity in section 7(a), pre-contractual negotiation evidence and post-contractual evidence arising when Diablo sought to renegotiate the agreement, along with proposed testimony about the negotiations and common industry practice, show what the parties meant in Section 7's division of their respective intellectual property rights. It is this evidence that is the subject of Diablo's MIL No. 2.

Diablo's proffer identifies several terms it contends are ambiguous and the proper subject of extrinsic evidence in order to determine their meaning:

> (1) "database design technology" from the definition of "Netlist Technology" in section 1 of the Supply Agreement;
> (2) "with DxD/LRD physically enabled" from the definition of "Netlist Chipset" in section 1;
> (3) "DDR3 industry standard register derivative of Netlist Chipset with either or both of DxD/LRD functionality physically disabled" from the definition of "Diablo Standard Register" in section 1;
> (4) "system architecture," which appears in section 7(b), the "Intellectual Property Rights, Netlist" provision; and
> (5) "competitive to" from section 8 concerning Confidential Information.

Though the terms Diablo identifies appear in other sections of the Supply Agreement, all but Term 5 bear on the meaning of the one provision identified by Netlist, section 7(a), as indicated by the bolded terms that follow:

> (a) Diablo. All rights, title and interest in and to the design and development of the Diablo Standard Register and Diablo's Implementation of the **Netlist Chipset *[Term 2]***; and any improvement, update, modification or additional parts thereof, and all of Diablo's Intellectual Property Rights embodied in the **Diablo Standard Register *[Term 3]***, shall at all times remain the sole and exclusive property of Diablo.  For purposes of this Agreement, "Implementation" shall mean the development of a silicon chip set using the **Netlist Technology *[Term 1]*** (including without limitation the packaging) which will meet Netlist's **Architecture *[Term 4]*** requirements.

(Supply Agreement §7(a), emphasis and cross-reference supplied.)  Thus, the Court looks first to the potential ambiguity of the terms identified by Diablo, and then turns to the question of whether section 7(a) is reasonably susceptible to more than one meaning before determining whether the extrinsic evidence proffered by Netlist should be excluded.

## II.    DOCUMENTS AND POTENTIAL TESTIMONY IDENTIFIED BY DIABLO IN ITS PROFFER

### A.    Term 1: "database design technology"

The term "database design technology" appears in the "Definitions" section of the Supply Agreement and is used to describe the meaning of the term "Netlist Technology."  It reads:

> "Netlist Technology" shall mean Netlist's patented and trade secret-protected Rank Multiplication/Load Rank Multiplication technology ("DxD/LRD"), including without limitation its "know-how" and **database design technology**, developed prior to the Effective Date and provided to Diablo.

(Supply Agreement §1, term at issue bolded.)

Diablo proposes that the term should mean "electronic circuit design files."  To support its construction, Diablo proffers (i) the testimony of its Vice President of Business Development, Cedric Paillard, to the effect that the parties understood the term to have this meaning, and (ii) the Statement of Work ("SOW") attached to the Supply Agreement, which states that Netlist would be providing the "existing reference design database" to Diablo to complete its implementation.  Further, Diablo proposes that Paillard testify that he never received "database design technology" and only "the rank

multiplication and the load reduction was delivered to Diablo." (Diablo Proffer, Dkt. No. 369, at 3:8-13 [C. Paillard Depo. at 95:16-23].)

The Court finds that Diablo's proffer fails to demonstrate that the term "database design technology" is reasonably susceptible of the narrow meaning it seeks to impose. Read in the context of the Supply Agreement, the "database design technology" appears to be one example (*i.e.*, "including without limitation") of Netlist's "patented and trade secret-protected Rank Multiplication /Load Rank Multiplication technology." (Supply Agreement §1.) Whatever relevance Paillard's testimony might have to issues of Netlist's performance, it does not bear on the meaning of this contract term. Further, testimony that is offered purely to establish one party's unexpressed subjective understanding of a term's meaning is inadmissible for purposes of contract interpretation. *Winet,* 4 Cal.App.4th at 1165-67.

The proffer does not establish that the term is reasonably susceptible of a different meaning. The Court finds that extrinsic evidence on the meaning of this term is not admissible.

### B. Term 2: "with DxD/LRD physically enabled"

This term appears in section 1 of the Supply Agreement as the contract's definition of "Netlist Chipset." That section reads:

> "a DDR3 proprietary chip set solution consisting of a DDR3 standard register **(with DxD/LRD physically enabled)** and [a] set of isolation devices utilizing the Netlist Technology for use in Netlist RDIMM products implemented in OEM server systems developed under this Agreement in accordance with the Specification"

(Supply Agreement §1, term at issue bolded.)

Diablo contends that the term "with DxD/LRD physically enabled" means "capable of actually performing both DxD and LRD functionalities." Diablo argues that: (i) documentary evidence will show that DxD and LRD are two separate functions and this provision refers to them as a single package, *i.e.* "DxD/LRD;" (ii) Netlist witness Jim Perrott will testify that "physically enabled" means "functional," leading to the conclusion that the Netlist Chipset must be able to perform both functionalities. Diablo also offers various dictionary definitions of the meaning of "enabled" and "enable."

Nothing about Diablo's proffer indicates that the term "with DxD/LRD physically enabled" is ambiguous. The testimony of Perrott cited by Diablo makes clear that he was offering his own interpretation of the meaning of a different but related term, "physically disabled":

> Q. Okay. What was your understanding as to what "physically disabled" means, same clause?
> A. *I would just be interpreting it.*
> Q. Please.
> A. It's either enabled or disabled. Functional or not functional.

(Diablo Proffer at 4:6-8, citing J. Perrott Depo. Tr. at 81:13-18, emphasis supplied.)

The parties apparently agree, as stated on the record at the hearing, that the word "physically" means that there is an actual, *physical* (not merely functional) aspect required to "enable" the DxD/LRD functionality. Diablo's proposed construction—"capable of actually performing both DxD and LRD functionalities"—ignores the word "physically." Thus, the construction Diablo offers creates more ambiguity than it dispels. Consequently, the Court will not admit extrinsic evidence on the meaning of "with DxD/LRD physically enabled."

### C. Term 3: "DDR3 industry standard register derivative of Netlist Chipset with either or both of DxD/LRD functionality physically disabled"

The next term Diablo identifies is the entire definition in the contract of "Diablo Standard Register" or "Register" which reads:

> 'Diablo Standard Register' or 'Register' shall mean a **DDR3 industry standard register derivative of Netlist Chipset with either or both of DxD/LRD functionality physically disabled**.

(Supply Agreement §1, phrase at issue bolded.) Here, Diablo argues that the provision should be construed to mean "A chip or chipset containing: (1) an RD incapable of performing DxD; and/or (2) a set of IDs incapable of performing LRD." Diablo argues that its proposed construction is supported by documentary and testimonial evidence, in addition to the ordinary meaning of "derivative." "DxD" and "LRD" refer to two separate functions: rank multiplication and load reduction, respectively. Diablo argues that "when either of them is functionally disabled and thus incapable of performing their designed functionality, then, consequently, the chipset is *physically* incapable of performing both DxD/LRD functionalities together." (Proffer at 6:2-5, emphasis

supplied.)  Diablo further argues that the words "derivative of the Netlist Chipset" supports an interpretation of the Diablo Standard Register as "having an RD chip *and/or an ID chip*."  In support of this interpretation of the contract provision, Diablo cites (i) dictionary definitions of "derivative," (ii) provisions of the Copyright Act, 17 U.S.C. Code section 101 concerning "derivative work," and (iii) anticipated testimony of Paillard to the effect that Netlist agreed that Diablo could use both the RD and ID chips to demonstrate its expertise in implementing the DxD/LRD functionalities to future customers.

The dictionary and statutory definitions do not aid Diablo here.  Having re-reviewed the actual language of the Supply Agreement, the argument that the Diablo Standard Register (a "DDR3 Standard register") is "derivative" of the Netlist Chipset (which contains both RD and ID chips), does not lead logically to the conclusion that Diablo Standard Register could contain both chips.

With respect to Paillard's testimony, Diablo's permission to use RD and ID to "demonstrate" the DxD/LRD functionality is apparently in dispute.  Moreover, even if it were not, the ability to demonstrate the work Diablo performed under the Supply Agreement to a potential customer does not support Diablo's construction of "Diablo Standard Register" or evidence Diablo's ownership of the intellectual property rights to a "chipset" [or standard register] with both RD and ID components.

Finally, the very testimony Diablo cites in its proffer indicates that the RD chip is synonymous with the "register" component of the Netlist Chipset.  (*See* Diablo Proffer at 5:19-27.)[1] The language of the Supply Agreement limits the Diablo Standard Register to the "register" portion of the Netlist Chipset, and does not mention the "set of isolation devices" or ID chip portion of the Netlist Chipset defined in section 1.  Thus, read in the context of the other contract terms and the proffered testimony, the definition Diablo offers is not supported by the evidence.  In short, Diablo's

---

[1] The Diablo Proffer at 5:19-27 reads: "M. Martinez Depo. at 123:12-23 [Q: Can you define what ID stands for in this context? A: The ID stands for the iSwitch and the ASIC stands for the – the register or the logic that goes onto the register that supports DxD. Q: Okay. So in terms of the proper nomenclature, ASIC is the register – is the register. And that's the DxD? A: Yes. Q: Okay. And then the ID is the iSwitch and that's the LRD? A: Yes.); *id.* at 207:10-13 (Q: Okay. And the ID, again, was the iSwitch or the LRD, right? A: Yes.); *id.* at 208:2-19 (Q: Okay. And then what about the LRD function? A: Well, the LRD function is the buffers, the LRD . . . the iSwitches. Q: Which is the ID? A: Right…Q: Are there any other functions it could do besides buffering? A: Oh, yeah. I mean, Dr. Lee is more the expert on this, but … there's a lot of functions to the – to the buffer.)."

proffer does not show that the provision at issue is reasonably susceptible to the interpretation it urges.

### D.     Term 4: "system architecture"

The next term identified by Diablo is "system architecture," which appears in section 7(b) of the Supply Agreement:

> (b) Netlist. All rights, title and interest in and to the design and development of the underlying Architecture of the Netlist Chipset, the Netlist Technology and all Intellectual Property Rights embodied in the Netlist Technology, any improvement, update, modification or additional parts thereof, shall at all times remain the sole and exclusive property of Netlist.  For purposes of this Agreement, "Architecture" shall mean **system architecture** with regard to Load Reduction and Rank Multiplication modules and DIMM topology.

(Supply Agreement §7(b), term at issue bolded.)

Diablo contends that "system architecture" should be read to mean "the way in which the parts of a system are organized."  Diablo proffers the testimony of Diablo witnesses Paillard and Amer that the parties understood "system architecture" to be the two documents Netlist provided to Diablo by email on April 12, 2008, as well as the Netlist power point presentation made on or about April 22, 2008, which provided the initial proposal for the organization of SDRAMs, Isolation Devices, and ASIC of the chipset, and used block diagram organizations to illustrate the system architecture of the chipset. (Diablo Proffer at 8:10-21, citing Trial Exh. 026 and 028 [specification for the ID and RD], 032 [Netlist presentation re: specifications and additional know-how].)  Diablo also proffers unspecified "drafting history of the Agreement" it contends will show that "system architecture" means the organization of the parts of the chipset whereas "implementation" relates to how the parts or components of the system are implemented in circuits, as well as a dictionary definition of "architecture."

First, the latter part of the proffer is too vague and circular to be meaningful.  Diablo asserts, summarily, that there is some evidence that supports the parties' agreement that there was distinction between organization and implementation, without more.  Diablo, in an attempt to contrast "organization" with "implementation," defines "implementation" as "how [parts] are implemented."

1 The remainder of the proffer is nothing more than an indication that three proposed trial
2 exhibits will establish the details of the "system architecture."  The proffer of evidence does not
3 suggest that the term "system architecture" requires the construction Diablo offers.

**E.  Term 5: "competitive to"**

This term appears in Section 8(a) of the Supply Agreement regarding "Nondisclosure and Nonuse" of the other party's Confidential Information, which states, in part:

> "For purposes of clarification, the Netlist Technology is the Confidential Information of Netlist and may not be used for any purpose other than as set forth in this Agreement, including without limitation use of such Netlist Technology to develop a chip **competitive to** the Netlist Chipset."

(Supply Agreement §8(a), term at issue bolded.)

Diablo contends the term "competitive to" should be construed to mean "a market substitute for."  Diablo again proffers the testimony of Paillard to the effect that he sought the ability to demonstrate Diablo's expertise in implementing the DxD/LRD functionalities in both the RD and ID chips to future customers, and Netlist agreed "with the caveat that Diablo was not allowed to sell a chipset that performed DxD/LRD functionalities to Netlist's competitors, which would compete with the Netlist Chipset." (Diablo Proffer at 9:18-19.)  Diablo contends that Paillard will also testify that Netlist was amenable to Diablo developing "a chipset derived from the Netlist Chipset so long as DxD/LRD functionalities were physically disabled."  (*Id.* at 9:20-22.)  Diablo also intends to offer the testimony of Diablo expert Paul Tiech that "complementary products" do not compete.

In addition, Diablo cites the recent *O'Bannon* decision for the proposition that, in determining competition for purposes of antitrust law, the product market is the "pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 986 (N.D. Cal. 2014) (citing to *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001)).

Nothing in Diablo's proffer suggests that "competitive to" is susceptible of different meanings such that the Court must interpret it in order for the jury to be able to determine if this provision is breached.  To the contrary, the evidence concerns the legal question of whether certain

products or actions were "competitive to" the Netlist Chipset, not the meaning of the words "competitive to."

**CONCLUSION**

None of the evidence proffered by Diablo is admissible to prove the meaning and scope of the identified terms of the Supply Agreement. The Court does not find, based on either party's proffer, that extrinsic evidence is needed to interpret the meaning of the Supply Agreement's terms. Although some of the evidence identified by both parties in their proffers might be admissible for other purposes, it will not be admitted to establish the meaning of the terms of the agreement.

Thus, the Court **ORDERS**:

(1) The evidence identified in Diablo's Proffer is not admissible for the purpose of establishing the meaning of the terms of the Supply Agreement;

(2) in the absence of a further proffer and leave of Court, neither party may offer extrinsic evidence as to the meaning or proper interpretation of the Supply Agreement; and

(3) Diablo's Motion in Limine No. 2 is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

Dated: March 10, 2015

_____
**HON. YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**