Benjamin K. Riley (CA Bar No. 112007)
briley@bzbm.com
Robert N. Bunzel (CA Bar No. 99395)
rbunzel@bzbm.com
C. Griffith Towle (CA Bar No. 146401)
gtowle@bzbm.com
W. Paul Schuck (CA Bar No. 203717)
pschuck@bzbm.com
Sony B. Barari (CA Bar No. 243379)
sbarari@bzbm.com
Simon R. Goodfellow (CA Bar No. 246085)
sgoodfellow@bzbm.com
Sean R. McTigue (CA Bar No. 286839)
smctigue@bzbm.com
**BARTKO, ZANKEL, BUNZEL & MILLER**
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile: (415) 956-1152

Gregory C. Schodde (*Pro Hac Vice*)
gschodde@mcandrews-ip.com
Wayne H. Bradley (*Pro Hac Vice*)
wbradley@mcandrews-ip.com
**McANDREWS, HELD & MALLOY**
500 West Madison Street, 34th Floor
Chicago, IL 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100

Sean C. Cunningham (CA Bar No. 174931)
sean.cunningham@dlapiper.com
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: (619) 699-2700
Facsimile: (619) 699-2701

Attorneys for Plaintiff
NETLIST, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NETLIST, INC.,<br><br>  Plaintiff,<br><br>  vs.<br><br>DIABLO TECHNOLOGIES, INC.,<br><br>  Defendant. | Case No. 4:13-cv-05962-YGR<br>(Related Case No. 4:13-cv-05889-YGR)<br><br>**PLAINTIFF NETLIST, INC.'S RENEWED PARTIAL RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW FOR BREACH OF CONTRACT**<br><br>Courtroom 1, 4th Floor<br>The Honorable Yvonne Gonzalez Rogers<br><br>Trial Date: March 9, 2015 |

# TABLE OF CONTENTS

I. INTRODUCTION ..........................................................................................................................1

II. LEGAL STANDARD.....................................................................................................................1

III. THE SUPPLY AGREEMENT EXPRESSLY PROHIBITS DIABLO'S USE OR SALE OF THE NETLIST ID CHIPS TO PARTIES OTHER THAN NETLIST....................2

    A. The Terms of the Supply Agreement..........................................................................2

    B. Diablo's Rights to the "Diablo Standard Register" Did Not Include the ID .................3

    C. The Contract Is Not "Reasonably Susceptible" to an Alternative Interpretation..........................................................................................................4

    D. Relevant Procedural History.......................................................................................6

    E. This Court's Determination Regarding Extrinsic Evidence Confirms That the Contract Is Unambiguous – the Diablo Standard Register Did Not Include the Netlist ID Chip...................................................................................7

IV. DIABLO'S USE OF THE ID IS INDISPUTABLE BASED ON THE EVIDENCE ...................................................................................................................................8

V. CONCLUSION..............................................................................................................................12

-i-

2458.000/901022.2   PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brobeck, Phleger & Harrison v. Telex Corp.*
  602 F.2d 866 (9th Cir. 1979) ...........................................................................................5

*City of Atascadero v. Merrill Lynch, Peirce, Fenner & Smith, Inc.*
  68 Cal. App. 4th 445 (1998) ............................................................................................5

*Employers Reinsurance Co. v. Superior Court*
  161 Cal.App.4th 906 (2008) ............................................................................................4

*Estate of Peterson*
  28 Cal.App.4th 1742 (1994) ............................................................................................5

*F.B.T. Productions, LLC v. Aftermath Records*
  827 F.Supp.2d 1092 (C.D.Cal. 2011) ..............................................................................5

*Hayter Trucking, Inc. v. Shell W. E&P, Inc.*
  18 Cal. App. 4th 1 (1993) ................................................................................................4

*In re Crystal Properties, Ltd., L.P.*
  268 F.3d 743 (9th Cir. 2001) ...........................................................................................4

*MediaTek Inc. v. Freescale Semiconductor, Inc.*
  No. 11-CV-5341 YGR, 2014 WL 4643947 (N.D. Cal. Sept. 17, 2014) ..........................1

*Mformation Techs, Inc., v. Research in Motion, Ltd.*
  No. 08-04990, 2012 WL 3222237 (N.D. Cal. Aug. 8, 2012) ..........................................1

*Miller v. Glen Miller Prod., Inc.*
  454 F.3d 975 (9th Cir. 2006) ...........................................................................................5

*Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*
  701 F.2d 95 (9th Cir. 1983) .............................................................................................5

*New York Life Ins. Co. v. Hollender*
  38 Cal.2d 73 (1951) .........................................................................................................5

*Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*
  69 Cal. 2d 33 (1968) ........................................................................................................5

*Reeves v. Sanderson Plumbing Prods.*
  530 U.S. 133 (2000) .........................................................................................................1

*Skilstaff, Inc. v. CVS Caremark Corp.*
  669 F.3d 1005 (9th Cir. 2012) .........................................................................................5

-ii-

2458.000/901022.2    PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A
                     MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR

*Thompson v. Toll Dublin, LLC*
    165 Cal.App.4th 1360 (2008) ...................................................................................................4

*Titan Corp v. Aetna Cas. & Surety Co.*
    22 Cal.App.4th 457 (1994) .......................................................................................................5

*Winarto v. Toshiba Am. Elecs. Components, Inc.*
    274 F. 3d 1276 (9th Cir. 2001) .................................................................................................1

**Statutes**

California Civil Code
    § 1636 .......................................................................................................................................4
    § 1641 .......................................................................................................................................4

**Other Authorities**

Federal Rules of Civil Procedure
    Rule 50(a) .................................................................................................................................1
    Rule 50(a)(1) .............................................................................................................................1
    Rule 50(a)(2) .............................................................................................................................1

BARTKO ZANKEL BUNZEL
BARTKO · ZANKEL · BUNZEL · MILLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-iii-

2458.000/901022.2   PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A
MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR

## I. INTRODUCTION

Plaintiff Netlist, Inc. ("Netlist") hereby moves pursuant to Rule 50(a) of the Federal Rules of Civil Procedure for Judgment as a Matter of Law against Defendant Diablo Technologies, Inc. ("Diablo"). Diablo has failed to present evidence that would permit a reasonable jury to conclude that Diablo did not breach the parties' September 10, 2008 Development and Supply Agreement (Trial Ex. 53) (the "Supply Agreement") by selling and using Netlist's ISwitch/Isolation Device ("ID") chips in Diablo's prototypes to advance its own memory module program – a use explicitly precluded by the terms of the Supply Agreement. Accordingly, Netlist hereby moves this Court for a Judgment as a Matter of Law on this breach of contract claim.[1]

## II. LEGAL STANDARD

Pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure, a court may grant judgment as a matter of law (JMOL) against a party on a claim or issue where the party has been 'fully heard on [that] issue during a jury trial,' and a 'reasonable jury would not have a legally sufficient evidentiary basis' to find for that party." *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341 YGR, 2014 WL 4643947, at *1 (N.D. Cal. Sept. 17, 2014); Fed. R. Civ. P. 50(a)(1). "A party is entitled to judgment as a matter of law if, under the governing law, there can be but one reasonable conclusion as to the verdict, and that is a finding in favor of the moving party." *Mformation Techs, Inc., v. Research in Motion, Ltd.,* No. 08-04990, 2012 WL 3222237, at *1 (N.D. Cal. Aug. 8, 2012) (citing *Winarto v. Toshiba Am. Elecs. Components, Inc.,* 274 F. 3d 1276, 1283 (9th Cir. 2001)). In other words: "In reviewing a JMOL motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and determine whether reasonable minds could come to single conclusion in favor of the moving party." *MediaTek,* 2014 WL 4643947, at *1; *see also Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

---

[1] Pursuant to Fed. R. Civ. P. 50(a)(2), Netlist hereby reserves its right to bring a further Rule 50(a) motion for judgment as a matter of law on other grounds before the case is submitted to the jury.

-1-

2458.000/901022.2   PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR

**III.     THE SUPPLY AGREEMENT EXPRESSLY PROHIBITS DIABLO'S USE OR SALE OF THE NETLIST ID CHIPS TO PARTIES OTHER THAN NETLIST**

**A.     The Terms of the Supply Agreement**

Diablo breached multiple provisions of the Supply Agreement. The Supply Agreement provided that Netlist would retain all rights to, among other things, the "Netlist Chipset," defined as:

> a DDR3 proprietary chip set solution consisting of a DDR3 standard register (with DxD/LRD physically enabled) and [a] set of isolation devices utilizing the Netlist Technology for use in Netlist RDIMM products implemented in OEM server systems developed under this Agreement in accordance with the Specification.

(Supply Agreement, § 1.)  Netlist would also retain rights to the "Netlist Technology," defined as:

> Netlist's patented and trade secret-protected Rank Multiplication/Load Rank Multiplication technology ("DxD/LRD"), including without limitation its "know-how" and database design technology, developed prior to the Effective Date and provided to Diablo.

(Supply Agreement, § 1.)  Meanwhile, upon completion of the project, Diablo would retain ownership rights over the "Diablo Standard Register" or "Register," defined as:

> a DDR3 industry standard register derivative of Netlist Chipset with either or both of DxD/LRD functionality physically disabled.

(Supply Agreement, § 1.)

Section 2(e) of the Supply Agreement granted Diablo a limited license to use the Netlist Technology, but the Netlist Chipset and Netlist Technology were reserved exclusively for Netlist:

> [T]he Netlist Chipset and Netlist Technology will be exclusive to Netlist in that Diablo shall not sell or manufacture any device constituting the Netlist Chipset or Netlist Technology to or for any person except Netlist; provided that Diablo will be allowed to make, have made, use, design, manufacture, distribute and sell to any third party the Diablo Standard Register.

(Supply Agreement, § 2(e)(ii).)

Section 7 ("Intellectual Property Rights") further confirmed that Netlist owned the Netlist Chipset and the underlying Netlist Technology, while Diablo would retain rights to the Diablo Standard Register:

> (a) Diablo.  All rights, title and interest in and to the design and development of the Diablo Standard Register and Diablo's Implementation of the Netlist Chipset; and any improvement, update, modification or additional parts thereof, and all of Diablo's Intellectual Property Rights embodied in the Diablo Standard Register, shall at all

-2-

2458.000/901022.2     PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR

> times remain the sole and exclusive property of Diablo. For purposes of this Agreement, "Implementation" shall mean the development of silicon chip set using the Netlist Technology (including without limitation the packaging) which will meet Netlist's Architecture requirements.
>
> (b) Netlist. All rights, title and interest in and to the design and development of the underlying Architecture of the Netlist Chipset, the Netlist Technology and all Intellectual Property Rights embodied in the Netlist Technology, any improvement, update modification or additional part thereof, shall at all times remain the sole and exclusive property of Netlist. For purposes of this Agreement, "Architecture" shall mean system architecture with regard to Load Reduction and Rank Multiplication modules and DIMM topology."

(Supply Agreement, § 7.)

Finally, Section 8, regarding "Confidential Information,"[2] distinctly and independently sets forth Diablo's obligation of nonuse of the Netlist Technology:

> (a) Nondisclosure and Nonuse. Each party shall treat as confidential all Confidential Information of the other party, shall not use such Confidential Information except as set forth in this Agreement, and shall use reasonable efforts not to disclose such Confidential Information to any third party … For purposes of clarification, the Netlist Technology is the Confidential Information of Netlist and may not be used for any purpose other than as set forth in this Agreement, including without limitation use of such Netlist Technology to develop a chip competitive to the Netlist Chipset.

(Supply Agreement, § 8.)

### B. Diablo's Rights to the "Diablo Standard Register" Did Not Include the ID

Under the plain terms of Sections 2(e), 7, and 8 of the Supply Agreement, while Diablo had certain limited rights to use a standard register (a physically disabled "RD" chip), it did not have any right to manufacture, use or sell a device including the Netlist ID chips to any party other than Netlist itself. Diablo only retained limited rights to the Diablo Standard Register, a DDR3 industry standard register derivative of Netlist Chipset – but such a standard register simply did not include the *entirety* of the Netlist Chipset, which, as defined, consisted of: (1) a DDR3 standard industry register device with Netlist's DxD/LRD technology physically enabled; <u>and</u> (2) a set of isolation devices. Diablo's rights were expressly limited to the former, a physically disabled standard

---

[2] "Confidential Information" of a party is defined by the Supply Agreement as: "any information disclosed by that party to the other pursuant to this Agreement which is in written, graphic, machine readable or other tangible form and is marked 'Confidential,' 'Proprietary' or in some other manner to indicate its confidential nature." It also includes "oral information disclosed by one party to the other pursuant to [the Supply Agreement]" and reduced to writing within a reasonable time. (Supply Agreement, § 1.)

-3-

2458.000/901022.2   PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR

register, but Diablo had no rights whatsoever to use or sell the isolation devices to parties other than Netlist or to develop a chip competitive to the Netlist Chipset[3] – *regardless* of whether the DxD/LRD technology in such isolation devices was "physically disabled" or not.

### C.   The Contract Is Not "Reasonably Susceptible" to an Alternative Interpretation

No reasonable interpretation of the Supply Agreement would allow any other understanding of the parties' obligations.  Any interpretation of a contract should reflect the mutual intent of the parties at the time of the contract.   Cal. Civ. Code § 1636.  Furthermore, in interpreting a disputed contract provision, the provision must be considered in context and within the broader purpose of the contract as a whole.  *Thompson v. Toll Dublin, LLC,* 165 Cal.App.4th 1360, 1370 (2008) (quoting *Employers Reinsurance Co. v. Superior Court,* 161 Cal.App.4th 906, 919 (2008) ("We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation"); *In re Crystal Properties, Ltd., L.P.,* 268 F.3d 743, 747 (9th Cir. 2001) (a written contract must be read as a whole, and every part must be interpreted with reference to the whole).  To the extent the two contracting parties may be part of a single industry, such trade usage or customs should also be considered in interpreting the contract.  *Hayter Trucking, Inc. v. Shell W. E&P, Inc.,* 18 Cal. App. 4th 1, 15 (1993).

Additionally, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  Cal. Civ. Code § 1641.

---

[3] *See, e.g.*, Supply Agreement, § 8.  The isolation devices clearly constitute confidential "Netlist Technology," use of which beyond the "Diablo Standard Register" was explicitly prohibited by, among other provisions, Section 8.  First, the Supply Agreement specifically states that the Netlist Chipset includes a "set of isolation devices *utilizing the Netlist Technology*." (Supply Agreement, § 1) (emphasis added).)  Moreover, the architectural specifications for the isolation devices (Trial Ex. 26) were clearly marked "Confidential," titled "LRD/DxD Isolation Device," and Diablo engineer Maher Amer acknowledged that the LRD/DxD component of the ID came from the documents "received from Netlist." (Trial Trans. 1502:24-1503:2.)  Diablo personnel also admittedly and unmistakably understood the information therein was confidential and "was owned by Netlist" (Trial Ex. 29 and related testimony of Cedric Paillard, Trial Trans. 714:3-14; 715:1-15) and that the provisions of Section 8 specifically applied to those isolation device specifications (Paillard Trial Trans. 718:14-719:7).  The testimony of Netlist personnel also corroborate that the initial ID specifications included Netlist Trade Secrets and architecture for the isolation devices (*see, e.g.*, Testimony of Dr. Hyun Lee, Trial Trans. 39:25-43:14; 134:10-19; Testimony of Chuck Hong, Trial Trans. 328:16-21; 336:10-337:14) and that the ID specification was considered the Netlist Technology and its Confidential Information per the terms of the Supply Agreement (Hong Testimony, Trial Trans. 346:4-113; 348:20-350:21).

-4-

2458.000/901022.2   PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR

To this end, a court "must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses inoperative or meaningless." *City of Atascadero v. Merrill Lynch, Peirce, Fenner & Smith, Inc.,* 68 Cal. App. 4th 445, 473 (1998) (citing *New York Life Ins. Co. v. Hollender*, 38 Cal.2d 73, 81-82 (1951); *Titan Corp v. Aetna Cas. & Surety Co.,* 22 Cal.App.4th 457, 473-474 (1994)). Accordingly, any "[c]ontradictory or inconsistent provisions of a contract are to be reconciled by interpreting the language in such a manner that will give effect to the entire contract." *Estate of Peterson*, 28 Cal.App.4th 1742, 1753-54, fn. 4 (1994); *Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d 866, 872 (9th Cir. 1979)("We seek to interpret the contract in a manner that makes the contract internally consistent.").

Given these considerations, evidence is only admissible for contract interpretation purposes to the extent it is relevant to proving a meaning to which the disputed provision is "reasonably susceptible." *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal. 2d 33, 37 (1968); *Skilstaff, Inc. v. CVS Caremark Corp.,* 669 F.3d 1005, 1015 (9th Cir. 2012). Ultimately, "[t]he court must settle the proper interpretation of a contract as a matter of law even when conflicting inferences can be drawn from undisputed extrinsic evidence, or where that extrinsic evidence renders the contract language susceptible to more than one reasonable interpretation." *F.B.T. Productions, LLC v. Aftermath Records,* 827 F.Supp.2d 1092, 1102 (C.D.Cal. 2011). It is only where there is a conflict in the admissible and relevant extrinsic evidence that a "jury must resolve the factual conflict." *Id.*

Ultimately, judgment as a matter of law is appropriate in a breach of contract claim where there is no evidentiary support for ambiguity in a contract. *See, e.g., Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.,* 701 F.2d 95, 96 (9th Cir. 1983) (holding that entry of summary judgment was appropriate despite contention that contract was ambiguous where there was no evidentiary support for competing interpretation of contract); *Miller v. Glen Miller Prod., Inc.* 454 F.3d 975, 990 (9th Cir. 2006) (holding that where the meaning of the contract is unambiguous, the court may properly interpret and rule on it as a matter of law). Here, there is simply no evidence that, given the entire context of the agreement between Netlist and Diablo, that there is any outstanding ambiguity in the language of the Supply Agreement such that it is reasonably susceptible to an interpretation that

-5-

Diablo was allowed to use or sell Netlist's ID chips, whether physically disabled or not. Accordingly, judgment as a matter of law is appropriate.

### D. Relevant Procedural History

The Court has now had extensive opportunity to review the terms of the Supply Agreement and has found that the relevant provisions and terms of the Supply Agreement are unambiguous. *See* March 10, 2015 Order Regarding Proffers and Extrinsic Evidence Related to Contract Interpretation. (Dkt. 386 ("Contract Order").) On January 26, 2015, Diablo submitted its Motions *in Limine* to Exclude Certain Evidence and Testimony. (Dkt. No. 303-9.) Diablo's second Motion *in Limine* ("MIL No. 2") sought to exclude various forms of extrinsic evidence relating to contractual interpretation of the Supply Agreement. (*Id.* at 6.) In response to this Court's request in Pretrial Order No. 3, and as discussed further below, the parties submitted proffers and responses regarding any supposedly ambiguous language or terms in the Supply Agreement and the scope of extrinsic evidence to be admitted for their interpretation. (Dkt. 361, at 2.) Diablo identified five supposedly ambiguous terms in its submissions and contended, among other things, that the "Diablo Standard Register" (to which it had rights) included the ID chips (Dkt. Nos. 369, 376), while Netlist maintained that the Supply Agreement was not ambiguous. (Dkt. Nos. 368, 375.) The Court ultimately determined that no party had identified "any terms the Court considers ambiguous" and held that consequently neither party could offer extrinsic evidence relating to contract interpretation and denied as moot Diablo's Motion *in Limine* No. 2 on the grounds that no extrinsic evidence was needed to interpret the meaning of the Supply Agreement's unambiguous terms. (Contract Order, at 2, 11.) During the trial, the Court reiterated its ruling that extrinsic evidence was not permitted on a number of occasions. (*See, e.g.*, Trial Trans. 417:19-19:21.)

In short, the relevant terms of the Supply Agreement are clear and not reasonably susceptible to alternative interpretations.[4]

---

[4] The Court also had an opportunity to interpret the relevant terms of the Supply Agreement in issuing its Preliminary Injunction Order of January 12, 2015 (Dkt. No. 277, at 10-11)("PI Order") ("As the Court reads the Supply Agreement, based on the evidence in the record, Diablo had no other right to use Netlist's Technology or to use or make the Netlist Chipset for itself or anyone other than Netlist. (Supply Agreement §§ 2(e), 7(b))"); *Id.,* at 14 ("Section 8(a) makes clear that

-6-

### E. This Court's Determination Regarding Extrinsic Evidence Confirms That the Contract Is Unambiguous – the Diablo Standard Register Did Not Include the Netlist ID Chip

This Court held in its March 10, 2015 Contract Order that having reviewed the actual language of the Supply Agreement, "the argument that the Diablo Standard Register (a 'DDR3 Standard register' is 'derivative' of the Netlist Chipset (which contains both RD and ID chips) does not lead logically to the conclusion that Diablo Standard Register could contain both chips." (Contract Order, at 8.)  Furthermore, this Court held that, " the ability to demonstrate the work Diablo performed under the Supply Agreement to a potential customer does not support Diablo's construction of 'Diablo Standard Register' or evidence Diablo's ownership of the intellectual property rights to a 'chipset' [or standard register] with both RD and ID components." (*Id.*)

The Court's ruling was as clear as the contract itself: "The language of the Supply Agreement limits the Diablo Standard Register to the 'register' portion of the Netlist Chipset, and does not mention the 'set of isolation devices' or ID chip portion of the Netlist Chipset defined in section 1."[5]  Simply, Diablo was prohibited from such use of the ID Chips, and any such use was a breach of Sections 2, 7, and/or 8 of the Supply Agreement.

---

Confidential Information 'may not be *used* for any purpose other than as set forth in this Agreement, including … to develop a chip competitive to the Netlist Chipset.")

[5] The Court's findings in its recent Contract Order are consistent with its findings in its earlier PI Order granting in part a preliminary injunction to Netlist.  There, the Court found that the RD and ID chips were separate, and that the "Supply Agreement itself indicates as much, when it says: the "Netlist Chipset" is a 'DDR3 proprietary chip set solution consisting of a DDR2 standard *register* (with DxD/LRD physically disabled) **_and_** a set of isolation devices utilizing the Netlist Technology' and the 'Diablo Standard Register' is a 'DDR3 *industry standard register* derivative of Netlist Chipset with either or both of DxD/LRD functionality physically disabled.'" (PI Order, at 10) (emphasis supplied by Court).)

  "Thus, while Diablo had a right to use the 'Diablo Standard Register,' that use would at most encompass the RD chip (*i.e.,* the register portion of the Netlist Chipset), not the ID chip (*i.e.,* the ISwitch or isolation device portion of the Netlist Chipset)." (*Id.,* at 10-11.)  Furthermore, the Court found that: "Section 8(a) requires that each party 'shall not *use* … [and] shall not disclose' such information." (*Id.,* at 14, fn. 6.)

  "Thus, on the record before the Court, the terms of the Supply Agreement did not give Diablo a right to use the designs and technology from ID to build anything, and most particularly not to build a DDR3 module that would compete for use of a computer's Memory channel.  More plainly, Section 2(e)(ii)'s exclusivity provisions only allowed Diablo to sell or manufacture any device constituting the Netlist Chipset *or* Netlist Technology *to Netlist*, unless that device was the Diablo Standard Register, *i.e., only the register portion of the Netlist Chipset*.  By using the RD *and ID* chip in its prototypes, Diablo manufactured and made use of a 'device constituting … the Netlist

## IV. DIABLO'S USE OF THE ID IS INDISPUTABLE BASED ON THE EVIDENCE

Despite the specific and unambiguous provisions of the Supply Agreement, Diablo used, manufactured, and even sold devices including the Netlist ID chips to parties other than Netlist by incorporating the Netlist ID chips into at least two of its prototype devices – the MegaDIMM and the TeraDIMM Lite – which it sold and sampled to customers and tested, allowing Diablo to significantly advance its TeraDIMM product development. The evidence that Diablo actually used Netlist's ID chips in its prototypes is overwhelming and incontrovertible, and no reasonable jury could conclude otherwise. Among other things:

### Testimony of Cedric Paillard

- Mr. Cedric Paillard, Diablo's Vice President of Business Development, acknowledged multiple times during his testimony that the MegaDIMM and TeraDIMM Lite used Netlist's ID chip. For instance:

    Q: Okay. And the TeraDIMM Lite actually used the ID chip, correct?
    A: They – it does, yes.
    Q: Okay. And the MegaDIMM, which you just mentioned a moment ago also used the ID chip, correct?
    A: Correct.

(Trial Trans. 734:25-735:5; *see also* Trial Trans. 768:13-16; Trial Exs. 453 and 454.)

- Mr. Paillard further acknowledged that Diablo demonstrated both the MegaDIMM and the TeraDIMM Lite to Original Equipment Manufacturers ("OEMs").

(Trial Trans. 767:16-18; 768:8-12.)

### Testimony of Riccardo Badalone

- Mr. Badalone, Diablo's CEO, testified that MegaDIMM used Netlist's ID chip:

    Q: So the MegaDIMM included the ID and RD chips from the HyperCloud project for Netlist, right?
    A: Yes.
    Q: And it did that because there was no Rush and Bolt chips available at the time, right?
    A: That's correct.

(Trial Trans. 848:13-18.)

---

*Technology*,' in terms of architecture, database design, and know-how, even if disabling the DxD/LRD capability meant the device was not the Netlist Chipset." (*Id.,* at 11 (emphasis in original).)

-8-

2458.000/901022.2    PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR

- Mr. Badalone even pointed out the Netlist ID chip on a sample MegaDIMM:

   Q: Mr. Badalone, would you point out for the ladies and gentlemen where the ID chip from the Netlist HyperCloud project is located on the MegaDIMM?
   A: So there are nine of them, and one through nine (indicating) here.

(Trial Trans. 851:17-21 re Trial Ex. 453; *see also* Exhibit 454 and related testimony at 852:3-8.)

- The Diablo Specification for the MegaDIMM specifically indicates the use of Netlist's ID chips on the MegaDIMM.

(Trial Ex. 121 and related testimony, Trial Trans. 848:13-849:9; 853:3-6.)

- Mr. Badalone also confirmed multiple times that the MegaDIMM and TeraDIMM Lite both used Netlist's ID chip. For instance:

   Q: The TeraDIMM Lite is one of two prototype products that used the RD and ID chips from the Netlist HyperCloud project?
   A: Yes.

(Trial Trans. 841:11-13; *see also* Trial Trans. 842:7-10.)

- The TeraDIMM Lite design specification specifically shows the use of Netlist's ID chip.

(Trial Ex. 1 and related testimony at Trial Trans. 860:14-861:1.)

- Furthermore, Mr. Badalone testified that some TeraDIMM Lites, using the Netlist ID chip, were actually <u>sold.</u>

   Q: So TeraDIMM Lite was used for demonstration, evaluation, and system test purposes?
   A: Yes. That's Correct.
   Q: And did – did Diablo or SMART Storage charge for demo or sample qualities (sic) to recover the costs thereof?
   A: Sorry. I don't believe that SMART Storage does. But I believe that we did sell some of the units, yes.
   Q: And how many of the TeraDIMM Lites were actually sold?
   A; I wouldn't know the exact number.
   Q: Well, we know that 200 to 300 were built, right?
   A: Yes.
   Q: So half of these were sold, or how many were sold?
   A: I really couldn't say. I know we sold some, but it would have been less than a hundred, I would think.

(Trial Trans. 842:20-843:8) (emphasis added).

- Mr. Badalone further stated that Diablo used the TeraDIMM Lite, with the Netlist ID chip, to sample to customers, including receipt of revenues, and to start software development and testing.

-9-

1  (Trial Tr. 861:4-862:2.)

2  - Mr. Badalone also acknowledged that Diablo used the Netlist ID's without Netlist's
3    permission.

4  (Trial Trans. 853:13-22.)

5  - Mr. Badalone also acknowledged that Diablo's use of the Netlist ID chip was extensive:
6    comprising 18 months of use for the MegaDIMM (Trial Trans. 855:9-10) and 4 months
7    for the TeraDIMM Lite (Trial Trans. 859:13-15).

8  - Mr. Badalone also testified that use of the Netlist ID chips in the prototypes allowed
9    Diablo to advance its TeraDIMM development program, including the ability to validate
10   software, emulate the TeraDIMM performance, and validate protocol, BIOS
11   development, marketing purposes, to test potential performance, and that Diablo sampled
12   the MegaDIMM to customers. For example:

    Q: And, Mr. Badalone, the – the – the MegaDIMM allowed the testing of the system
       before the Rush and the Bolt chips were ready, right?
    A: Yes.

15 (Trial Trans. 852:14-17; see also, Trial Trans. 856:6-8; Trial Trans. 854:6-855:10; Trial Ex. 135 and
16 related testimony at Trial Tr. 859:9-860:7; Trial Ex. 118 and related testimony, Trial Trans. 820:22-
17 822:21.)

18 **Testimony of John Vincent**

19 - Former Diablo employee, Mr. John Vincent, testified that the MegaDIMM used the
20   Netlist ID chip. (Vincent Deposition, 144:19-145:01, at Trial Trans. 992:24-25.)

21 **Testimony of Michael Takefman**

22 - Diablo engineer Mr. Michael Takefman also testified that the MegaDIMM and the
23   TeraDIMM Lite used the Netlist ID. (Takefman Deposition at 32:24-33:04; 33:25-34:02;
24   34:20-35:04; 243:04-243:25; and 251:07-251:15, at Trial Trans. 993:6-7).

25 **Testimony of Michael Parziale**

26 - Diablo's co-founder and Vice President Michael Parziale admitted Diablo's use of the ID
27   in both the MegaDIMM and the TeraDIMM Lite. (Trial Trans. 1447:3-18.)

28

-10-

**Testimony of Maher Amer**

- Diablo founder and engineer Mr. Maher Amer also acknowledged use of the ID chips for the MegaDIMM (Trial Trans. 1532:6-8).

**Diablo's Opening Statement**

Finally, Diablo has no intention of presenting any evidence to the contrary – *i.e.,* that it did not use Netlist's ID chips in its prototypes. While not itself evidence, Diablo counsel's remarks during Diablo's Opening Statement are nonetheless indicative of the totality of its position:

- "And Diablo made two prototypes … We don't dispute that in the least to demonstrate its that idea would work." (Trial Trans. 266:20-23.)

- "So these prototypes were made and were provided to IBM and other potential manufacturers, potential customers who would buy these products for the limited purpose of demonstrating that Diablo's concept would work.…" (Trial Trans. 267:14-17.)

- "So while Diablo did use – and we absolutely admit that we used the RD and the ID chips with DxD and LRD disabled, as I will describe, to create the prototypes, these two chips, okay, the RD and the ID, which, again are in the HyperCloud with DxD and LRD physically enabled." (Trial Trans. 268:3-7.)

- "So you can see in the current graphic that what was used in these two prototypes is just the RD and the ID without DxD/LRD.…" (Trial Trans. 268:12-14.)

- "I've already explained to you the concept that Diablo used the RD and ID chips in the prototypes with DxD and LRD disabled." (Trial Trans. 274:21-23.)

- "When Diablo used the RD and ID chips, which it paid to have built in the prototypes, DxD/LRD were physically disabled." (Trial Trans. 283:6-8.)

In short, there is no question that Diablo sold and used Netlist's ID chips to build its TeraDIMM prototypes – the MegaDIMM and the TeraDIMM Lite – significantly advancing its memory module development program by allowing Diablo to, among other things: sample the products to customers; develop software, firmware, and hardware for its modules; and extensively test and debug the modules for months before its own chips were eventually ready.[6] Given the consistent and incontrovertible evidence thereto, no reasonable jury would have a legally sufficient evidentiary basis to conclude otherwise.

---

[6] As Netlist's technical expert, Mr. Ken Jansen testified, this improper use of the Netlist ID Chip provided Diablo with a 13-month head start to market. (Trial Trans. 1211:4-1215:7; 1226:2-9.)

-11-

## V. CONCLUSION

The terms of the Supply Agreement – prohibiting Diablo's use or sale of the Netlist ID chips – are clear. So is Diablo's improper use and sale of the ID chips. For the reasons set forth above, Netlist respectfully requests judgment as a matter of law that Diablo breached the Supply Agreement with Netlist by using and selling Netlist's ID chips.

Dated: March 19, 2015

**BARTKO, ZANKEL, BUNZEL & MILLER**
**McANDREWS, HELD & MALLOY**
**DLA PIPER LLP (US)**

By: ___*/s/ Benjamin K. Riley*___
Benjamin K. Riley

Attorneys for Plaintiff
NETLIST, INC.

-12-

2458.000/901022.2   PLAINTIFF NETLIST, INC.'S RENEWED RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW FOR BREACH OF CONTRACT / Case No. 4:13-cv-05962-YGR