FABIO E. MARINO (SBN 183825)
fmarino@mwe.com
L. KIERAN KIECKHEFER (SBN 251978)
kkieckhefer@mwe.com
NITIN GAMBHIR (SBN 259906)
ngambhir@mwe.com
BARRINGTON DYER (SBN 264762)
bdyer@mwe.com
TERI H.P. NGUYEN (SBN 267498)
thpnguyen@mwe.com
NATALIE BENNETT (*Admitted Pro Hac Vice*)
nbennett@mwe.com
McDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 94025-4004
Telephone: 650-815-7400
Facsimile: 650-815-7401

RUSSELL HAYMAN (SBN 110643)
rhayman@mwe.com
JON DEAN (SBN 184972)
jdean@mwe.com
McDERMOTT WILL & EMERY LLP
2049 Century Park East, 38th Floor
Los Angeles, CA 90067
Telephone: 310-277-4110
Facsimile: 310-277-4730

Attorneys for Defendant
DIABLO TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| NETLIST, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>DIABLO TECHNOLOGIES, INC., a Canadian corporation,<br><br>Defendant. | CASE NO. 4:13-cv-05962 YGR<br>(Related Case No. 4:13-cv-05889 YGR)<br><br>**DIABLO TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON LANHAM ACT CLAIMS**<br><br>Date: June 30, 2015<br>Time: 10:00 a.m.<br>Ctrm: 1, 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers |

1    Diablo Technologies, Inc. ("Diablo") renewed its motion for JMOL on the claims of Plaintiff Netlist, Inc. ("Netlist") under the Lanham Act for trademark infringement and false advertising. (Dkt. 470). Netlist opposes JMOL. (Dkt. 485). Diablo respectfully replies.

Netlist's own statement of facts underscores that Diablo is entitled to JMOL on the Lanham Act claims. Even as recounted by Netlist, the trial record lacks substantial evidence to support a determination that Diablo is liable for false advertising or trademark infringement. Netlist's failure to satisfy the elements compels the entry of JMOL for Diablo on both counts.

**I.     Diablo is entitled to JMOL on Netlist's false advertising claim.**

Under the Lanham Act, a prima facie case requires a showing that: (1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in commercial advertisement or promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008). To survive JMOL, Netlist must identify substantial evidence in the record to satisfy *each* of the six elements. Netlist cannot satisfy *any* of the six.

The first element is not met because Diablo did not make a "false statement either about the plaintiff's or its own product." The statement at issue from Diablo's website is:

> The VT-Berlinetta chipset, a proprietary design, provides the Load Reduction and Rank Multiplication implementation for DDR3 Hypercloud memory modules.

That statement is *not* false. Netlist relies on *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (9th Cir. 1993), for the proposition that a "false statement includes one that is 'false by necessary implication.'" (Dkt. 485 at 6). In fact*, Castrol* holds that to be actionable under the Lanham Act, a plaintiff must prove either "literal falsity" or "consumer confusion." *Id.* at 943. There is no basis to assert that the statement at issue is literally false *because it is literally true*—and true in any nonliteral sense as well.

1    Netlist writes that "Diablo deliberately described the HyperCloud module as 'a proprietary
2    design.'" (Dkt. 485 at 6). But Netlist must be purposefully misreading Diablo's statement.
3    Diablo accurately described accurately *the VT-Berlinetta chipset*, not "HyperCloud," as a
4    "proprietary design." Diablo's language is clear and not susceptible to any other interpretation.
5    No reasonable fact finder could believe that Diablo was describing HyperCloud as Diablo's
6    "proprietary design." Indeed, Netlist offered *no* evidence—fact or expert—that *anyone* did or
7    could interpret Diablo's statement in the manner suggested by Diablo. As a matter of undisputed
8    fact, the VT-Berlinetta chipset *is* a Diablo proprietary design that provides the Load Reduction
9    and Rank Multiplication implementation for DDR3 HyperCloud memory modules. Diablo
10   cannot be held liable for false advertising on the basis of a *true* statement. This element ends the
11   inquiry.

12   The second element is not met because Diablo and Netlist do not compete. *See Heartland*
13   *Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. 14-437, 2014 U.S. Dist. LEXIS 158054, at
14   *11-*12 (N.D. Cal. Nov. 7, 2014) ("To constitute 'commercial advertising or promotion' under
15   the Lanham Act, a statement must be . . . by a defendant who is a commercial competitor of the
16   plaintiff . . . ."). Netlist responds: "Yet as the Court is fully aware, Netlist presented compelling
17   evidence that Netlist's HyperCloud, NVvault and upcoming HyperVault product, and Diablo's
18   TeraDIMM (which became SanDisk's ULLtraDIMM), do compete." (Dkt. 485 at 6-7). But
19   Diablo's TeraDIMM was just a reference design. *TeraDIMM never became a product. Tr.*
20   1530:5-11 (Amer) (TeraDIMM was a prototype or "proof of concept"); *Tr.* 1003:21-23
21   (Scaramuzzo) (TeraDIMM Lite used for testing purposes); *see also* 1005:16-1006:2
22   (Scaramuzzo). And ULLtraDIMM is a *SanDisk* product, not a Diablo product. Diablo sells
23   chips, not memory products. *Tr.* 742:15-19 (Paillard) (Diablo designs innovative chipsets in
24   ASIC); *Tr.* 1355:20-1356:10 (McFarlane); Tr. 1356:23-24 (McFarlane); *Tr.* 306:23-307:3 (Hong)
25   (Netlist sells memory channel DIMM-based products). Netlist points to no evidence suggesting
26   that *any* Netlist product competed with *any* Diablo product.

27   Separately, the second element *also* is not met because "although the representations need
28   not be made in a 'classic advertising campaign,' they must be 'disseminated sufficiently to the

- 2 -

DIABLO'S REPLY ISO ITS RENEWED MTN
FOR JMOL ON LANHAM ACT CLAIMS
CASE NO. 4:13-CV-05962 YGR

relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.'"
*Walker & Zangler, Inc. v. Paragon Indus.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007) (quoting *Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir 1999)). In its motion, Diablo contended that Netlist introduced no evidence whatsoever of sufficient dissemination within the industry. (Dkt. 470 at 5). *Netlist offers no response*. This additional failure by Netlist *independently* ends the inquiry and compels JMOL.

The third element is not met because Netlist introduced no evidence that Diablo's use of "HyperCloud" without reference to Netlist "actually deceived or has the tendency to deceive a substantial segment of its audience." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). In response, Netlist asserts: "Diablo cannot argue that Netlist failed to show that the website's audience was deceived when Diablo's own intent was to deceive." (Dkt. 485 at 8). Diablo, however, is simply arguing that Netlist must be held to the elements of a false advertising claim under the Lanham Act. Even if there were evidence of intent to deceive by Diablo, that would not alleviate Netlist's burden to show that the alleged false statement "actually deceived or has the tendency to deceive a substantial segment of its audience." *Southland*, 108 F.3d at 1139.

Citing *Southland,* Netlist argues that where there is deliberate falsity, it is not necessary to satisfy this element. But Netlist's cropped quotation from *Southland* is misleading. (Dkt. 485 at 8). The actual statement by the Ninth Circuit relates to the availability of monetary relief, not the elements of the claim, as the *full* quotation *without ellipses* makes clear: "Because a reasonable jury could conclude, based on the evidence submitted by Plaintiffs, that Defendants comparative advertisement claims were deliberately false within the meaning of § 43(a), Plaintiffs may be entitled to a presumption of actual consumer deception and reliance, *and would therefore be entitled to appropriate monetary relief unless Defendants could rebut the presumption.*" *Southland*, 108 F.3d at 1146 (emphasis added). Intent to deceive does not establish that a statement either actually deceives or has a tendency to deceive. Establishing that element was Netlist's burden, and Netlist failed. Notably, in its opposition, Netlist cites no evidence that *anyone* was "actually deceived" by the statement on Diablo's website or that the statement would

have the tendency to deceive *anyone*, let alone a substantial segment of its audience. Instead, Netlist relies on two fatally-flawed notions. First, Netlist contends that the jury could have reasonably concluded that "Diablo deceptively implied that the HyperCloud® module was Diablo's proprietary design." (Dkt. 485 at 8). But no jury could reasonably reach such a conclusion from the unambiguous (and *unambiguously true*) statement by Diablo: "The VT-Berlinetta chipset, a proprietary design, provides the Load Reduction and Rank Multiplication implementation for DDR3 Hypercloud memory modules." Second, Netlist contends that Diablo intended that the webpage would result in customers contacting Diablo about HyperCloud®, allowing Diablo to gather customer information for its TeraDIMM product. Netlist relies exclusively upon an e-mail from Cedric Paillard, Diablo's vice president of business development, suggesting that customers interested in HyperCloud might contact Diablo. *But Paillard's e-mail is from 2010. Id.* It is undisputed that in 2010, Diablo's website referred to "Netlist's patented DDR3 Hypercloud memory modules." *Tr. Ex. 166* at 1. Thus, at the time Diablo believed it might be contacted by people interested in HyperCloud, Diablo *was* expressly attributing HyperCloud to Netlist. Not only that, but Diablo was directing people interested in HyperCloud *to Netlist* as a matter of policy. *The attribution to Netlist was not removed until 2012*, after the relationship between the parties had deteriorated to the point of ceasing all communications. Thus, there is no substantial evidence to support Netlist's theory or to satisfy this element.

The fourth element is not met because Netlist introduced no evidence that Diablo's use of "HyperCloud" without reference to Netlist was material—*i.e.*, likely to influence the purchasing decision. In its opposition, Netlist argues that "[i]n *Southland*, the Ninth Circuit held that a competitor's 'effort to deceive consumers and influence their purchasing decisions' justifies a presumption that he has succeeded in affecting the purchasing decision." (Dkt. 485 at 7 (quoting *Southland*, 108 F.3d at 1146)). But once again, that passage in *Southland* relates to damages. No such presumption attaches in proving the elements—and indeed, this Court gave no instruction to the jury regarding such a presumption. To the contrary, in *Southland*, the plaintiff presented "a marketing research expert who attempted to gauge consumer reactions to the

- 4 -

DIABLO'S REPLY ISO ITS RENEWED MTN
FOR JMOL ON LANHAM ACT CLAIMS
CASE NO. 4:13-CV-05962 YGR

1    advertisements through a multi-phased survey." 108 F.3d at 1142.  The expert "concluded that a

2    majority of consumers interpreted the advertisement claims to be based on tests against other

3    turfgrass products, and that the advertisements would influence the purchasing decisions of a

4    majority of consumers." *Id.*  This is precisely the sort of evidence that is absent from Netlist's

5    case.  The absence of any substantial evidence of materiality *standing alone* compels JMOL for

6    Diablo.

7          The fifth element is not met because Netlist introduced no evidence that Diablo caused the

8    statement at issue to enter interstate commerce.  In response, Netlist asserts:  "The evidence

9    showed that Diablo's false statement was on its webpage on the Internet for over six months."

10   (Dkt. 485 at 9).  In fact, according to the statement of facts in Netlist's own opposition, the

11   statement at issue (the one in which Hypercloud is not attributed to Netlist) was on the Internet

12   for less than three years, but no matter:  Netlist is proposing a *per se* rule that advertising on the

13   Internet causes a statement to enter interstate commerce for purposes of false advertising under

14   the Lanham Act.  The Ninth Circuit has not adopted such a rule.  The element remains one for

15   Netlist to prove.  There is no evidence that the statement on Diablo's website entered interstate

16   commerce.  Netlist failed to introduce *any* substantial evidence—not one document, not one line

17   of testimony—to meet its burden.

18         The sixth element is not met because there is no evidence that Netlist has been or is likely

19   to be injured as a result of the false statement, either by direct diversion of sales from itself to the

20   defendant, or by a lessening of goodwill associated with Netlist's product.  In its opposition,

21   Netlist quotes *American Specialty Health Group, Inc. v. Healthways, Inc.*, No. 11-cv-2819, 2012

22   WL 4863779 (S.D. Cal. Oct. 12, 2012), for the proposition that "[t]he Ninth Circuit has 'generally

23   presumed commercial injury when defendant and plaintiff are direct competitors and the

24   defendant's misrepresentation has a tendency to mislead consumers.  Competitors 'vie for the

25   same dollars from the same consumer group,' and a misleading ad can upset their relative

26   competitive positions." *Id.* at *3 (quoting *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820,

27   825 (9th Cir. 2011)).  That is a willful distortion of the law.  The decisions in *American Specialty*

28   *Health Group* and *TrafficSchool.com* both discuss a presumption of injury *in the context of*

*Article III standing*. Neither case vitiates the requirement that a plaintiff meet the elements of the claim to prevail. Neither case establishes a presumption that when the parties are direct competitors, and the defendant's misrepresentation has a tendency to mislead consumers, the sixth element is *presumed* satisfied. Indeed, such a presumption would be nonsensical, because it would render the sixth element nugatory. Direct competition is required by the second element and a tendency to deceive is required by the third element, so the sixth element would never be reached unless both these factors are present. Their presence, therefore, cannot create a presumption that the sixth element is satisfied—and that is why Netlist has cited no authority for that proposition and the jury was given no such instruction.

Netlist also argues that "there was sufficient evidence for the jury to reasonably conclude that Diablo's wrongful portrayal of the HyperCloud module as its own 'proprietary design' was likely to lessen Netlist's goodwill." (Dkt. 485 at 9). Once again, Diablo did not portray the HyperCloud as its own proprietary design. Diablo stated that the VT-Berlinetta chipset is a proprietary design, and no other good-faith interpretation of its statement is possible. Moreover, there is no evidence that either Netlist or HyperCloud had *any* good will in the market to lessen, let alone that a statement on Diablo's website was likely to lessen it. Netlist identifies no evidence that *anyone* even read the statement on Diablo's website. Netlist contends:

> Here, the evidence included testimony from Netlist's CEO Chuck Hong that customers including Toshiba and Samsung terminated meetings with Netlist concerning working together on its forthcoming HyperVault product based on Netlist's dispute with Diablo as to who owned the HyperCloud® technology.

(Dkt. 485 at 10). But that is false. Regarding the meeting with Toshiba, Mr. Hong testified: "They stopped the meeting because they had met with Diablo recently. And they do not want to get involved in a technology that is at dispute." *Tr*. 478:18-20. *The Court struck that testimony as hearsay. Tr*. 478:21-23. Regarding the meeting with Samsung, Mr. Hong testified that Samsung was not interested in proceeding with Netlist "after learning of the Diablo dispute." *Tr*. 481:22-482:17. But Mr. Hong did *not* testify that Samsung terminated the meeting *because* of Netlist's dispute with Diablo; Mr. Hong could not know what Samsung was thinking. And regardless, the dispute between Netlist and Diablo is not and has never been about "who owned

1 the HyperCloud technology," and the statement at issue on Diablo's website could not reasonably
2 be read to implicate such a dispute. Netlist also writes: "Mr. Hong also testified about
3 'confus[ion] [in] the market as to the true rightful owner of this technology[,]' and that '[i]t's
4 obviously been a big loss to our employees [and] shareholders.'" (Dkt. 485 at 10) (quoting *Tr*.
5 489:16-18). Netlist must assume no one will check the transcript to verify its citation. Mr.
6 Hong's testimony was in response to the following question: "Mr. Hong, what's—what's the
7 result to—to Netlist of Diablo in—in your view, misappropriating trade secrets and breaching the
8 contract? What's the harm? What's the result to you?" *Tr*. 489:10-13. Mr. Hong did *not* testify
9 about any harm related to the lack of attribution of HyperCloud to Netlist that appeared on
10 Diablo's website. Neither did anyone else. There is no substantial evidence to support this
11 element of the claim.

12 Netlist's failure to present substantial evidence on each of the six elements of false
13 advertising compels JMOL.

14 **II.  Diablo is entitled to JMOL on Netlist's trademark infringement claim.**

15 A claim for trademark infringement cannot survive JMOL absent substantial evidence of
16 likelihood of confusion. Netlist effectively concedes that it presented no evidence that Diablo's
17 use of the "HyperCloud" mark on Diablo's website without attributing HyperCloud to Netlist was
18 *actually* confusing to anyone. Netlist also concedes that it failed to introduce any fact or expert
19 testimony or any survey data to establish *likelihood* of confusion.

20 Unable to rebut Diablo's central arguments, Netlist points to several jury instructions that
21 purportedly justify the verdict. First, Netlist highlights the instruction on the "use of the mark"
22 factor that "the same or related or complimentary kinds of goods" may result in a "greater
23 likelihood of confusion about the source of the goods." (Dkt. 485 at 4 (quoting *Tr*. 2102:10-13)).
24 The facts do not implicate this instruction, however, because Diablo was using the word
25 "HyperCloud" on its website to market a Diablo chipset—specifically, the VT-Berlinetta chipset.
26 HyperCloud is a memory module, *not* a chipset, and Netlist does not make or sell chipsets.
27 Diablo's products are not "the same or related or complimentary kinds of goods" as HyperCloud.
28 //

Second, Netlist notes the instruction for the "marketing and advertising channels" factor that "[i]f Netlist and Diablo's goods are likely to be sold in the same or similar stores or outlets or advertised in similar media, this may increase the likelihood of confusion." *Id.* at 4 (quoting *Tr.* 2103:20-22). But Netlist's opposition does not point to *any* evidence suggesting that Netlist and Diablo's good are "sold in similar stores or outlets or advertised in similar media." And in fact, neither party's products are sold through stores, outlets, advertisements, or websites.

Third—and according to Netlist, "most importantly"—Netlist relies on the intent factor. Netlist notes that the jury was instructed that "[k]nowing use by Diablo of Netlist's mark to identify similar goods may strongly show an intent to derive benefit from the representation of Netlist mark suggesting an intent to cause a likelihood of confusion." *Id.* at 5 (quoting *Tr.* 2103:12-15). Netlist relies exclusively on an e-mail from Diablo employee Franco Forlini stating:

> On the VT-B page, I had sent out comments a while ago to remove all reference to Netlist, and use a title like this: [] The VT-Berlinetta chipset, a proprietary design, provides the Load Reduction and Rank Multiplication implementation for DDR3 Hypercloud memory modules.

*Id.* at 3 (quoting *Tr. Ex.* 133). But by its own terms, the Court's instruction applies to use of a mark "to identify *similar goods*." Thus, it would apply if Diablo sold memory modules and marked them as "HyperCloud" modules. But Diablo did not make or market any memory modules that would constitute goods similar to HyperCloud. The facts in the record do not justify application of this factor to find likelihood of confusion.

Unable to sustain its claims by applying the trial record to the factors for likelihood of confusion, Netlist again searches for a presumption to save itself. Netlist quotes *Fleishmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir. 1963), for the proposition that "when the evidence does show or require the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit." *Id.* at 158. But *Fleishmann* merely underscores that Netlist's claim cannot survive. There is no evidence

- 8 -

DIABLO'S REPLY ISO ITS RENEWED MTN
FOR JMOL ON LANHAM ACT CLAIMS
CASE NO. 4:13-CV-05962 YGR

1  showing or justifying an inference that Diablo used "HyperCloud" without reference to Netlist in
2  order to take advantage of good will, good name, or good trade built up by Netlist.  *Indeed, there*
3  *is no evidence whatsoever associating the HyperCloud mark with good will, good name, or good*
4  *trade of any kind.*  This is precisely the sort of evidence one would expect a Lanham Act plaintiff
5  to present to establish likelihood of confusion, but Netlist introduced nothing of the kind.
6      Netlist next quotes *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979) for
7  the proposition that "[w]hen the alleged infringer knowingly adopts a mark similar to another's,
8  reviewing courts presume that the defendant can accomplish his purpose: that is, that the public
9  will be deceived."  But subsequently the Ninth Circuit clarified that, notwithstanding the quoted
10  statement from *Sleekcraft*, it is error to consider the intent factor in isolation and conclude that
11  intent weighs in the plaintiff's favor without *first* determining that the defendant intended to
12  deceive consumers.  *Network Automation, Inc. v. Advanced System Concepts, Inc.*, 638 F.3d
13  1137, 1153 (9th Cir. 2011).  Intent may not be presumed.  It must be proven by the plaintiff.
14  Here, there is no evidence of any intent by Diablo to deceive *anyone* nor does the evidence
15  support such an inference.  Thus, Netlist is not entitled to any "presumption" permitting it to
16  avoid proving likelihood of confusion with actual evidence.
17      Netlist's conclusion to its argument is telling:

> As discussed above, the Court must draw all reasonable inferences in Netlist's favor and must not weigh the evidence. By this standard, it is clear that there was sufficient evidence for the jury to reasonably conclude that Diablo intentionally omitted any reference to Netlist on its website, implied that the HyperCloud® module was Diablo's "proprietary design," and then used the HyperCloud® trademark to gather potential customers for its own TeraDIMM product. This evidence established likelihood of confusion by a preponderance of the evidence. Diablo cannot claim no likelihood of confusion when its own conduct showed it expected and hoped that customers would contact Diablo, rather than Netlist, about the HyperCloud® module, thereby allowing Diablo to gather information about potential customers for its own competing product.

24  Once again, Netlist is playing games with the facts.  Netlist's purported evidence that Diablo
25  "expected and hoped that customers would contact Diablo, rather than Netlist" is the Paillard e-
26  mail stating:  "If we are being contacted for Hypercloud and not Netlist, we will send them over
27  but the main thing is too [sic] collect who is interested in HyperCloud for TeraDIMM possible
28  marketing activities."  *Tr. Ex. 104* at 1, *quoted in* Dkt. 485 at 3.  The e-mail is from 2010, *two*

- 9 -

DIABLO'S REPLY ISO ITS RENEWED MTN
FOR JMOL ON LANHAM ACT CLAIMS
CASE NO. 4:13-CV-05962 YGR

*years before Diablo removed the attribution to Netlist from its website.* Diablo's "hope" and "expectation" that people would contact it rather than Netlist about HyperCloud is necessarily unrelated to the conduct accused of trademark infringement, which occurred in 2012. No reasonable jury could find otherwise. Netlist points to *no evidence whatsoever* suggesting that the removal had *anything* to do with gathering potential customer information or anything else that might support any inference of confusion.

There is simply no substantial evidence of likelihood of confusion. Netlist does not identify any in its opposition. On this record, a verdict of trademark infringement cannot be sustained. Diablo is entitled to JMOL.

*       *       *

A jury's verdict will withstand a Rule 50(b) motion if it is supported by substantial evidence. Here, there is no substantial evidence of trademark infringement or false advertising, because Netlist cannot satisfy each element of either offense. Diablo is not a trademark infringer or a false advertiser. Netlist's pervasive failures of proof entitle Diablo to JMOL.

Dated: May 29, 2015

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

By: /s/ *Natalie A. Bennett*
Natalie A. Bennett

Attorneys for Defendant
DIABLO TECHNOLOGIES, INC.

- 10 -

DIABLO'S REPLY ISO ITS RENEWED MTN
FOR JMOL ON LANHAM ACT CLAIMS
CASE NO. 4:13-CV-05962 YGR