FABIO E. MARINO (SBN 183825)
fmarino@mwe.com
L. KIERAN KIECKHEFER (SBN 251978)
kkieckhefer@mwe.com
NITIN GAMBHIR (SBN 259906)
ngambhir@mwe.com
BARRINGTON DYER (SBN 264762)
bdyer@mwe.com
TERI H.P. NGUYEN (SBN 267498)
thpnguyen@mwe.com
NATALIE BENNETT (*Admitted Pro Hac Vice)*
nbennett@mwe.com
McDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 94025-4004
Telephone: 650 815 7400
Facsimile: 650 815 7401

RUSSELL HAYMAN (SBN 110643)
rhayman@mwe.com
JON DEAN (SBN 184972)
jdean@mwe.com
McDERMOTT WILL & EMERY LLP
2049 Century Park East, 38th Floor
Los Angeles, CA 90067
Telephone: 310-277-4110
Facsimile: 310-277-4730

Attorneys for Defendant
DIABLO TECHNOLOGIES, INC.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

NETLIST, INC., a Delaware corporation,

Plaintiff,

vs.

DIABLO TECHNOLOGIES, INC., a Canadian corporation,

Defendant.

CASE NO. 4:13-cv-05962 YGR
(Related Case No. 4:13-cv-05889 YGR)

**DIABLO TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR ATTORNEY'S FEES**

Date: June 30, 2015
Time: 10:00 a.m.
Ctrm: 1, 4th Floor
Judge: Hon. Yvonne Gonzalez Rogers

## TABLE OF CONTENTS

Page

I. THIS IS AN EXCEPTIONAL CASE .......... 1

A. Netlist did not show Dr. Lee the patent claims before bringing its claim .......... 1

B. There is not, and has never been, evidence that Dr. Lee is a co-inventor .......... 4

II. DIABLO SEEKS APPROPRIATE COMPENSATION .......... 8

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banas v. Volcano Corp.*
47 F. Supp. 3d 957 (N.D. Cal. 2014) ....................11, 12

*Beckman Instruments, Inc. v. LKB Produkter AB*
892 F.2d 1547 (Fed. Cir. 1989)....................10

*Cambrian Sci. Corp. v. Cox Communications, Inc.*
No. 11-1011-AG, 2015 U.S. Dist. LEXIS 4415 (N.D. Cal. Jan. 6, 2015)....................3

*Commil USA, LLC v. Cisco Sys., Inc.*
No. 13-896, slip op. (U.S. May 26, 2015)....................4

*Digital Reg. of Tex. v. Adobe Sys., Inc.*
No. 12-1971-CW, 2015 U.S. Dist. LEXIS 29328 (N.D. Cal. Mar. 9, 2015)....................3

*Gabriel Techs. Corp. v. Qualcomm Inc.*
No. 08-cv-1992, 2013 U.S. Dist. LEXIS 14105 (S.D. Cal. Feb. 1, 2013)....................10

*Ingram v. Oroudjian*
647 F.3d 925 (9th Cir. 2011)....................11, 12

*IPVX Patent Holdings, Inc. v. Voxernet LLC*
No. 13-1708-HRL, 2014 U.S. Dist. LEXIS 158037 (N.D. Cal. Nov. 6, 2014)....................3

*Kilopass Tech. Inc. v. Sidense Corp.*
No. 10-cv-2066-SI, 2015 U.S. Dist. LEXIS 30650 (N.D. Cal. Mar. 11, 2015)....................3

*Linex Techs., Inc. v. HP Co.*
No. 13-159-CW, 2014 U.S. Dist. LEXIS 129717 (N.D. Cal. Sept. 15, 2014)....................3

*Logic Devices, Inc. v. Apple Inc.*
No. 13-2933-WA, 2014 U.S. Dist. LEXIS 168380 (N.D. Cal. Dec. 4, 2014)....................3

*Mathis v. Spears*
857 F.2d 749 (Fed. Cir. 1988)....................11

*Moreno v. City of Sacramento*
534 F.3d 1106 (9th Cir. 2008)....................9

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*
134 S. Ct. 1749 (2014)....................2, 3

Case4:13-cv-05962-YGR Document492 Filed05/29/15 Page4 of 16

## TABLE OF AUTHORITIES CONTINUED

**Page(s)**

**Cases**

*Rambus, Inc. v. Infineon Techs. AG*
155 F. Supp. 2d 668 (E.D. Va. 2001)....................10

*Yufa v. TSI Inc.*
No. 09-1315-KAW, 2014 U.S. Dist. LEXIS 113148 (N.D. Cal. Aug. 14, 2014)....................3

**Statutes**

35 U.S.C. § 285....................1, 3, 10

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

- iii -

DIABLO'S REPLY IN SUPPORT OF ITS
MOTION FOR ATTORNEY'S FEES
CASE NO. 4:13-CV-05962 YGR

Netlist brought a claim that Dr. Lee was an inventor of Diablo's '917 patent. It did so without even showing the claims of the '917 patent to Dr. Lee—without even seeking confirmation that the supposed inventor *believed* he was an inventor. The inventorship claim failed before the jury, and Netlist has now abandoned it. Pursuant to 35 U.S.C. § 285, Diablo moved for a portion of its attorney's fees bearing on the inventorship claim. (Dkt. 469). Netlist opposes the motion. (Dkt. 486). Diablo respectfully replies.

# I. THIS IS AN EXCEPTIONAL CASE

## A. Netlist did not show Dr. Lee the patent claims before bringing its claim.

Diablo's motion set forth the fundamental reason this case is exceptional: Netlist alleged that Dr. Lee invented claims of the '917 patent without ever showing him the patent claims—and thus without confirming that its allegations were based in fact, let alone corroborated. (Dkt. 469 at 1). This would seem undisputable given that Dr. Lee testified at his deposition that he may have glanced at the patent but never read the claims.

In its opposition, however, Netlist asserts that "to the extent Dr. Lee exhibited some uncertainty as to the contents of the '917 Patent's claims, he only acknowledged that he had not reviewed the patent 'in detail.'" (Dkt. 486 at 12). But in fact Dr. Lee acknowledged far more, as his testimony makes clear:

> Q. Now we've marked as Exhibit 20 a copy of U.S. Patent No. 8,452,917. Now that you have it in front of you, have you seen a copy of this document before?
>
> A. I may have. I don't recall 100 percent. If I seen it, I probably just glanced it. So . . .
>
> Q. So you never reviewed it in detail.
>
> A. No.
>
> Q. Did you ever read the claims of this patent?
>
> A. Not really. I don't read the claims.

*Lee Depo.* 232:9-18. Faced with this testimony, Netlist acknowledges that "Dr. Lee may not have read the claims of the patent 'in detail' at the time the suit was filed." (Dkt. 486 at 14). To be clear, the problem is *not* that Dr. Lee did not read the claims of the patent "in detail." *He did not read them at all.* He testified: "*I don't read the claims.*" Netlist did not ask Dr. Lee, its own employee, whether he contributed to inventing any of the claims, because Netlist did not show

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

Dr. Lee the claims *at all*. Dr. Lee's testimony is unambiguous on that point. At trial, Dr. Lee testified that he was "aware" of the claims of the '917 patent. But he did not—and could not—back off his previous testimony that when the lawsuit was filed, he had not read the claims.

Why would Netlist file a federal complaint alleging that its employee Dr. Lee was the inventor of patent claims without first showing those claims to Dr. Lee? The question almost answers itself. If Dr. Lee's response to Netlist's inquiries did not match up to the theories Netlist's attorneys created from whole cloth when they drafted the First Amended Complaint, the claims would be dead. So Netlist decided not to show Dr. Lee the patent claims or ask him about the claims. Even during the preparation for Dr. Lee's deposition, Netlist did not show Dr. Lee the claims. And Netlist also alleged that *Thomas Bryan* was an inventor (Dkt. 146 ¶ 25), only to drop *him* entirely from their narrative entirely (a point Diablo made in its motion to which Netlist responds with *utter silence*). Finally, Netlist alleged it should be a co-owner of the patent, a claim it chose not to pursue at trial.

The question now before the Court is: Is this an ordinary manner of litigating, or does it stand out from the way this Court expects cases to be litigated? If filing an inventorship claim without ever asking the alleged inventor whether he contributed to the claims—without ever showing him the claims—is the norm, and if alleging *someone else* is actually an inventor of the claims and then dropping him from the case entirely is the norm, then that resolves this motion. But if that course of conduct stands out, then this is an "exceptional case," and the Court may award Diablo its attorney's fees. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

Netlist argues that it did not act in "subjective bad faith" because of "the careful and independent reviews conducted prior to trial"—by which it means a supplemental report submitted by its expert Ken Jansen. (Dkt. 486 at 14-15). First, objective and subjective bad faith are creatures of the pre-*Octane Fitness* test for an exceptional case finding. Under *Octane Fitness*, this Court need not limit itself to such findings. The Court need simply decide whether the case stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable

manner in which the case was litigated. *Octane Fitness*, 134 S. Ct. at 1756. Second, Jansen's reviews were *not* independent. Jansen was Netlist's paid expert. There is nothing wrong with that: Each side offered expert opinion, as contemplated by the rules. But there is no *per se* rule that if, in the run-up toward trial, a party serves an expert report setting forth the party's litigation position, the case is not exceptional. Netlist's ability to find an expert who would opine in favor of its position is typical and expected. A party can nearly always do that. What is exceptional here is Netlist's decision—before filing the case and even before Dr. Lee's deposition—not to show the alleged inventor the claims. What is exceptional is proceeding with a claim that Dr. Lee was an inventor when *Dr. Lee could not know that for reasons of Netlist's own making*. Diablo respectfully submits that on such grounds this case stands apart.

Although attorney's fees may only be awarded in exceptional cases, since *Octane Fitness*, courts in this District have not been shy about awarding fees against litigants whose conduct does not meet the court's standards.[1] The number of patent cases in which fees have been awarded across the country is legion. Courts are enforcing their expectations of how litigants must conduct themselves. Indeed, since Netlist's opposition was filed, the Supreme Court spoke on this issue *sua sponte*:

> No issue of frivolity has been raised by the parties in this case, nor does it arise on the facts presented to this Court. Nonetheless, it is still necessary and proper to stress that district courts have the authority and responsibility to ensure frivolous cases are dissuaded. If frivolous cases are filed in federal court, it is within the power of the court to sanction attorneys for bringing such suits. Fed. Rule Civ.

[1] *See, e.g.*, *Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-cv-2066-SI, 2015 U.S. Dist. LEXIS 30650, at *46 (N.D. Cal. Mar. 11, 2015) (awarding $5.3 million in fees); *Digital Reg. of Tex. v. Adobe Sys., Inc.*, No. 12-1971-CW, 2015 U.S. Dist. LEXIS 29328, at *16 (N.D. Cal. Mar. 9, 2015) (awarding fees for the depositions and examinations of two witnesses); *Cambrian Sci. Corp. v. Cox Communications, Inc.*, No. 11-1011-AG, 2015 U.S. Dist. LEXIS 4415, at *20-*21 (N.D. Cal. Jan. 6, 2015) (awarding attorney's fees to all defendants for a portion of the case and to one defendant for the entire case); *Logic Devices, Inc. v. Apple Inc.*, No. 13-2933-WA, 2014 U.S. Dist. LEXIS 168380, at *12-*13 (N.D. Cal. Dec. 4, 2014) (awarding attorney's fees because "this action was litigated in a wholly unreasonable manner and it stands out from the others with respect to the substantive strength of Logic Devices' litigation position); *IPVX Patent Holdings, Inc. v. Voxernet LLC*, No. 13-1708-HRL, 2014 U.S. Dist. LEXIS 158037, at *13-*20 (N.D. Cal. Nov. 6, 2014) (finding case exceptional and awarding $820,642 in fees); *Linex Techs., Inc. v. HP Co.*, No. 13-159-CW, 2014 U.S. Dist. LEXIS 129717, at *12-*19 (N.D. Cal. Sept. 15, 2014) (awarding attorney's fees as to a portion of the claims); *Yufa v. TSI Inc.*, No. 09-1315-KAW, 2014 U.S. Dist. LEXIS 113148, at *6-*12 (N.D. Cal. Aug. 14, 2014). The above citations comprise an incomplete list of the awards of attorney's fees under 35 U.S.C. § 285 just in the last year and only in the Northern District of California.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

> Proc. 11. It is also within the district court's discretion to award attorney's fees to prevailing parties in "exceptional cases." 35 U.S.C. § 285.

*Commil USA, LLC v. Cisco Sys., Inc.*, No. 13-896, slip op. at 14 (U.S. May 26, 2015). Netlist's inventorship claim was frivolous. It was frivolous when it was brought, and it remained frivolous when Netlist pursued it through trial before abandoning it after the verdict.[2] This Court should exercise the power that the Supreme Court went out of its way to emphasize.

**B. There is not, and has never been, evidence that Dr. Lee is a co-inventor.**

The first page of Netlist's opposition brief advances a key admission and an assertion that Netlist cannot substantiate: "Netlist detailed, through the testimony of Dr. Lee and expert Mr. Jansen, and through trial exhibits how Dr. Lee *studied Diablo's proposed 'synchronous solution'* for many months, ultimately proposing *modification* to many of the *key timing parameters of the DIMM operation*." (Dkt. 486 at 1) (emphasis added). In short, Netlist maintains that its co-inventorship claim is "justified by the evidence," *id.*, because Dr. Lee introduced timing parameters that were previously unknown to Diablo. This assertion cannot stand in view of the facts established at trial and known to Netlist prior to the filing of the lawsuit.

First, Netlist does not assert that Dr. Lee developed, contributed to, or advanced what Netlist concedes was "*Diablo's* proposed 'synchronous solution.'" *Netlist Opp.* at 1 (emphasis added). Netlist recognizes (as it must) that Dr. Lee merely "*studied*" a timing solution that *Diablo* had already independently developed:

> Tom and Hyun
>
> Based on last weeks conference call, Diablo understands the programming of CWL/CL issue and has solved the problem by adding a cycle to the DRAM. This is their patent. the ML bit can be shorted out to allow to make this feature a boot up feature on the chip. I feel Diablo understands the problem and is now providing us a matrix, which we requested, to capture RL and WL to futher prove their solution. Based on initial data, the RDIMM compatiblity mode, which adds the cycle to the DRAM, this mode is the most efficient of all the modes. This mode has the minimal amount of latency, thanks Mario

[2] Prior to the verdict, Netlist abandoned its claim for improper assignment of the '917 patent. In the Second Amended Complaint (Dkt. No. 146) ("SAC"), Netlist sought "a declaration that Netlist is a joint owner of the '917 Patent under 35 U.S.C. § 262." SAC at ¶ 46. By the time of trial, however, Netlist never mentioned an assignment or requested any jury instruction on assignment. And the '917 patent was assigned exclusively to Diablo. Effectively, even if the jury had found in favor of Netlist on the inventorship claim, Netlist would have derived no ownership rights. Netlist therefore put Diablo through the expense of litigating the inventorship solely for the possibility of adding Dr. Lee's name to the '917 patent.

Trial Ex. 77. Dr. Lee was not a named inventor on the provisional application filed September 12, 2008, because he did not actively contribute to the invention submitted to the Patent Office.

Netlist attempts to conflate the content of the LRD/DxD specifications with the provisional patent application, but the '917 patent is directed solely to Diablo's synchronous solution, not the asynchronous timing envisioned in the LRD/DxD specifications. It was actually the failure of the asynchronous timing parameters in the Netlist LRD/DxD specifications that necessitated the work by Diablo engineers to design new timing parameters. Netlist relies heavily on the fact that Diablo engineers met with or corresponded with Dr. Lee throughout August and early September in 2008, *Netlist Opp.*, at 8, but this does not suggest that Dr. Lee operating in any inventive capacity. Quite the opposite. The evidence at trial demonstrated that when Diablo received the LRD/DxD specifications from Netlist in April 2008, the timing parameters were irretrievably "broken." *Takefman Depo Tr.* 45:20-47:3, 48:11-49:13, 51:5-52:9, 53:13-54:10; *Tr.* 895:2-9 (Badalone); *Tr.* 1507:15-1509:16, 1873:8-1874:3 (Amer).

Because Dr. Lee's specifications were unworkable, Diablo's engineers worked tirelessly from April until August 2008 on a wholesale re-design. By August 2008, Diablo had the synchronous solution, but it took endless meetings with Dr. Lee to convince him to accept that his solution was broken and Diablo's worked. *Tr.* 1509:17-1510:8 (Amer) (recalling that it required multiple discussions with Dr. Lee to apprise Netlist that "the asynchronous path has no chance of working" and that during these discussions it took "a lot of effort" convince "Dr. Lee to actually realize the problems and – and work—and accept our solutions."); *see also* 1510:23-1513:9 (Amer) (discussing Trial Exhibit 59 to establish that by September 26, 2008 Diablo was creating documents for Netlist to the synchronous versus non-synchronous paths and convince Dr. Lee that the synchronous solution was the only one that would work within the ID). The meetings in August and September 2008 upon which Netlist relies do *not* substantiate that Dr. Lee was an inventor. They merely support the fact that he was a customer who needed to be sold on the proposed solution—a solution that Mr. Amer and Mr. Takefman had worked out and memorialized by the end of August 2008. *E.g.* Dkt. 186-1 (third version of VT-Berlinetta RD Specification dated August 26, 2008). None of the testimony, none of the meeting notes, and

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

none of the trial exhibits cited on page 8 of Netlist's opposition identifies Dr. Lee *contributing* a *key timing parameter* that Diablo included in the provisional patent application filed on September 12, 2008. Both the trial evidence and Netlist's characterization of the evidence compel a singular conclusion: When it came to the timing solution, Dr. Lee was a spectator, not an inventor.

Second, even accepting Netlist's assertion that Dr. Lee made technical contributions, Netlist does not even attempt to establish that the alleged contributions pre-dated the execution of the Supply Agreement. The dates are critical because under the Agreement, only a modification of a key timing parameter *before* the Effective Date of September 10, 2008 would have entitled Netlist to any ownership rights in the '917 patent. Any contribution that would qualify as "Netlist Technology" had to be "developed prior to the Effective Date and provided to Diablo." Trial Ex. 53 at 1. (definition of "Netlist Technology"). After the Effective Date, Section 7 of the Supply Agreement subdivided intellectual property that would belong to Diablo (development and design of the chip) and intellectual property that would belong to Netlist (development of the chipset architecture). *See* Trial Ex. 53 at 6-7. Even if Dr. Lee modified a timing parameter, those IP rights would vest with Diablo unless the alleged modification was completed and sent to Diablo prior to the Effective Date.[3] Netlist has failed to identify any evidence demonstrating that Dr. Lee made any inventive modifications to timing parameters prior to the Effective Date.

Third, Netlist cannot corroborate the self-serving claim that Dr. Lee ultimately proposed modifications "to many of the *key timing parameters of the DIMM operation*." (Dkt. 486 at 1) (emphasis added). Netlist's opposition brief does not point at anything that specifically supports this assertion. Instead, Netlist vaguely alludes to Trial Exhibit 80—"Dr. Lee's February 3, 2009 Memo." Netlist argues that the February 3 Memo "added several additional parameters to be modified, including tWRmin." *Id*. at 10. But this conclusion directly contradicts the testimony of

[3] The existence of meetings discussing write leveling or the need to align ODT to a clock signal is not evidence that Dr. Lee was an inventor. *See Netlist Opp*. at 8-9. Netlist only states that "there was a clear dialogue between the two parties." *Id*. at 9. A dialogue between two parties is not a good faith basis to file suit for correction of inventorship when all the actual evidence points to Diablo developing the timing solution and then meeting with Dr. Lee to convince him that Diablo's solution worked.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

Netlist's own expert that these timing parameters appeared in Diablo's original provisional application. The acronym tWRmin is shorthand for the time to write parameter. This parameter did not appear for the first time in the February 3 Memo. Mr. Jansen conceded that the time to write parameter was part of the filing on September 12, 2008:

> Q. And then in the next sentence, goes on to clarify, the members of the set are any timing parameters that controls timing from the end of the read or write command if that timing parameter depends in any way, shape, form on the data face of the read and write command. You see that?
>
> A. Yes.
>
> Q. Okay. And that would include the – the time to write the—time read to write parameter, correct?
>
> A. (Reviewing document.)
> I'm just reading this to make sure I understand it fully.
> (Reviewing document.)
> I believe that the timing parameters would be included in the member of that set if that was one of the timing parameters that they decided needed to be changed.

*Tr*. 1282:17- 1283:5 (Jansen) (reviewing *Trial Ex. 57* at 9). Further, by the time Diablo made its presentation to Intel, Mr. Amer had already determined that the time to write command required one cycle of delay. *Trial Ex. 363*; *see also Tr.* 1518:10-1521:10 (Amer) (explaining the synchronous RDIMM interoperability solution Diablo had worked out and shared with Netlist/Intel in January 2009), 1820:4-1821:4 (Amer) (clarifying that the wTRmin variable in claim 4 was "the same variable that was identified in the application from September of '08"). The February 3 Memo merely parrots Diablo's original idea.

Additionally, an email chain produced by Netlist and used during Mr. Perrot's deposition stated in the subject line "Meeting Minutes from Thursday's Call – <u>January 15th</u>, Intel, Diablo, Netlist."

**From:** Mario Martinez
**Sent:** Monday, January 19, 2009 12:17 PM
**To:** Ruff, Klaus
**Subject:** Meeting Minutes from Thursday's call - January 15th, Intel, Diablo, Netlist

. . .

Attendees:
Intel: Groom, Ruff, Steve Kulick, Van Lovelace, Chris Mozak, George Vergis
Diablo: Bugee, Maher, Parziale,
Netlist: Lee, Bryan, Sheth, Martinez

/ /

/ /

/ /

Trial Ex. 266 (emphasis added). Therein, Mr. Perrot memorializes the contents of a call with Intel where the following topics were covered:

> Mario,
>
> My only concern is "Implications to Netlist" number 3. (Remove "....Hyun's comment" Diablo will simply take this as his unsubstantiated opinion)
>
> We are claiming that based upon the call with Intel that our Asynch mode is 'broken'. We've added that Diablo's synch mode is broken, but I didn't hear that. Intel suggested that it could work given we can get memory that will support this mode. So it would be inaccurate to claim that their synch mode is broken as of the Intel call. In fact, we have contradictory information from the same vendor, Qimonda, where Diablo suggests that the memory is available, and we claim it isn't. Though I agree that it appears that their mode is broken, I think that we need to get that supporting information from the DRAM manufacturers and present to Diablo. We also need to ask them to be specific in finding out who within Qimonda provided them the details they reference.
>
> Jim

- The Netlist "Asynch mode was 'broken.'"
- Intel suggested that Diablo's synch mode "could work."
- "[I]t would be inaccurate to claim that [Diablo's] synch mode is broken as of the Intel call."
- Netlist was in possession of information that contradicted the conclusion that Diablo's synch mode was broken.

*Trial Ex. 266*. It was thus known internally at Netlist by at least the date of the Mr. Perrot's email, January 21, 2009, that the Netlist timing solution did not work, but Intel believed Diablo's synchronous solution would work. The email of Netlist's own witnesses confirm that time write parameters were not only developed by Diablo but also that Diablo shared those parameters with Intel (and Dr. Lee) weeks before the February 3 Memo surfaced. *Id.*

The bottom line is that Netlist's opposition plays games with the facts to obscure the fundamental truth: There never was a basis to bring its inventorship claim, and there was no basis to pursue it at trial. In the ordinary case, a party does not bring a claim it knows or should know to be meritless, and when it learns a claim is meritless, it does not vexatiously pursue the claim. Netlist played by different rules, however, and that renders this case extraordinary.

## II. DIABLO SEEKS APPROPRIATE COMPENSATION.

Netlist argues that a "fee petition must be specific enough so that a judge is able to make a fair evaluation of the time expended and the need for service." (Dkt. 486 at 16). However, Local Rule 54(b)(2) specifically states what is required in this District: "A statement of the services rendered by each person for whose services fees are claimed together with a summary of the time

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

spent by each person, and a statement describing the manner in which time records were maintained." The rule provides that "[d]epending on the circumstances, the Court may require production of an abstract of or the contemporary time records for inspection, including in camera inspection, as the Judge deems appropriate." If the Court requires production of the invoices, Diablo will produce *in camera* the time entries of Diablo's attorneys hourly. For now, Diablo has provided the required information in the Declaration of Jon Dean.

Meanwhile, Netlist has not objected to the amount of time Diablo's attorneys spent on any of the activities subject to Diablo's request. Nor has Netlist objected to Diablo's staffing of any of these activities (*none* of which involved more than one partner or more than two associates). Nor does Netlist deny that each of these activities were necessary to defend against Netlist's inventorship claim. Nor does Netlist argue that the total amount of fees sought in relation to the inventorship claim, $493,125, is an unreasonable sum to defend against a claim of this nature. The burden of lodging *specific* objections was on *Netlist*, as the Ninth Circuit has made clear: "But the burden of producing a sufficiently cogent explanation can mostly be placed on the shoulders of the losing parties, who not only have the incentive, but also the knowledge of the case to point out such things as excessive or duplicative billing practices." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1116 (9th Cir. 2008). "If opposing counsel cannot come up with specific reasons for reducing the fee request that the district court finds persuasive, *it should normally grant the award in full, or with no more than a haircut*." *Id.* (emphasis added).

Netlist complains that it would be "unconscionable" to award fees for an activity that also related to other of Netlist's failed claims. For example, Diablo sought recovery of fees for all of Mr. Hayman's and Ms. Bennett's time preparing for opening and closing arguments, even though those arguments also dealt extensively with Netlist's rejected claims for breach of contract and misappropriation of trade secrets. According to Netlist, "Diablo makes no attempt to explain why it has not reasonably apportioned its requested fees to the patent issues." (Dkt. 486 at 17). But Diablo *did* reasonably apportion its requested fees. Diablo's *total* fees for defending against Netlist's failed claims exceed $6 million—perhaps not surprisingly, given that this was literally a "bet the company" case. If Netlist had succeeded, it would have put Diablo out of business,

which was Netlist's objective all along. Under Federal Circuit law, Diablo could seek recovery of its fees for the *entire* case—*both the patent and the non-patent claims. Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552 n.2 (Fed. Cir. 1989) ("LKB also contends that it was improper for the district court to consider a non-patent claim, namely the antitrust counterclaim, in a recovery under 35 U.S.C. § 285. However, in an action having both patent and non-patent claims, recovery may be had under § 285 for the non-patent claims if the issues involved therewith are intertwined with the patent issues."). And in fact district courts award attorney's fees under 35 U.S.C. § 285 for non-patent claims, such as misappropriate of trade secrets, when the case also includes patent claims, such as correction of inventorship. *See, e.g.*, *Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08-cv-1992, 2013 U.S. Dist. LEXIS 14105, at *21 (S.D. Cal. Feb. 1, 2013) (awarded $12.4 million in attorney's fees for patent and non-patent claims); *Rambus, Inc. v. Infineon Techs. AG*, 155 F. Supp. 2d 668, 684-85 (E.D. Va. 2001) (awarding $7.1 million in attorney's fees for patent and non-patent claims).

Netlist disputes that the patent and non-patent claims in this case were intertwined, but Netlist reinforces Diablo's point by complaining that the specific activities for which Diablo seeks recovery involved both the patent and non-patent claims. The testimony of *every witness* with respect to whom fees are sought—Dr. Lee, Mr. Hong, Mr. Amer, Mr. Jansen, Mr. McAlexander—related to *both* the patent *and* the non-patent claims. Netlist asserts its inventorship claim was "tertiary" to its non-patent claims. (Dkt. 486 at 17). But the inventorship claim was the first count in Netlist's operative complaint. (Dkt. 186 at 13). And the inextricable nature of the claims was established by Netlist's counsel's opening statement:

> Now, in fact, from day one, Diablo breached the contract. We believe the evidence will show. *In fact, it's actually day two.* Contract was signed on September 10th, 2008. On September 12th, 2008, Diablo filed a patent application. Didn't ask Netlist, didn't ask permission, didn't tell Netlist until couple months after. And that patent application relates to ideas developed on this HyperCloud project. And I think the evidence will show that Dr. Lee significantly contributed to those ideas, yet on September 12th, Diablo file—unilaterally filed the patent application.

*Tr.* 211:22-212:6. As shown, Netlist argued to the jury from the outset that Diablo breached its contract with Netlist by filing the patent application for the '917 patent "unilaterally" without

McDermott Will & Emery LLP Attorneys At Law Menlo Park

naming Dr. Lee as inventor. The claims could not possibly be more intertwined than that. Netlist cannot now walk away from what it explicitly told the jury.

In this motion, however, Diablo is seeking recovery *only* for activities directly related to the inventorship claim. *That* is Diablo's reasonable apportionment.[4] *That* is why Diablo is seeking *less than 10%* of its fees in this case. The Court is not required to reduce the lodestar to account for the proportion of each examination dedicated to a particular subject, and it would be impracticable to do so.

Netlist also objects to the hourly rates charged by Diablo's attorneys. But Netlist never actually asserts that McDermott Will & Emery's rates are unreasonable. Mr. Dean's declaration testifies that McDermott's fees are reasonable compared with rates charges by comparable attorneys. *A careful reading of Netlist's opposition reveals no disagreement.*

Instead, Netlist's objection is limited to an alleged failure of proof by Diablo. But this Court is familiar with the rates charged by large law firms for the time of attorneys in this District, and the Court can rely on that experience. *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011). <u>Indeed, rates like those sought by Diablo have been expressly approved in the Northern District of California.</u> In this case, McDermott charged hourly rates of $1,020 for Mr. Hayman and Mr. Marino, $840 for Mr. Dean, and $690 for Mr. Dyer, Mr. Gambhir, and Ms. Bennett. (McDermott charged lower rates for more junior attorneys and paralegals, but Diablo is not seeking recovery for such time.) Thus, the rates in this case are comparable to those in *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957 (N.D. Cal. 2014), in which Cooley LLP sought fees ranging from $1,095 per hour for partners to $355 for associates. *Id.* at 965. Like Netlist, the opposing party "contend[ed] that Volcano has failed to provide any competent evidence that these rates are within the prevailing market rates for similar cases in the Northern District." *Id.* The *Banas* court held to the contrary: "The rates requested by Volcano, while high, *are within the prevailing market rates for similar cases in the Northern District.*" *Id.* (emphasis added). The *Banas* court relied on an affidavit from a consulting firm partner establishing that "that Cooley's claimed rates

[4] Diablo is also not seeking reimbursement for expert witness fees, even though it is within the Court's power to award them. *See Mathis v. Spears*, 857 F.2d 749, 758-59 (Fed. Cir. 1988).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

are within the range, though on the high end, of prevailing market rates for comparable firms in the Northern District." *Id.* The court further stated: "That conclusion is consistent with my own knowledge of prevailing market rates for this type of case." *Id.* (citing *Ingram*, 647 F.3d at 928, for the proposition that "it is appropriate for district court to rely on its own familiarity with the legal market when assessing the reasonableness of hourly rates claimed in fees motions"). McDermott's rates are slightly *lower* than the Cooley rates approved in *Volcano*. Under *Bansas*, just as Cooley's rates were reasonable, so too are the rates of McDermott.

* * *

For the reasons stated above, this Court should grant Diablo's motion, declare the case exceptional, and award Diablo attorney's fees of $493,125.

Dated: May 29, 2015

Respectfully submitted,
McDERMOTT WILL & EMERY LLP

By: */s/ Natalie A. Bennett*
Natalie A. Bennett

Attorneys for Defendant
DIABLO TECHNOLOGIES, INC.