United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NETLIST, INC.,** | Case No.: 13-cv-5962 YGR |
| Plaintiff, | |
| vs. | **ORDER DENYING NETLIST'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL** |
| **DIABLO TECHNOLOGIES, INC.,** | |
| Defendant. | **DKT. NO. 479** |

On March 25, 2015, the jury in this matter returned its verdict which, in part, found in favor of Defendant Diablo Technologies, Inc. ("Diablo") on the claims of Plaintiff Netlist, Inc. ("Netlist") for breach of contract, trade secret misappropriation, and correction of inventorship.  (Dkt. No. 420.) After consideration of evidence and arguments on equitable relief, the Court entered judgment in favor of Diablo on these claims on April 24, 2015.  (Dkt. No. 459.)

Netlist now brings its Renewed Motion For Judgment As A Matter Of Law pursuant to Rule 50(b), and Motion for a New Trial pursuant to Rule 59.  (Dkt. No. 479.)  Netlist argues that the Supply Agreement at issue in the breach of contract claim was unambiguous, the facts regarding breach were undisputed, and the Court should have instructed the jury that it had been breached, rather than submitting that issue to the jury.  Relying principally on the Court's findings of likelihood of success in connection with Netlist's motion for preliminary injunction, Netlist insists that the Court had already determined that the Supply Agreement was breached.  Netlist further contends that the Court's failure to so instruct the jury on the contract claim infected the jury's determination of the trade secret misappropriation claim, requiring a new trial.

The Court has carefully considered the papers submitted and the pleadings in this action, the witnesses' testimony and entire trial record, the arguments of counsel, and the applicable authorities.

Based upon its review, and for the reasons set forth below, the Court **DENIES** Netlist's renewed motion for judgment as a matter of law and motion for a new trial.

**I.     APPLICABLE STANDARDS**

**A.     Renewed Motion for Judgment As a Matter of Law**

Federal Rule of Civil Procedure 50(b) provides that if a court does not grant a motion for judgment as a matter of law made under Rule 50(a), "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  A party having previously made such a motion "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).  In ruling on the renewed motion, the court may: (1) allow judgment on the verdict; (2) order a new trial; or (3) direct entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b)(1)-(3).

In reviewing a renewed motion for judgment as a matter of law, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Josephs v. Pacific Bell,* 443 F.3d 1050, 1062 (9th Cir. 2006). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.*  "A jury's verdict must be upheld if it is supported by substantial evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (emphasis supplied) (further explaining that "[s]ubstantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence").  The court may not weigh evidence or order a result it finds more reasonable if substantial evidence supports the jury verdict. *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir. 1984).  While the court should review the record as a whole, "it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 105 (2000).

**B.     Motion for New Trial**

In order to grant a motion for new trial under Rule 59, the trial court must find that "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  *Passantino v. Johnson & Johnson Consumer Prods.,* 212 F.3d

493, 510 n. 15 (9th Cir. 2000). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has the duty ... to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation omitted). Thus, in connection with a motion for new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Constr., Co., Inc. v. Royal Bank of Canada,* 833 F.2d 1365, 1371–72 (9th Cir. 1987) (quoting 11 Wright & Miller, *Fed. Prac. & Proc.* § 2806, at 48–49). While there is no set formula, the Ninth Circuit has held that he Court should grant the motion for new trial "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*; *see also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1075 (N.D. Cal. 2006) *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007) (same).

## II.   DISCUSSION

### A.   Summary of Pertinent Evidence Presented At Trial

The parties agree, and the evidence is undisputed, that Diablo used the ID chips in two of its prototypes – the MegaDIMM and the TeraDIMM Lite – for 22 months. (*See, e.g.*, Trial Tr. 993:6-7 [Takefman]; Trial Tr. 1447:3-18 [Parziale].) The evidence in the record shows that:

- TeraDIMM Lite, using the Netlist ID chip, was sold to customers. (Trial Tr. 842:20-843:8 [Badalone].)

- Diablo used the TeraDIMM Lite, with the Netlist ID chip, to sample to customers, including receipt of revenues, and to start software development and testing. (Trial Tr. 861:4-862:2 [Badalone].)

- Diablo used the Netlist ID chips without Netlist's permission. (Trial Tr. 853:13-22 [Badalone].)

- Diablo used the Netlist ID chip for 18 months on the MegaDIMM and 4 months on the TeraDIMM Lite. (Trial Tr. 855:9-10; 859:13-15 [Badalone]).

- Diablo's use of the Netlist ID chips in the prototypes allowed Diablo to advance its TeraDIMM development program, including the ability to validate software, emulate the TeraDIMM performance, validate protocol, and develop BIOS, as well as use for marketing, testing performance, and sampling to customers.  (Trial Tr. 852:14-17, 854:6-855:10, 856:6-8, 859:9-860:7, 820:22-822:21 [Badalone]; Trial Exh. 118, 135.)

There is also evidence from Diablo, contested by Netlist, concerning the DxD/LRD technology, as follows:

- ID chips on the MegaDIMM could not perform rank multiplication or load reduction because the MegaDIMM only had one rank of DRAM.  (Trial Tr. 1232:21-23 [Jansen]; Trial Tr. at 1568:3-11 [Amer].)
- "switching" is not rank multiplication or load reduction since such functionalities require continuous switching between ranks of DRAM, not one-time switches between DRAM and the FPGA. (*Tr.* 1690:8-13 [McAlexander].)
- the ID chips in the TeraDIMM Lite prototypes could not perform load reduction because the TeraDIMM Lite did not include any ranks of DRAM. (Trial Tr.  1569:7-10 [Amer].)
- ID chips on the TeraDIMM Lite did not perform rank multiplication because the pin that instructs on rank multiplication was physically grounded (*i.e.*, disabled). (Trial Tr. 1569:9-14 [Amer].)
- While the RD chips were not disabled, the DxD/LRD functionality was physically disabled.  (Trial Tr. 1756:19-24 [McAlexander]; *see also* 1697:1-19, 1701:3-24, 1702:10-1703:19, 1705:22-1706:15 [McAlexander].)

The terms of the Supply Agreement provide that:

- Netlist retained all rights to:

    (i) its "Netlist Technology," defined as: "Netlist's patented and trade secret protected Rank Multiplication/Load Rank Multiplication technology ('DxD/LRD'), including without limitation its 'know how' and database design technology, developed prior to the Effective Date and provided to Diablo;" and

    (ii) the "Netlist Chipset," defined as "a DDR3 proprietary chip set solution consisting of a DDR3 standard register (with DxD/LRD physically enabled) and [a] set of isolation devices utilizing the Netlist Technology for use in Netlist RDIMM

United States District Court
Northern District of California

4

United States District Court
Northern District of California

products implemented in OEM server systems developed under this Agreement in accordance with the Specification.

(Trial Exh. 53, Supply Agreement 1-2.)

- Diablo retained ownership rights to the:

    'Diablo Standard Register' or 'Register' [which] shall mean a DDR3 industry standard register derivative of Netlist Chipset with either or both of DxD/LRD functionality *physically disabled*.

(*Id.* at p. 2, emphasis supplied.)

- Diablo retained a license to use the Netlist Technology limited as follows:

    Diablo shall not sell or manufacture any device *constituting the Netlist Chipset or Netlist Technology* to or for any person except Netlist; provided that Diablo will be allowed to make, have made, use, design, manufacture, distribute and sell to any third party the Diablo Standard Register.

(*Id.* at section 2(e), emphasis suppied.)

- The parties' respective "Intellectual Property Rights" were set forth in Section 7:

    (a) Diablo. All rights, title and interest in and to the design and development of the Diablo Standard Register and Diablo's Implementation of the Netlist Chipset; and any improvement, update, modification or additional parts thereof, and all of Diablo's Intellectual Property Rights embodied in the Diablo Standard Register, shall at all times remain the sole and exclusive property of Diablo. For purposes of this Agreement, "Implementation" shall mean the development of a silicon chip set using the Netlist Technology (including without limitation the packaging) which will meet Netlist's Architecture requirements.

    (b) Netlist. All rights, title and interest in and to the design and development of the underlying Architecture of the Netlist Chipset, the Netlist Technology and all Intellectual Property Rights embodied in the Netlist Technology, any improvement, update, modification or additional parts thereof, shall at all times remain the sole and exclusive property of Netlist. For purposes of this Agreement, "Architecture" shall mean system architecture with regard to Load Reduction and Rank Multiplication modules and DIMM topology.

(*Id.* at p. 6.)

Prior to trial, the Court ordered briefing and argument on the question of whether any terms in the Supply Agreement were ambiguous and would require extrinsic evidence in order to interpret

them.  (Dkt. No. 361; *see also* Dkt. No. 364, 358 [minutes and proposed order submitted by counsel].)  The Court directed each party to identify any terms it believed were ambiguous, and to offer a construction of the term and evidence to support it.

In its response, Netlist took the position that the terms of the Supply Agreement were not ambiguous and did not require construction.  Diablo, for its part, offered a number of terms it contended needed interpretation.  After carefully considering those responses, the Court found that none of the terms identified as ambiguous actually required the Court to determine their construction.  Because the parties did not identify any terms that would require extrinsic evidence to understand, the Court ordered that no extrinsic evidence on the meaning of the terms would be permitted.  (Dkt. No. 386.)

On the breach of contract claim, the Court's instructions as to liability stated as follows:

> There are three elements.  One, that Netlist and Diablo entered into a contract; two, that Diablo did something that the contract prohibited it from doing; and three, that Netlist was harmed by that action.  If you find that Netlist has proved each element, then you must find for Netlist.  If, on the other hand, you find that Netlist has failed to prove any of -- any one of these elements, then you must find for Diablo.

(Trial Tr. 2087:20-2088:3.)  Netlist never requested or proposed any instruction regarding the meaning of the Supply Agreement or any of its terms.  Netlist never objected to the absence of such any instruction on the meaning of the agreement or its terms.[1]

## B.      Renewed Motion for Judgment As a Matter of Law

Netlist contends that, given the undisputed evidence of Diablo's use of the Netlist ID chips, the Court should have determined the Supply Agreement was breached as a matter of law.  Netlist contends that the contract breach is merely a question of whether Diablo used the ID chips.  This is an oversimplification of the Supply Agreement.

The Supply Agreement permits Diablo to use and sell, a "Diablo Standard Register," which it defines as a "DDR3 industry standard register derivative of Netlist Chipset with either or both of

---

[1]  Rule 51 of the Federal Rules of Civil Procedure provides that a party "may assign as error" a "failure to give a [a jury] instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected."  Fed. R. Civ. P. 51(d)(2).

United States District Court
Northern District of California

1    DxD/LRD functionality physically disabled." (Trial Exh. 53, Supply Agreement § 2(e).)  The

2    Supply Agreement limits Diablo's ability to sell or manufacture any device "constituting" the Netlist

3    Chipset or Netlist Technology, both of which are defined to include DxD/LRD functionality and, in

4    the case of the Netlist Chipset, the DxD/LRD functionality had to be physically enabled.  (Trial Exh.

5    53, Supply Agreement § 2(e), and p. 2.)  Diablo presented evidence from which the jury reasonably

6    could determine that "either or both of" the DxD/LRD functionality was physically disabled in the

7    MegaDIMM and TeraDIMM Lite modules.  Thus, the evidence at trial was sufficient for the jury to

8    find that Netlist had failed to show that Diablo "did something the contract prohibited it from doing."

9    (Trial Tr. 2087:20-2088:3.)

10         The Court's prior determinations in connection with the preliminary injunction were based on

11    a more limited record than was presented at trial.  Netlist's implicit reliance on that preliminary

12    determination does not preclude the jury from finding differently, based on the trial record.  The

13    Court must draw all reasonable inferences in favor of upholding the jury's verdict.  Netlist has not

14    offered a sufficient basis to disturb the jury's verdict on the breach of contract claims.[2]

15         **C.      Motion for New Trial**

16         Netlist argues that a new trial is warranted because the submission of the contract claim to the

17    jury infected the verdict.  Netlist contends that the Court should have instructed the jury that Diablo

18    had breached the contract, and failure to do so meant that the jury could not render its verdict

19    properly.  In Netlist's estimation, the "clear weight of the evidence" proved that Diablo breached the

20    contracts by using the Netlist ID chips, and the Court should order a new trial on the contract claims

21    as well as the trade secret misappropriation claim.

22         The Court has given a careful review to the evidence presented at trial and the parties'

23    arguments herein.  Based such review, the Court is not left with the "definite and firm conviction"

24    that the jury's decision was mistaken or against the weight of the evidence.  As stated above, Diablo

25    presented evidence countering Netlist's theory of breach.  In particular, Diablo presented evidence

26

27         [2]  Because the Court finds that the jury's factual determination should not be disturbed, the
      Court does not reach Diablo's argument that the jury's verdict should be upheld for the further
28    reason that, as a matter of law, exceeding the scope of a license agreement does not constitute a
      breach of contract.  Likewise, the Court does not reach Netlist's unsupported, after-thought argument
      that Diablo's use of the ID chip also breached the parties Non-Disclosure Agreement.

that DxD/LRD *functionality* was physically disabled in the prototypes.  Such evidence would support a finding that Diablo's undisputed use of the ID chips was not something the Supply Agreement precluded it from doing, and therefore no breach was shown.  In light of this testimony, the Court cannot find that the jury's verdict is contrary to the clear weight of the evidence here.

**III.    CONCLUSION**

For the foregoing reasons, Netlist's Motion For Judgment As A Matter Of Law and Motion For a New Trial are **DENIED**.

This Order terminates Dkt. No. 479.

**IT IS SO ORDERED.**

Date: September 1, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

8